IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In the Matter of the National Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, and 2005-3. | C.A. No. 16-341-SLR |

**OPENING BRIEF OF THE RESPONDENT TRUSTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**GRANT & EISENHOFER P.A.**
James J. Sabella (Del. Bar No. 5124)
jsabella@gelaw.com
Michael T. Manuel (Del. Bar No. 6055)
mmanuel@gelaw.com
123 Justison Street
Wilmington, DE 19801
302-622-7000

*Attorneys for National Collegiate
Student Loan Trusts 2003-1, 2004-1,
2004-2, 2005-1, 2005-2, and 2005-3*

March 15, 2017

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

NATURE AND STAGE OF THE PROCEEDINGS ................................................................1

SUMMARY OF ARGUMENT ...............................................................................................1

STATEMENT OF FACTS ......................................................................................................2

    A.    INTRODUCTION ............................................................................................2

    B.    THE STRUCTURE AND OPERATION OF THE TRUSTS ...................................4

    C.    THE ODYSSEY SERVICING AGREEMENT ....................................................7

ARGUMENT ...........................................................................................................................8

I.    ODYSSEY WAS PROPERLY HIRED BY THE TRUSTS AS A
SERVICER IN ACCORDANCE WITH THE PROVISIONS OF
THE RELEVANT AGREEMENTS .........................................................................8

    A.    THE TRUSTS ARE ENTITLED UNDER THE AGREEMENTS
TO HIRE ANOTHER SERVICER ..................................................................8

    B.    THE RATING AGENCY CONDITION WAS SATISFIED .................................10

II.    THERE ARE NO CONFLICTS BETWEEN THE ODYSSEY
AGREEMENT AND OTHER RELEVANT AGREEMENTS ........................................13

III.    THE ODYSSEY INVOICES SHOULD BE PAID ........................................................16

    A.    UNDER THE AGREEMENTS, THE TRUSTS ARE NOT OBLIGATED
TO PROVIDE "BACK-UP" FOR INVOICES FROM THEIR SERVICE PROVIDERS ............16

    B.    IN ANY EVENT, ODYSSEY PERFORMED SERVICES FOR THE TRUSTS
SUFFICIENT TO SUPPORT THE INVOICES .................................................19

CONCLUSION ........................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Cap. Corp. v. GC-Sun Holdings, L.P.*,
910 A.2d 1020 (Del. Ch. 2006)....................................................................................10

*Bank of N.Y. Mellon v. Realogy Corp.*,
979 A.2d 1113 (Del. Ch. 2008)......................................................................................8

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) .........................................................................4

*In re Drexel Burnham Lambert Gp.*,
1992 WL 53742 (S.D.N.Y. Bankr. Mar. 4, 1992) ..........................................................6

*Fleet Nat'l Bank v. Trans World Airlines, Inc.*,
767 F. Supp. 510 (S.D.N.Y. 1991) .................................................................................6

*San Antonio Fire & Police Pension Fund v. Amylin Pharms., Inc.*,
983 A.2d 304 (Del. Ch. 2009), *aff'd*, 981 A.2d 1173 (Del. 2009)................................ 9-10, 13

*U.S. Bank N.A. v. U.S. Timberlands Klamath Falls, L.L.C.*,
2004 WL 1699057 (Del. Ch. July 29, 2004), *remanded*, 875 A.2d 632
(Del. 2005) ................................................................................................................. 5-6

*Waxman v. Cliffs Natural Res., Inc.*,
2016 WL 7131545 (S.D.N.Y. Dec. 6, 2016) ................................................................10

**Statutes and Rules**

12 *Del. C.* § 3806(a)........................................................................................................4

## NATURE AND STAGE OF THE PROCEEDINGS

Respondents National Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, and 2005-3 (the "Trusts" or "Issuers") were created as Delaware statutory trusts to acquire pools of student loans, issue notes backed by the Trust assets, and provide for the servicing of the loans.  Petitioner U.S. Bank National Association ("U.S. Bank") as Indenture Trustee filed a Petition in state court in Minnesota, seeking instructions as to whether the Trusts properly appointed Odyssey Education Resources LLC ("Odyssey") as a servicer and whether invoices submitted by Odyssey for services rendered to the Trusts should be paid.[1]  The Trusts removed the case to the United States District Court for the District of Minnesota, and thereafter, U.S. Bank and the Trusts stipulated to transferring the case to this Court.  By Order entered May 10, 2016, the case was transferred by the United States District Court for the District of Minnesota to this Court.

Discovery is completed.

On August 3, 2016, the Court entered a Scheduling Order providing for dispositive motions and opening briefs to be filed by March 15, 2017.

## SUMMARY OF ARGUMENT

1.      The Trusts' hiring of Odyssey as an additional servicer complied with all provisions of the relevant agreements.  Nothing in the Indenture or any other relevant agreement precludes the Trusts from hiring an additional servicer.  Indentures are read strictly and unless they expressly restrict the rights of the issuer, the issuer retains freedom to act.

---

[1] A copy of the Petition with its exhibits is in the Trusts' Appendix ("TA") at TA1.  A copy of the Trusts' Answer with its exhibits is at TA313.

2.     The Odyssey Agreement does not conflict with any provisions of the Special Servicing Agreement or any other relevant agreement.

3.     Odyssey's invoices should be paid.  The Trusts are not required by any relevant agreement to provide to U.S. Bank any backup for invoices from its service providers in order for payment of such invoices to be made.  In any event, Odyssey provided valuable services to the Trusts.

## STATEMENT OF FACTS

### A.     INTRODUCTION

The hiring of Odyssey was necessitated by the web of conflicts of interest in which U.S. Bank is enmeshed, as well as U.S. Bank's inadequate performance of its contractual obligations. In addition to serving as Indenture Trustee, since 2012 U.S. Bank has also served as the Trusts' Special Servicer, with responsibility for seriously delinquent and defaulted loans.[2]  Since 2012, it is estimated that loans owned by the Trusts with a face value of hundreds of millions of dollars have become uncollectible due to the expiration of the statute of limitations, and that hundreds of millions if not billions of dollars of other loans have defaulted, are virtually uncollectible, and no payments were made on approximately three quarters of these loans.[3]  To try to improve the handling of delinquent and defaulted loans, the Odyssey Agreement directs newly-defaulted loans to Odyssey.[4]  In addition, under the Odyssey Agreement, Odyssey is empowered to sell loans where it is determined that selling the loans would be more economically advantageous than keeping them in the Trusts' pools.  As was explained to the ratings agencies:

---

[2] A copy of the Special Servicing Agreement is at TA120.

[3] Declaration of Jorge Rodriguez, dated March 10, 2017 ("Rodriguez Decl."), ¶ 2 (TA613).

[4] A copy of the Odyssey Agreement is at TA25.

The existing vendor agreements (e.g., the Special Servicing Agreement and the Administration Agreements) pay fees based on the total principal balance of the NCSLT Trusts. As such, there is no economic incentive for those vendors to sell loans as it would result in a reduction of their fees. There are currently loans (notably the loans that have expired out of their collection statute of limitations) whereby the NCSLT Trusts pay more in fees annually than can be expected to ever be collected from the borrowers. This is an obvious example of loans that could be sold that would result in a higher net margin for the NCSLT Trusts (via the reduction in fees on the portion of the loans sold).

TA562; *see also* TA564-65.

U.S. Bank has filed a Petition seeking "the Court's instructions on three issues." TA8 ¶ 5. First, it seeks instructions as to whether Odyssey was properly appointed as a servicer. *Id*. Second, it seeks instructions as to how to resolve alleged conflicts between the Trusts' agreement with Odyssey and other Trust-related agreements. TA8 ¶ 6. Third, it seeks instruction regarding whether to pay Odyssey's outstanding invoices. TA9 ¶ 7.

While the Petition states that U.S. Bank merely "seeks instruction regarding whether to release the funds necessary to pay Odyssey's outstanding invoices," TA9 ¶ 7, in its prayer for relief the Petition makes clear that U.S. Bank is not a neutral stakeholder on this matter but rather a partisan litigant that seeks an order "[d]etermining that the Indenture Trustee should not pay, or cause the release of, any funds to Odyssey…." TA17. This is not surprising.

Due to its conflicts of interest, U.S. Bank has a substantial financial interest in seeking to prevent the appointment of Odyssey from taking effect. As Special Servicer, U.S. Bank receives a fee based on the total outstanding loan balances in each Trust, regardless of whether the borrowers are making any payments on them.[5] To the extent that the hiring of Odyssey will result in loans being sold, that would reduce the fee to which U.S. Bank would otherwise be

---

[5] TA123 § 5A.

entitled. "[T]he longer the loan exists, the more servicing fees the servicer can collect." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1151 (C.D. Cal. 2008)

U.S. Bank's challenges to the Odyssey Agreement rest on misconceptions as to the role Odyssey will play under the Odyssey Agreement, as well as an effort by U.S. Bank to read into the Indenture and other Trust-related agreements requirements and provisions that they do not contain. As shown below, when the provisions of the Odyssey Agreement and the other relevant agreements are carefully analyzed, it is clear that the appointment of Odyssey complied with all of the requirements of the relevant agreements; there are no conflicts between the Odyssey Agreement and other agreements; and the Odyssey invoices should be paid.

**B.    THE STRUCTURE AND OPERATION OF THE TRUSTS**

Under the relevant Delaware statute and the Trust Agreements, the Owner Trustee – in this case Wilmington Trust Company ("Wilmington") – is responsible for managing the Trusts' affairs at the direction of the Owners of the beneficial interest therein. 12 *Del. C.* § 3806(a) provides:

> Except to the extent otherwise provided in the governing instrument of a statutory trust, the business and affairs of a statutory trust shall be managed by or under the direction of its trustees. To the extent provided in the governing instrument of a statutory trust, any person (including a beneficial owner) shall be entitled to direct the trustees or other persons in the management of the statutory trust.

Implementing this provision, the Trust Agreements provide that the Owner Trustee has all of the "rights, powers and duties set forth herein and in the Statutory Trust Statute." Trust Agreement § 2.04; *see id.* § 8.01. [6]  Under § 2.03 of the Trust Agreements (entitled "Purposes and Powers"), the Trusts have the obligation and power, *inter alia*, "to provide for the

---

[6] A copy of a representative Trust Agreement is at TA340.

administration of the Trust and the servicing of the Student Loans." TA353 § 2.03(a)(ii). The Trusts further have the power "[t]o engage in those activities and to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith." TA353 § 2.03(a)(iii). They also have the power "[t]o engage in such other activities as may be required in connection with conservation of the Trust Property…." TA353 § 2.03(a)(iv).

These are owner-directed Trusts. As provided in § 2.03(b)(i) of the Trust Agreements, in conducting the operations of the Trusts, the Trusts act solely in their own name, and "the Owner Trustee or other agents selected in accordance with this Agreement will act on behalf of the Trust *subject to direction by the Owners*…."[7] U.S. Bank has acknowledged that the Owner Trustee "acts on behalf of and takes direction from the owners of the Trust."[8]

At the time of the Odyssey transaction, the owners of the beneficial interests in the Trusts were an affiliate of Citibank named SL Resid Holdings, LLC ("Citibank"), and NC Owners, LLC ("NC Owners") (collectively, the "Owners"). VCG Securities, LLC ("VCG") was the authorized representative of the Owners in connection with the transaction.

Each of the Trusts executed an Indenture with U.S. Bank, under which U.S. Bank has certain specified rights and duties.[9] "An indenture trustee derives its powers and rights from the indenture itself, and such trustee is limited to those powers specifically articulated therein." *U.S. Bank N.A. v. U.S. Timberlands Klamath Falls, L.L.C.*, 2004 WL 1699057, at *2 (Del. Ch. July

---

[7] TA353. (Unless otherwise noted, all emphasis in quoted material has been supplied.)

[8] TA509.

[9] TA40.

29, 2004), *remanded on other grounds*, 875 A.2d 632 (Del. 2005); *see id.* at *3 (rejecting U.S. Bank's argument "that it has broad powers to protect the holders of the notes covered by the Indenture" and holding that "the powers of the Trustee are defined by and limited by the terms of the Indenture"); *see also Fleet Nat'l Bank v. Trans World Airlines, Inc.,* 767 F. Supp. 510, 513 (S.D.N.Y. 1991) ("It is axiomatic that the powers of an indenture trustee are limited to those specifically articulated in the indentures themselves."); *In re Drexel Burnham Lambert Gp.*, 1992 WL 53742, at *3 (S.D.N.Y. Bankr. Mar. 4, 1992) (an indenture trustee's "powers are strictly limited by the terms of the governing indenture"). The Indentures provide that "the Indenture Trustee undertakes to perform such duties and *only* such duties as are specifically set forth in this Indenture and the other Basic Documents to which the Indenture Trustee is a party...." TA88 § 6.01(b)(i). U.S. Bank has stated that it "do[es] not assume or undertake any obligation beyond what is required of us by the applicable indenture."[10]

As noted above, in addition to serving as Indenture Trustee, U.S. Bank also serves as Special Servicer for the Trusts. This came about as follows. Initially, the Trusts entered into an Administration Agreement with First Marblehead Data Services, Inc. ("FMDS"),[11] and a master servicing agreement (the "Master Servicing Agreement") with Pennsylvania Higher Education Assistance Agency ("PHEAA").[12] In 2009, the Trusts also entered into the Special Servicing Agreement with First Marblehead Education Resources, Inc. ("FMER"), which provided that FMER would service certain seriously delinquent and defaulted loans and which further

---

[10] TA509.

[11] A copy of the Administration Agreement is at TA155.

[12] A copy of the Master Servicing Agreement is at TA435.

provided that if FMER were to resign as Special Servicer, U.S. Bank would step in as the Special Servicer.

In 2012, FMDS, the Administrator, was sold to a company called Goal Structured Solutions, Inc. ("Goal") and renamed GSS Data Services, Inc. ("GSS").[13] Shortly after that sale, FMER resigned as Special Servicer, triggering U.S. Bank's role as back-up Special Servicer.

## C. THE ODYSSEY SERVICING AGREEMENT

In 2014, the Owners – Citibank and NC Owners – decided that the Trusts needed to hire a new servicer to deal with defaulted loans.[14] In doing so, they were mindful that the new servicing agreement "must be designed to meet the Rating Agency Condition,"[15] and also "must follow and comply with all the requirements" of other agreements and "must resolve any conflict."[16]

The result of these discussions was an agreement with Odyssey whereby Odyssey would service newly-defaulted loans and sell loans in situations where the expected revenues from the loans were less than the fees the Trusts were paying on them. The Owners directed Wilmington as Owner Trustee to execute the Odyssey Servicing Agreement on behalf of the Trusts,[17] and Wilmington did so.[18]

---

[13] GSS has appeared as a Party in Interest in this case.

[14] TA514.

[15] TA515. The Rating Agency Condition is discussed in Point IB *infra*.

[16] *Id*.

[17] TA516.

[18] TA35.

<u>**ARGUMENT**</u>

The Indenture Trustee has "the burden of proving that the proposed transaction is not permitted…." *Bank of N.Y. Mellon v. Realogy Corp.*, 979 A.2d 1113, 1121 (Del. Ch. 2008). As demonstrated below, it is clear that the appointment of Odyssey complied with all of the requirements of the relevant agreements; there are no conflicts between the Odyssey Agreement and other agreements; and the Odyssey invoices should be paid.

I.     **ODYSSEY WAS PROPERLY HIRED BY THE TRUSTS AS A SERVICER IN ACCORDANCE WITH THE PROVISIONS OF THE RELEVANT AGREEMENTS**

     A.     **THE TRUSTS ARE ENTITLED UNDER THE AGREEMENTS TO HIRE ANOTHER SERVICER**

As discussed above, under the Trust Agreements, the Trusts have the obligation and power, *inter alia*, "to provide for the administration of the Trust and the servicing of the Student Loans." TA353 § 2.03(a)(ii). The Trusts further have the power "to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith." TA353 § 2.03(a)(iii).

While the Trusts previously entered into agreements with certain entities to provide certain services, *i.e.*, the Master Servicing Agreement and the Special Servicing Agreement, nothing in those agreements or any other relevant agreement purports to establish an exclusive arrangement pursuant to which the Trusts forfeited their right and power under §§ 2.03(a)(ii) and (iii) of the Trust Agreements to enter into other agreements for the servicing of loans. The Master Servicing Agreement specifically states:

> **Non-Exclusive Agreement for FMC**.[19]  Nothing contained herein shall be construed to create an exclusive arrangement as to FMC.  The Servicer understands and agrees that FMC may enter into other agreements for the servicing of Private Student Loans in the future.

TA471 § 15.03.

Indeed, the Indentures state that "*[i]nitially*, the Issuer has contracted with the Servicer and the Administrator to assist the Issuer in performing its duties under this Indenture," TA65 § 3.07(b), and that "the Issuer will contract with *other* Persons to assist it in performing its duties under this Indenture," *id.* – clearly implying that the Trusts might later enter into additional such contracts.  Furthermore, the Indentures define "servicer" as PHEAA "and *any other* loan servicer satisfying the Rating Agency Condition."[20]  And, in fact, the Special Servicing Agreement, under which U.S. Bank became Special Servicer, was entered into in 2009, which was years after the Trust Agreements, the Indentures and the Master Servicing Agreement were executed.

The Petition's complaint that the Indenture Trustee was not "involved in or aware of the negotiation or execution of the Odyssey Agreement," TA11 ¶ 19, is a red herring, as the Indenture Trustee has no right to be involved in such matters.[21]  The Indenture is governed by New York law.  *See* TA113 § 11.13.  Under New York law, "'[i]ndentures are to be read *strictly* and to the extent they do not *expressly* restrict the rights of the issuer, the issuer is left with the freedom to act, subject only to the boundaries of other positive law.'"  *San Antonio Fire & Police Pension Fund v. Amylin Pharms., Inc.*, 983 A.2d 304, 314 (Del. Ch. 2009), *aff'd*, 981

---

[19] The Trusts are the assignees of FMC's rights under the Master Servicing Agreement.  *See, e.g.*, TA426.

[20] TA422.

[21] In fact, U.S. Bank has known for years that the Owners wanted to hire Odyssey as a servicer for the Trusts.  Rodriguez Decl. ¶ 3 (TA613).

A.2d 1173 (Del. 2009) (quoting *In re Loral Space & Commc'ns Inc. Consol. Litig.*, 2008 WL 4293781, at \*35 (Del. Ch. Sept. 19, 2008)) (applying New York law); *see Waxman v. Cliffs Natural Res., Inc.*, 2016 WL 7131545, at \*9 (S.D.N.Y. Dec. 6, 2016) (same).[22]

Therefore, because the Indentures and other Trust-related agreements "do not expressly restrict the rights of" the Trusts to hire other servicers, the Trusts retain that right and were entitled to hire Odyssey.

## B. THE RATING AGENCY CONDITION WAS SATISFIED

As noted above, in order for the Trusts to hire a servicer, the Rating Agency Condition had to be satisfied. The Indentures for the Trusts at issue in this case define Rating Agency Condition as follows:

> "Rating Agency Condition" means, with respect to any action, that each Rating Agency shall have been given 10 days' prior notice thereof (or such shorter period as shall be acceptable to the Rating Agencies) and that none of the Rating Agencies shall have notified the Administrator or the Indenture Trustee, in writing that such action will in and of itself result in a reduction or withdrawal of the then current rating of the Notes ....[23]

Therefore, there was no requirement that the ratings agencies confirm satisfaction; the absence of a communication to the contrary is sufficient.[24]

---

[22] The rule is the same in Delaware. *See Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1033 (Del. Ch. 2006) ("the highly-negotiated provisions of notes and debentures that restrict the commercial freedom that issuers otherwise enjoy under default law are traditionally interpreted strictly").

[23] TA419. It may be noted that with respect to other, later trusts (which are not involved in this case), the Rating Agency Condition was changed and required affirmative confirmation from the rating agencies. That revised definition is inapplicable in this case. Rodriguez Decl. ¶ 4 (TA613-14).

[24] The Administrator has agreed that the Rating Agency Condition is satisfied as long as "none of the Ratings Agencies have either notified the Administrator or the Indenture Trustee that

*(Cont'd)*

On November 25, 2014, the three ratings agencies – Standard and Poor's Rating Services, Moody's Investor Services, Inc., and Fitch Ratings – were notified of the Trusts' "intention to hire Odyssey as a Servicer" and were sent a copy of the Odyssey Agreement.[25] None of them sent any notification within 10 days (or at any other time) that hiring Odyssey would result in a reduction or withdrawal of the then current rating of the Notes,[26] and the Petition does not allege otherwise. Thus, the Rating Agency Condition was satisfied.

The Trusts asked the Indenture Trustee to acknowledge the hiring of Odyssey. Under § 11.01 of the Indentures, if the Issuer requests that the Indenture Trustee take any action, the Issuer must "furnish to the Indenture Trustee (i) an Officers' Certificate of the Issuer stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with and (ii) an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with …." TA109. The Trusts provided to U.S. Bank such an Officer's Certificate[27] and Opinion of Counsel.[28] Hence, the requirements of Indenture § 11.01 were satisfied, but U.S. Bank nevertheless refused to acknowledge the retention of Odyssey.

The Petition questions whether these requirements were satisfied, but its assertions are meritless. First, the Petition professes confusion as to whether Odyssey was hired as a servicer or a special servicer, asserting that the rating agency condition is different if Odyssey was hired

_____

execution of" an agreement would result in a reduction or withdrawal of the rating of the Notes, or published any notice to that effect. *See* TA510-11.

[25] TA539.

[26] Rodriguez Decl. ¶ 5 (TA614).

[27] *See* TA578.

[28] *See* TA600.

as a special servicer. The Petition alleges that "[a] replacement Special Servicer cannot be properly appointed without written confirmation from each Rating Agency (other than Fitch, Inc.) that the appointment will not result in a reduction or withdrawal of the Notes' current rating." TA12 ¶ 22 (citing Special Servicing Agreement § 6E). This provision has no applicability here.

Special Servicing Agreement § 6E applies, by its terms, to the "resignation or removal of the Special Servicer" and "[t]he appointment of any successor Special Servicer." TA125. The Odyssey Agreement hires Odyssey to be an additional servicer. It does not remove U.S. Bank as Special Servicer nor does it purport to appoint Odyssey as successor Special Servicer. To the contrary, as the Trusts informed the rating agencies, "[t]he existing Special Servicing Agreement (U.S. Bank and Goal) will stay in full force and effect. The loans that are currently being serviced under that agreement will continue to be serviced under that agreement."[29] "[O]nly newly defaulted loans" would be sent to Odyssey.[30] Thus, Odyssey was appointed as a servicer, not the successor Special Servicer, and U.S. Bank has not been removed from its position as Special Servicer under the Special Servicing Agreement. Special Servicing Agreement § 6E is, therefore, inapplicable.

Second, the Petition complains that the Officer's Certificate and the Opinion of Counsel did not "attach or describe the purported notice" to the ratings agencies. TA12 ¶ 23. There is no merit to this complaint, because § 11.01 of the Indenture does not require any such attachment or description. U.S. Bank is improperly trying to expand the requirements of the Indenture.

---

[29] *See* TA568.

[30] *Id.*

Section 11.01 merely requires representations that any conditions precedent have been complied with, and those representations were concededly included. Because, as noted above, "'[i]ndentures are to be read strictly,'" *San Antonio Fire & Police Pension Fund*, 983 A.2d at 314, U.S. Bank's effort to engraft additional requirements must be rejected. In any event, there can be no dispute that the requisite notice was provided to the ratings agencies.[31]

## II. THERE ARE NO CONFLICTS BETWEEN THE ODYSSEY AGREEMENT AND OTHER RELEVANT AGREEMENTS

The Petition does not enumerate a list of purported conflicts between the Odyssey Agreement and other agreements, but speculates that there might be some. The fact is that there are no conflicts between the Odyssey Agreement and the Special Servicing Agreement (or any other relevant agreement).

The Odyssey Agreement does not conflict with U.S. Bank's Special Servicing Agreement. As discussed above, the Special Servicing Agreement does not have any exclusivity clause that would preclude the Trusts from hiring an additional servicer. Nor does the Odyssey Agreement purport to remove U.S. Bank as Special Servicer or to take away from U.S. Bank any loans that it is currently servicing. As the Trusts explained to the ratings agencies, the agreement provides "[t]he existing Special Servicing Agreement (U.S. Bank and Goal) will stay in full force and effect," and that "[t]he loans that are currently being serviced under that agreement will continue to be serviced under that agreement."[32]

As explained to the ratings agencies, the Odyssey Agreement differed in certain important respects from U.S. Bank's Special Servicing Agreement, but none of those differences

---

[31] TA539.

[32] TA568.

constitutes a "conflict" with the Special Servicing Agreement. The ratings agencies were informed that there were "three main differences":

  i. To keep from adding any additional fees to the NCSLT Trusts, the Odyssey Agreement does not pay Odyssey the 1bp Special Servicing Fee;

  ii. To prevent duplicity of work and overlap between the existing Special Servicing Agreement and the Odyssey Agreement, the Odyssey Agreement only provides for <u>newly</u> Defaulted Loans (as defined in the Odyssey Agreement) to be allocated to Odyssey;

  iii. The Odyssey Servicing Agreement provides a mechanism for loans to be sold in accordance with the governing documents of the NCSLT Trusts. *The existing Special Servicing Agreement does not include this directive.* ....[33]

After the Odyssey Agreement was executed, in order to further eliminate any suggestion of a conflict between it and the Special Servicing Agreement, the Trusts and Odyssey entered into a Waiver Agreement, whereby, until further notice, they waived the provision in the Odyssey Agreement calling for newly defaulted loans to be allocated to Odyssey.[34]

U.S. Bank's Petition also asserts that the Odyssey Agreement "materially alters how Loans may be released from the Indentures," TA12 ¶ 24, and that it "permits Odyssey to purchase defaulted Loans at below-market prices, which is not allowed by any of the other servicing agreements." *Id*. The Petition is wrong. Section 2.09 of the Indentures, entitled "Release of Collateral," provides that the Indenture Trustee shall release collateral when requested by the Issuers and accompanied by an Officers' Certificate of the Issuer. TA60. The Odyssey Agreement does not change this. The Indenture does not address or preclude selling

---

[33] TA561-62 (underscoring in original). Section 3.14(b) of the Indenture allows sales of loans to a servicer at a price in accordance with the servicing agreement. TA69. However, no servicing agreement other than the Odyssey Agreement provides a mechanism for setting such a price, and hence no other servicer can purchase and sell loans.

[34] TA575.

loans below market value but rather requires that the disposition price be equal to or in excess of the amount required by the applicable servicing agreement. The Indenture specifically provides that loans may be sold "to the Servicer" (TA69 § 3.14(iii)) and that the "the disposition price is equal to or in excess of the amount required by … the Servicing Agreement…" TA69 § 3.14(b). The Odyssey Agreement provides that the servicer shall set the purchase price for each loan it decides to purchase determined by one of the two following methods:

> (a) 10% less than the highest bid received pursuant to the Servicer marketing the Loans Eligible For Sale for sale to at least three (3) qualified bidders and conducting the sale process in a manner that, in the sole judgment of the Servicer, will yield the highest and best net proceeds to be paid in exchange for the Loans Eligible For Sale, provided however, that with respect to such sale process, Servicer shall, at a minimum: (i) provide an information packet ("Information Packet") applicable to each sale which describes the loans offered for sale and contains such other customary information applicable to such sale; (ii) in a good faith effort to maximize the proceeds to the Trust from the sale of the Loans, invite a sufficient number of qualified bidders under the circumstances to participate in such sale, and in no event shall the Servicer receive less than three (3) bids from qualified bidders; (iii) establish a time period between the distribution of the Information Packet and the acceptance of bids to allow the prospective bidders to research and analyze the Loans Eligible For Sale; and (iv) hold the sale at a convenient time and in a convenient location or (b) 10% less that the average value established pursuant to the Servicer engaging two (2) reputable appraisers, in the business of appraising loans, to appraise the Loans Eligible for Sale which the Servicer intends to purchase.

TA28 § 2(c)(iii). The Petition does not allege that Odyssey has purchased any loan in violation of this provision, and no such purchase has occurred.[35]

---

[35] The deduction of 10% represents Odyssey's commission for the transaction. Analytically, this is equivalent to a sale at market value, with Odyssey retaining a 10% commission and remitting the balance.

U.S. Bank also speculates that Noteholder consent to Odyssey's appointment might be required, if the Odyssey Agreement would "waive, amend, modify, supplement or terminate" U.S. Bank's Special Servicing Agreement. TA12-13 ¶ 25 (citing Indenture § 3.07(c) (TA65)). But Noteholder consent is not required, because the Odyssey Agreement does not waive, amend, modify, supplement, or terminate U.S. Bank's Special Servicing Agreement. The Petition does not identify any provision in the Odyssey Agreement that does any of those things. As discussed above, U.S. Bank's Special Servicing Agreement is not, and does not purport to be, an exclusive arrangement for servicing of loans, and Odyssey will be servicing only newly-defaulted loans. It will not service loans currently being serviced by U.S. Bank. Section 3.14 of the Indenture, specifically contemplates the release of collateral so that loans may be sold, and states that the Noteholders have consented to such release. TA69 § 3.14(d). Therefore, to the extent the Odyssey Agreement permits Odyssey to sell loans, additional Noteholder consent is not required.

## III.   THE ODYSSEY INVOICES SHOULD BE PAID

Odyssey has rendered invoices in the total amount of $1.46 million for services to the Trusts.[36] The Indenture Trustee, which has control over the Trusts' funds, has refused to pay any of the invoices rendered by Odyssey for services it has rendered to the Trusts. This is a violation of the Trust-related agreements.

### A.   UNDER THE AGREEMENTS, THE TRUSTS ARE NOT OBLIGATED TO PROVIDE "BACK-UP" FOR INVOICES FROM THEIR SERVICE PROVIDERS

The Trusts' handling of the invoices from Odyssey complied in all respects to the requirements of the relevant agreements. Odyssey's invoices were sent to the Administrator, with the direction that it forward same to the Indenture Trustee for payment to Odyssey.

---

[36] TA177, 254.

Pursuant to § 1(a)(i)(G) of the Administration Agreement, the Administrator was obligated to follow that direction. TA156. Under that provision, the Administrator "shall take all appropriate action that is the duty of the Issuer to take pursuant to the Trust Related Agreements including, without limitation, ... [p]roviding instructions to the Indenture Trustee as required by Section 8.02(d) of the Indenture." The Indentures provide that the Administrator "shall instruct the Indenture Trustee" (TA98 § 8.02(d)) to make distributions to pay "Servicing Fees," TA98 § 8.02(d)(1)(ii), and that "the Indenture Trustee shall comply with such instruction." TA98 § 8.02(d). Thus, under the Administration Agreement, it is the Administrator's duty to provide instructions to the Indenture Trustee to pay the Servicer. The Administrator cannot demand further approval or seek further details of the services rendered. If the Administrator has a question or needs guidance in this regard, it is to seek direction from the Owner Trustee, not the Indenture Trustee.

Notwithstanding the foregoing, the Administrator objected to the bills and took the position that it would not forward the bills to the Indenture Trustee unless extensive information concerning Odyssey was provided.[37] The Owner Trustee thereupon issued an Issuer Order directing the Administrator to prepare and transmit all of the documents necessary to cause the Indenture Trustee to pay the Odyssey bills.[38] The Administrator did so, but when it transmitted the bills to the Indenture Trustee the Administrator stated that it had concerns about whether

---

[37] The reason why the Administrator, GSS, opposes Odyssey being hired is that the Administrator also has a severe conflict of interest. As discussed above, GSS is a subsidiary of Goal. *See* p. 7 *supra*. U.S. Bank hired a Goal subsidiary, Turnstile Capital Management, LLC ("Turnstile") to serve as Special Subservicer. To the extent that Odyssey sells non-performing loans, that would reduce fees paid to the Administrator's affiliate, Turnstile.

[38] *See* TA284-85.

Odyssey was properly appointed a servicer.[39]

      While under the Indenture, as discussed above, the Indenture Trustee is obligated to pay bills sent to it by the Administrator, the Indenture Trustee has failed and refused to pay Odyssey's bills. Instead, U.S. Bank's Petition complains that "[n]o documentation or backup for the expenses allegedly incurred by Odyssey has been provided." TA14 ¶ 34; *see* TA9 ¶ 7 ("Odyssey has not provided the Administrator or Indenture Trustee any evidence that it has performed any services for the Issuers, and the Indenture Trustee has not received any funds for forwarding to Noteholders generated by Odyssey's alleged servicing activities").

      There is nothing in the Indenture or the Administration Agreement that requires that any "documentation or backup" for the Trusts' servicers be given to the Administrator or the Indenture Trustee as a precondition to payment of such servicers' invoices. The Trusts have repeatedly asked U.S. Bank to identify any provisions in the agreements that require such "backup" be provided, but U.S. Bank has never identified any. Nor is there any requirement that a servicer transmit funds to the Indenture Trustee as a precondition for payment of its invoices. U.S. Bank is, again, attempting to re-write the agreements to insert therein provisions and requirements that are not there. The provisions of § 8.02(d)(1) of the Indenture are clear and mandatory, requiring the Indenture Trustee to pay servicers' invoices submitted to the Indenture Trustee. As discussed above, the powers of an indenture trustee are strictly limited to what is set forth in the indenture. *See* pp. 5-6 *supra*. Since the Indenture does not give the Indenture Trustee the right and power to demand "backup" for service providers' invoices, U.S. Bank has no such power.

---

[39] TA302-06.

The request for payment of the Odyssey invoices was done in strict adherence to the Trust-related agreements, and U.S. Bank's refusal to pay the invoices was a violation of the agreements.

## B. IN ANY EVENT, ODYSSEY PERFORMED SERVICES FOR THE TRUSTS SUFFICIENT TO SUPPORT THE INVOICES

As discussed above, U.S. Bank is not entitled under the relevant agreements to any further explanation of the services that Odyssey provided. Furthermore, there is nothing in the relevant documents that authorizes U.S. Bank to decide whether or not the invoices of service providers are sufficiently reasonable in amount to be paid. The Petition does not ask the Court to judge whether Odyssey's invoices are reasonable in light of the services provided, and the Court would not be in a position to make such an evaluation if that question were presented. Nevertheless, it can be readily shown that Odyssey performed valuable services to the Trusts.

As described in the accompanying Declaration of Donald Uderitz,[40] among other things, Odyssey has analyzed the Trusts' loan portfolios in order to assess historical performance, identify poor and problematic collection practices, and develop forecast models regarding defaults. It has identified statutes of limitations issues and calculated expiration dates for a large number of loans. It has reviewed the performance of PHEAA, the servicer, and U.S. Bank as Special Servicer, and suggested amendments to the servicing agreement and servicing guidelines. It has participated in meetings with PHEAA to discuss and analyze its servicing operations. It has assisted in responding to requests for information from the Consumer

---

[40] The Declaration of Donald Uderitz, dated March 10, 2017, is at TA615.

Financial Protection Bureau, which is investigating the improper collection practices by U.S. Bank and Turnstile.

These and the other services described in the Uderitz Declaration are of great value and importance to the Trusts.

<u>**CONCLUSION**</u>

The Trusts respectfully request that the Court issue an order granting the Trusts' motion for summary judgment, directing the Indenture Trustee and the Administrator to execute the Odyssey Agreement, and directing the Indenture Trustee to pay the invoices submitted by Odyssey for services to the Trusts.

Dated:   March 15, 2017

Respectfully submitted,

**GRANT & EISENHOFER P.A.**

By    /s/ James J. Sabella
James J. Sabella (Del. Bar No. 5124)
jsabella@gelaw.com
Michael T. Manuel (Del. Bar No. 6055)
mmanuel@gelaw.com
123 Justison Street
Wilmington, DE  19801
302-622-7000

*Attorneys for National Collegiate*
*Student Loan Trusts 2003-1, 2004-1,*
*2004-2, 2005-1, 2005-2, and 2005-3*