IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN THE MATTER OF THE NATIONAL | ) | |
| COLLEGIATE STUDENT LOAN TRUSTS | ) | C.A. No. 16-341-SLR |
| 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, and | ) | |
| 2005-3 | ) | |

## INDENTURE TRUSTEE'S BRIEF IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:
Michael A. Collyard
Peter Ihrig
Thomas F. Berndt
ROBINS KAPLAN LLP
800 LaSalle Ave., Suite 2800
Minneapolis, MN 55402
(612) 349-8500

John W. Shaw (No. 3362)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
*Attorneys for U.S. Bank*
*National Association*

Dated: March 15, 2017

# TABLE OF CONTENTS

Page

Nature & Stage of the Proceedings ............................................................... 1

Summary of Argument .................................................................................... 1

Statement of Facts ........................................................................................... 3

    I.     Background ........................................................................... 3

    II.    Loan servicing ..................................................................... 4

    III.   The Indentures .................................................................... 5

    IV.   The Odyssey controversy ................................................... 6

         A.    VCG purports to appoint its affiliate, Odyssey, to service Defaulted Loans. .................................................... 6

         B.    Odyssey seeks reimbursement from the Indenture Trust Estate for $1.46 million in alleged servicing expenses, though Odyssey never serviced any Loans. .................................................................. 7

Standard of Review & Governing Law ......................................................... 8

    I.     Summary judgment is appropriate because this motion raises purely-legal questions of contractual interpretation. ............................. 8

    II.    New York law controls interpretation of the agreements at issue. ........................ 8

Legal Argument .............................................................................................. 9

    I.     Odyssey's appointment is invalid because the Odyssey Agreement would amend or modify the Basic Documents without satisfying conditions precedent. ................................................................. 9

         A.    The Odyssey Agreement is invalid because it would modify the terms of the SSA without Trustee and Noteholder Approval. ................... 9

         B.    The Odyssey Agreement is invalid because the Issuers did not satisfy the SSA Rating Agency Condition for appointing a successor special servicer. ........................................................ 12

         C.    Contrary to the Issuers' position, Section 3.14 of the Indentures is either irrelevant or directly conflicts with the Odyssey Agreement. ........ 13

i

1.      Section 3.14 is irrelevant as it only applies to Loans sold by the Indenture Trustee, not by Odyssey on behalf of the Issuers. ........................................................................................ 14

2.      Alternatively, Section 3.14 does not allow sales at below-market value, making Trustee and Noteholder Approval necessary. ................................................................................ 16

II.     Odyssey should not be reimbursed because it was not validly appointed and did not satisfy the condition precedent to increasing Servicing Fees. ........... 18

Conclusion ...................................................................................................................... 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................................8

*Davis v. Furlong*,
328 N.W.2d 150 (Minn. 1983)...................................................................................9

*Ferens v. John Deere Co.*,
494 U.S. 516 (U.S. 1990)...........................................................................................8

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.*,
889 F.2d 1274 (2d Cir.1989).....................................................................................14

*In re Am. Home Mortg. Inv. Trust*
*2005-2*, 2014 U.S. Dist. LEXIS 111867 (S.D.N.Y. July 24, 2014)..............9, 14, 18

*In re The Educational Resources Institute*,
Case No. 08-12540 (HJB) (Bankr. D. Mass. Apr. 7, 2008)......................................4

*In re JER CRE CDO*
*2005-1*, 2013 U.S. Dist. LEXIS 182663 (S.D.N.Y. Dec. 31, 2013) .........................8

*Mastrobuono v. Shearson Lehman Hutton*,
514 U.S. 52 (U.S. 1995)...........................................................................................15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
415 U.S. 475 (1986)...................................................................................................8

*MHR Capital Partners LP v. Presstek, Inc.*,
12 N.Y.3d 640 (N.Y. 2009) ................................................................................19, 20

*Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*,
2000 U.S. Dist. LEXIS 3941 (S.D.N.Y. Mar. 29, 2000) .........................................17

*President & Fellows of Harvard College v. Glancy*,
2003 Del. Ch. LEXIS 25 (Del. Ch. Mar. 21, 2003) ............................................9, 12

*Proyecfin de Venezuela, S.A. v. Banco Indus. de Venezuela, S.A.*,
760 F.2d 390 (2d Cir. N.Y. 1985)............................................................................15

*Revson v. Cinque & Cinque, P.C.*,
221 F.3d 59 (2d Cir. N.Y. 2000)..............................................................................14

**Statutes**

15 U.S.C. § 77aaa ..........................................................................................................17

15 U.S.C. § 77bbbb.........................................................................................................17

Minn. Stat. § 501C.0201 ..................................................................................................1

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................8

## NATURE & STAGE OF THE PROCEEDINGS

This is a Trust Instructional Proceeding originally filed in Minnesota state court by U.S. Bank National Association, in its capacity as indenture trustee (the "Indenture Trustee") with regard to six trusts created to hold student loans and issue notes (the "Notes") backed by those loans—National Collegiate Student Loan Trust 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, and 2005-3 (the "Issuers"). A Trust Instructional Proceeding is a Minnesota statutory proceeding that "[a]n interested person"—including an indenture trustee like U.S. Bank—may initiate to seek a court's instruction concerning "any matter involving [a] trust's administration or the discharge of the trustee's duties." Minn. Stat. § 501C.0201. Shortly after the Indenture Trustee initiated this proceeding, the Issuers removed it to the U.S. District Court for the District of Minnesota based on diversity of citizenship and then stipulated with the Indenture Trustee to transfer the proceeding to this Court. Discovery in this proceeding closed December 1, 2016 and the Indenture Trustee now moves for summary judgment on two questions of contractual interpretation that the Indenture Trustee believes will be dispositive.[1]

## SUMMARY OF ARGUMENT

This motion presents two purely-legal questions of contractual interpretation.[2] The first is whether the Issuers' purported appointment of Odyssey Education Resources, LLC ("Odyssey") to act as a servicer or special servicer under a December 30, 2014 agreement (the "Odyssey Agreement") was valid, although noteholder approval was never sought or obtained, as required

---

[1] *See* Ihrig Decl. ex. 1 at Request for Relief ¶¶ c(i), c(iii). Unless indicated otherwise, all references to exhibits in this brief refer to the exhibits attached to the Declaration of Peter C. Ihrig filed herewith.

[2] In order to avoid burdening the Court by filing thousands of pages of substantially similar contracts, this brief refers to NCSLT 2005-3's governing documents. A chart identifying the differences between the provisions of NCSLT 2005-3's Indenture and Prospectus Supplement cited in this brief's Legal Argument section, and those applicable to NCSLT 2003-1, 2004-1, 2005-1, and 2005-2, is attached as exhibit 2 to the Ihrig Declaration.

1

by the relevant indentures (the "Indentures"). The second is whether Odyssey should be reimbursed for alleged servicing expenses although it was never validly appointed as a servicer and, in any event, failed to satisfy an express condition precedent to charging such fees under the Indentures. The Indenture Trustee believes that, under the Indentures' plain language, the only reasonable answer to both of these questions is no.

*First*, Odyssey was not validly appointed to act as a servicer because neither the noteholders nor the Indenture Trustee approved Odyssey's appointment, as the Indentures require. To protect the noteholders' interests and rights, the Indentures provide that the "Basic Documents"—certain key agreements governing the noteholders' investments in the Notes or the Indenture Trust Estate (as defined below)—cannot be waived, amended, modified, supplemented or terminated without the noteholders' and the Indenture Trustee's approval. Here, the Odyssey Agreement purporting to appoint Odyssey as a servicer would waive, amend, modify, supplement, or terminate the Basic Documents' terms. The Issuers, however, admit that neither noteholder nor Indenture Trustee approval was ever sought or obtained for Odyssey's appointment. Accordingly, Odyssey's appointment as servicer under the Odyssey Agreement was invalid as a matter of law.

Additionally, Odyssey's purported appointment was invalid because the Issuers did not satisfy an express condition precedent to the appointment of a successor special servicer. To protect noteholders, the Special Servicing Agreement provides that a successor special servicer cannot be appointed without receiving written confirmation from the rating agencies that the appointment would not result in a downgrade or removal of the Notes' ratings (the "Rating Agency Condition"). Here, the Issuers admit that such written confirmation was not obtained, and therefore Odyssey's appointment was invalid as a matter of law.

*Second*, Odyssey should not be reimbursed from the Indenture Trust Estate for alleged

servicing expenses because, as discussed above, Odyssey was not validly appointed as a servicer or special servicer. Additionally, Odyssey should not be reimbursed because it did not notify the rating agencies that the Odyssey Agreement would increase the servicing fees payable from the Indenture Trust Estate. As this Rating Agency Condition is an express condition precedent to increasing existing servicing fees, the Issuers' failure to satisfy it precludes Odyssey from being reimbursed as a matter of law.

Judgment as a matter of law is warranted on both legal questions presented by this motion. The Indenture Trustee seeks an order from this Court that (1) Odyssey was not validly appointed as a servicer or special servicer and (2) Odyssey should not be reimbursed for alleged servicing expenses.

## STATEMENT OF FACTS

### I.  Background

The Issuers are six Delaware Statutory Trusts that were created to hold privately issued student loans, and to facilitate the issuance and sale of notes secured by the principal and interest payments received from those student loans. To do this, each Issuer entered into an Indenture through which it pledged student loans (the "Loans"), and the rights under the Basic Documents, to the Indenture Trustee, and issued multiple classes of notes that grant their holders (the "Noteholders") the right to repayment from the principal and interest payments collected from the borrowers who took out the Loans in the first place.[3]

The Issuers also issued certificates (the "Certificates") that represent equitable ownership

---

[3] *See* ex. 3 at § 2.03. Each Issuer was created pursuant to its own Trust Agreement, between the Delaware Trust Company, National Association, as Owner Trustee, and the National Collegiate Funding LLC and The Educational Resources Institute Inc., as Owners. Wilmington Trust Company replaced Delaware Trust Company, National Association as Owner Trustee of each Trust in 2008.

interests in the Issuers themselves.[4] The Certificates differ from the Notes in that the Notes represent debt issued by the Issuers, while the Certificates represent equity ownership in the Issuers. The holders of the Certificates, known as the "Owners," receive payment on their Certificates only after the Noteholders receive payments on their Notes.[5] The current Owners are controlled by VCG Securities, LLC ("VCG"), which also controls Odyssey.[6]

## II.   Loan servicing

Generally, loan servicing is the process by which borrowers' principal and interest payments on the Loans are collected and remitted to the Indenture Trustee for distribution to the Noteholders (and, if applicable, to the Certificateholders). When the Notes were issued (2003-2005), the Pennsylvania Higher Education Assistance Agency ("PHEAA") was each Issuer's sole or primary servicer.[7] At that time, The Educational Resources Institute Inc.'s ("TERI") guaranteed full repayment on the Loans by agreeing to purchase a Loan for 100 percent of the Loan's outstanding principal balance plus all accrued interest whenever a borrower failed to make payments on a Loan for a specified number of days, went bankrupt, or died.[8] TERI, however, went bankrupt in 2008, and thereafter ceased guaranteeing Loans.[9]

---

[4] Ex. 3 at § 3.01(a). At closing, the Certificates were issued to the then-Owners for a total capital contribution of $1. *Id*. at §§ 3.01(a), 6.02, Schedule A.

[5] *See* ex. 4 at § 8(d)(12).

[6] Ex. 7 at ¶¶ 2, 18.

[7] *See* ex. 4 at Appendix A-27 (definition of "Servicer"). For each Issuer, PHEAA's duties are defined by the Alternative Servicing Agreement dated October 16, 2001 between PHEAA and The First Marblehead Corporation, and as later amended and restated (the "PHEAA Servicing Agreement"). Pertinent excerpts from the PHEAA Servicing Agreement are attached as exhibits 14-16. *See* Ihrig decl. ¶¶ 16-18.

[8] *See* ex. 5 at S-30 – S-31. TERI's Guarantee applied to all Loans, except where the Loan's origination or servicing did not comply with TERI's requirements. *Id*. at S-31, S-46. If either of these exceptions applied, the Loan's Seller or Servicer, as applicable, was obligated to purchase (or repurchase) the Loan. *Id*. at S-60.

[9] *See In re The Educational Resources Institute*, Case No. 08-12540 (HJB) (Bankr. D. Mass. Apr. 7, 2008).

Following TERI's bankruptcy, the Issuers entered into a Special Servicing Agreement (the "SSA") that, along with certain related sub-servicing agreements, provide for servicing of defaulted Loans.[10] Specifically, the SSA applies to two categories of Loans, "Defaulted Loans" and "Delinquent Loans" (such Defaulted and Delinquent Loans, and all Loans in default for at least 31 days, are referred to collectively as "Defaulted Loans").[11] All Defaulted Loans are currently covered under the SSA and its related sub-servicing agreements.

The SSA also established requirements that had to be satisfied before a successor Special Servicer could be appointed.[12] Specifically, the SSA required that the Issuers provide written notice to the Rating Agencies, and receive written confirmation from the Rating Agencies, that the proposed appointment would not result in a reduction or withdrawal of the Notes' then-current ratings (the "SSA Rating Agency Condition").[13]

## III.   The Indentures

In addition to issuing the Notes, the Indentures lay out the Indenture Trustee's and the Noteholders' rights with respect to the Loans and the Basic Documents.[14] The Noteholders' fundamental protection is the priority security interest (a lien) in the Loans and the Basic

---

[10] *See* ex. 6. U.S. Bank, National Association, in its capacity as Back-Up Special Servicer, succeeded FMER as Special Servicer following FMER's resignation in 2012.

[11] *See id* at § 2.B. A "Defaulted Loan" is a Loan that "the Servicer has determined that a borrower has defaulted under his respective student loan credit agreement and has notified the Special Servicer of such occurrence." *Id*. at 1. A "Delinquent Loan" is a Loan that is "at least 31 days past due but is not yet a Defaulted Loan." *Id*.

[12] *Id*. at § 6.E.

[13] *See id*. at §§ 6.E, 16. This differs from the Indentures' Rating Agency Condition, which merely requires notice to the Rating Agencies, and that 10 days elapse without the Rating Agencies responding in writing that the proposed appointment will result in the reduction, or withdrawal, of the Notes' then-current ratings (the "Indenture Rating Agency Condition").

[14] Each Indenture was entered into by two parties, the Indenture Trustee and the relevant Issuer itself. *See, e.g.*, ex. 4.

Documents pledged by the Issuers to the Indenture Trustee under the Indentures.[15] With respect to Loan servicing, the Indentures protect the Noteholders' rights to payment by prescribing rules related to engaging and terminating Servicers,[16] increasing Servicing Fees,[17] the Issuers' interactions with their affiliates,[18] and selling Loans to a Servicer free of the Indenture Trustee's lien.[19] And, most importantly, the Indentures protect these rights by providing that the Issuers will not "waive, amend, modify, supplement or terminate" these rights without written approval from the Indenture Trustee and the Interested Noteholders holding a majority of the Outstanding Amount of the related Class(es) of Notes (collectively "Trustee and Noteholder Approval").[20]

## IV.   The Odyssey controversy

### A.  VCG purports to appoint its affiliate, Odyssey, to service Defaulted Loans.

On December 30, 2014, the Owners (VCG) directed the Issuers to enter into the Odyssey Agreement, which purports to appoint VCG's affiliate Odyssey as a "Servicer" for each Issuer's Loans.[21] The Odyssey Agreement provides that Odyssey will service "Defaulted Loans" and "Loans Eligible For Sale."[22] By their terms, both "Defaulted Loans" and "Loans Eligible For Sale"

---

[15] *See* ex. 4 at Granting Clause. In addition to the Loans, the Issuers pledged their rights under several agreements to the Indenture Trustee, including the PHEAA Servicing Agreement.  The Issuers' rights under the SSA were pledged to the Indenture Trustee through the SSA itself. *See* ex. 6 at §§ 15, 22. The rights under these contracts, along with the Loans and all other rights pledged to the Indenture Trustee by the Issuers, are known as the "Indenture Trust Estate." *See* ex. 4 at Appendix A-17 (definition of "Indenture Trust Estate").

[16] Ex. 4 at § 3.07(e), Appendix A-27 (definition of "Servicer").

[17] *Id*. at Appendix A-27 (definition of "Servicing Fee").

[18] *Id*. at § 3.23(l). *See also id*. at Appendix A-2 (definition of "Affiliate").

[19] *Id*. at § 8.01(c), Appendix A-24 (definitions of "Purchase Amount" and "Purchased Student Loans").

[20] *See, e.g.*, *id*. at §§ 3.07(c), (f), Appendix A-18, A-22 (definitions of "Interested Noteholder" and "Outstanding Amount").

[21] The Issuers have admitted that VCG controls Odyssey, the Owners, and the Issuers. *See* ex. 7 at ¶¶ 2, 18, 19.

[22] Ex. 8 at 1, § 2.B. A "Defaulted Loan" under the Odyssey Agreement is a "[Loan] owned by a Trust for which the borrower of such [Loan] has failed to repay such [Loan] according to the terms agreed to in the applicable controlling loan documents and agreements, provided however,

are "Delinquent Loans" as defined under the SSA because they are Loans in default for at least 31 days. As such, any "Defaulted Loan" or "Loan Eligible For Sale" that would be serviced by Odyssey under the Odyssey Agreement, is already subject to the SSA's special servicing provisions.

The Odyssey Agreement's most notable characteristic is that it allows Odyssey itself to purchase certain Defaulted Loans for ten-percent below market prices (a "Below Market Sale").[23]

### B.  Odyssey seeks reimbursement from the Indenture Trust Estate for $1.46 million in alleged servicing expenses, though Odyssey never serviced any Loans.

On December 8, 2015 the Issuers submitted $1.46 million in invoices from Odyssey for payment from the Indenture Trust Estate (the "Odyssey Invoices"). Each Odyssey Invoice seeks "Reimbursement of Expenses" in varying amounts on a monthly basis from January 2015- February 2016.[24] The Issuers refused to provide any explanation as to what these "expenses" were actually for.[25] But, in response to an interrogatory, the Issuers revealed that the Odyssey Invoices relate to various categories of fixed monthly expenses purportedly incurred by Odyssey in its capacity as servicer under the Odyssey Agreement.[26] To date, however, Odyssey has not

---

that such [sic] Borrower shall have been delinquent in its repayment obligations for no less than 31 days[.]" *Id*. at 1. A "Loan Eligible For Sale" is a "[Loan] owned by a Trust for which the borrower of such [Loan] has failed to repay such [Loan] according to the terms agreed to in the applicable controlling loan documents and agreements, and such [sic] Borrower(s) shall have been delinquent in its repayment obligations for no less than 180 days." *Id*.

[23] *Id*. at § 2.C. The Odyssey Agreement permits Below Market Sales to Odyssey at ten percent below market prices, where market prices are determined by either the highest bid received from three bidders, or by taking the average of two appraisals. *Id*.

[24] *See* ex. 9.

[25] *See* ex. 10.

[26] Ex. 11 at 4-6. By far the largest of these fixed monthly expenses was for "salaries & fringe expenses," which according to the Issuers includes salaries and wages, holiday pay, overtime pay, employee incentive pay, sick pay, payroll tax, severance pay, insurance and 401k benefits, and workers compensation. *Id*. The Issuers, however, have been unable to locate or produce any documents showing these expenses. *See* ex. 12. ("We are continuing to investigate if there are documents responsive to your request concerning the invoices, but have not located any.")

"serviced" (i.e. collected money from) any of the Loans.[27] No money has been tendered to Odyssey or the Trusts in response to the Odyssey Invoices, though the funds necessary to pay the Odyssey Invoices has been set aside by the Indenture Trustee pending the Court's instruction.

## STANDARD OF REVIEW & GOVERNING LAW

**I.    Summary judgment is appropriate because this motion raises purely-legal questions of contractual interpretation.**

Summary judgment is appropriate on questions of contractual interpretation in a Trust Instructional Proceeding. *See, e.g.*, *In re JER CRE CDO 2005-1*, 2013 U.S. Dist. LEXIS 182663 (S.D.N.Y. Dec. 31, 2013). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 475, 586-87 (1986). A factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50. Here, summary judgment is appropriate because this motion presents only legal questions of contractual interpretation.

**II.   New York law controls interpretation of the agreements at issue.**

The choice-of-law analysis applicable to this matter is straightforward. This proceeding originated in Minnesota state court, was removed to the U.S. District Court for the District of Minnesota based on diversity jurisdiction, and was then transferred to this Court. This Court, therefore, applies the District of Minnesota's choice-of-law rules to this matter. *Ferens v. John*

---

[27] Ex. 7 at ¶35.

*Deere Co.*, 494 U.S. 516, 523 (U.S. 1990). As this is a diversity case, the District of Minnesota would apply Minnesota's choice-of-law rules. *In re Am. Home Mortg. Inv. Trust 2005-2*, 2014 U.S. Dist. LEXIS 111867, at *28 (S.D.N.Y. July 24, 2014). Under Minnesota's choice-of-law rules, parties may agree that another state's law will govern their agreement. *See Davis v. Furlong*, 328 N.W.2d 150, 153 (Minn. 1983). Here, all relevant agreements—the Indentures, the SSA, and the Odyssey Agreement—contain New York choice-of-law provisions.[28] This Court, therefore, must apply New York law when interpreting the contracts at-issue.

### LEGAL ARGUMENT

I. **Odyssey's appointment is invalid because the Odyssey Agreement would amend or modify the Basic Documents without satisfying conditions precedent.**

Both the SSA and the Indentures are Basic Documents and, as such, cannot be waived, amended, modified, supplemented or terminated without satisfying certain express conditions precedent, namely Trustee and Noteholder Approval. Here, the Odyssey Agreement would waive, amend, modify, supplement, or terminate provision of the SSA and/or Indentures. And, because Trustee and Noteholder Approval was not obtained, the Odyssey Agreement "must be deemed illegal" and "its provisions cannot be legally enforced." *President & Fellows of Harvard College v. Glancy*, 2003 Del. Ch. LEXIS 25, at *63-64 (Del. Ch. Mar. 21, 2003).

A. **The Odyssey Agreement is invalid because it would modify the terms of the SSA without Trustee and Noteholder Approval.**

The Trustee and Noteholder Approval Requirement is one of the key protections the Indentures provide to the Noteholders. The Basic Documents are the core documents governing the Noteholders' investments and the Indenture Trust Estate and grant the Noteholders and the Indenture Trustee certain rights and protections. The Trustee and Noteholder Approval

---

[28] Ex. 6 at § 22.B. *See also* ex. 8 at § 21.B. *See also* ex. 4 at § 11.13.

Requirement ensures that these Basic Documents—along with the rights and protections they provide—cannot be modified without the Noteholders' consent.[29]

But the Odyssey agreement would do exactly that. Since 2009, all Defaulted Loans have been serviced under the SSA and its related sub-servicing agreements. The Odyssey Agreement, however, would allow Odyssey to service Defaulted Loans that would otherwise be serviced under the SSA and its related sub-servicing agreements. This may not be problematic if the Odyssey Agreement's terms were substantially identical to the SSA's. But the Odyssey Agreement does not mirror the SSA's terms. Instead, it effectively modifies the SSA by materially weakening or eliminating numerous rights and protections the SSA provides to the Noteholders and Indenture Trustee.

Specifically, the Odyssey Agreement modifies the SSA in at least five ways:

1) By allowing Defaulted Loans to be sold at below-market value;

2) By weakening the Noteholder's and Indenture Trustee's indemnification rights with respect to Defaulted Loan servicing;

3) By weakening the Noteholders' and Indenture Trustee's ability to remove Odyssey for cause;

4) By weakening protections in the event Odyssey's parent company encounters financial hardship; and

5) By eliminating the requirement that the Administrator consent to any amendments.

*First*, while the SSA does not allow Loans to be sold, the Odyssey Agreement allows Odyssey to sell Loans to itself at below-market value.[30]

*Second*, the Odyssey Agreement modifies the SSA by weakening the Noteholders' and

---

[29] *See* ex. 4 at Appendix A-5, A-27 (definitions of "Basic Documents" and "Servicing Agreement"). *See also* ex. 2 at 1, 2, 8, 9, 15, 16, 21, 22, 28, 29. *See also* ex. 6 at § 3. ("[T]he definition of "Servicing Agreement" in each of the Indentures shall include this Agreement.")
[30] *See* ex. 6. *See also* ex. 8 at § 2.C.

Indenture Trustee's indemnification rights. The SSA provides for indemnification arising from the Special Servicer's "willful misconduct, negligence or bad faith,"[31] while the Odyssey Agreement only provides indemnification arising from Odyssey's "willful misconduct, *gross* negligence or bad faith."[32]

*Third*, the Odyssey Agreement modifies the SSA by weakening the Noteholders' and Indenture Trustee's ability to remove Odyssey for cause. Under the SSA, the Indenture Trustee "shall" remove the Special Servicer upon the occurrence of certain specified defaults.[33] Under the Odyssey Agreement, however, the Indenture Trustee "shall have the right" to remove Odyssey upon the occurrence of certain specified defaults, but only "with the prior written consent of the [Issuer]."[34]

*Fourth*, the Odyssey Agreement modifies the SSA by providing the Indenture Trustee and the Noteholders materially weaker protections in the event Odyssey's parent company encounters financial hardship. Under the SSA, the Special Servicer is removed if its parent cannot pay its debts or reports that it has less than $30 million in cash on hand.[35] The Odyssey Agreement, in contrast, contains no analogous protection with regard to Odyssey's parent company.[36]

And *fifth*, while the SSA cannot be amended without the Administrator's written consent,[37] amending the Odyssey Agreement only requires the consent of the Issuers (who control Odyssey).[38] Such modifications require Trustee and Noteholder Approval.

---

[31] Ex. 6 at § 10.
[32] Ex. 8 at § 9 (emphasis added).
[33] Ex. 6 at § 6.D.
[34] Ex. 8 at § 6.C.
[35] Ex. 6 at § 6.D(iv).
[36] Ex. 8 at § 6.C.
[37] Ex. 6 at § 16.
[38] Ex. 8 at § 15.

The Delaware Chancery Court's opinion in *Glancy* is instructive regarding the validity of later-executed contracts (like the Odyssey Agreement) unilaterally modifying pre-existing contracts (like the SSA and Indentures) in violation of an amendment-approval requirement. In *Glancy*, the Chancery Court considered whether a Shareholder Agreement improperly amended a pre-existing Voting Trust Agreement, where the Voting Trust Agreement required that any amendment be approved by all shareholders whose shares were deposited in the voting trust, and by the University of Washington. *Id*. at *37. The Court found that the Shareholder Agreement "had the effect of altering the original terms of the Voting Trust, and therefore…must be considered an amendment to the Voting Trust Agreement." *Id*. at *39. The Court then held that "[t]he Voting Trust Agreement explicitly required the University of Washington's approval of any amendments," "the University of Washington was never consulted about this amendment," and therefore the Shareholder Agreement "must be deemed illegal" and "its provisions cannot be legally enforced." *Id*. at *63-64.

*Glancy's* facts mirror the facts of this proceeding. Like the Voting Trust Agreement in *Glancy*, the SSA is a preexisting agreement that, by virtue of being classified as a Basic Document, cannot be amended without certain parties' consent. And, like the Shareholder Agreement in *Glancy*, the Odyssey Agreement effectively amends the SSA by altering the terms on which Defaulted Loans are serviced without the requisite approvals. Consequently, like the agreement in *Glancy*, the Odyssey Agreement "must be deemed illegal" and "its provisions cannot be legally enforced." 2003 Del. Ch. LEXIS at *63-64.

### B. The Odyssey Agreement is invalid because the Issuers did not satisfy the SSA Rating Agency Condition for appointing a successor special servicer.

In addition to the Issuers' failure to obtain Trustee and Noteholder Approval, Odyssey's appointment was also invalid for failure to satisfy the SSA Rating Agency Condition. Under the

SSA, appointing a successor special servicer requires satisfaction of the SSA Rating Agency Condition. Here, the Odyssey Agreement effectively appoints Odyssey as a successor special servicer. This is demonstrated by the fact that the Odyssey Agreement allows Odyssey to service Defaulted Loans that would otherwise be serviced under the SSA and its related sub-servicing agreements.[39] And, given that the SSA clearly contemplates an ***ongoing*** (as opposed to a static) mechanism whereby Loans become subject to the SSA and its related sub-servicing agreements as they go into default, Odyssey will effectively succeed the Special Servicer with respect to any newly defaulted Loans Odyssey services because, as the Issuers admit, those Loans will be serviced under the Odyssey Agreement, not the SSA.[40] The Issuers also admit that they did not satisfy the SSA Rating Agency Condition.[41] Accordingly, Odyssey's appointment was invalid because it attempts to appoint Odyssey as a successor special servicer without satisfying the SSA Rating Agency Condition.

### C. Contrary to the Issuers' position, Section 3.14 of the Indentures is either irrelevant or directly conflicts with the Odyssey Agreement.

The Issuers have identified Section 3.14 of the Indentures ("Section 3.14") as providing the contractual justification for the Odyssey Agreement's Below Market Sale scheme.[42] Section 3.14 allows the Indenture Trustee to dispose of Loans to three parties: a guarantor, a seller, and a Servicer.[43] Loans sold to the Servicer must receive "the amount required by the…Servicing Agreement."[44]

---

[39] The Loans defined as "Defaulted Loans" under the Odyssey agreement, are subsumed under Loans defined as "Delinquent Loans" by the SSA.

[40] *See* ex. 7 at ¶ 4 ("Odyssey will service newly defaulted Loans that the Special Servicer is not servicing…No additional Loans are being directed to the Special Servicer.")

[41] *Id*. at ¶ 21.

[42] *See id*. at ¶ 24.

[43] *See* ex. 4 at § 3.14. *See also* ex. 2 at 3-5, 10-12, 17-19, 23-25, 30-32.

[44] Ex. 4 at § 3.14(b). *See also* ex. 2 at 3-4, 10-11, 17-18, 23-24, 30-31.

The Issuers argue that this language allows the Servicer to purchase Loans for whatever price is specified in its servicing agreement. They then reason that, because the Odyssey Agreement declares itself a "Servicing Agreement," Loans can be sold to Odyssey for whatever price is specified in the Odyssey Agreement. The Issuers' interpretation is incorrect as a matter of law because (i) Section 3.14 applies only to Loans disposed of by the Indenture Trustee, not by Odyssey on behalf of the Issuers, and (ii) even if Section 3.14 applies to Loans sold by the Issuers, the Odyssey Agreement's Below Market Sale provisions violate Section 3.14's requirements regarding the price the Servicer must pay when purchasing a Loan.

### 1. Section 3.14 is irrelevant as it only applies to Loans sold by the Indenture Trustee, not by Odyssey on behalf of the Issuers.

"A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *In re Am. Home* at *49; *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. N.Y. 2000). An ambiguity exists only if each party's interpretation is reasonable and does not "strain the contract language beyond its reasonable and ordinary meaning." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989).

Here, by its plain terms, Section 3.14 only applies to "Loans sold, transferred, exchanged or otherwise disposed of ***by the Indenture Trustee***."[45] Loans sold under the Odyssey Agreement, however, could not be characterized as disposed of "by the Indenture Trustee" because Odyssey acts for the Issuers, not for the Indenture Trustee.[46] Any action taken by a Servicer hired by the Issuer, and identified in an Officer's Certificate, which Odyssey was,[47] is considered an action

---

[45] Ex. 4 at § 3.14 (emphasis added). *See also* ex. 2 at 3-5, 10-12, 17-19, 23-25, 30-32.
[46] Any action taken by a Servicer hired by the Issuers, and identified in an Officer's Certificate (which Odyssey was), is considered an action taken by the Issuer. *Id.* at § 3.07(b). *See also* ex. 2 at 3, 10, 17, 23, 30.
[47] *See* ex. 13.

taken by the Issuer.[48] Indeed, the Indenture Trustee is not a party to the Odyssey Agreement, and has no ability to perform under the Odyssey Agreement. Section 3.14, therefore, cannot reasonably be read to apply to Loans transferred by Odyssey on behalf of the Issuers and cannot, therefore, authorize the Odyssey Agreement's Below Market Sale provisions.

Additionally, the fact that other sections of the Indentures allow the Issuers to request that the Indenture Trustee dispose of Loans, but only if the Issuers furnish certain items including an opinion of counsel, suggests that Section 3.14 does not apply to Loans disposed of by the Indenture Trustee at the Issuers' request. For example, section 8.05 requires that the Indenture Trustee receive "seven days' notice," "copies of any instruments involved," and "an Opinion of Counsel" when the Indenture Trustee is "requested by the Issuer" to "release property from the lien of this Indenture, or convey the Indenture Trustee's interest in the same" under section 8.04(a).[49]  But Section 3.14(c) explicitly exempts loans transferred under Section 3.14 from such requirements.[50] These differences indicate that the parties intended to distinguish between Loans disposed of by the Indenture Trustee under Section 3.14 and Loans disposed of by or on behalf of the Issuers. *See Mastrobuono v. Shearson Lehman Hutton,* 514 U.S. 52, 63 (U.S. 1995) ("a document should be read to give effect to all its provisions and to render them consistent with each other."). *See also Proyecfin de Venezuela, S.A. v. Banco Indus. de Venezuela, S.A.*, 760 F.2d 390, 395-396 (2d Cir. N.Y. 1985) ("where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect."). Reading the Indentures as a whole, therefore, demonstrates that Section 3.14 only applies to Loans disposed of by the Indenture Trustee, and not by or at the request of the Issuers.

---

[48] Ex. 4 at § 3.07(b). *See also* ex. 2 at 3, 10, 17, 23, 30.
[49] Ex. 4 at §§ 8.04(a), 8.05. *See also* ex. 2 at 6-7, 13-14, 20, 26-27, 33-34.
[50] Ex. 4 at § 3.14. *See also* ex. 2 at 3-5, 10-12, 17-19, 23-25, 30-32.

### 2.   Alternatively, Section 3.14 does not allow sales at below-market value, making Trustee and Noteholder Approval necessary.

Even if Section 3.14 permits the Issuers to sell Loans to the Servicer, it only contemplates Loans being sold for an amount equal to all outstanding principal and accrued interest for any Loan it purchases ("Full Payment"). Section 3.14 allows the Indenture Trustee to dispose of Loans to three parties: (1) a Guarantee Agency (TERI) under a Guarantee Agreement, (2) a Seller or Depositor under the applicable purchase or sale agreements, or (3) a Servicer. Sales under the first two categories are unequivocally required to be for Full Payment. Section 3.14 also contemplates that sales under the third category—sales to a Servicer for "the amount required by the…Servicing Agreement"—would also be for Full Payment.[51] The definition of "Servicing Agreement" explicitly includes the PHEAA Servicing Agreement, which also unequivocally requires Full Payment.[52]

The interplay between other provisions of the Indentures supports interpreting Section 3.14 to require Full Payment. For example, the Indentures' Granting Clauses assign the Indenture Trustee the right to cause the Servicer to purchase Loans. In such instances, section 8.01(c) requires the Indenture Trustee to deposit the "aggregate Purchase Amount" for Loans purchased by the Servicer into the Collection Account.[53] The "Purchase Amount" is defined as 100 percent of the amount necessary to prepay the Loan, plus accrued interest—in other words, Full Payment. If, as it would under the Odyssey Agreement, the Indenture Trustee receives less than Full Payment for the "Purchased Student Loan," the Indenture Trustee could not deposit "100 percent of the amount

---

[51] *See* ex. 4 at § 3.14(b). *See also* ex. 2 at 2 at 3-4, 10-11, 17-18, 23-24, 30-31.

[52] Ex. 15 at § 4. ("[T]he Servicer shall purchase any such Student Loan by paying to Owner an amount equal to the principal balance and accrued and unpaid interest."). *See also* ex. 16 at § 9. ("[T]he Servicer shall purchase any such Student Loan by paying…an amount equal to the principal balance and all accrued and unpaid interest through the date of purchase.")

[53] *See* ex. 4 at § 8.01(c). *See also id.* at Appendix A-24 (definitions of "Purchase Amount" and "Purchased Student Loans.") *See also* ex. 2 at 5-6, 12-13, 19-20, 25-26, 32-33.

16

necessary to prepay the Loan, plus accrued interest" into the Collection Account. Reading the Indenture as a whole, therefore, demonstrates that sales under Section 3.14 are necessarily for Full Payment.

The Trust Indenture Act (the "TIA") also supports interpreting Section 3.14 to require Full Payment.[54] TIA sections 314(c) and 314(d)(1) (collectively "TIA Section 314") protect Noteholders by requiring that the obligor (here the Issuers) deliver certain certifications and reports regarding the value of collateral the obligor seeks to have released from the lien created by the Indenture. Indenture Section 3.14(c), however, exempts Loans sold under Section 3.14 from TIA Section 314's certification and reporting requirements.[55]

This exemption is telling because, if, as the Issuers argue, the parties that executed the Indentures intended Section 3.14 to allow Loans to be sold for less than Full Payment, exempting such sales from the TIA would be nonsensical. On the other hand, if the parties to the Indenture actually intended that Loans sold per Section 3.14 receive Full Payment, exempting those sales from TIA Section 314 makes sense because TIA Section 314 "is not applicable in any case in which release could not possibly impair the security under the indenture." *Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*, 2000 U.S. Dist. LEXIS 3941, *19 (S.D.N.Y. Mar. 29, 2000). Full Payment makes the Indenture Trust Estate whole (as it has a priority lien), and therefore cannot "impair the security under the indenture." As such, the parties' decision to exempt Section 3.14 sales from TIA Section 314 is a clear indication that they intended that Loans sold pursuant Section 3.14 receive Full Payment, and that they did not intend that Section 3.14 sales would be for indeterminate, variable values as the Odyssey Agreement provides.

---

[54] The TIA is codified at 15 U.S.C. §§ 77aaa–77bbbb. The TIA is incorporated into each Indenture. *See, e.g.*, ex. 4 at 1.
[55] Ex. 4 at § 3.14(c). *See also* ex. 2 at 4, 11, 18, 24, 31.

Lastly, the Prospectus Supplements are consistent with this interpretation and demonstrate that the parties to the Indentures intended that all Loans sold to the Servicer receive Full Payment. The Prospectus Supplements are important because they "disclos[e] all material terms and conditions of the placements of the Notes." *See In re Am. Home* at *50. As such, "[i]n construing the Indenture, [the Court is] required to read [the Indenture] alongside the Prospectus[.]" *In re Am. Home* at *51. While the Prospectus Supplement discloses the risk that borrower pre-payments could lower the amount of interest generated by the Loans, it does not disclose the risk that such pre-payments would be at below-market value.[56] This is because pre-payments necessarily involve payment in full prior to maturity. Accordingly, both the Indentures themselves and the Prospectus Supplement contemplate that sales under Section 3.14 will be for Full Payment. The Odyssey Agreement's Below Market Sale provisions "waive, amend, modify, supplement or terminate" the Indentures' Full Payment requirement, and therefore require Trustee and Noteholder Approval, which the Issuers did not obtain.

## II.   Odyssey should not be reimbursed because it was not validly appointed and did not satisfy the condition precedent to increasing Servicing Fees.

Odyssey's invoices should not be reimbursed for at least two reasons. First, as explained above, Odyssey's appointment was ineffective because Trustee and Noteholder Approval was not obtained and the SSA Rating Agency Condition was not satisfied. As Odyssey was not validly appointed as a Servicer, it cannot as a matter of law earn Servicing Fees. Second, as explained below, even if Odyssey's appointment was valid, Odyssey's Invoices would effectively increase "Servicing Fees" under the Indentures, which the governing agreements prohibit unless the Indenture Rating Agency Condition for increased Servicing Fees is satisfied. Because the Issuers did not satisfy the Indenture Rating Agency Condition for increasing Servicing Fees, Odyssey's

---

[56] *See* ex. 5 at S-60. *See also* ex. 2 at 35-40.

Invoices cannot be reimbursed.

The Indentures provide that Servicing Fees "may be increased upon satisfying the Rating Agency Condition."[57] The Indenture Rating Agency Condition is, therefore, an expressed condition precedent that must be satisfied before Servicing Fees can be increased. *See MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645-646 (N.Y. 2009). The Indenture Rating Agency Condition requires that the Rating Agencies are notified of "any action" for which their approval is sought.[58]

Here, the Odyssey Agreement would effectively increase "Servicing Fees." This is because the existing Servicing Fees, payable under the PHEAA Servicing Agreement and the SSA and related subservicing agreements, represent a percentage of the Loans' outstanding principal balance.[59] The Odyssey Agreement does not modify the existing Servicing Fees, nor does it exempt Loans serviced under the Odyssey Agreement from the aggregate Loan balance used to calculate the existing Servicing Fees.[60] In other words, under the Odyssey Agreement, Odyssey's "Servicing Fees" would not be paid out of the lump sum that makes up the existing Servicing Fees, and the Odyssey Agreement does not reduce this lump sum in an amount commensurate with the Servicing Fees that would be paid to Odyssey. Thus, because the Odyssey Agreement would pay Servicing Fees to Odyssey without reducing the Servicing Fees paid to the existing Servicers, it necessarily increases the total amount of "Servicing Fees" paid from the Indenture Trust Estate.[61]

---

[57] Ex. 4 at Appendix A-27 (definition of "Servicing Fee"). *See also* ex. 2 at 2-3, 9-10, 16-17, 22-23, 29-30.

[58] Ex. 4 at Appendix A-24 (definition of "Rating Agency Condition"). *See also* ex. 2 at 1-2, 8-9, 15-16, 21-22, 28-29.

[59] *See* ex. 6 at § 5. *See also* ex. 14 at § 6.1 "Fee Schedule." *See also* ex. 16 at § 8.01, "Fee Schedule."

[60] *See* ex. 8 at § 5.

[61] Ex. 8 at §§ 2.C(iii), 5.A, 5.B. The Issuers admit that Odyssey would earn a ten percent commission on each Below Market Sale. *See* ex. 11 at 6-8. ("The 10% discount to market

Recognizing this, the Issuers assert that their November 25, 2014 letter to the rating agencies satisfied the Indenture Rating Agency Condition for increased Servicing Fees.[62] This letter, however, does not mention increased Servicing Fees at all, and merely "notif[ies] [each] Agency of the [Issuers'] intention to hire Odyssey as a Servicer."[63] But, formal compliance with an expressed condition precedent is required, and thus the Rating Agency Condition Notice's failure to mention Servicing Fees at all means that the Issuers failed to notify the Rating Agencies of the specific "action" for which their approval was sought. *See MHR Capital* at 646. (Finding that a Bank's informal consent submitted by fax insufficient where condition precedent required that specific consent form be executed.). Accordingly, Odyssey cannot be reimbursed because the Issuers did not satisfy the condition precedent to increasing the existing Servicing Fees.

## CONCLUSION

The Odyssey Agreement is invalid because (1) it would amend or modify the Basic Documents without Trustee and Noteholder Approval and (2) it would appoint a successor Special Servicer without satisfying the SSA Rating Agency Condition. Additionally, Odyssey should not be reimbursed from the Indenture Trust Estate for alleged servicing expenses because (1) Odyssey was never validly appointed as a servicer and (2) the Odyssey Agreement would increase Servicing Fees without satisfying the Indenture Rating Agency Condition. Accordingly, judgment as a matter of law that Odyssey's appointment pursuant to the Odyssey Agreement was invalid and that Odyssey's invoiced expenses should not be paid should be granted.

---

value…represents the compensation that Odyssey is to receive in connection with its services to the [Issuers] in monetizing the Loans Eligible for Sale, and is analogous to the commission that a broker would receive for facilitating the sale of loans to a third party.")

[62] Ex. 7 at ¶ 21.

[63] Ex. 17. The Issuers have not produced a copy of the RAC Notice. In fact, S&P was the only Rating Agency to actually produce a copy of the RAC Notice. It is therefore unknown at this time whether or not Moody's Investor Service or Fitch Ratings received the RAC Notice. Ihrig decl. ¶ 19.

Respectfully submitted,

/s/ John W. Shaw

OF COUNSEL:

Michael A. Collyard

Peter Ihrig

Thomas F. Berndt

ROBINS KAPLAN LLP

800 LaSalle Ave., Suite 2800

Minneapolis, MN 55402

(612) 349-8500

John W. Shaw (No. 3362)

SHAW KELLER LLP

300 Delaware Avenue, Suite 1120

Wilmington, DE 19801

(302) 298-0700

jshaw@shawkeller.com

Attorneys for U.S. Bank

National Association

Dated: March 15, 2017

21