Filed in Second Judicial District Court
2/17/2006 1:09:15 PM
Ramsey County, MN

Servicer on behalf of each Trust, including costs and expenses incurred by the Servicer in establishing and maintaining the Odyssey Collection Account; provided that the fees and expenses of Subservicers with respect to collections on Loans Eligible For Sale and Defaulted Loans shall be paid from such collections prior to remittance to such Odyssey Collection Account, as described in Section 2(B)(vii), 2(B)(x) and 2(c)(vii) above. The reimbursement described in this Section 5(A) with respect to Default Prevention Services (but not with respect to Early Awareness Services) shall not exceed the dollar amount listed for each Trust on Schedule B, attached hereto, in the aggregate per calendar month per respective Trust. The reimbursement described in this Section 5(A) with respect to Early Awareness Services shall not exceed the dollar amount listed for each Trust on Schedule C attached hereto, in the aggregate for each such Trust until its respective Indenture is discharged.

B.    In carrying out the foregoing duties or any of its other obligations under this Agreement, the Servicer may charge a fee for any collection services that it provides and enter into transactions or otherwise deal with any of its affiliates, including, without limitation, collection agency which affiliates may also charge reasonable fees and receive other forms of remuneration, provided however, that the terms of any such transaction or dealings with an affiliate shall be, in the Servicer's opinion, no less favorable to the Trusts than would be available from unaffiliated parties.

Section 6.    Term of Agreement: Resignation and Removal of Servicer.

A. Term. This Agreement shall continue in force with respect to each Trust until the dissolution of such Trust and the payment in full of the Notes under the related Indenture, upon which event this Agreement shall automatically terminate with respect to that Trust.

B. Resignation. Subject to Section 6(D) of this Agreement, the Servicer may resign its duties hereunder by providing the Trust, the Administrator and the Indenture Trustee with at least 10 days' prior written notice.

C. Removal for Cause. Subject to Section 6(D) of this Agreement, the Indenture Trustee shall have the right to remove the Servicer with the prior written consent of the Trust, by delivering to the Servicer written notice of termination if any of the following events shall occur:

(i)    The Servicer shall default in the performance of any of its duties under this Agreement and, after written notice of such default, shall not cure such default within forty-five days (or such longer period as shall be reasonably satisfactory to the Indenture Trustee);

(ii)    A court having jurisdiction in the premises shall enter a decree or order for relief, and such decree or order shall not have been vacated within 60 days, with respect to any involuntary case commenced against the Servicer under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect or shall appoint a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for the Servicer or any substantial part of its property or order the winding-up or liquidation of its affairs; or

(iii)    The Servicer shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, shall consent to the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator or similar official for it or any substantial part of its property, shall consent to the taking of possession by any such official of any substantial part of its property, shall make any general assignment for the benefit of its creditors or shall fail generally to pay its debts as they become due.

The Servicer agrees that if any of the events specified in clauses (ii) or (iii) of this Section shall occur, it shall give written notice thereof to the Trust, each of the Rating Agencies and the Indenture Trustee within two Business Days after the happening of such event. Concurrently with the giving of such notice as provided above (and in any event no later than five (5) Business Days after receipt of such notice of

Filed in Second Judicial District Court
2/16/2016 1:08:15 PM
Ramsey County, MN

termination), the Servicer shall identify any Loans Eligible For Sale and Defaulted Loans still being serviced by it hereunder.

D. <u>Succession</u>. No resignation or removal of the Servicer pursuant to this Section shall be effective until a successor Servicer (which Servicer shall be reasonably acceptable to the Indenture Trustee) shall have agreed in writing to be bound by the terms of this Agreement in the same manner as the Servicer is bound hereunder. The appointment of any successor Servicer shall be effective only after each Rating Agency shall have been given 10 days' prior notice of such proposed appointment and each Rating Agency other than Fitch Ratings (Fitch, Inc.) shall have declared in writing that such appointment will not result in a reduction or withdrawal of the then-current rating of the Notes.

Section 7.     <u>Action upon Termination. Resignation or Removal</u>.     Promptly upon the effective date of termination of this Agreement pursuant to Section 6(A) of this Agreement or the resignation or removal of the Servicer pursuant to Section 6(B) or Section 6(C) of this Agreement, the Servicer shall be entitled to be paid all fees and reimbursable expenses accruing to it to the date of such termination, resignation or removal. The Servicer shall forthwith upon such termination pursuant to Section 6 of this Agreement deliver to the Trusts as appropriate, all property and documents of or relating to the Financed Student Loans then in the custody of the Servicer pursuant to this Agreement. In the event of the resignation or removal of the Servicer pursuant to Section 6 of this Agreement, the Servicer, for a period of not less than 120 days following notice of such resignation or removal, shall cooperate with the Trusts and take all reasonable steps requested to assist the Trusts in making an orderly transfer of the duties of the Servicer to the successor Servicer, as applicable.

Section 8.     <u>Representations and Warranties</u>.     The Servicer hereby makes the following representations and warranties to each of the Trusts:

(i)     <u>Organization and Good Standing</u>. The Servicer is an entity duly organized, validly existing, and in good standing under the laws of its state of incorporation or formation or the laws of the United States, and is in compliance with the laws of each state in which any property is located to the extent necessary to perform its obligations hereunder.

(ii)     <u>No Violation</u>. Neither the execution and delivery by the Servicer of this Agreement, nor the consummation by it of the transactions contemplated hereby, nor the performance of and compliance by the Servicer with the provisions hereof, will conflict with or result in a breach or violation of, or constitute a default (or an event which, with notice or the lapse of time, or both, would constitute a default) under, the organizational documents (its articles of incorporation or charter or by-laws) of the Servicer, any of the provisions of any judgment, decree, demand, or order of any federal, state, or local court binding on the Servicer, or any of the provisions of any indenture, mortgage, contract, instrument, or other document to which the Servicer is a party or by which it is bound, or result in the creation or imposition of any lien, charge, or encumbrance upon any of its properties pursuant to the terms of any indenture, mortgage, contract, instrument, or other document. Neither the execution and delivery by the Servicer of this Agreement, nor the consummation by it of the transactions contemplated hereby, nor the performance of and compliance by the Servicer with the provisions hereof will, to its knowledge, result in a breach of any law, rule or regulation of any federal, state or local governmental or regulatory authority binding on the Servicer. The Servicer is not otherwise in violation of any law, rule, regulation, judgment, decree, demand, or order (of any federal, state or local governmental or regulatory authority or court), which violation, in the Servicer's good faith and reasonable judgment, is likely to affect materially and adversely either its ability to perform its obligations hereunder, or the financial condition of the Servicer.

(iii)     <u>Authorization and Enforceability</u>.     The execution and delivery by the Servicer of this Agreement, the consummation of the transactions contemplated hereby, and the performance and compliance by the Servicer with the terms hereof are within the powers of the Servicer

Filed in Second Judicial District Court
2/17/2006 1:09:15 PM
Ramsey County, MN

and have been duly authorized by all necessary action on the part of the Servicer. All organizational resolutions and consents necessary for the Servicer to enter into and consummate all transactions contemplated hereby have been obtained, This Agreement has been duly executed and delivered by the Servicer and constitutes the legal, valid and binding obligation of the Servicer enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, and other similar laws affecting creditors' rights generally, and to general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law. The Servicer has not failed to obtain any consent, approval, authorization, or order of, or failed to cause any registration or qualification with, any court or regulatory authority or other governmental body having jurisdiction over the Servicer, which consent, approval, authorization, order, registration, or qualification is required for, and the absence of which would materially adversely affect, the legal and valid execution, delivery, and performance of this Agreement by the Servicer,

(iv)    <u>Approvals and Permits</u>.   The Servicer possesses such certificates, authorizations, licenses, and permits issued by the appropriate state, federal, and foreign regulatory agencies or bodies necessary to conduct the business now operated by it, and it has not received any notice of proceedings relating to the revocation or modification of any such certificate, authorization, or permit which, singly or in the aggregate, if the subject of an unfavorable decision, ruling, or finding, would materially and adversely affect the ability of the Servicer to perform its obligations hereunder.

(v)    <u>No Litigation.</u>   No litigation is pending or, to the best of the Servicer's knowledge, threatened against it, which, if determined adversely to the Servicer would prohibit the Servicer from entering into this Agreement or, in the good faith and reasonable judgment of the Servicer, is likely to materially and adversely affect either its ability to perform its obligations hereunder or the financial condition of the Servicer.

(vi)    <u>Standard of Care</u>.   In exercising its duties hereunder, Servicer agrees to use at least the same degree of care that it would use if the Defaulted Loans and Loans Eligible For Sale were Servicer's own property, but no less than a reasonable degree of care.

Section 9.    <u>Indemnification</u>.   The Servicer will indemnify each of the Trusts, the Owner Trustee and the Indenture Trustee and their respective officers, directors, employees and agents for, and hold them harmless against, any losses, liability or expense, including reasonable attorneys' fees and expenses, incurred in the absence of willful misconduct, negligence or bad faith on the part of the Trusts, the Owner Trustee, the Indenture Trustee (as applicable) and any Administrator, Servicer, Sub-Servicer or other agent of or servicer provider to the Trust and any of their agents, arising out of the willful misconduct, gross negligence or bad faith of the Servicer (or its agents) in the performance of the Servicer's duties contemplated by this Agreement; provided that neither the Servicer nor any of its directors, officers, employees or agents shall be liable for any action taken or for refraining from the taking of any action pursuant to instructions or directions from the Trust, the Administrator or the Indenture Trustee or in accordance with this Agreement. To the extent any indemnification amounts are not paid by the Servicer, such amounts shall be paid by each Trust (to the extent permitted under the applicable Indenture as indemnities, fees and expenses of the Servicer paid after the payment of principal and interest) in accordance with the respective Pool Balance of Financed Student Loans then owned by each Trust.

Section 10.    <u>Records: Inspection</u>.   The Servicer shall maintain appropriate books of account and records relating to services performed hereunder, which books of account and records shall be accessible for inspection by the Indenture Trustee at any time during normal business hours. The Servicer hereby grants the Indenture Trustee the right, for so long as any of the Notes remain outstanding, to perform ongoing due diligence review of the Servicer's activities hereunder; provided that, such due diligence be conducted in a reasonable manner, convenient to the Servicer and the Indenture Trustee. All expenses associated with the

Filed in Second Judicial District Court
2/18/2016 1:08:15 PM
Ramsey County, MN

performance of the due diligence review shall be paid by the Trusts and shall be subject to the Monthly Reimbursement Limit described in Section 5(A).

Section 11.    Reporting; Additional Information to be Furnished. On the tenth Business Day after the end of each calendar month, the Servicer shall furnish the Administrator, on behalf of the Trusts, an electronically transferred data file containing a monthly collection report regarding the Loans Eligible For Sale and Defaulted Loans in a form satisfactory to the Administrator. On the tenth Business Day after the end of each calendar month, the Servicer shall furnish the Administrator on behalf of the Trusts an electronically transferred data file containing recovery data for Loans Eligible For Sale and Defaulted Loans owned by each respective Trust and other information as required by Regulation AB, each for investor reporting purposes. The Servicer shall furnish to the Administrator on behalf of the Trusts from time to time such additional information regarding the Loans Eligible For Sale and Defaulted Loans as the Administrator on behalf of the Trusts shall reasonably request.

Section 12.    Subservicing Agreement. The Servicer will cause each subservicing agreement with a Subservicer to contain provisions consistent with this Agreement, including provisions requiring the applicable Subservicer to maintain adequate records and procedures with respect to a Financed Student Loan and its performance. Each subservicing agreement shall be terminable by the Servicer upon thirty days written notice, and shall provide that any successor to the Servicer shall succeed to the Servicer thereunder.

Section 13.    Regulation AB. On or before September 15 of each calendar year beginning in 2015, the Servicer shall deliver to the Administrator any reports, Servicer compliance statements and attestations as may be required pursuant to the terms of any Indenture. In the event the Servicer is required to deliver to the Administrator the documents described in this Section 13, the costs associated with delivering such reports, including the fees and expenses of a registered public accounting firm, shall be borne by the Administrator and reimbursed by the Trusts as a Servicer expense; provided however that the obligation of the Servicer to deliver any such reports shall terminate if such reports are no longer required by Regulation AB.

Section 14.    Security Interest. Each of the Trusts hereby Grants to the Indenture Trustee as of the date hereof, all of the Trust's right, title and interest in and to this Agreement and all present and future claims, demands, causes and chooses in action in respect of this Agreement and all payments on or under and all proceeds of every kind and nature whatsoever in respect of this Agreement. The foregoing Grant is made in trust to secure the payment of principal of and/or interest on, as applicable, and any other amounts owing in respect to the Notes, all as provided in the Indentures. The Indenture Trustee, as Indenture Trustee on behalf of the holders of the Notes, acknowledges such Grant, and accepts the Grant in accordance with the provisions of the Indentures.

Section 15.    Amendments. This Agreement may be amended from time to time by the parties hereto to add additional trusts, provided that any amendment must be accompanied by the written consent of the Trust and upon satisfying the Rating Agency Condition.

Section 16.    Independence of the Servicer. For all purposes of this Agreement, the Servicer shall be an independent contractor and shall not be subject to the supervision of the Trusts with respect to the manner in which it accomplishes the performance of its obligations hereunder. Unless expressly authorized by the Trusts, the Servicer shall have no authority to act for or represent the Trusts, respectively, in any way other than as specified hereunder and shall not otherwise be deemed an agent of the Trusts.

Section 17.    No Joint Venture. Nothing contained in this Agreement (i) shall constitute the Servicer and any of the Trusts as members of any partnership, joint venture, association, syndicate, unincorporated business or other separate entity, (ii) shall be construed to impose any liability as such on any of them, or (iii) shall be deemed to confer on any of them any express, implied or apparent authority to Incur any obligation or liability on behalf of the others.

Filed in Second Judicial District Court
2/17/2016 1:09:15 PM
Ramsey County, MN

Section 18.    Other Activities of the Servicer. Nothing herein shall prevent the Servicer or its Affiliates from engaging in other businesses or, in its or their sole discretion, from acting in a similar capacity as servicer for any other person or entity even though such person or entity may engage in business activities similar to those of the Trusts.

Section 19.    Notices. Any notice, report or other communication given hereunder shall be in writing and addressed as follows:

If to the Servicer, to:

> Odyssey Education Resources LLC
> 800 Corporate Drive,
> Ft. Lauderdale, FL 33334
> Attn: Tom Glanfield

> With a copy to:

> Cook and Sadorf, PL
> 1744 N. Belcher Rd., Suite 150
> Clearwater, FL 33765
> Attn: Rick Sadorf

If to the Trusts, to:

> Wilmington Trust Company
> Rodney Square North
> 1100 North Market Street
> Wilmington, DE 19890-0001
> Attn: Corporate Trust Administration

> With a copy to:

> VCG Securities LLC
> 407 SE 1st Street
> Delray Beach, FL 33483
> Attn: Donald Uderitz

Or to such other address as any party shall have provided to the other parties in writing. Any notice required to be in writing hereunder shall be deemed given if such notice is mailed by certified mail, postage prepaid, sent by overnight courier for next-day delivery or hand-delivered to the address of such party as provided above.

Section 20.    Notice to Noteholders. Promptly upon execution of this Agreement, but in any event no later than 30 days following execution hereof, the Servicer shall deliver to the Indenture Trustee of each of the Trusts an executed copy of this Agreement along with a form of notice to each Noteholder to be distributed to each Noteholder by the Indenture Trustee in accordance with Article XI of each Indenture to the effect that the respective Trust has entered into this Agreement and has appointed Odyssey as Servicer and each Noteholder can request a copy of the Agreement by contacting the Indenture Trustee.

Section 21.    Miscellaneous.

A. Successors and Assigns. This Agreement may not be assigned by the Servicer unless such assignment is previously consented to in writing by the Indenture Trustee and unless each Rating Agency, after having been given 10 days prior notice of such assignment, shall have declared in writing that such assignment will not result in a reduction or withdrawal of the then-current rating of the Notes or Certificates. An assignment with such consent and satisfaction, if accepted by the assignee, shall bind the assignee

Filed in Second Judicial District Court
2/30/2006 1:09:15 PM
Ramsey County, MN

hereunder in the same manner the Servicer is bound hereunder. Notwithstanding the foregoing, this Agreement may be assigned by the Servicer, without the consent of the Indenture Trustee to a corporation or other organization that is a successor (by merger, consolidation or purchase of assets) to the Servicer; provided that such successor organization executes and delivers to the Indenture Trustee and the other parties hereto an agreement in which such corporation or other organization agrees to be bound hereunder in the same manner as the Servicer is bound hereunder. Subject to the foregoing, this Agreement shall bind any such permitted successors or assigns of the parties hereto.

B. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to conflicts of laws provisions thereof (other than Section 5-1401 of the New York General Obligations Law).

C. Headings. The section headings hereof have been inserted for convenience of reference only and shall not be construed to affect the meaning, construction or intent of this Agreement.

D. Counterparts. This Agreement may be executed in counterparts, each of which when so executed shall together constitute but one and the same agreement.

E. Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

F. Limitation of Liability of Owner Trustee. Notwithstanding anything contained herein to the contrary, this instrument has been executed by Wilmington Trust Company, not in its individual capacity but solely in its capacity as Owner Trustee of each of the Trusts, and in no event shall Wilmington Trust Company in its individual capacity or any beneficial owner of the Trusts have any liability for the representations, warranties, covenants, agreements or other obligations of the Trusts hereunder, as to all of which recourse shall be had solely to the assets of the Trusts. For all purposes of this Agreement, in the performance of any duties or obligations of the Trusts hereunder, the Owner Trustee shall be subject to, and entitled to the benefits of, the terms and provisions of Articles VIII, IX and X of the each Trust Agreement of the Trusts.

G. Third Party Beneficiary. The parties hereto acknowledge that the Noteholders, Certificateholders and the Indenture Trustee are express third party beneficiaries hereof and are entitled to enforce their respective rights hereunder as if actually parties hereto.

H. No Petition. The parties hereto will not at any time institute against the Trusts any bankruptcy proceeding under any United States federal or state bankruptcy or similar law in connection with any obligations of the Trusts under any Basic Documents as defined in the Indenture.

I. Grant. Each Trust hereby acknowledges that this Agreement is a "Servicing Agreement" for all purposes of its applicable Indenture. Each Trust hereby grants to the Indenture Trustee, as trustee under each Indenture for the benefit of the Noteholders and other secured parties as applicable under the applicable Indenture, all of its right, title and interest in and to (i) the Agreement; and (ii) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, condemnation awards, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of the foregoing. The Administrator on behalf of each Trust shall take all steps necessary to ensure the perfection and priority of the Indenture Trustee's security interest in the foregoing collateral. By its signature below, the Indenture Trustee on behalf of the Noteholders and other secured parties as applicable, acknowledges such Grant.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

ODYSSEY EDUCATION RESOURCES LLC, as the Servicer

By: _____

Name: Donald Uderitz

Title: Authorized Signatory

Each of the Trusts listed on Schedule A, attached hereto

By: WILMINGTON TRUST COMPANY, not in its individual capacity but solely as Owner Trustee

By: _____

Name: Dorri Costello

Title: Assistant Vice President

ACKNOWLEDGED:

GSS DATA SERVICES, INC., as Administrator

By: _____
Name:
Title:

U.S. BANK NATIONAL ASSOCIATION, as Indenture Trustee for each of the Indentures listed on Schedule A attached hereto

By: _____
Name:
Title:

Filed in Second Judicial District Court
2/16/2016 1:09:15 PM
Ramsey County, MN

## SCHEDULE A

Trusts:

• The National Collegiate Student Loan Trust 2003-1;
• The National Collegiate Student Loan Trust 2004-1;
• The National Collegiate Student Loan Trust 2004-2;
• The National Collegiate Student Loan Trust 2005-1;
• The National Collegiate Student Loan Trust 2005-2; and
• The National Collegiate Student Loan Trust 2005-3.

Indentures:

Each of the following Indentures, as amended or supplemented, entered into by and between U.S. Bank National Association, as Indenture Trustee and:

• The National Collegiate Student Loan Trust 2003-1, dated as of December 1, 2003;
• The National Collegiate Student Loan Trust 2004-1, dated as of June 1, 2004;
• The National Collegiate Student Loan Trust 2004-2, dated as of October 1, 2004;
• The National Collegiate Student Loan Trust 2005-1, dated as of February 1, 2005;
• The National Collegiate Student Loan Trust 2005-2, dated as of June 1, 2005; and
• The National Collegiate Student Loan Trust 2005-3, dated as of October 1, 2005.

TA277

## SCHEDULE B

[Schedule of Default Prevention Services Reimbursement Limits per Trust by Calendar Month]

Filed in Second Judicial District Court
2/37/2006 1:09:15 PM
Ramsey County, MN

# SCHEDULE C

[Schedule of Early Awareness Services Reimbursement Limits per Trust by Calendar Month]

Filed in Second Judicial District Court
2/17/2016 1:09:15 PM
Ramsey County, MN

## Exhibit C

[Opinion of Counsel]

Filed in Second Judicial District Court
2/19/2016 1:08:15 PM
Ramsey County, MN

# CHAITMAN LLP
## 465 PARK AVENUE
## NEW YORK, NY 10022
## (888) 759-1114
#### TELEPHONE & FAX

January 14, 2016

**VIA EMAIL**

U. S. Bank National Association
Corporate Trust Services-SFS
One Federal Street
3rd Floor
Boston, MA 02111

Re:  Opinion of Counsel re: National Collegiate Student Loan Trusts and Odyssey Servicing Agreement

Ladies and Gentlemen:

As special litigation counsel to the Trusts listed on Exhibit A, we have been asked, in accordance with Section 11.01 of the Indenture applicable to each of the named Trusts, to provide an opinion respecting the actions directed in the Officers' Certificate of Issuer related hereto, and in particular the action requesting U.S. Bank National Association, in their capacity as Indenture Trustee, to provide written acknowledgement of the Odyssey Servicing Agreement dated as of December 30, 2014.

As such counsel, we have examined the relevant Indentures, Trust Agreements, the Odyssey Servicing Agreement, and such other documents and papers as we have deemed necessary as a basis for the opinions hereinafter set forth, including such covenants or conditions and the definitions relating therein relating hereto. In all such examinations made by us in connection with this opinion, we have assumed the genuineness of all signatures, the completeness and authenticity of all records and all documents submitted to us as originals, the conformity with the originals of all documents submitted to us as copies thereof and the accuracy of statements as to factual matters made to us in discussions. In rendering this opinion, we have relied, as to all questions of fact material to this opinion, upon certificates of officers and agents of the Owners (as defined in the Indenture of each of the referenced Trusts) and upon the representations made to us by one or more officers or agents of the Owners. Although we have not conducted any independent investigation of, or attempted to verify independently, such factual matters, nothing has come to our attention leading us to question the accuracy of such certificates or representations.

Based upon and subject to the foregoing, we are of the opinion that the execution of the Odyssey Servicing Agreement is authorized and/or permitted by the applicable Indentures and that all conditions precedent to such execution have been complied with.

We are members of the bar of the State of New York and this opinion is limited to the laws of the States of New York and the Federal laws of the United States of America.

{00017954 2 }

TA281

Filed in Second Judicial District Court
2/18/2016 1:09:15 PM
Ramsey County, MN

# CHAITMAN LLP

U.S. Bank National Association
January 14, 2016
Page 2

Our opinions contained herein are rendered only as of the date hereof, and we undertake no obligation to update this letter or the opinions contained herein after the date hereof.

We express no opinion on any matter not discussed in this letter. This letter is rendered for the sole benefit of the addressee hereof, and no other person or entity is entitled to rely hereon. Copies of this letter may not be made available, and this letter may not be quoted or referred to in any other document made available to any other person or entity except to (i) any applicable rating agency, institution providing credit enhancement or liquidity support or governmental authority, (ii) any accountant or attorney for any person or entity entitled hereunder to rely hereon or to whom or which this letter may be made available as provided herein and (iii) as otherwise required by law.

Very truly yours,

Chaitman LLP

Chaitman LLP

TA282

Filed in Second Judicial District Court
2/30/2008 1:09:15 PM
Ramsey County, MN

# EXHIBIT 10

Filed in Second Judicial District Court
2/16/2016 1:08:15 PM
Ramsey County, MN

## ISSUER ORDER

January 20, 2016

GSS Data Services, Inc.
401 West A Street, Suite 1300
San Diego, CA 92101
Attention: Mr. Ken Ruggiero

Re: National Collegiate Student Loan Trusts; Acknowledgement of Odyssey Servicing
Agreement; Payment of Odyssey Invoices

Ladies and Gentlemen:

We refer you to the Administration Agreements (the, "Administration Agreements") for the
National Collegiate Student Loan Trusts listed on Exhibit A (the "Trusts"), by and between
Wilmington Trust Company, not in its individual capacity, but solely as Owner Trustee (the
"Owner Trustee"), U.S. Bank National Association, as Indenture Trustee (the "Indenture
Trustee"), The National Collegiate Funding LLC, as Depositor (the "Depositor") and First
Marblehead Data Services, Inc., as Administrator (the "Administrator"). Capitalized terms used
herein without definition have the meaning assigned to them in the Administration Agreements
and in the Trust Agreements.

The Trusts have entered into a Servicing Agreement (the "Odyssey Servicing Agreement") with
Odyssey Education Resources LLC ("Odyssey") and you have received a copy of the related
Officers' Certificate of Issuer and Opinion of Counsel whereby the Trusts and their counsel have
certified that all conditions precedent for the execution of the Odyssey Servicing Agreement
have been satisfied.

The undersigned Trusts hereby give GSS Data Services, Inc. ("GSS"), as Administrator the
following instructions pursuant to each of the Administration Agreements, effective
immediately:

   i.    GSS is hereby directed to acknowledge the Odyssey Servicing Agreement attached
hereto by executing on the signature line in the space provided therein and return such
executed Servicing Agreement to the Trusts (care of the Owner Trustee) and Odyssey;

  ii.    On behalf of the Trusts, GSS is hereby directed to immediately cause the payment of all
outstanding Odyssey invoices that have been previously submitted to GSS, as the
Administrator, in accordance with the Administration Agreements and the Indentures;

Filed in Second Judicial District Court
2/18/2016 1:08:15 PM
Ramsey County, MN

iii.     On behalf of the Trusts, GSS is hereby directed to timely cause the payment of all ongoing Odyssey invoices that are submitted to GSS, as the Administrator, in accordance with the Administration Agreements and the Indentures;

iv.     GSS is hereby directed to take any and all additional action as may be necessary, advisable, or appropriate to carry out the purpose and intent of this letter, including the preparation of any and all direction, notification or other communication to the Indenture Trustee as necessary or required pursuant to the Indenture.

This Letter is executed and delivered on behalf of the Trusts by Wilmington Trust Company, not in its individual capacity but solely as Owner Trustee of the Trusts, and the statements contained herein are those of the Trusts and not Wilmington Trust Company. Further, Wilmington Trust Company has relied upon the accuracy and completeness of such statements and certifications in its execution and delivery of this Letter on the Authorization and Directions received by the Owners.

Sincerely,

THE NATIONAL COLLEGIATE STUDENT LOAN TRUSTS 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, and 2005-3

BY: WILMINGTON TRUST COMPANY, not in its Individual capacity but solely as Owner Trustee for THE NATIONAL COLLEGIATE STUDENT LOAN TRUSTS 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, and 2005-3

By: _____

Name: Dorri Costello

Title:    Vice President

TA285

Filed in Second Judicial District Court
2/16/2016 1:09:15 PM
Ramsey County, MN

## Exhibit A

- National Collegiate Student Loan Trust 2003-1, created pursuant to the Trust Agreement dated as of December 1, 2003;

- National Collegiate Student Loan Trust 2004-1, created pursuant to the Trust Agreement dated as of June 10, 2004;

- National Collegiate Student Loan Trust 2004-2, created pursuant to the Trust Agreement dated as of October 28, 2004;

- National Collegiate Student Loan Trust 2005-1, created pursuant to the Trust Agreement dated as of February 23, 2005;

- National Collegiate Student Loan Trust 2005-2, created pursuant to the Trust Agreement dated as of June 9, 2005;

- National Collegiate Student Loan Trust 2005-3, created pursuant to the Trust Agreement dated as of October 12, 2005.

Filed in Second Judicial District Court
2/02/2066 1:38:15 PM
Ramsey County, MN

## SERVICING AGREEMENT

This Servicing Agreement, dated as of December 30, 2014 (this "<u>Agreement</u>"), is entered into by and among Odyssey Education Resources LLC ("<u>Odyssey</u>"), as the Servicer (together with its successors and assigns, the "<u>Servicer</u>"), and each of the Trusts listed on <u>Schedule A</u> attached hereto (the "<u>Trusts</u>"). Any capitalized terms used, but not defined herein shall have the meaning given to such term set forth in the Basic Documents (as that term is defined in the Indenture applicable to each such Trust, the "<u>Basic Documents</u>").

WHEREAS, the Trusts desire to, from time to time, dispose of certain defaulted Financed Student Loans;

WHEREAS, pursuant to the Indenture applicable to each Trust, Financed Student Loans may only be sold, transferred or otherwise disposed of to a servicer at a disposition price specified under the applicable Servicing Agreement;

WHEREAS, each of the Trusts has previously appointed other entities as the servicer of certain Financed Student Loans and accordingly Odyssey is likely not performing all of the servicing responsibilities with respect to the Financed Student Loans;

WHEREAS, none of the existing servicers of the Financed Student Loans nor their applicable Servicing Agreements have a mechanism currently in place to dispose of Financed Student Loans;

WHEREAS, Odyssey will utilize employees and agents (appointed from time to time by it, as provided herein) who are experts in the management of collections on and the disposition of Financed Student Loans;

WHEREAS, each of the Trusts is appointing Odyssey as a Servicer under each Trust's respective Trust Agreement, to perform certain limited duties with respect to certain Financed Student Loans owned by the Trusts that are defaulted or Loans Eligible For Sale (as defined below); and

WHEREAS, Servicer is being engaged pursuant hereto to purchase Loans from each Trust as directed or permitted by the applicable Trust.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties agree as follows:

Section 1.    Definitions.    Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Basic Documents. For purposes of this Agreement, the following capitalized terms shall have the respective meanings set forth below:

"<u>Loans Eligible For Sale</u>" means Financed Student Loan(s) owned by a Trust for which the borrower of such Financed Student Loan has failed to repay such Financed Student Loan according to the terms agreed to in the applicable controlling loan documents and agreements, and such Borrower(s) shall have been delinquent in its repayment obligations for no less than 180 days.

"<u>Defaulted Loan</u>" means any Financed Student Loan owned by a Trust for which the borrower of such Financed Student Loan has failed to repay such Financed Student Loan according to the terms agreed to in the applicable controlling loan documents and agreements, provided however, that such Borrower shall have been delinquent in its repayment obligations for no less than 31 days;

"<u>Default Prevention Services</u>" means such services determined by the Servicer to be desirable to collect and seek enforcement of Financed Student Loans that are greater than 30 days past due and less than 180 days past due. Default Prevention Services may include both telephonic and mail correspondence and related monthly reporting.

"Early Awareness Services" means such services determined by the Servicer to be desirable to reduce the number and percentage of Financed Student Loans becoming delinquent in the repayment process prior to the initial payment due date, including without limitation, services that are intended to alert borrowers and co-borrowers to their repayment obligations, available borrower benefits (such as ACH automatic payments) and contact information for the Servicer. Early Awareness Services may include both telephonic and mail contacts, as well as address verification and skip tracing.

Section 2.     Appointment;     Servicing Duties.

A. Appointment. Each of the Trusts hereby hires, designates and appoints the Servicer as a Servicer under each Trust's applicable, respective Indenture to perform the servicing duties (as defined below) with respect to Loans Eligible For Sale and Defaulted Loans, and the Servicer accepts such appointment and agrees to perform such duties with respect to the Loans Eligible For Sale and Defaulted Loans in accordance with the terms of this Agreement and each Indenture.

B. Services. The Servicer shall take such actions as it shall deem reasonably necessary or appropriate to administer and oversee the enforcement and collection of Loans Eligible For Sale and Defaulted Loans, and to provide recommendations to the relevant Trust with respect to those Loans Eligible For Sale to be sold by the terms hereof, to maximize the collection of amounts payable on the Financed Student Loans (collectively, the "Services"), including without limitation:

(i)     Retaining and entering into agreements with licensed collection agencies, loan brokers and other legally authorized persons (the "Subservicers") engaged in providing default prevention and collection services and loan sale services, in form and substance satisfactory to the Servicer, pursuant to which the Subservicers, for and on behalf of the applicable Trust, will contact borrowers with respect to the Loans Eligible For Sale and Defaulted Loans, and seek enforcement and collection of such Loans Eligible For Sale and Defaulted Loans, including without limitation Early Awareness Services and Default Prevention Services when applicable;

(ii)    At the sole discretion of the Servicer, (a) performing periodic audits of Subservicers for compliance and performance reviews and (b) providing oversight of the activities of Subservicers with regard to account management, litigation assistance, and/or settlement strategies;

(iii)   Replacing any Subservicer who, in the sole judgment of the Servicer, is deemed to be deficient or negligent in performing the duties outlined in its subservicing agreement with the Servicer;

(iv)    Requiring in the applicable subservicing agreement that the Subservicers provide certain monthly reports to the Servicer with respect to Loans Eligible For Sale and Defaulted Loans serviced by such Subservicer, in each case, in a form and substance satisfactory to the Servicer;

(v)     With respect to Loans Eligible For Sale and Defaulted Loans, reviewing claim packages as described in subparagraph (xi);

(vi)    With respect to Loans Eligible For Sale and Defaulted Loans being serviced by the Servicer or Subservicers, remitting within two (2) days of receipt to the Odyssey Collection Account (as hereinafter defined) for the receipt of all cash collected by Servicer and for the receipt of collections from a Subservicer for the benefit of the respective Trusts.

(vii)   With respect to Loans Eligible For Sale or Defaulted Loans (a) roll or reassign such loans being serviced by Servicer into a default recovery queue for collection effort or a queue for sale efforts in accordance with the provisions of Section 2(C) below, (b) direct any Subservicer to roll or reassign any loans that become Charge-Off Loans to the Servicer for

Filed in Second Judicial District Court
2/30/2008 1:09:15 PM
Ramsey County, MN

assignment into the queue for sale efforts, and (c) remit within two (2) days of receipt to the Odyssey Collection Account (as hereinafter defined) for the receipt of collections for the benefit of the respective Trusts, as their interests may appear, all cash collected on all Loans Eligible For Sale in the queue for sale until such time as the loan is sold.

(viii)    Reporting to the relevant Trust all Loans Eligible For Sale being held in the queue for purchase; soliciting direction from the Trust as to which loans shall be sold pursuant to the terms of Section 2(C) below.

(ix)    Conduct the sale of all Loans Eligible For Sale in accordance with the provisions or Section 2(C) below.

(x)    Establishing and maintaining an account or accounts (the "Odyssey Collection Account") in the name of the Indenture Trustee (or its agent or custodian), for benefit of the applicable secured parties of the Trusts under the respective Indentures, for the deposit by Servicer and any Subservicer of net collections (including all net proceeds of any sale of Loans Eligible For Sale in accordance with the provisions of 2(C) below) on all Loans Eligible For Sale and Defaulted Loans serviced by Servicer or Subservicer for the respective Trust and in connection therewith, preparing or causing to be prepared such control agreement or agreements as may be necessary or desirable to maintain and preserve the lien and security interest therein of the Indenture Trustee under the respective Indentures;

(xi)    Reviewing claim packages prepared by any Servicer or Subservicer with respect to Loans Eligible For Sale and Defaulted Loans to confirm, on the basis of such review, that (a) the Servicer or Subservicer has complied with applicable servicing guidelines and (b) the loan originator has complied with applicable program guidelines;

(xii)    Receiving reports from Servicers and Subservicers related to payments with respect to Loans Eligible For Sale and Defaulted Loans and updating records with respect to Financed Student Loans as interest and other charges accrue and amounts are collected;

(xiii)    Remitting or causing the Subservicers to remit net collections received on Loans Eligible For Sale and Defaulted Loans to the Odyssey Collection Account;

(xiv)    Retaining counsel on behalf of the applicable Trust (whether directly or through collection agencies) to further pursue enforcement and collection of Loans Eligible For Sale and Defaulted Loans, including through litigation and bankruptcy or probate proceedings; and

(xv)    Negotiating any settlement or compromise of any claim with respect to a Loans Eligible For Sale or Defaulted Loans, which in the reasonable judgment of the Servicer are more likely to produce greater proceeds of collection than by virtue of a forbearance, payment management or other accommodation with the borrower; and

(xvi)    At the sole discretion of the Servicer, identifying, recommending, selling, transferring, exchanging, purchasing or otherwise disposing of Loans Eligible For Sale in accordance with the Basic Documents.

For the avoidance of doubt the parties hereto hereby acknowledge and agree that nothing in this Agreement is intended to nor does it amend the applicable Trust Agreement, Indenture or Administration Agreement for each Trust or limit in any way the Trusts' rights thereunder, including without limitation, the right to direct or restrict the activities of the Servicer.

C. Purchase of Loans Eligible For Sale. The Servicer shall take all such action, as it shall deem reasonably necessary or appropriate to purchase the Loans Eligible For Sale, including without limitation:

(i) Entering into custodial agreements either directly or through agents for the purpose of perfecting a security interest in the Loans Eligible For Sale and to provide for the safekeeping of the Loans Eligible For Sale and all documents and information relating to the Loans Eligible For Sale;

(ii) Preparing all necessary sale documentation including, but not limited to, appropriate terms required for each bidder, the loan purchase agreement and other related documentation required to memorialize and accomplish the sale of the Loans Eligible For Sale;

(iii) In its sole discretion, determining the purchase price for each such Loan Eligible For Sale that it determines to purchase pursuant to the terms hereof based on one of the two following methods: (a) 10% less than the highest bid received pursuant to the Servicer marketing the Loans Eligible For Sale for sale to at least three (3) qualified bidders and conducting the sale process in a manner that, in the sole judgment of the Servicer, will yield the highest and best net proceeds to be paid in exchange for the Loans Eligible For Sale, provided however, that with respect to such sale process, Servicer shall, at a minimum: (i) provide an information packet ("Information Packet") applicable to each sale which describes the loans offered for sale and contains such other customary information applicable to such sale; (ii) in a good faith effort to maximize the proceeds to the Trust from the sale of the Loans, invite a sufficient number of qualified bidders under the circumstances to participate in such sale, and in no event shall the Servicer receive less than three (3) bids from qualified bidders; (iii) establish a time period between the distribution of the Information Packet and the acceptance of bids to allow the prospective bidders to research and analyze the Loans Eligible For Sale; and (iv) hold the sale at a convenient time and in a convenient location or (b) 10% less that the average value established pursuant to the Servicer engaging two (2) reputable appraisers, in the business of appraising loans, to appraise the Loans Eligible for Sale which the Servicer intends to purchase;

(iv) Notifying the Relevant Trust and the Administrator that each of the Loans Eligible For Sale sold pursuant to the Loan Sale is a Liquidated Student Loan pursuant to the Basic Documents;

(v) Simultaneous with the Loan Sale, remitting or causing the Subservicers to remit the Liquidation Proceeds and all Recoveries associated with the Liquidated Student Loans to the Odyssey Collection Account.

Section 3. Incorporation. As of the date hereof, the definition of "Servicing Agreement" in each of the Indentures shall include this Agreement, the definition of "Servicer" in each of the Indentures shall include the Servicer and any Servicing Fee and other fees and expenses payable under this Agreement to the Servicer shall be a "Servicing Fee" for purposes each of the Indentures.

Section 4. Subservicers. In carrying out its duties under this Agreement with respect to the Loans Eligible For Sale and Defaulted Loans, the Servicer may retain and employ Subservicers to perform any of the Services with respect to the Financed Student Loans owned by any of the Trusts, and to commence any actions or proceedings the Subservicers deem necessary or appropriate in connection with such enforcement or collection efforts on such Loans Eligible For Sale and Defaulted Loans.

Section 5. Servicing Fee; Reimbursement for Expenses. As compensation for the performance of the Servicer's obligations under this Agreement and as reimbursement for its expenses related thereto, the Servicer shall be entitled to a fee and expense reimbursement (the "Servicing Fee") payable from each Trust in accordance with the related Indenture on each Distribution Date consisting of:

A. Reimbursement by each Trust for all of the Servicer's expenses incurred in performing its obligations hereunder for such Trust, including all fees and expenses of all Subservicers and other persons appointed as agents of the Servicer pursuant to this Agreement and any other expenses incurred by the

TA290

Filed in Second Judicial District Court
2/18/2016 1:08:15 PM
Ramsey County, MN

Servicer on behalf of each Trust, including costs and expenses incurred by the Servicer in establishing and maintaining the Odyssey Collection Account; provided that the fees and expenses of Subservicers with respect to collections on Loans Eligible For Sale and Defaulted Loans shall be paid from such collections prior to remittance to such Odyssey Collection Account, as described in Section 2(B)(vii), 2(B)(x) and 2(c)(vii) above. The reimbursement described in this Section 5(A) with respect to Default Prevention Services (but not with respect to Early Awareness Services) shall not exceed the dollar amount listed for each Trust on Schedule B, attached hereto, in the aggregate per calendar month per respective Trust. The reimbursement described in this Section 5(A) with respect to Early Awareness Services shall not exceed the dollar amount listed for each Trust on Schedule C attached hereto, in the aggregate for each such Trust until its respective Indenture is discharged.

B.  In carrying out the foregoing duties or any of its other obligations under this Agreement, the Servicer may charge a fee for any collection services that it provides and enter into transactions or otherwise deal with any of its affiliates, including, without limitation, collection agency which affiliates may also charge reasonable fees and receive other forms of remuneration, provided however, that the terms of any such transaction or dealings with an affiliate shall be, in the Servicer's opinion, no less favorable to the Trusts than would be available from unaffiliated parties.

Section 6.  Term of Agreement: Resignation and Removal of Servicer.

A. Term. This Agreement shall continue in force with respect to each Trust until the dissolution of such Trust and the payment in full of the Notes under the related Indenture, upon which event this Agreement shall automatically terminate with respect to that Trust.

B. Resignation. Subject to Section 6(D) of this Agreement, the Servicer may resign its duties hereunder by providing the Trust, the Administrator and the Indenture Trustee with at least 10 days' prior written notice.

C. Removal for Cause. Subject to Section 6(D) of this Agreement, the Indenture Trustee shall have the right to remove the Servicer with the prior written consent of the Trust, by delivering to the Servicer written notice of termination if any of the following events shall occur:

(i)  The Servicer shall default in the performance of any of its duties under this Agreement and, after written notice of such default, shall not cure such default within forty-five days (or such longer period as shall be reasonably satisfactory to the Indenture Trustee);

(ii)  A court having jurisdiction in the premises shall enter a decree or order for relief, and such decree or order shall not have been vacated within 60 days, with respect to any involuntary case commenced against the Servicer under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect or shall appoint a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for the Servicer or any substantial part of its property or order the winding-up or liquidation of its affairs; or

(iii)  The Servicer shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, shall consent to the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator or similar official for it or any substantial part of its property, shall consent to the taking of possession by any such official of any substantial part of its property, shall make any general assignment for the benefit of its creditors or shall fail generally to pay its debts as they become due.

The Servicer agrees that if any of the events specified in clauses (ii) or (iii) of this Section shall occur, it shall give written notice thereof to the Trust, each of the Rating Agencies and the Indenture Trustee within two Business Days after the happening of such event. Concurrently with the giving of such notice as provided above (and in any event no later than five (5) Business Days after receipt of such notice of

Filed in Second Judicial District Court
2/18/2016 1:09:15 PM
Ramsey County, MN

termination), the Servicer shall identify any Loans Eligible For Sale and Defaulted Loans still being serviced by it hereunder.

D. Succession. No resignation or removal of the Servicer pursuant to this Section shall be effective until a successor Servicer (which Servicer shall be reasonably acceptable to the Indenture Trustee) shall have agreed in writing to be bound by the terms of this Agreement in the same manner as the Servicer is bound hereunder. The appointment of any successor Servicer shall be effective only after each Rating Agency shall have been given 10 days' prior notice of such proposed appointment and each Rating Agency other than Fitch Ratings (Fitch, Inc.) shall have declared in writing that such appointment will not result in a reduction or withdrawal of the then-current rating of the Notes.

Section 7.    Action upon Termination, Resignation or Removal.   Promptly upon the effective date of termination of this Agreement pursuant to Section 6(A) of this Agreement or the resignation or removal of the Servicer pursuant to Section 6(B) or Section 6(C) of this Agreement, the Servicer shall be entitled to be paid all fees and reimbursable expenses accruing to it to the date of such termination, resignation or removal. The Servicer shall forthwith upon such termination pursuant to Section 6 of this Agreement deliver to the Trusts as appropriate, all property and documents of or relating to the Financed Student Loans then in the custody of the Servicer pursuant to this Agreement. In the event of the resignation or removal of the Servicer pursuant to Section 6 of this Agreement, the Servicer, for a period of not less than 120 days following notice of such resignation or removal, shall cooperate with the Trusts and take all reasonable steps requested to assist the Trusts in making an orderly transfer of the duties of the Servicer to the successor Servicer, as applicable.

Section 8.    Representations and Warranties.    The Servicer hereby makes the following representations and warranties to each of the Trusts:

(i)    Organization and Good Standing. The Servicer is an entity duly organized, validly existing, and in good standing under the laws of its state of incorporation or formation or the laws of the United States, and is in compliance with the laws of each state in which any property is located to the extent necessary to perform its obligations hereunder.

(ii)    No Violation. Neither the execution and delivery by the Servicer of this Agreement, nor the consummation by it of the transactions contemplated hereby, nor the performance of and compliance by the Servicer with the provisions hereof, will conflict with or result in a breach or violation of, or constitute a default (or an event which, with notice or the lapse of time, or both, would constitute a default) under, the organizational documents (its articles of incorporation or charter or by-laws) of the Servicer, any of the provisions of any judgment, decree, demand, or order of any federal, state, or local court binding on the Servicer, or any of the provisions of any indenture, mortgage, contract, instrument, or other document to which the Servicer is a party or by which it is bound, or result in the creation or imposition of any lien, charge, or encumbrance upon any of its properties pursuant to the terms of any indenture, mortgage, contract, instrument, or other document. Neither the execution and delivery by the Servicer of this Agreement, nor the consummation by it of the transactions contemplated hereby, nor the performance of and compliance by the Servicer with the provisions hereof will, to its knowledge, result in a breach of any law, rule or regulation of any federal, state or local governmental or regulatory authority binding on the Servicer. The Servicer is not otherwise in violation of any law, rule, regulation, judgment, decree, demand, or order (of any federal, state or local governmental or regulatory authority or court), which violation, in the Servicer's good faith and reasonable judgment, is likely to affect materially and adversely either its ability to perform its obligations hereunder, or the financial condition of the Servicer.

(iii)    Authorization and Enforceability.    The execution and delivery by the Servicer of this Agreement, the consummation of the transactions contemplated hereby, and the performance and compliance by the Servicer with the terms hereof are within the powers of the Servicer

Filed in Second Judicial District Court
2/30/2006 11:09:16 AM
Ramsey County, MN

and have been duly authorized by all necessary action on the part of the Servicer. All organizational resolutions and consents necessary for the Servicer to enter into and consummate all transactions contemplated hereby have been obtained, This Agreement has been duly executed and delivered by the Servicer and constitutes the legal, valid and binding obligation of the Servicer enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, and other similar laws affecting creditors' rights generally, and to general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law. The Servicer has not failed to obtain any consent, approval, authorization, or order of, or failed to cause any registration or qualification with, any court or regulatory authority or other governmental body having jurisdiction over the Servicer, which consent, approval, authorization, order, registration, or qualification is required for, and the absence of which would materially adversely affect, the legal and valid execution, delivery, and performance of this Agreement by the Servicer,

(iv)     Approvals and Permits.   The Servicer possesses such certificates, authorizations, licenses, and permits issued by the appropriate state, federal, and foreign regulatory agencies or bodies necessary to conduct the business now operated by it, and it has not received any notice of proceedings relating to the revocation or modification of any such certificate, authorization, or permit which, singly or in the aggregate, if the subject of an unfavorable decision, ruling, or finding, would materially and adversely affect the ability of the Servicer to perform its obligations hereunder.

(v)      No Litigation.   No litigation is pending or, to the best of the Servicer's knowledge, threatened against it, which, if determined adversely to the Servicer would prohibit the Servicer from entering into this Agreement or, in the good faith and reasonable judgment of the Servicer, is likely to materially and adversely affect either its ability to perform its obligations hereunder or the financial condition of the Servicer.

(vi)     Standard of Care.   In exercising its duties hereunder, Servicer agrees to use at least the same degree of care that it would use if the Defaulted Loans and Loans Eligible For Sale were Servicer's own property, but no less than a reasonable degree of care.

Section 9.      Indemnification.   The Servicer will indemnify each of the Trusts, the Owner Trustee and the Indenture Trustee and their respective officers, directors, employees and agents for, and hold them harmless against, any losses, liability or expense, including reasonable attorneys' fees and expenses, incurred in the absence of willful misconduct, negligence or bad faith on the part of the Trusts, the Owner Trustee, the Indenture Trustee (as applicable) and any Administrator, Servicer, Sub-Servicer or other agent of or servicer provider to the Trust and any of their agents, arising out of the willful misconduct, gross negligence or bad faith of the Servicer (or its agents) in the performance of the Servicer's duties contemplated by this Agreement; provided that neither the Servicer nor any of its directors, officers, employees or agents shall be liable for any action taken or for refraining from the taking of any action pursuant to instructions or directions from the Trust, the Administrator or the Indenture Trustee or in accordance with this Agreement. To the extent any indemnification amounts are not paid by the Servicer, such amounts shall be paid by each Trust (to the extent permitted under the applicable Indenture as indemnities, fees and expenses of the Servicer paid after the payment of principal and interest) in accordance with the respective Pool Balance of Financed Student Loans then owned by each Trust.

Section 10.      Records: Inspection.   The Servicer shall maintain appropriate books of account and records relating to services performed hereunder, which books of account and records shall be accessible for inspection by the Indenture Trustee at any time during normal business hours. The Servicer hereby grants the Indenture Trustee the right, for so long as any of the Notes remain outstanding, to perform ongoing due diligence review of the Servicer's activities hereunder; provided that, such due diligence be conducted in a reasonable manner, convenient to the Servicer and the Indenture Trustee. All expenses associated with the

Filed in Second Judicial District Court
2/18/2016 1:06:15 RM
Ramsey County, MN

performance of the due diligence review shall be paid by the Trusts and shall be subject to the Monthly Reimbursement Limit described in Section 5(A).

Section 11.    Reporting; Additional Information to be Furnished. On the tenth Business Day after the end of each calendar month, the Servicer shall furnish the Administrator, on behalf of the Trusts, an electronically transferred data file containing a monthly collection report regarding the Loans Eligible For Sale and Defaulted Loans in a form satisfactory to the Administrator. On the tenth Business Day after the end of each calendar month, the Servicer shall furnish the Administrator on behalf of the Trusts an electronically transferred data file containing recovery data for Loans Eligible For Sale and Defaulted Loans owned by each respective Trust and other information as required by Regulation AB, each for investor reporting purposes. The Servicer shall furnish to the Administrator on behalf of the Trusts from time to time such additional information regarding the Loans Eligible For Sale and Defaulted Loans as the Administrator on behalf of the Trusts shall reasonably request.

Section 12.    Subservicing Agreement. The Servicer will cause each subservicing agreement with a Subservicer to contain provisions consistent with this Agreement, including provisions requiring the applicable Subservicer to maintain adequate records and procedures with respect to a Financed Student Loan and its performance. Each subservicing agreement shall be terminable by the Servicer upon thirty days written notice, and shall provide that any successor to the Servicer shall succeed to the Servicer thereunder.

Section 13.    Regulation AB. On or before September 15 of each calendar year beginning in 2015, the Servicer shall deliver to the Administrator any reports, Servicer compliance statements and attestations as may be required pursuant to the terms of any Indenture. In the event the Servicer is required to deliver to the Administrator the documents described in this Section 13, the costs associated with delivering such reports, including the fees and expenses of a registered public accounting firm, shall be borne by the Administrator and reimbursed by the Trusts as a Servicer expense; provided however that the obligation of the Servicer to deliver any such reports shall terminate if such reports are no longer required by Regulation AB.

Section 14.    Security Interest. Each of the Trusts hereby Grants to the Indenture Trustee as of the date hereof, all of the Trust's right, title and interest in and to this Agreement and all present and future claims, demands, causes and chooses in action in respect of this Agreement and all payments on or under and all proceeds of every kind and nature whatsoever in respect of this Agreement. The foregoing Grant is made in trust to secure the payment of principal of and/or interest on, as applicable, and any other amounts owing in respect to the Notes, all as provided in the Indentures. The Indenture Trustee, as Indenture Trustee on behalf of the holders of the Notes, acknowledges such Grant, and accepts the Grant in accordance with the provisions of the Indentures.

Section 15.    Amendments. This Agreement may be amended from time to time by the parties hereto to add additional trusts, provided that any amendment must be accompanied by the written consent of the Trust and upon satisfying the Rating Agency Condition.

Section 16.    Independence of the Servicer. For all purposes of this Agreement, the Servicer shall be an independent contractor and shall not be subject to the supervision of the Trusts with respect to the manner in which it accomplishes the performance of its obligations hereunder. Unless expressly authorized by the Trusts, the Servicer shall have no authority to act for or represent the Trusts, respectively, in any way other than as specified hereunder and shall not otherwise be deemed an agent of the Trusts.

Section 17.    No Joint Venture. Nothing contained in this Agreement (i) shall constitute the Servicer and any of the Trusts as members of any partnership, joint venture, association, syndicate, unincorporated business or other separate entity, (ii) shall be construed to impose any liability as such on any of them, or (iii) shall be deemed to confer on any of them any express, implied or apparent authority to incur any obligation or liability on behalf of the others.

TA294

Filed in Second Judicial District Court
2/16/2016 1:09:15 PM
Ramsey County, MN

Section 18.    Other Activities of the Servicer. Nothing herein shall prevent the Servicer or its Affiliates from engaging in other businesses or, in its or their sole discretion, from acting in a similar capacity as servicer for any other person or entity even though such person or entity may engage in business activities similar to those of the Trusts.

Section 19.    Notices. Any notice, report or other communication given hereunder shall be in writing and addressed as follows:

If to the Servicer, to:

  Odyssey Education Resources LLC
  800 Corporate Drive,
  Ft. Lauderdale, FL 33334
  Attn: Tom Glanfield

  With a copy to:

  Cook and Sadorf, PL
  1744 N. Belcher Rd., Suite 150
  Clearwater, FL 33765
  Attn: Rick Sadorf

If to the Trusts, to:

  Wilmington Trust Company
  Rodney Square North
  1100 North Market Street
  Wilmington, DE 19890-0001
  Attn: Corporate Trust Administration

  With a copy to:

  VCG Securities LLC
  407 SE 1st Street
  Delray Beach, FL 33483
  Attn: Donald Uderitz

Or to such other address as any party shall have provided to the other parties in writing. Any notice required to be in writing hereunder shall be deemed given if such notice is mailed by certified mail, postage prepaid, sent by overnight courier for next-day delivery or hand-delivered to the address of such party as provided above.

Section 20.    Notice to Noteholders. Promptly upon execution of this Agreement, but in any event no later than 30 days following execution hereof, the Servicer shall deliver to the Indenture Trustee of each of the Trusts an executed copy of this Agreement along with a form of notice to each Noteholder to be distributed to each Noteholder by the Indenture Trustee in accordance with Article XI of each Indenture to the effect that the respective Trust has entered into this Agreement and has appointed Odyssey as Servicer and each Noteholder can request a copy of the Agreement by contacting the Indenture Trustee.

Section 21.    Miscellaneous.

A. Successors and Assigns. This Agreement may not be assigned by the Servicer unless such assignment is previously consented to in writing by the Indenture Trustee and unless each Rating Agency, after having been given 10 days prior notice of such assignment, shall have declared in writing that such assignment will not result in a reduction or withdrawal of the then-current rating of the Notes or Certificates. An assignment with such consent and satisfaction, if accepted by the assignee, shall bind the assignee

TA295

hereunder in the same manner the Servicer is bound hereunder. Notwithstanding the foregoing, this Agreement may be assigned by the Servicer, without the consent of the Indenture Trustee to a corporation or other organization that is a successor (by merger, consolidation or purchase of assets) to the Servicer; provided that such successor organization executes and delivers to the Indenture Trustee and the other parties hereto an agreement in which such corporation or other organization agrees to be bound hereunder in the same manner as the Servicer is bound hereunder. Subject to the foregoing, this Agreement shall bind any such permitted successors or assigns of the parties hereto.

B. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to conflicts of laws provisions thereof (other than Section 5-1401 of the New York General Obligations Law).

C. Headings. The section headings hereof have been inserted for convenience of reference only and shall not be construed to affect the meaning, construction or intent of this Agreement.

D. Counterparts. This Agreement may be executed in counterparts, each of which when so executed shall together constitute but one and the same agreement.

E. Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

F. Limitation of Liability of Owner Trustee. Notwithstanding anything contained herein to the contrary, this instrument has been executed by Wilmington Trust Company, not in its individual capacity but solely in its capacity as Owner Trustee of each of the Trusts, and in no event shall Wilmington Trust Company in its individual capacity or any beneficial owner of the Trusts have any liability for the representations, warranties, covenants, agreements or other obligations of the Trusts hereunder, as to all of which recourse shall be had solely to the assets of the Trusts. For all purposes of this Agreement, in the performance of any duties or obligations of the Trusts hereunder, the Owner Trustee shall be subject to, and entitled to the benefits of, the terms and provisions of Articles VIII, IX and X of the each Trust Agreement of the Trusts.

G. Third Party Beneficiary. The parties hereto acknowledge that the Noteholders, Certificateholders and the Indenture Trustee are express third party beneficiaries hereof and are entitled to enforce their respective rights hereunder as if actually parties hereto.

H. No Petition. The parties hereto will not at any time institute against the Trusts any bankruptcy proceeding under any United States federal or state bankruptcy or similar law in connection with any obligations of the Trusts under any Basic Documents as defined in the Indenture.

I. Grant. Each Trust hereby acknowledges that this Agreement is a "Servicing Agreement" for all purposes of its applicable Indenture. Each Trust hereby grants to the Indenture Trustee, as trustee under each Indenture for the benefit of the Noteholders and other secured parties as applicable under the applicable Indenture, all of its right, title and interest in and to (i) the Agreement; and (ii) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, condemnation awards, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of the foregoing. The Administrator on behalf of each Trust shall take all steps necessary to ensure the perfection and priority of the Indenture Trustee's security interest in the foregoing collateral. By its signature below, the Indenture Trustee on behalf of the Noteholders and other secured parties as applicable, acknowledges such Grant.

Filed in Second Judicial District Court
2/18/2016 1:38:15 PM
Ramsey County, MN

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

ODYSSEY EDUCATION RESOURCES LLC, as the Servicer

By: _____

Name: Donald Uderitz

Title: Authorized Signatory

Each of the Trusts listed on Schedule A, attached hereto

By: WILMINGTON TRUST COMPANY, not in its individual capacity but solely as Owner Trustee

By: _____

Name: Dorri Costello

Title: Assistant Vice President

ACKNOWLEDGED:

GSS DATA SERVICES, INC., as Administrator

By: _____

Name:

Title:

U.S. BANK NATIONAL ASSOCIATION, as Indenture Trustee for each of the Indentures listed on Schedule A attached hereto

By: _____

Name:

Title:

TA297

Filed in Second Judicial District Court
2/16/2006 1:08:15 AM
Ramsey County, MN

## SCHEDULE A

Trusts:

• The National Collegiate Student Loan Trust 2003-1;
• The National Collegiate Student Loan Trust 2004-1;
• The National Collegiate Student Loan Trust 2004-2;
• The National Collegiate Student Loan Trust 2005-1;
• The National Collegiate Student Loan Trust 2005-2; and
• The National Collegiate Student Loan Trust 2005-3.

Indentures:

Each of the following Indentures, as amended or supplemented, entered into by and between U.S. Bank National Association, as Indenture Trustee and:

• The National Collegiate Student Loan Trust 2003-1, dated as of December 1, 2003;
• The National Collegiate Student Loan Trust 2004-1, dated as of June 1, 2004;
• The National Collegiate Student Loan Trust 2004-2, dated as of October 1, 2004;
• The National Collegiate Student Loan Trust 2005-1, dated as of February 1, 2005;
• The National Collegiate Student Loan Trust 2005-2, dated as of June 1, 2005; and
• The National Collegiate Student Loan Trust 2005-3, dated as of October 1, 2005.

TA298

Filed in Second Judicial District Court
2/09/2006 1:06:15 PM
Ramsey County, MN

## SCHEDULE B

[Schedule of Default Prevention Services Reimbursement Limits per Trust by Calendar Month]

Filed in Second Judicial District Court
2/18/2016 1:09:15 PM
Ramsey County, MN

## SCHEDULE C

[Schedule of Early Awareness Services Reimbursement Limits per Trust by Calendar Month]

Filed in Second Judicial District Court
2/15/2008 1:09:15 PM
Ramsey County, MN

# EXHIBIT 11

Filed in Second Judicial District Court
2/18/2016 1:08:15 PM
Ramsey County, MN

# GSS DATA SERVICES, INC.

402 West Broadway
20th Floor
San Diego, CA 92101

February 18, 2016

VIA EMAIL (david.duclos@usbank.com)

U.S. Bank National Association
Corporate Trust Services-SFS
One Federal Street
3rd Floor
Boston, MA 02111
Attention: David Duclos

> Re: National Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, 2005-3 (the "NCSLT Trusts")

Dear Mr. Duclos

GSS Data Services, Inc. ("GSS"), as administrator for the NCSLT Trusts pursuant to the Administration Agreements (the "Administration Agreements") for the NCSLT Trusts entered into by and among the applicable NCSLT Trust, Wilmington Trust Company, not in its individual capacity, but solely as owner trustee (the "Owner Trustee"), U.S. Bank National Association, as indenture trustee (the "Indenture Trustee"), The National Collegiate Funding LLC, as depositor, and GSS, as administrator (in such capacity, the "Administrator"), has today submitted to U.S. Bank National Association a Monthly Issuer Order (each, an "MIO") for each of the NCSLT Trusts. Each MIO contains instructions to pay specified amounts as "Servicing Fees & Expenses" to Odyssey Education Resources LLC ("Odyssey") on the February 25, 2016 Monthly Servicing Payment Date. The expenses purportedly have been incurred by Odyssey pursuant to a Servicing Agreement, dated as of December 30, 2014 (the "Odyssey Servicing Agreement"), among Odyssey, as a servicer, and each of the NCSLT Trusts. The instructions to pay such expenses to Odyssey are being given by the Administrator solely pursuant to directions from the NCSLT Trusts pursuant to an Issuer Order, dated January 20, 2016 (the "Issuer Order"), executed on behalf of the NCSLT Trusts by Wilmington Trust Company, not in its individual capacity but solely as Owner Trustee (a copy of which is attached hereto as Exhibit A), directing the Administrator to cause the payment of certain invoices attached hereto as Exhibit B (the "Invoices") submitted on behalf of Odyssey. Note that the Administrator is not required to indemnify the Indenture Trustee, the NCSLT Trusts or the Owner Trustee under the Administration Agreement when it acts at the instruction of the Issuer (NCSLT Trusts) or the Owner Trustee.

Filed in Second Judicial District Court
2/18/2016 11:09:15 PM
Ramsey County, MN

# GSS DATA SERVICES, INC.

402 West Broadway
20th Floor
San Diego, CA 92101

Absent the Issuer Order, the Administrator would not have submitted the Invoices for payment due to the following unresolved concerns:

1. **No Evidence of Satisfaction of Rating Agency Conditions.**

None of the NCSLT Trusts have provided the Administrator with evidence that (a) Odyssey has been properly appointed as a "Servicer" pursuant to each of the Indentures (each, an "Indenture") entered into between the applicable NCSLT Trust and the Indenture Trustee, (b) the Odyssey Servicing Agreement constitutes a "Servicing Agreement" for purposes of the Indentures and (c) the NCSLT Trusts are permitted to pay any fees and expenses to Odyssey under the Odyssey Servicing Agreement as increased "Servicing Fees" for purposes of the Indentures. The Administrator did not participate in, nor was it even notified of, any process to satisfy the Rating Agency Condition (as defined in the corresponding Indenture) with respect to Odyssey or the Odyssey Servicing Agreement.

Each Indenture provides that the Rating Agency Condition must be satisfied for each of the following: (a) the appointment of a new Servicer under an Indenture, (b) the execution and delivery of a new Servicing Agreement between the Issuer and a Servicer under which such Servicer agrees to service Financed Student Loans (as defined in the corresponding Indenture) under an Indenture and (c) an increase in the Servicing Fees paid under an Indenture.

The "Rating Agency Condition" under each Indenture requires that each Rating Agency (as defined in the corresponding Indenture) be provided with 10 days' prior notice of any proposed action (or such shorter period as shall be acceptable to the Rating Agencies) and that none of the Rating Agencies shall have notified the Administrator, the Indenture Trustee and the Remarketing Agents (as defined in the corresponding Indenture), if applicable, in writing that such action will in and of itself result in a reduction or withdrawal of the then current rating of the notes issued by the corresponding NCSLT Trust (the "Notes"), based upon the review by each such Rating Agency of payment and default performance of the Financed Student Loans, financial information relating to the NCSLT Trust, the Trust Estate, the Guarantee Agency, the Servicers or the Administrator (each as defined in the corresponding Indenture), and such other information that such Rating Agency determines to review.

While the Administrator has been provided with a letter, dated February 4, 2015 (the "NC OWNERS Letter") from NC OWNERS LLC, the owner of the NCSLT Trusts, and has been copied on an Officer's Certificate of the Issuer (the "Officer's Certificate") and an opinion of Chaitman LLP, special litigation counsel to the NCSLT Trusts (the "Opinion"), each addressed to the Indenture Trustee, stating that the requirements for such Rating Agency Conditions have been satisfied for the execution and delivery of the Odyssey Servicing Agreement, it is unreasonable for the Administrator to merely rely upon statements by an NCSLT Trust, its owner or its counsel that such requirements have been satisfied in connection with approving payments to be made to an entity, Odyssey, that is related to the owners of the NCSLT Trusts. In point of fact, the Administrator cannot legally rely on the Officer's Certificate or Opinion as it is not an addressee of those documents. Although the Administrator has expressed these concerns

Filed in Second Judicial District Court
2/18/2016 1:58:15 PM
Ramsey County, MN

# GSS DATA SERVICES, INC.

402 West Broadway
20th Floor
San Diego, CA 92101

to NC OWNERS LLC and Chaitman LLP, the Administrator has not been provided with any such evidence of compliance. Further, the NCSLT Trusts have provided written instructions to the Administrator to not engage in any communication with the Rating Agencies concerning or in any way relating to Odyssey; therefore, the Administrator cannot independently verify such compliance. In addition, the Administrator never received any requests from the NCSLT Trusts or the Rating Agencies for the information required to be provided to the Rating Agencies in connection with satisfying a Rating Agency Condition, nor has it been provided with any evidence that each Rating Agency determined that it did not need to review such information in connection with the satisfaction of the Rating Agency Condition.

None of the NC OWNERS Letter, the Officer's Certificate or the Opinion addressed the payment of the fees and expenses to Odyssey as increased "Servicing Fees" pursuant to each Indenture. Section 3 of the Odyssey Servicing Agreement provides that "any Servicing Fee and other fees and expenses payable under [the Odyssey Servicing] Agreement to [Odyssey] shall be a "Servicing Fee" for purposes each of the Indentures." The definition of "Servicing Fee" in each Indenture provides that the Servicing Fee "may be increased upon satisfying the Rating Agency Condition." To date, the NCSLT Trusts have not provided the Administrator with any evidence that the Rating Agency Condition has been satisfied with respect to the payment of any Servicing Fee and other fees and expenses payable under the Odyssey Servicing Agreement.

## 2. The Odyssey Servicing Agreement Conflicts with the Existing Special Servicing Agreement.

All of the delinquent and defaulted Financed Student Loans owned by the NCSLT Trusts are presently required to be serviced by U.S. Bank National Association, as the backup special servicer (the "Backup Special Servicer"), pursuant to the Special Servicing Agreement, dated as of March 1, 2009 (the "Special Servicing Agreement"), among First Marblehead Education Resources, Inc., the Backup Special Servicer and the NCSLT Trusts. The Odyssey Servicing Agreement purports to provide many of the same services being performed by the Backup Special Servicer, and both of the Special Servicing Agreement and the Odyssey Servicing Agreement provide for servicing Financed Student Loans owned by the NCSLT Trusts that are more than 30 days delinquent. As all of the Financed Student Loans owned by the NCSLT Trusts that are more than 30 days delinquent are presently required to be serviced by the Backup Special Servicer, there are no Financed Student Loans available for Odyssey to service pursuant to the Odyssey Servicing Agreement, and for which it could request reimbursement for expenses.

If Odyssey is intending to service any delinquent and defaulted Financed Student Loans that are currently required to be serviced by the Backup Special Servicer pursuant to the Special Servicing Agreement, then Odyssey is required to satisfy the requirements of Section 6(E) of the Special Servicing Agreement with respect to the replacement of the Backup Special Servicer, which requirements are also identical to the requirements for replacing Odyssey pursuant to Section 6(D) of the Odyssey Servicing Agreement. Each of the Special Servicing Agreement and the Odyssey Servicing Agreement provides that the replacement of the Backup Special Servicer or Odyssey, as applicable, requires a written confirmation from each Rating Agency

Filed in Second Judicial District Court
2/13/2016 1:08:15 PM
Ramsey County, MN

# GSS DATA SERVICES, INC.

402 West Broadway
20ᵗʰ Floor
San Diego, CA 92101

(other than Fitch, Inc.) that such appointment will not result in a reduction or withdrawal of the then current rating of the Notes. No such written confirmations have been provided to the Administrator.

### 3. The Administrator Is Not Aware of any Services being Performed by Odyssey with Respect to Any of the Financed Student Loans.

The Administrator is not aware of any services that Odyssey is performing with respect to any of the Financed Student Loans owned by the NCSLT Trusts. The Administrator has had no interaction with Odyssey with respect to the servicing of any Financed Student Loans, and Odyssey has never made a deposit of collections on any Financed Student Loans into any Collection Account established pursuant to an Indenture. Further, the NCSLT Trusts have provided written instructions to the Administrator to not engage in any communication with the Pennsylvania Higher Education Assistance Agency, the servicer for the Financed Student Loans, concerning or in any way relating to Odyssey; therefore, the Administrator cannot independently verify whether Odyssey is performing any services with respect to the Financed Student Loans.

### 4. The Invoices Do Not Comply with the Administrator's Standards for Backup Documentation.

On December 8, 2015, Lance Gotthoffer, Esq. of Chaitman LLP, submitted Invoices covering each calendar month in 2015, and Odyssey has subsequently submitted Invoices for the months of January and February 2016 (the February 2016 Invoices are not included in the MIOs). Although each Invoice purports to bill the corresponding NCSLT Trust for the reimbursement of expenses for a particular calendar month, each Invoice is dated the first day of such month and is due on the last day of such month. It was unclear to the Administrator how Odyssey would know the exact amount of its expenses for the entire month on the first day of such month. Also, other than the December 2015 and January 2016 Invoices, all of the Invoices submitted were well past their purported due dates (and none of the pre-December 2015 Invoices had previously been submitted to the Administrator for payment), raising questions as to whether such expenses had truly been incurred. The Administrator requires that all invoices submitted to the Administrator for the reimbursement of expenses include backup documentation evidencing that such expenses were incurred by the entity to be reimbursed with respect to services provided pursuant to its agreement with the NCSLT Trusts, and the Administrator has consistently applied such a requirement to all such requests. The Invoices submitted on behalf of Odyssey did not contain any backup documentation evidencing that Odyssey incurred the requested reimbursements in connection with servicing of Financed Student Loans, and Odyssey refused to provide such documentation when requested to do so by the Administrator. Approving such a payment is inconsistent with the Administrator's standard practice of requiring backup documentation for the reimbursement of expenses, however, the Administrator is acting on the Issuer Order which specifically directs payment of the Invoices.

### 5. The Odyssey Servicing Agreement Provides for the Sale of Financed Student Loans at Less than their Fair Market Value.

Filed in Second Judicial District Court
2/18/2016 1:08:15 PM
Ramsey County, MN

# GSS DATA SERVICES, INC.

402 West Broadway
20th Floor
San Diego, CA 92101

As the Odyssey Servicing Agreement provides for the sale of defaulted Financed Student Loans to Odyssey at less than the fair market value thereof, a possibility which was not disclosed to holders of the Notes at the times the Notes were issued by the NCSLT Trusts, the execution and delivery of the Odyssey Servicing Agreement may violate the terms of the Indentures unless the consent of the holders of the Notes to the Odyssey Servicing Agreement is obtained. Releases of Financed Student Loans from the Indentures at less than their fair market values pursuant to such a provision would expose the NCSLT Trusts, as well as the Indenture Trustee and the Administrator, to potential claims from the holders of the Notes.

Should you have any comments or question concerning the above, please do not hesitate to call.

Sincerely,

GSS DATA SERVICES, INC.

By: _____
        Ryan Gray, Vice President

TA306

Filed in Second Judicial District Court
2/18/2016 ... PM
Filed in Second Judicial District Court
2/18/2016 11:00:19 AM IN
Ramsey County, MN

# National Collegiate Student Loan Trust 2003-1

Distribution Period – 02/25/16
Collection Period – January 2016

| From | To | Payment Date | Amount | Service Period | Services Provided |
|---|---|---|---|---|---|
| Future Distribution | Collection Account - | 2/24/2016 | $ 62.44 | 01 2016 | Future Distribution Interest Transfer |
| Reserve Account - | Collection Account - | 2/24/2016 | 285.87 | 01 2016 | Reserve Distribution Interest Transfer |
| Reserve Account - | Collection Account - | 2/24/2016 | 62,249.02 | 01 2016 | Specified Reserve Takedown |
| Collection Account - | Future Distribution | 2/24/2016 | 6,890,002.43 | 01 2016 | Future Distribution Funding |
| | | | $ 6,952,573.76 | | |

**Total Internal Transfers**

| Vendor | Vendor | Services Provided | | Amount | Services Provided |
|---|---|---|---|---|---|
| Payments from Future Distribution Account | | | | 1,570.25 | |
| Trustee Fees & Expenses | RLF | Owner Trustee Fee | $ | 70,305.00 | |
| | USB | Ruling Trustee Fee | | 480.46 | |
| | CHAITMAN | Trustee Legal Expense | | | |
| | | Trustee Fees & Expense Subtotal: | $ | 78,344.71 | |
| Servicing Fees & Expenses | AES | Monthly Servicing Fees | | 50,045.02 | |
| | AES | Privacy Mailings | | 6,097.76 | |
| | GL | Monthly Servicing Fees | | 325.20 | |
| | TSI | Special Servicing | | 8,876.50 | |
| | TCM | Special Servicing | | 1,277.60 | |
| | ODYSSEY | Servicing Fees & Expenses | | 226,548.37 | |
| | | Servicing Fees & Expense Subtotal: | $ | 293,070.45 | |
| Administration Fees & Expenses | GSSDS | Quarterly Administrator Fee | | 76,265.21 | |
| | GSSDS | Privacy Mailings | | 4,857.86 | |
| | BALLARD SPAHR | Legal Expenses | | 20.03 | |
| | DENTONS | Reg AB Audit | | 274.81 | |
| | DELOITTE | Reg AB Audit | | 5,546.86 | |
| | KUTAK R | Legal Expenses | | 868.99 | |
| | WSMB | Legal Expenses | | 54.30 | |
| | CHAPMAN | Legal Expenses | | 42.45 | |
| | ALSTON & BIRD | Legal Expenses | | 2,384.69 | |
| | | Administration Fees & Expense Subtotal: | $ | 90,383.51 | |

**Total Payments** $ 461,818.17

| Note - Interest Payments | CUSIP | | Amount | For Period | Payment Date |
|---|---|---|---|---|---|
| Class A-7 | 63543PAG1 - INT | $ | 318,103.18 | 11/25/2015 - 02/24/2016 | 2/25/2016 |
| Class A-IO | | | 85,863.07 | 11/26/2015 - 02/24/2016 | 2/25/2016 |
| Class B-1 | 63543PAJ5 - INT | | 123,890.25 | 01/26/2016 - 02/24/2016 | 2/25/2016 |
| Class B-2 | 63543PAK2 - INT | | 146,840.25 | 01/26/2016 - 02/25/2016 | 2/25/2016 |
| Total Payment of Interest Distribution | | $ | 645,806.75 | | |

| Note - Broker Dealer Fee Payments | CUSIP | | Amount | For Period | Payment Date |
|---|---|---|---|---|---|
| Class B-1 | 63543PAJ5 - BD | $ | 862.50 | 01/26/2016 - 02/24/2016 | 3/25/2016 |
| Class B-2 | 63543PAK2 - BD | | 462.50 | 01/25/2016 - 02/25/2016 | 2/25/2016 |
| Total Payment of Interest Distribution | | $ | 1,925.00 | | |

| Note - Principal Payments | CUSIP | | Amount | For Period | Payment Date |
|---|---|---|---|---|---|
| Class A-7 | 63543PAG1 - PRIN | $ | 6,264,666.26 | 11/25/2015 - 02/24/2016 | 2/25/2016 |
| Class B-1 | 63543PAJ5 - PRIN | | | | |
| Class B-2 | 63543PAK2 - PRIN | | | | |
| Total Payment of Principal Distribution | | $ | 6,264,666.26 | | |

In Witness Whereof, the undersigned has hereunto set its hand this 25th day of February 2016.

National Collegiate Student Loan Trust 2003-1
By: GSS Data Services, Inc.
As Administrator

By: _____
Ryan Gray - Vice President

TA307

## National Collegiate Student Loan Trust 2004-1

Distribution Date - 02/25/16
Collection Period - January 2016

| From | To | Payment Date | Amount | Service Period | Services Provided |
|------|-----|-----|-----|-----|-----|
| Future Distribution | Collection Account | 02/24/16 | $ 43.88 | 01 2016 | Future Distribution Interest Transfer |
| Reserve Account | Collection Account | 02/24/16 | 441.90 | 01 2016 | Reserve Distribution Interest Transfer |
| Reserve Account | Collection Account | 02/24/16 | - | 01 2016 | Specified Reserve Takedown |
| Collection Account | Future Distribution | 02/24/16 | 756,012.06 | 01 2016 | Future Distribution Funding |
| **Total Internal Transfers** | | | **$ 756,497.71** | | |

| Vendor Payments | Vendor | Service Provided | Amount |
|-----|-----|-----|-----|
| From Future Distribution Account | | | |
| Servicing Fees & Expenses | | | |
| | AES | Monthly Servicing Fees | 66,266.06 |
| | GL | Monthly Servicing Fees | 1,583.31 |
| | FM | Monthly Servicing Fees | 251.67 |
| | AES | Privacy Mailing | 1,044.19 |
| | TSI | Special Servicing | 8,544.92 |
| | TCM | Special Servicing | 1,458.70 |
| | ODYSSEY | Servicing Fees & Expenses | 225,549.67 |
| | | Servicing Fees & Expense Subtotal: | $ 295,273.91 |
| **Total Payment** | | | **$ 295,273.91** |

| Payment of Class A Interest | CUSIP | Amount | For Period | Payment Date |
|-----|-----|-----|-----|-----|
| From Future Distribution Account | | | | |
| Class A-2 | 63543PAM5 - INT | $ - | | |
| Class A-3 | 63543PAN8 - INT | - | | |
| Class A-4 | 63543PAP1 - INT | - | | |
| Class A IO-2 | 63543PAR7 - INT | - | | |
| **Total Payment of Interest Distribution Amount to Class A Notes** | | **$ -** | | |

| Payment of Class B Interest | CUSIP | Amount | For Period | Payment Date |
|-----|-----|-----|-----|-----|
| From Future Distribution Account | | | | |
| Class B-1 | 63543PAS5 - INT | $ - | | |
| Class B-1 Broker-Dealer Fees | 63543PAS5 - BD | - | | |
| Class B-2 | 63543PAT3 - INT | 118,697.50 | 03/04/2016 - 03/03/2016 | 3/4/2016 |
| Class B-2 Broker-Dealer Fees | 63543PAT3 - BD | 921.67 | 03/04/2016 - 03/03/2016 | 3/4/2016 |
| **Total Payment of Interest Distribution to Class B Notes** | | **$ 119,619.17** | | |

| Payment of Class A Principal | CUSIP | Amount | For Period | Payment Date |
|-----|-----|-----|-----|-----|
| From Future Distribution Account | | | | |
| Class A-2 | 63543PAM5 - PRIN | $ - | | |
| Class A-3 | 63543PAN8 - PRIN | - | | |
| Class A-4 | 63543PAP1 - PRIN | - | | |
| **Total Payment of Principal Distribution to Class A Notes** | | **$ -** | | |

In Witness Whereof, the undersigned has hereunto set his hand this 25th day of February 2016.

National Collegiate Student Loan Trust 2004-1
By: GSS Data Services, Inc.
As Administrator

By: _____
Ryan Grey - Vice President

62-TR-CV-16-5
62-TR-CV-16-5

Filed in Second Judicial District Court
Filed In Second Judicial District Court
2/18/2019 8:51 AM
Ramsey County, MN

## National Collegiate Student Loan Trust 2004-2

Distribution Date - 02/25/16
Collection Period - January 2016

| From | To | Payment Date | Amount | Service Period | Service Provided |
|------|----|--------------|--------|----------------|------------------|
| Reserve Account - | Collection Account | 2/24/2016 | $ | 701.85 | 01/2016 | Reserve Interest Transfer |
| **Total Internal Transfers** | | | $ | 701.85 | | |

| | Vendor | Service Provided | | Amount | |
|--|--------|------------------|--|--------|--|
| **Payments from Collection Account** | | | | | |
| **Servicing Fees & Expenses** | | | | | |
| | AES | Monthly Servicing Fees | $ | 92,031.15 | |
| | TSI | Special Servicing | | 26,335.65 | |
| | TCM | Special Servicing | | 2,297.70 | |
| | ODYSSEY | Servicing Fees & Expenses | | 225,549.87 | |
| | | Servicing Fees & Expense Subtotal: | $ | 346,213.37 | |
| **Administration Fees & Expenses** | | | | | |
| | GSS/DS | Administrator Fee | | 23,874.86 | |
| | AES | Privacy Mailings | | 1,920.64 | |
| | DENTONS | Legal Expenses | | 274.61 | |
| | | Administration Fees & Expense Subtotal: | $ | 26,170.11 | |
| **Irish Agent Paying Fees & Expenses** | | | | | |
| | Custom Hosue | Annual Irish Stock Exchange Expenses | | 2,750.00 | |
| | | Irish Agent Paying Fees Subtotal: | € | 2,750.00 | |
| **Back-up Administration Fees & Expenses** | | | | | |
| | US BANK | USB Backup Admin Fee | | 1,000.00 | |
| | | Backup Admin Fees & Expense Subtotal: | $ | 1,000.00 | |
| **Total Payments in Euros** | | | $ | 2,750.00 | |
| **Total Payments** | | | $ | 373,383.48 | |

| Note Payments - Interest | CUSIP | Amount | For Period | Payment Date |
|--------------------------|-------|--------|------------|--------------|
| Class A-1 | 63543PAU0 - INT | $ | | |
| Class A-2 | 63543PAV8 - INT | | | |
| Class A-3 | 63543PAW6 - INT | | | |
| Class A-4 | 63543PAX4 - INT | 55,168.10 | 1/26/2016-2/24/2016 | 2/25/2016 |
| Class A-5-1 | FMD042A51 - INT | 63,376.47 | 1/9/2016-2/24/2016 | 2/24/2016 |
| Class A-5-2 | FMD042A52 - INT | 3,777.06 | 1/26/2016-2/24/2016 | 2/25/2016 |
| Class A-5-3 | FMD042A53 - INT | 11,334.25 | 1/26/2016-2/24/2016 | 2/25/2016 |
| Class A-5-4 | FMD042A54 - INT | 16,108.33 | 1/26/2016-2/24/2016 | 2/25/2016 |
| Class A-5-5 | FMD042A55 - INT | 7,654.17 | 1/26/2016-2/24/2016 | 2/25/2016 |
| Class A-5-6 | FMD042A56 - INT | 37,770.83 | 1/26/2016-2/24/2016 | 2/25/2016 |
| Class B | 63543PBA1 - INT | 48,440.33 | 1/26/2016-2/24/2016 | 2/25/2016 |
| Class C | 63543PBB1 - INT | | | |
| **Total Payments** | | $ 243,619.56 | | |

| Note Payments - Principal | CUSIP | Amount | For Period | Payment Date |
|---------------------------|-------|--------|------------|--------------|
| Class A-1 | 63543PAU0 - PRIN | $ | | |
| Class A-2 | 63543PAV8 - PRIN | | | |
| Class A-3 | 63543PAW6 - PRIN | | | |
| Class A-4 | 63543PAX4 - PRIN | 4,098,002.43 | 1/26/2016-2/24/2016 | 2/25/2016 |
| Class A-5-1 | FMD042A51 - PRIN | - | | |
| Class A-5-2 | FMD042A52 - PRIN | - | | |
| Class A-5-3 | FMD042A53 - PRIN | - | | |
| Class A-5-4 | FMD042A54 - PRIN | - | | |
| Class A-5-5 | FMD042A55 - PRIN | - | | |
| Class A-5-6 | FMD042A56 - PRIN | - | | |
| Class B | 63543PBA1 - PRIN | - | | |
| Class C | 63543PBB1 - PRIN | - | | |
| **Total Payments** | | $ 4,098,002.43 | | |

In Witness Whereof, the undersigned has hereunto set his hand this 25th day of February 2016

National Student Loan Trust 2004-2
By: GSS Data Services, Inc
As Administrator

By:
Ryan Gizy - Vice President

Filed in Second Judicial District Court
3/7/2016 1:19:11 PM
Filed in Second Judicial District Court
2/16/2016 11:06:16 AM
Ramsey County, MN

National Collegiate Student Loan Trust 2005-1

Distribution Date : 02/25/16
Collection Period - January 2016

| From: | To: | Payment Date | Amount | Service Period | Services Provided | |
|-------|-----|--------------|--------|----------------|-------------------|---|
| Reserve Account - | Collection Account - | 2/24/2016 | $ 593.00 | 01/2016 | Interest Transfer | |
| **Total Interest Transfers** | | | $ 593.00 | | | |

| | Vendor | Service Provided | | Amount | | |
|---|--------|------------------|---|--------|---|---|
| Payments from Collection Account | | | | | | |
| Servicing Fees & Expenses | | | | | | |
| | ACS | Monthly Servicing Fees | $ | 597.75 | | |
| | AES | Monthly Servicing Fees | | 74,026.46 | | |
| | GL | Monthly Servicing Fees | | 3,207.60 | | |
| | TSI | Special Servicing | | 12,129.42 | | |
| | TCM | Special Servicing | | 1,775.70 | | |
| | ODYSSEY | Servicing Fees & Expenses | | 225,548.87 | | |
| | | Servicing Fees & Expense Subtotal: | $ | 317,294.78 | | |
| Administration Fees & Expenses | | | | | | |
| | BGSDS | Administrator Fee | | 17,725.87 | | |
| | AES | Privacy Mailings | | 1,117.48 | | |
| | BENTONS | Legal Expenses | | 274.61 | | |
| | | Administration Fees & Expense Subtotal: | $ | 19,117.78 | | |
| Irish Agent Paying Fees | | | | | | |
| | Annual Irish Stock Exchange | Annual Irish Agent Announcement Fees | | 2,000.00 | | |
| | Custom House | Annual Irish Stock Exchange Expenses | | 3,250.00 | | |
| | | Irish Agent Paying Fees Subtotal: | € | 5,250.00 | | |
| Back-up Administration Fees & Expenses | | | | | | |
| | US BANK | USB Backup Admin Fee | | 1,000.00 | | |
| | | Backup Admin Fees & Expense Subtotal: | $ | 1,000.00 | | |
| **Total Payments in Euros** | | | € | 5,250.00 | | |
| **Total Payments** | | | $ | 337,412.54 | | |

| Note | | CUSIP | Amount | For Period | Payment Date | |
|------|---|-------|--------|------------|--------------|---|
| Class A-1 | 63543PBD7 - INT | 63543PBD7 | $ | - | | |
| Class A-2 | 63543PBE5 - INT | 63543PBE5 | | - | | |
| Class A-3 | 63543PBF2 - INT | 63543PBF2 | | - | | |
| Class A-4 | 63543PBG0 - INT | 63543PBG0 | 39,477.90 | 1/25/2016-2/24/2016 | 2/25/2016 | |
| Class A-5-1 | 63543PBH8 - INT | 63543PBH8 | 127,898.51 | 1/25/2016-2/24/2016 | 2/25/2016 | |
| Class A-5-2 | 63543PBN5 - INT | 63543PBN5 | 76.73 | 1/25/2016-2/24/2016 | 2/25/2016 | |
| Class A-IO | 63543PBP0 - INT | 63543PBP0 | - | | | |
| Class B | 63543PBK1 - INT | 63543PBK1 | 32,195.38 | 1/25/2016-2/24/2016 | 2/25/2016 | |
| Class C | 63543PBL9 - INT | 63543PBL9 | - | | | |
| **Total Payments for Interest Distribution** | | | $ 199,608.52 | | | |

| Note | | CUSIP | Amount | For Period | Payment Date | |
|------|---|-------|--------|------------|--------------|---|
| Class A-1 | 63543PBD7 - PRIN | 63543PBD7 | $ | - | | |
| Class A-2 | 63543PBE5 - PRIN | 63543PBE5 | | - | | |
| Class A-3 | 63543PBF2 - PRIN | 63543PBF2 | | - | | |
| Class A-4 | 63543PBG0 - PRIN | 63543PBG0 | 3,264,931.41 | 1/25/2016-2/24/2016 | 2/25/2016 | |
| Class A-5-1 | 63543PBH8 - PRIN | 63543PBH8 | | | | |
| Class A-5-2 | 63543PBN5 - PRIN | 63543PBN5 | | | | |
| Class A-IO | 63543PBP0 - PRIN | 63543PBP0 | | | | |
| Class B | 63543PBK1 - PRIN | 63543PBK1 | | | | |
| Class C | 63543PBL9 - PRIN | 63543PBL9 | | | | |
| **Total Payments for Principal Distribution** | | | $ 3,264,931.41 | | | |

In Witness Whereof, the undersigned has hereunto set his hand this 25th day of February 2016

National Collegiate Student Loan Trust 2005-1
By: GSS Data Services, Inc.
As Administrator

By: _____
Ryan Gray - Vice President

Filed in Second Judicial District Court
3/7/2016 1:19:11 PM
Filed in Second Judicial District Court
2/16/2016 11:08:15 AM
Ramsey County, MN

**National Collegiate Student Loan Trust 2005-2**

Distribution Date - 02/25/16
Collection Period - January 2016

| From | To | Payment Date | Amount | Service Period | Services Provided |
|---|---|---|---|---|---|
| Reserve Account - | Collection Account - | 2/24/2016 $ | 396.74 | 01 2016 | Interest Transfer |
| Reserve Account - | Collection Account - | 2/24/2016 | 20,696.16 | 01 2016 | Excess of Specified Reserve Transfer |
| **Total Internal Transfers** | | | $ 31,024.90 | | |

| | Vendor | Service Provided | | Amount | |
|---|---|---|---|---|---|
| **Payments from Collection Account** | | | | | |
| Servicing Fees & Expenses | ACS | Monthly Servicing Fees | $ | 245.33 | |
| | AES | Monthly Servicing Fees | | 52,602.28 | |
| | GSL | Monthly Servicing Fees | | 748.52 | |
| | FM | Monthly Servicing Fees | | 615.29 | |
| | TSI | Special Servicing | | 13,613.37 | |
| | TCM | Special Servicing | | 1,854.19 | |
| | ODYSSEY | Servicing Fees & Expenses | | 225,348.87 | |
| | | Servicing Fees & Expense Subtotal: | $ | 295,025.71 | |
| Administration Fees & Expenses | GSS09 | Administrator Fee | | 13,535.25 | |
| | AES | Privacy Mailings | | 749.01 | |
| | DENTONS | Legal Expenses | | 274.61 | |
| | | Administration Fee & Expense Subtotal: | $ | 14,555.87 | |
| Irish Agent Paying Fees & Expenses | CUSTOM HOUSE | Annual Irish Stock Exchange Expenses | | 3,250.00 | |
| | | Irish Agent Paying Fees Subtotal: | $ | 3,250.00 | |
| Back-up Administration Fees & Expenses | US BANK | USB Backup Admin Fee | | 1,000.00 | |
| | | Backup Admin Fees & Expense Subtotal: | $ | 1,000.00 | |
| **Total Payments to Buros** | | | $ | 3,250.00 | |
| **Total Payments** | | | $ | 310,579.58 | |

| Note | CUSIP | Amount | For Period | Payment Date |
|---|---|---|---|---|
| Class A-1 | 63543PBD9 - INT / 63543PBD9 | $ | | |
| Class A-2 | 63543PBH0 - INT / 63543PBH0 | | | |
| Class A-3 | 63543PBE4 - INT / 63543PBE4 | 56,746.89 | 1/25/2016-02/24/2016 | 2/25/2016 |
| Class A-4 | 63543PBT2 - INT / 63543PBT2 | 64,424.26 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-1 | 63543PBU9 - INT / E454-BPU9 | 48.01 | 1/25/2016-02/24/2016 | 2/25/2016 |
| Class A-5-2 | 63543PBV7 - INT / 53543PBV7 | | | |
| Class A-IO | 63543PBV7 - INT / 63543PBV7 | | | |
| Class B | 63543PBW5 - INT / 63543PBW5 | | | |
| Class C | 63543PBX3 - INT / 63543PBX3 | | | |
| **Total Payments for Interest Distribution** | | $ 110,218.36 | | |

| Note | CUSIP | Amount | For Period | Payment Date |
|---|---|---|---|---|
| Class A-1 | 63543PBD9 - PRIN / 63543PBD9 | $ | | |
| Class A-2 | 63543PBH0 - PRIN / 63543PBH0 | | | |
| Class A-3 | 63543PBE4 - PRIN / 63543PBE4 | | | |
| Class A-4 | 63543PBT2 - PRIN / 63543PBT2 | 2,917,760.33 | 1/25/2016-02/24/2016 | 2/25/2016 |
| Class A-5-1 | 63543PBU9 - PRIN / 63543PBU9 | | | |
| Class A-5-2 | 63543PBV7 - PRIN / 63543PBV7 | | | |
| Class A-IO | 63543PBV7 - PRIN / 63543PBV7 | | | |
| Class B | 63543PBW5 - PRIN / 63543PBW5 | | | |
| Class C | 63543PBX3 - PRIN / 63543PBX3 | | | |
| **Total Payments for Principal Distribution** | | $ 2,917,760.33 | | |

In Witness Whereof, the undersigned has hereunto set his hand this 25th day of February 2016

National Collegiate Student Loan Trust 2005-2
By    GSS Data Services, Inc
As Administrator

By
Ryan Gray - Vice President

Filed in Second Judicial District Court
3/7/2016 1:19:11 PM
Filed in Second Judicial District Court
2/18/2016 11:05:15 AM
Ramsey County, MN

National Collegiate Student Loan Trust 2005-3

Distribution Date - 02/25/16
Collection Period - January 2016

| From | To | Payment Date | Amount | Service Period | Services Provided |
|---|---|---|---|---|---|
| Reserve Account | Collection Account | 2/24/2016 | $ 1,146.93 | 01 2016 | Reserve Interest Transfer |
| Reserve Account | Collection Account | 2/24/2016 | 89,325.73 | 01 2016 | Specified Reserve Takedown |
| **Total Internal Transfers** | | | $ 90,472.66 | | |

| | Vendor | Service Provided | | Amount | |
|---|---|---|---|---|---|
| **Payments from Collection Account** | | | | | |
| Servicing Fees & Expenses | | | | | |
| | AES | Monthly Servicing Fees | | 167,125.81 | |
| | TSI | Special Servicing | | 38,552.44 | |
| | TSM | Special Servicing | | 3,770.60 | |
| | ODYSSEY | Servicing Fees & Expenses | | 226,546.07 | |
| | | Servicing Fees & Expense Subtotal: | $ | 432,994.92 | |
| **Administration Fees & Expenses** | | | | | |
| | GSRDR | Administration Fee | | 37,709.07 | |
| | AES | Privacy Mailings | | 1,697.00 | |
| | DENTONS | Legal Expenses | | 274.81 | |
| | | Administration Fees & Expense Subtotal: | $ | 39,675.88 | |
| **Irish Agent Paying Fees & Expenses** | | | | | |
| | Custom House | Annual Irish Stock Exchange Expense | | 3,250.00 | |
| | | Irish Agent Paying Fees Subtotal: | $ | 3,250.00 | |
| **Backup Administration Fees & Expenses** | | | | | |
| | US BANK | USB Backup Admin Fee | | 7,000.00 | |
| | | Backup Admin Fees & Expense Subtotal: | $ | 7,000.00 | |
| **Total Payments to NCSLT** | | | | $ | 1,250.00 |
| **Total Payments** | | | | $ | 573,566.51 |

| Note Payments - Interest | CUSIP | | Amount | For Period | Payment Date |
|---|---|---|---|---|---|
| Class A-1 | 635437AA8 - INT | | $ | | |
| Class A-2 | 635437AB6 - INT | | - | | |
| Class A-3 | 635437AC2 - INT | | - | | |
| Class A-4 | 635437AD0 - INT | | 68,809.00 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-1 | FMD0527A0-1 - INT | | 7,684.63 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-2 | FMD0527A0 - INT | | 13,164.50 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-3 | FMD0527A83 - INT | | 13,167.50 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-4 | FMD0527A84 - INT | | 11,734.50 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-5 | FMD0527A95 - INT | | 16,857.75 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-6 | FMD0527A06 - INT | | 16,857.15 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-7 | FMD0527A07 - INT | | 16,857.54 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-8 | FMD0527A08 - INT | | 14,975.18 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-9 | FMD0527A59 - INT | | 10,803.38 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-10 | FMD0527A10 - INT | | 10,107.01 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-11 | FMD0527A11 - INT | | 11,799.62 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-12 | FMD0527A12 - INT | | 158,347.50 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-13 | FMD0527A13 - INT | | 4.57 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-14 | FMD0527A14 - INT | | 0.33 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-15 | FMD0527A15 - INT | | 7.64 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-16 | FMD0527A16 - INT | | 6.54 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-17 | FMD0527A17 - INT | | 10.42 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-18 | FMD0527A18 - INT | | 0.72 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-19 | FMD0527A19 - INT | | 0.72 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-20 | FMD0527A20 - INT | | 9.93 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-21 | FMD0527A21 - INT | | 8.33 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-22 | FMD0527A22 - INT | | 7.04 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-23 | FMD0527A23 - INT | | 5.94 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-24 | FMD0527A24 - INT | | 55.14 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class B | 635437AJ3 - INT | | 66,210.01 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class C | 635437AK0 - INT | | | | |
| **Total Payment of Interest Distribution** | | | $ 345,444.61 | | |

| Note Payments - Principal | CUSIP | | Amount | For Period | Payment Date |
|---|---|---|---|---|---|
| Class A-1 | 635437AA8 - PRIN | | $ - | | |
| Class A-2 | 635437AB6 - PRIN | | - | | |
| Class A-3 | 635437AC2 - PRIN | | - | | |
| Class A-4 | 635437AD0 - PRIN | | 6,639,646.63 | 1/25/2016-2/24/2016 | 2/25/2016 |
| Class A-5-1 | 635437AE8 - PRIN | | - | | |
| Class A-5-2 | 635437AF5 - PRIN | | - | | |
| Class B | 635437AJ3 - PRIN | | - | | |
| Class C | 635437AK0 - PRIN | | - | | |
| **Total Payment of Principal Distribution** | | | $ 6,639,646.63 | | |

In Witness Whereof, the undersigned has hereunto set his hand this 25th day of February 2016

National Collegiate Student Loan Trust 2005-3
By: GSS Services, Inc.
As Administrator

By:
Ryan Gray - Vice President

TA312

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

In the Matter of the National Collegiate
Student Loan Trusts 2003-1, 2004-1,
2004-2, 2005-1, 2005-2 and 2005-3.

Case No. 16-cv-00775

## ANSWER AND OBJECTION OF THE TRUSTS TO THE
## PETITION OF U.S. BANK NATIONAL ASSOCIATION,
## AS INDENTURE TRUSTEE, FOR INSTRUCTIONS IN THE
## ADMINISTRATION OF TRUSTS PURSUANT TO MINN. STAT. §501C.0201

National Collegiate Student Loan Trust 2003-1, National Collegiate Student Loan Trust 2004-1, National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2005-1, National Collegiate Student Loan Trust 2005-2 and National Collegiate Student Loan Trust 2005-3 (the "Issuers" or "Trusts"), for their Answer and Objection to the Petition of U.S. Bank National Association, as Indenture Trustee (the "Indenture Trustee" or "U.S. Bank"), hereby state as follows:

### INTRODUCTION

In 2012, over the objections of the majority of the Beneficial Owners ("Owners") of the Trusts and upon the resignation of First Marblehead Education Resources, Inc. ("First Marblehead") as Special Servicer to the Trusts, U.S. Bank exercised its option to step in as successor Special Servicer under the Special Servicing Agreement.  At the time, the Owners were concerned that U.S. Bank's servicing division had admitted to the

Owners that it had no experience servicing student loans.[1]  Further, U.S. Bank informed the Owners that it was under an obligation, pursuant to a previously undisclosed agreement with Goal Structured Solutions, Inc. ("Goal"), which is the parent company of the Administrator, GSS Data Services, Inc. ("GSSDS"), to hire a subsidiary of Goal to perform all of U.S. Bank's duties under the Special Servicing Agreement should U.S. Bank ever become the successor Special Servicer.  The Owners were concerned that such a scheme would result in an affiliate of the Administrator performing the servicing of defaulted Student Loans on behalf of an affiliate of the Indenture Trustee and would therefore create many conflicts of interest that would deprive the Owners of their right to manage and service the Student Loans as provided by the Basic Documents.

Since the U.S. Bank – Goal scheme was put in place by U.S. Bank in 2012, over $1 billion of Loans have become uncollectable due to the expiration of the relevant collection limitations periods.  Over $4 billion of Loans have defaulted, and no payments were made on approximately three quarters of those Loans.  In addition, law suits brought against borrowers all over the nation by attorneys hired through U.S. Bank's collection scheme are being dismissed due to faulty documentation and procedures, and the Trusts are being sued in both class action suits and by individuals for what the courts are

---

[1] There is a long history of correspondence dating back to 2012 between the Trusts and U.S. Bank, in both its roles as Indenture Trustee and Special Servicer, highlighting serious concerns and risks of default with respect to the servicing and administration of the Loans.  U.S. Bank, in both its roles as Indenture Trustee and Special Servicer, ignored the warnings and concerns, and since then, those concerns have played out, significantly harming both the Beneficial Owners and Noteholders.

determining to be illegal collection practices.[2]   A simple Google search of the NCSLT

name will show the extent to which the Trusts are suffering because of the

mismanagement of the collection process.   The Trusts were also alarmed that in addition

to the losses being experienced due to bad collection practices, the Trusts were saddled

with paying Administration fees, Indenture Trustee fees and Servicing Fees on an

increasing balance of Loans that had a total value that was lower than the Fees being paid

each year.

Faced with inexplicable obstruction from both the Administrator and the Indenture

Trustee in accepting Odyssey Education Resources LLC ("Odyssey") either as Special

Servicer or a Sub-Servicer to the Trusts under existing agreements, the Owners decided

to exercise their rights under the Basic Documents to appoint Odyssey as a Servicer to

the Trusts.   In appointing Odyssey, the Trusts had the objective of improving the poor

performance of the deals by, among other things:   (1) determining which Loans have a

market value that is lower than the amount of fees that are being paid to service them, and

disposing of them in accordance with the Indenture.   (By doing this, the Trusts benefit by

not having to pay Administrator, Indenture Trustee and Servicer Fees on Loans that have

no chance of recovery, thus increasing the amount of money available to pay

Noteholders.); and (2) improving the performance of any Loans that defaulted after the

Odyssey engagement by instructing the Servicer, Pennsylvania Higher Education

Assistance Agency ("PHEAA"), to direct "newly defaulted loans" to Odyssey.   The

---

[2] In 2015, the Administrator asked the Owner Trustee to engage counsel to, among other things,
defend the Owner Trustee and the Administrator against such suits.

Trusts' engagement of Odyssey was done in strict adherence to the exclusive rights of the Issuer to hire Servicers under the Basic Documents.

While evaluating the Loans, Odyssey has discovered significant problems with the servicing and administration of the Loans that the Trusts are in the process of addressing, including serious operational defaults and blatant disregard of the governing documents and contracts, all of which have significantly harmed the Trusts, Owners and Noteholders. Most of these problems are directly related to the Administrator's and the Indenture Trustee's unwillingness to address the problems that were raised with them by the Owners since 2012.

U.S. Bank has not properly discharged its duties and responsibilities to the Trusts and obviously is displeased that Odyssey's role may reduce the fees paid to U.S. Bank and also expose wrongdoing by U.S. Bank. Therefore, U.S. Bank has brought this Petition seeking to invalidate Odyssey's appointment and to prevent Odyssey from being paid for its services. As shown below, the Petition is meritless, Odyssey was properly appointed, and its invoices should be paid.

## THIS MATTER DOES NOT BELONG IN A MINNESOTA COURT

As a threshold matter, this case does not belong in a court in Minnesota, as the State of Minnesota has at best a tenuous connection to any of the matters here at issue. Pursuant to 28 U.S.C. § 1404, the case should be transferred to the District of Delaware.

First, the law applicable to this dispute is not Minnesota law. The Petition states that the so-called "Governing Agreements" are the Trust Agreement, the Indenture, the

TA316

Servicing Agreement, the Administration Agreement, and the Special Servicing Agreement.  Petition ¶ 5 n.2.[3]  None of these agreements are governed by Minnesota law.

The principal issue raised by the Petition is whether Odyssey was properly appointed pursuant to the terms of the Trust Agreements, which involves construing the provisions of the Trust Agreements.[4]  Section 14.10 of the Trust Agreements provides:

> This Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of Delaware (excluding conflict of law rules), including all matters of construction, validity and performance."

With respect to the other so-called "Governing Agreements," none of them is governed by Minnesota law either:

- Section 11.13 of the Indenture provides that it "shall be construed in accordance with the laws of the State of New York without reference to its conflict of law provisions, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws."

- Section 13 of the Administration Agreement provides that it "shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to  conflicts of laws provisions thereof (other than Section 5-1401 of the New York General Obligations Law)."

- Section 22B of the Special Servicing Agreement provides that it "shall be governed by, and construed in accordance with, the laws of the State of New

---

[3] "Governing Agreements" is not a term used in any relevant agreement, and the Trusts do not concede that it is a meaningful term in this case.

[4] A copy of a Trust Agreement, materially identical to the other Trust Agreements, is attached hereto as Exhibit 1.

TA317

York, without giving effect to conflicts of laws provisions thereof (other than Section 5-1401 of the New York General Obligations Law)."

- Section 13 of the Servicing Agreement provides that it "shall be construed in accordance with the laws of the Commonwealth of Pennsylvania, without regard to any principles of conflict of laws."

And with respect to the Odyssey Agreement, Section 21(B) thereof provides that it "shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to conflicts of laws provisions thereof (other than Section 5-1401 of the New York General Obligations Law)."

Second, the Petition alleges:

> The Indenture Trustee is a national banking association and has its principal corporate trust office in St. Paul, Minnesota.  This Court has jurisdiction *in rem* over this Petition under Minn. Stat. § 501C.0201 because the Indenture Trusts' assets are administered by and through the Indenture Trustee's St. Paul corporate trust office.

Petition ¶ 8.

These allegations do not establish that the case belongs in a court in Minnesota. First, the Petition nowhere explains what it means when it uses the vague phrase that the assets are "administered by and through" U.S. Bank's St. Paul office.  Conspicuously absent from the Petition is any allegation as the location of the account into which monies collected on the Loans are deposited.  Furthermore, the allegation that the assets are administered by and through U.S. Bank's St. Paul office does not seem consistent with the following statement contained in the Notice of Trust Instruction Court Hearing that U.S. Bank issued:

Noteholders wishing to contact the Indenture Trustee to share their views about the matters described in this notice or to provide directions to the Indenture Trustee in accordance with the Indentures should direct their communications in writing to:

David Duclos
U.S. Bank National Association
One Federal Street, 3rd Floor
Boston, MA 02110
Email:  david. duclos @usbank.com

Notice at 2-3.

Moreover, the Indenture provides that notices to the Indenture Trustee are to be

directed to its "Corporate Trust Office," which Appendix A to the Indenture defines as

"One Federal Street, 3rd Floor, Boston Massachusetts 02110 or such other address as the

Indenture Trustee may designate.  Indenture, Appendix A-10.[5]

The Administration Agreement similarly provides that notices to the Indenture

Trustee are to be sent to:

U.S. Bank National Association
Corporate Trust Services-SFS
One Federal Street, 3rd Floor
Boston, Massachusetts 02110
Attention: Ms. Vaneta I. Bernard

Administration Agreement Section 10(c).

The Petition does not cite any provision in the Trust Agreements designating

Minnesota as the principal place of the Trusts' administration (*see* Minn. Stat.

§ 501C.0108(a)).  Indeed, the Trust Agreements provide to the contrary:

Situs of Trust.  The Trust will be located and administered in the State of Delaware.  The Trust shall not have any employees in any state

---

[5] A copy of Appendix A to the Indentures is attached hereto as Exhibit 2.

other than in the State of Delaware and payments will be received by the Owner Trustee on behalf of the Trust only in the State of Delaware and payments will be made by the Owner Trustee on behalf of the Trust only from the State of Delaware.

Trust Agreement Section 2.07.

None of the other entities to whom U.S. Bank is giving notice as listed by U.S. Bank on Schedule A of the Notice is stated to be located in Minnesota (apart from U.S. Bank).

Therefore, pursuant to 28 U.S.C. § 1404, transfer to the United States District Court for the District of Delaware is appropriate.

## RESPONSES TO SPECIFIC PARAGRAPHS OF THE PETITION

The Trusts deny all allegations of the Petition not hereinafter specifically admitted.

As to the correspondingly numbered paragraphs of the Petition, the Trusts respond as follows:

1.      The Trusts admit that U.S. Bank purports to bring the Petition in its capacity as Indenture Trustee but deny that in so doing U.S. Bank is acting for the benefit of the holders of Notes issued through the Trusts.  The Trusts further allege that the phrase "Indenture Trust" used in the Petition is not meaningful and is not a defined term in any relevant agreement.  The Trusts are Delaware Statutory Trusts which are the Issuers of the Notes held by Noteholders.

2.      The Trusts admit that U.S. Bank purports to seek instructions but they deny that the Petition is an appropriate request for instructions and allege that it is, in reality, a request for a declaratory judgment filed in a court that lacks personal jurisdiction over the

TA320

adverse parties against whom the declaratory judgment is sought.  The Trusts further

deny that VCG Securities LLC ("VCG") attempted to appoint Odyssey as a Special

Servicer for each Trust.  The Trusts allege that VCG represents 100% of the Owners of

the "Beneficial Interest" in the Trusts and as such has the right to direct or consent to

actions of the Owner Trustee and otherwise participate in the management and control of

the affairs of the Trusts.  The Trusts allege that the appointment of Odyssey as a Servicer

under the Basic Documents  was done in strict adherence to Section 2.03 of the Trust

Agreements, specifically the Power of the Trusts to enter into Trust Related Agreements,

to provide for the administration of the Trusts and the servicing of the Loans and to enter

into such agreements as are necessary, suitable or convenient to accomplish the foregoing

under Sections 2.03(a)(ii) and (iii) and Section 2.03(b)(i) of the Trust Agreements.  The

Trusts further allege that the appointment of Odyssey as a Servicer under the Basic

Documents was done pursuant to the Issuers' duty under Sections 3.07(a), (b) and (c) of

the Indentures.  Section 3.07(b) of the Indentures specifies: "Although the Issuer will

contract with other Persons to assist it in performing its duties under the Indenture, any

performance of such duties by a person identified to the Indenture Trustee in an Officers

Certificate of the Issuer shall be deemed to be an action taken by the Issuer."  It further

specifies: "Initially, the Issuer has contracted with the Servicers and the Administrator to

assist the Issuer in performing its duties under this Indenture."  The Trusts' engagement

of Odyssey as a Servicer under the Basic Documents was disclosed to the Indenture

Trustee in compliance with Section 11.01 with the corresponding opinion of counsel

stating that all conditions precedent to such engagement had been satisfied.  The Trusts

TA321

allege that they have no knowledge of any Section of any of the Basic Documents that confer on either the Administrator or the Indenture Trustee any responsibility, duty or supervision of the Trusts' ability to appoint Servicers.

3.     The Trusts deny that the Indenture Trustee "maintains certain Trust accounts that hold funds for payments to Noteholders and other parties including servicers." The Trusts allege that under Section 8.02(a)(i) of the Indentures, "[t]he Issuer, for the benefit of the Noteholders and itself, shall establish and maintain in the name of the Indenture Trustee an Eligible Deposit Account (the 'Collection Account') bearing a designation clearly indicating that the funds deposited therein are held for the benefit of the Noteholders and the Issuer." Further, Section 8.02(c)(E) states that the Issuer "shall instruct the Indenture Trustee to make withdrawals and payments from the Trust Accounts for the purpose of permitting the Indenture Trustee to carry out its duties under this Indenture." The Indentures provide that the Administrator "shall instruct the Indenture Trustee" to make distributions to pay "Servicing Fees" (Section 8.02(d)(1)(i)) and further provide that "the Indenture Trustee shall comply with such instruction" (Section 8.02(d)(1)). The Trusts allege that under Section 1(a)(i)(G) of the Administration Agreements, the Administrator "shall take all appropriate action that is the duty of the Issuer to take pursuant to the Trust Related Agreements including, without limitation, … [p]roviding instructions to the Indenture Trustee as required by Section 8.02(d) of the Indenture." The Trusts allege that the appointment of Odyssey and the request for payment of the Odyssey Servicing Fees were done in strict adherence with the Basic Documents. The Petition's failure to cite any section of any Basic Document that

U.S. Bank believes is in conflict with the actions of the Issuer undermines the credibility

of the Petition and suggests that U.S. Bank is acting out of a desire to protect the fees it

generates in its role as Special Servicer and to prevent Odyssey from uncovering the

wrongdoing and conflicts of interest by U.S. Bank.  Further, Section 3.20(b) of the

Indentures clearly states that the Indenture Trustee "shall have no obligation to

administer, service or collect the Loans … or to maintain or monitor the administration,

servicing or collection of the Loans."  Section 6.01(b)(i) of the Indenture provides that

the Indenture Trustee shall perform "only such duties as are specifically set forth in this

Indenture and the other Basic Documents."  The Indentures provide that the

Administrator "shall instruct the Indenture Trustee" to make distributions to pay

"Servicing Fees" (Section 8.02(d)(1)(i)) and further provide that "the Indenture Trustee

shall comply with such instruction" (Section 8.02(d)(1)).

        4.      The Trusts deny that Odyssey has not performed any services to benefit the

Noteholders.  There is no requirement in any of the Basic Documents or in the Indentures

setting forth specific services that Servicers must perform in order to be entitled to

payment, and the Trusts allege that Odyssey has performed services in strict adherence

with the Odyssey Servicing Agreement, such as conducting audits and other work in

order to evaluate what defaulted Loans might be capable of being sold.  The Indentures

provide that the Administrator "shall instruct the Indenture Trustee" to make distributions

to pay "Servicing Fees" (Section 8.02(d)(1)(i)) and further provide that "the Indenture

Trustee shall comply with such instruction" (Section 8.02(d)(1)).  The Trusts further deny

that Odyssey's appointment alters the current servicing arrangements in any way.  The

Special Servicing Agreement is not, and does not purport to be, an exclusive arrangement for servicing of loans.  The Odyssey Agreement does not provide that Odyssey will take over the servicing of any Loan currently being serviced by U.S. Bank as Special Servicer. Odyssey will service newly defaulted Loans that the Special Servicer is not servicing. Under the Special Servicing Agreement, a "Defaulted Loan" that U.S. Bank is entitled to service must be a Loan as to which the Servicer (PHEAA) "has notified" U.S. Bank.  No additional Loans are being directed to the Special Servicer.  Odyssey may purchase and sell Loans for the benefit of the Trusts regardless of what Servicer is servicing them, but this is not in conflict with the Special Servicing Agreement.  The Odyssey Agreement was entered into in strict adherence to all of the requirements of the Basic Documents and all conditions precedent have been met.  The Trusts further deny that the Odyssey Agreement creates any potential for self-dealing and allege that the Odyssey Agreement contains adequate provisions with respect to the prices at which Odyssey may purchase Loans from the Trusts.  *See* Odyssey Agreement Section 2(c)(iii).  The procedures contained in the Odyssey Agreement for disposition of Financed Student Loans are in strict compliance with Sections 2.09 and 3.14 of the Indentures.  The Indenture Trustee fails to identify any provision of any agreement with which the Odyssey Agreement is in conflict.

5.     The Trusts admit that the Indenture Trustee purports to seek instruction of these issues.  The Trusts allege that the Indenture Trustee has been provided with numerous communications regarding the validity of the Odyssey Servicing Agreement, including those required under Section 11.01 of the Indentures.

TA324

6.      The Trusts deny that Odyssey was appointed as a Special Servicer and allege that Odyssey was properly appointed as a Servicer.  The Trusts deny that there are any conflicts between the Odyssey Agreement and any other agreement.  The Trusts further allege that they have for the last three years in various forms communicated with the Indenture Trustee explaining why and how Odyssey was not appointed a Special Servicer and how the Odyssey Agreement does not conflict with any current Servicing Agreement or Special Servicing Agreement, including making a formal request that the Indenture Trustee acknowledge Odyssey, as provided for under Section 11.01 of the Indentures.  The Trusts further allege that under Section 5.16 of the Indentures, in the event of any concerns regarding a Servicer, the Indenture Trustee is supposed to refer such matter to the Issuers.

7.      The Trusts deny that Odyssey was appointed as a Special Servicer and allege that Odyssey was properly appointed as a Servicer.  The Trusts deny that any provision of the Trust Agreements or the Indentures requires that a Servicer provide to the Administrator or the Indenture Trustee evidence of the services it has performed for the Trusts.  The Trusts further deny that the receipt of any funds by the Indenture Trustee from the Servicer is a precondition to payment of invoices for servicing fees, and the Petition fails to cite any provision in the Trust Agreement or the Indenture or the Odyssey Agreement containing such precondition.  The Odyssey Agreement (Section 5) provides for the reimbursement of Odyssey's servicing fees and expenses.  The Indentures provide that the Administrator "shall instruct the Indenture Trustee" to make distributions to pay

TA325

"Servicing Fees" (Section 8.02(d)(1)(i)) and further provide that "the Indenture Trustee shall comply with such instruction" (Section 8.02(d)(1)).

8.     The Trusts lack knowledge or information sufficient to form a belief as to the truth of the allegations that the Indenture Trustee has its principal corporate trust office in St. Paul, Minnesota and that the Trusts' assets are administered by and through U.S. Bank's St. Paul corporate trust office.   The Indenture provides that notices to the Indenture Trustee are to be directed to its "Corporate Trust Office," which Appendix A to the Indenture defines as "One Federal Street, 3rd Floor, Boston Massachusetts 02110 or such other address as the Indenture Trustee may designate.   Indenture, Appendix A-10. The Petition fails to allege the location of the accounts holding the monies collected on the Loans in the trusts.   PHEAA, which has been the Servicer collecting the payments on the Loans in the Trusts, is located in Pennsylvania.   The Trusts are governed by Delaware law.   The Owner Trustee is Wilmington Trust Company, located in Delaware.   As set forth in the Trust Agreements (Section 2.07), the situs of the trusts is Delaware.   The Odyssey agreement is governed by New York law.   The Indentures are governed by New York law.   The Trusts allege that this case does not belong in a court in Minnesota.

9.     The Trusts deny the allegations of paragraph 9.

10.     The Trusts admit the allegations of paragraph 10.

11.     In response to paragraph 11 of the Petition, the Trusts refer to the documents referred to for their complete contents.

12.     The Trusts admit the allegations of paragraph 12.

TA326

13.     The Trusts admit that the Issuers are responsible for the operations of each Trust, including the administration of the Trusts and the servicing of the Loans (*see* Trust Agreement Section 2.03(a)(ii)), and that certain duties of the Issuers are carried out by Servicers and Administrators hired by the Issuers.  Section 3.07(b) of the Indenture provides that "the Issuer will contract with other Persons to assist it in performing its duties under this Indenture" and that "any performance of such duties by a Person identified to the Indenture Trustee in an Officers' Certificate of the Issuer shall be deemed to be action taken by the Issuer."  It further provides that "the Issuer has contracted with the Servicers and the administrator to assist the Issuer in performing its duties under this Indenture."  The Trusts deny that the Indenture Trustee carries out the operations of the Trusts and refer to the Indentures for specification of the obligations of the Indenture Trustee.  The Trusts further deny that the Indenture Trustee is responsible for monitoring the services provided by Servicers.

14.     The Trusts deny that U.S. Bank is responsible for administering each Trust. Section 3.20(b) of the Indentures states that the Indenture Trustee "shall have no obligation to administer, service or collect the Loans … or to maintain or monitor the administration, servicing or collection of the Loans."  Section 6.01(b)(i) of the Indenture provides that the Indenture Trustee shall perform "only such duties as are specifically set forth in this Indenture and the other Basic Documents."  The Indentures provide that the Administrator "shall instruct the Indenture Trustee" to make distributions to pay "Servicing Fees" (Section 8.02(d)(1)(i)) and further provide that "the Indenture Trustee shall comply with such instruction" (Section 8.02(d)(1)).

TA327

15.     The Trusts allege that PHEAA is not the only Servicer for the Trusts and otherwise admit the allegations of paragraph 15.

16.     The Trusts admit that U.S. Bank succeeded First Marblehead as Special Servicer in 2012.  However, with respect to U.S. Bank's allegation that it "later contracted" with Transworld Systems Inc. ("TSI") and Turnstile Capital Management, LLC ("TCM") to act as Sub-Servicer and Special Sub-Servicer, respectively, the Trusts allege that pursuant to a 2009 side agreement, U.S. Bank had agreed that if it became Special Servicer, it would hire an affiliate of Goal, GSSDS's parent company, to perform such duties.  TSI and TCM are affiliates of Goal.

17.     The Trusts admit that GSSDS acts as the Administrator.  The Trusts allege that under Section 1(a)(i)(G) of the Administration Agreements, the Administrator "shall take all appropriate action that is the duty of the Issuer to take pursuant to the Trust Related Agreements including, without limitation, … [p]roviding instructions to the Indenture Trustee as required by Section 8.02(d) of the Indenture."  The Indentures provide that the Administrator "shall instruct the Indenture Trustee" to make distributions to pay "Servicing Fees" (Section 8.02(d)(1)(i)) and further provide that "the Indenture Trustee shall comply with such instruction" (Section 8.02(d)(1)).

18.     The Trusts admit that VCG represents the Owners of all or the majority of the beneficial interest in each Issuer and allege that the definition of "Beneficial Interest" in the Trust Agreements provides that the holder of such interest has the "right to direct or consent to actions of the Owner Trustee and otherwise participate in the management

TA328

of and control the affairs of the Trust."  The Trusts further admit that VCG is affiliated with Odyssey.

19.    The Trusts admit that VCG directed the Owner Trustee on behalf of the Issuers to enter into the Odyssey Agreement, which appoints Odyssey as a Servicer for each Issuer.  Section 3.07(b) of the Indentures specifies that the Issuers may contract with additional persons, such as Servicers.  Sections 2.03(a)(ii) and (iii) of the Trust Agreements provide that a purpose and power of the Trusts is "to provide for the administration of the Trust and the servicing of the Student Loans" and "to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing." The Trusts deny that the Administrator and the Indenture Trustee were unaware that VCG wanted Odyssey appointed as a Servicer and allege that they knew for approximately three years that VCG wanted Odyssey appointed as a Servicer instead of the servicing scheme devised by U.S. Bank and GSS.  In addition, the Trusts allege that there is no requirement in the Trust Agreements or the Indentures for the Administrator or the Indenture Trustee to be involved in the negotiation of agreements with Servicers.

20.    The Trusts admit that the Odyssey Agreement appoints Odyssey as a Servicer and denies that it appoints Odyssey as a Special Servicer and deny that this is unclear.  There is no conflict between the Odyssey Agreement and the Special Servicing Agreement.  The Special Servicing Agreement is not, and does not purport to be, an exclusive arrangement for servicing of loans.  The Odyssey Agreement does not provide that Odyssey will take over the servicing of any Loan currently being serviced by U.S. Bank as Special Servicer.  Odyssey will service newly defaulted Loans that the Special

TA329

Servicer is not servicing.  Under the Special Servicing Agreement, a "Defaulted Loan" that U.S. Bank is entitled to service must be a Loan as to which the Servicer (PHEAA) "has notified" U.S. Bank.  No additional Loans are being directed to the Special Servicer. Odyssey may purchase and sell Loans for the benefit of the Trusts regardless of what Servicer is servicing them, but this is not in conflict with the Special Servicing Agreement.

21.     The Trusts admit that a servicing agreement must satisfy the Rating Agency Condition, which means that each Rating Agency shall have been given 10 days' prior notice of such agreement and that none of the Rating Agencies shall have notified the Administrator and the Indenture Trustee in writing that such agreement will in and of itself result in a reduction or withdrawal of the then-current rating of the Notes.  The Trusts further allege that they gave appropriate notice and a copy of the Odyssey Agreement to the Ratings Agencies, that the Ratings Agencies did not provide any notification that such action will result in a reduction or withdrawal of the current rating of the Notes, and that the Trusts informed U.S. Bank in writing that all conditions precedent to execution of the Odyssey Agreement had been met.  Nothing further is required by the relevant agreements.  With respect to the allegations of footnote 6 of the Petition, the Trusts allege that the definition of "Servicing Fee" contained in Appendix A to the Indentures states that servicing fees "may be increased upon satisfying the Rating Agency Condition."  As set forth above, the Rating Agency Condition was satisfied.

22.     The Trusts deny that Odyssey is replacing U.S. Bank as Special Servicer and therefore the provision cited in paragraph 22 of the Petition is inapplicable.  The

TA330

Odyssey Agreement does not provide that Odyssey will take over the servicing of any Loan currently being serviced by U.S. Bank as Special Servicer. Odyssey will service newly defaulted Loans that the Special Servicer is not servicing. With respect to footnote 8 of the Petition, the Trusts allege that it would not violate the Special Servicing Agreement for recently defaulted Loans to be sent to Odyssey instead of to U.S. Bank. The Special Servicing Agreement is not, and does not purport to be, an exclusive arrangement for servicing of loans. The Special Servicer only services defaulted Loans as to which PHEAA has notified U.S. Bank.

23.     The Trusts admit that the Administrator received a letter from VCG stating that the Rating Agency Condition had been satisfied. The Trusts deny the implication of paragraph 23 of the Petition that the Administrator and the Indenture Trustee are required to be "involved in" the satisfaction of the Rating Agency Condition. The Trusts further deny the implication of paragraph 23 of the Petition that there was any obligation to attach or describe the notices that had been sent to the Ratings Agencies, and the Petition fails to cite any provision in any agreement imposing such obligation. The Trusts further deny the implication of paragraph 23 of the Petition that there was any obligation to describe any confirmation from the Ratings Agencies that the appointment would not result in a rating reduction or withdrawal, and the Petition fails to cite any provision in any agreement imposing such obligation. The Petition has it backwards. The definition of "Rating Agency Condition" contained in Appendix A to the Indenture makes clear that the Condition is satisfied as long as the Ratings Agencies do not send any notification that the agreement would result in a rating reduction or withdrawal. Section 11.01 of the

Indenture specifies that the Issuer shall provide the Indenture Trustee with an Officer's Certificate stating that all conditions precedent have been complied with and an opinion of counsel to the same effect. The Issuer did that here. *See* Petition Ex. 9. The Trusts deny that the Administrator and the Indenture Trustee were unaware that VCG wanted Odyssey appointed as a Servicer and allege that they knew for approximately three years that VCG wanted Odyssey appointed as a Servicer.

24.     The Trusts deny that the Odyssey Agreement materially alters how Loans may be released from the Indentures. Section 2.09 of the Indentures, entitled "Release of Collateral," provides that the Indenture Trustee shall release collateral when requested by the Issuers and accompanied by an Officers' Certificate of the Issuer. The Odyssey Agreement does not change this. The Indenture does not address whether Loans can be sold below market value but rather requires that the disposition price be equal to or in excess of the amount required by the applicable Servicing Agreement. The Indenture specifically provides that Loans may be sold "to the Servicer" (Section 3.14(iii)) and that the "the disposition price is equal to or in excess of the amount required by … the Servicing Agreement…" (Section 3.14(b)). The Odyssey Agreement provides that the Servicer shall set the purchase price for each Loan it decides to purchase based on fair market value determined by one of the two following methods:

> (a) 10% less than the highest bid received pursuant to the Servicer marketing  the Loans Eligible For Sale for sale to at least three (3) qualified bidders and conducting the sale process in a manner that, in the sole judgment of the Servicer, will yield the highest and best net proceeds to be paid in exchange for the Loans Eligible For Sale, provided however, that with respect to such sale process, Servicer shall, at a minimum: (i) provide an information  packet ("Information

TA332

Packet") applicable to each sale which describes the loans offered for sale and contains such other customary information applicable to such sale; (ii) in a good faith effort to maximize the proceeds to the Trust from the sale of the Loans, invite a sufficient number of qualified bidders under the circumstances to participate in such sale, and in no event shall the Servicer receive less than three (3) bids from qualified bidders; (iii) establish a time period between the distribution of the Information Packet and the acceptance of bids to allow the prospective bidders to research and analyze the Loans Eligible For Sale; and (iv) hold the sale at a convenient time and in a convenient location or (b) 10% less that the average value established pursuant to the Servicer engaging two (2) reputable appraisers, in the business of appraising loans, to appraise the Loans Eligible for Sale which the Servicer intends to purchase.

Odyssey Agreement Section 2(c)(iii). The Petition does not allege that Odyssey has purchased any Loan in violation of this provision, and the Trusts allege that no such purchase has occurred.

25.    The Trusts deny that Noteholder consent is required for appointment of a Servicer, because the Odyssey appointment does not waive, amend, modify, supplement, or terminate the current Servicing or Special Servicing Agreements and the Petition does not identify any provision in the Odyssey Agreement that does any of those things. The Special Servicing Agreement is not, and does not purport to be, an exclusive arrangement for servicing of loans. Odyssey will be servicing only newly-defaulted Loans. It is not servicing Loans currently being serviced by the Special Servicer. Section 3.14 of the Indenture, which provides for the release of collateral so that Loans may be sold, states that the Noteholders have consented to such release (Section 3.14(d)). Therefore, to the extent the Odyssey Agreement permits Odyssey to sell Loans, additional Noteholder consent is not required.

26.     The Trusts admit that the Administrator stated that Odyssey was not an approved Servicer, but they deny that the Administrator has any role in evaluating whether preconditions to appointment of a Servicer have been fulfilled.  The Administrator is obligated to follow the instructions of the Issuer upon being informed that the preconditions have been satisfied.

27.     The Trusts admit that the Owner Trustee, on behalf of the Issuers and at the direction of the Owners, directed the Administrator not to have any communications regarding Odyssey with PHEAA or any Rating Agency and directed the Administrator not to cause any additional defaulted Loans to be transferred to the Special Servicer or to hire any other entity to service defaulted Loans.  The Issuers allege that it was necessary to do so because the Administrator was providing inaccurate and misleading information concerning the Odyssey Agreement to the Ratings Agencies and others.  The Trusts further allege that the Issuers' instructions were entirely appropriate and that, pursuant to Section 1(d)(ii) of the Administration Agreement, the Administrator was obligated to abide by such directions.  The Special Servicing Agreement is not, and does not purport to be, an exclusive arrangement for servicing of Loans.

28.     In response to paragraph 28 of the Petition, the Trusts refer to the document referred to for its complete contents.

29.     The Trusts admit that invoices for Odyssey's services were emailed to the Administrator and allege that they were sent by the Owner Trustee.

30.     In response to paragraph 30 of the Petition, the Trusts refer to the document referred to for its complete contents.

31.     In response to paragraph 31 of the Petition, the Trusts refer to the document referred to for its complete contents.

32.     The Trusts deny that Odyssey had not been validly appointed as a Servicer and otherwise the Trusts refer to the document referred to in paragraph 32 of the Petition for its complete contents.

33.     The Trusts admit the allegations of paragraph 33 of the Petition.

34.     The Trusts allege that Odyssey provided monthly invoices to the Administrator and allege that no additional "documentation or backup" is required by the terms of any relevant agreement.  The Petition does not cite any provision in any relevant agreement requiring the submission of such "documentation or backup."

35.     The Trusts allege that while Odyssey has performed important services for the Trusts, including conducting audits and other work in order to evaluate what defaulted Loans might be capable of being sold, Odyssey has not collected any money in connection with its activities pursuant to the Odyssey Agreement and therefore have not forwarded any money to the Indenture Trustee.  The Trusts further allege that collecting money and transmitting money to the Indenture Trustee is not a prerequisite for Odyssey being reimbursed for services it performs under the Odyssey Agreement.  The Petition does not cite any provision in any relevant agreement requiring the transmission of money to the Indenture Trustee as a perquisite for payment to a Servicer.

36.     The Trusts admit the allegations of paragraph 36 of the Petition.

37.     In response to paragraph 37 of the Petition, the Trusts refer to the document referred to for its complete contents.

TA335

38.     In response to paragraph 38 of the Petition, the Trusts refer to the document referred to for its complete contents.

39.     In response to paragraph 39 of the Petition, the Trusts refer to the document referred to for its complete contents.

40.     In response to paragraph 40 of the Petition, the Trusts refer to the documents referred to for their complete contents.

41.     In response to paragraph 41 of the Petition, the Trusts refer to the document referred to for its complete contents.

## FIRST DEFENSE

The Petition fails to state a claim upon which relief may be granted.

## SECOND DEFENSE

This Court lacks *in rem* jurisdiction.

## THIRD DEFENSE

This Court lacks *in personam* jurisdiction over the Trusts and other indispensable parties.

## FOURTH DEFENSE

The case should be dismissed for failure to join indispensable parties.

## FIFTH DEFENSE

Minn. Stat. §§ 501C.0201 *et seq.* are unconstitutional as applied to the circumstances of this case.

TA336

## SIXTH DEFENSE

Pursuant to 28 U.S.C. § 1404, this case should be transferred to the United States

District Court for the District of Delaware.

WHEREFORE, the Trusts respectfully request that this case be transferred to the

United States District Court for the District of Delaware.  If the Court does not transfer

the case, the Trusts respectfully request that this Court find that Odyssey was properly

appointed a Servicer and direct that the Indenture Trustee pay Odyssey's invoices.  The

Trusts further request that the Court grant such other and further relief as the Court may

deem just and proper.

Dated:  April 1, 2016                        Respectfully submitted,

**LOCKRIDGE GRINDAL NAUEN P.L.L.P**


By ___/s/ Robert K. Shelquist_____
Robert K. Shelquist, #21310X
David W. Asp, #344850
Scott A. Moriarity, #0321977
100 Washington Avenue S, Suite 2200
Minneapolis, Minnesota 55401
Tel:  (612) 339-6900

Adam J. Levitt
**GRANT & EISENHOFER P.A.**
30 North LaSalle Street, Suite 2350
Chicago, Illinois  60602
Tel:  (312) 214-0000

TA337

James J. Sabella
Charles T. Caliendo
**GRANT & EISENHOFER P.A.**
485 Lexington Ave., 29th Floor
New York, NY 10017
Tel.:  (646) 722-8500

Michael T. Manuel
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, Delaware  19801
Tel:  (302) 622-7000

Marc A. DiCello
**THE DICELLO LAW FIRM**
7556 Mentor Avenue
Mentor, Ohio 44060
Tel.:  (440) 953-8888
*Counsel for National Collegiate Student
Loan Trust 2003-1, National Collegiate
Student Loan Trust 2004-1, National
Collegiate Student Loan Trust 2004-2,
National Collegiate Student Loan Trust
2005-1, National Collegiate Student Loan
Trust 2005-2, and National Collegiate
Student Loan Trust 2005-3*

TA338

# EXHIBIT 1

THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3

TRUST AGREEMENT

Among

DELAWARE TRUST COMPANY, NATIONAL ASSOCIATION
as OWNER TRUSTEE

and

THE NATIONAL COLLEGIATE FUNDING LLC
and THE EDUCATION RESOURCES INSTITUTE, INC.
as OWNERS

Dated as of
October 12, 2005

TA340

# TABLE OF CONTENTS

### ARTICLE I

DEFINITIONS.................................................................................................................1
    Section 1.01  Capitalized Terms ...............................................................................1

### ARTICLE II

ORGANIZATION .........................................................................................................8
    Section 2.01  Name .................................................................................................8
    Section 2.02  Office .................................................................................................8
    Section 2.03  Purposes and Powers.........................................................................8
    Section 2.04  Appointment of the Owner Trustee ................................................10
    Section 2.05  Declaration of Trust .........................................................................10
    Section 2.06  No Liability of Owners for Expenses or Obligations of Trust......................10
    Section 2.07  Situs of Trust....................................................................................10

### ARTICLE III

TRUST CERTIFICATES AND TRANSFER OF INTEREST .....................................10
    Section 3.01  Issuance of Trust Certificate.............................................................10
    Section 3.02  Registration and Transfer of Certificates.........................................10
    Section 3.03  Lost, Stolen, Mutilated or Destroyed Certificates ...........................11
    Section 3.04  Limitation on Transfer of Ownership Rights....................................12
    Section 3.05  Assignment of Right to Distributions ...............................................12

### ARTICLE IV

CONCERNING THE OWNERS....................................................................................13
    Section 4.01  Action by Owners with Respect to Certain Matters. ........................13
    Section 4.02  Action Upon Instructions..................................................................14
    Section 4.03  Super-majority Control .....................................................................14
    Section 4.04  Representations and Warranties of the Depositor..............................14
    Section 4.05  Power of Attorney .............................................................................15

### ARTICLE V

INVESTMENT AND APPLICATION OF TRUST FUNDS .......................................15
    Section 5.01  Investment of Trust Funds ...............................................................15
    Section 5.02  Application of Funds.........................................................................16

i

ARTICLE VI

CAPITAL................................................................................................................16
Section 6.01 Tax Characterization.................................................................16
Section 6.02 Initial Capital Contributions of Owners.................................16
Section 6.03 Capital Accounts.......................................................................16
Section 6.04 Interest.......................................................................................17
Section 6.05 No Additional Capital Contributions.....................................17
Section 6.06 Investment of Capital Contributions......................................17
Section 6.07 Repayment and Return of Capital Contributions..................17

ARTICLE VII

ALLOCATION OF PROFIT AND LOSS; DISTRIBUTIONS.................................18
Section 7.01 Profit.........................................................................................18
Section 7.02 Loss...........................................................................................18
Section 7.03 Special Allocations..................................................................18
Section 7.04 Curative Allocations................................................................20
Section 7.05 Other Allocation Rules............................................................20
Section 7.06 Distribution of Net Cash Flow................................................21
Section 7.07 Distribution Date Statement....................................................21
Section 7.08 Allocation of Tax Liability......................................................21
Section 7.09 Method of Payment..................................................................21
Section 7.10 No Segregation of Funds; No Interest....................................21
Section 7.11 Interpretation and Application of Provisions by the Administrator.............22

ARTICLE VIII

AUTHORITY AND DUTIES OF THE OWNER TRUSTEE.....................................22
Section 8.01 General Authority.....................................................................22
Section 8.02 Specific Authority.....................................................................22
Section 8.03 General Duties...........................................................................22
Section 8.04 Accounting and Reports to the Owners; the Internal Revenue
              Service and Others......................................................................23
Section 8.05 Signature of Returns.................................................................23
Section 8.06 Right to Receive and Rely Upon Instructions........................23
Section 8.07 No Duties Except as Specified in this Agreement or in Instructions...........23
Section 8.08 No Action Except Under Specified Documents or Instructions.................24
Section 8.09 Restriction..................................................................................24

ARTICLE IX

CONCERNING THE OWNER TRUSTEE..............................................................24
Section 9.01 Acceptance of Trusts and Duties............................................24
Section 9.02 Furnishing of Documents........................................................25
Section 9.03 Reliance; Advice of Counsel...................................................25
Section 9.04 Not Acting in Individual Capacity..........................................25

ii

TA342

Section 9.05  Representations and Warranties of Owner Trustee .......................................26

ARTICLE X

COMPENSATION OF OWNER TRUSTEE.................................................................26
   Section 10.01  Owner Trustee's Fees and Expenses.............................................26
   Section 10.02  Indemnification.................................................................................26
   Section 10.03  Lien on Trust Property .....................................................................26
   Section 10.04  Payments to the Owner Trustee ....................................................27

ARTICLE XI

TERMINATION OF TRUST.........................................................................................27
   Section 11.01  Termination of Trust........................................................................27
   Section 11.02  Distribution of Assets .....................................................................27
   Section 11.03  No Termination by Depositor or Owners .....................................28

ARTICLE XII

SUCCESSOR OWNER TRUSTEES AND ADDITIONAL OWNER TRUSTEES ....................28
   Section 12.01  Resignation of Owner Trustee; Appointment of Successor.........................28
   Section 12.02  Appointment of Additional Owner Trustees...........................................29

ARTICLE XIII

TAX MATTERS PARTNER ..........................................................................................29
   Section 13.01  Tax Matters Partner.........................................................................29
   Section 13.02  Notice of Tax Audit .........................................................................30
   Section 13.03  Authority to Extend Period for Assessing Tax ...........................30
   Section 13.04  Choice of Forum for Filing Petition for Readjustment...............30
   Section 13.05  Authority to Bind Owners by Settlement Agreement.................30
   Section 13.06  Notices Sent to the Internal Revenue Service...........................30
   Section 13.07  Indemnification of Tax Matters Partner.......................................30
   Section 13.08  Approval of Tax Matters Partner's Decisions ...........................30
   Section 13.09  Participation by Owners in Internal Revenue Service
                      Administrative Proceedings ..........................................................30

ARTICLE XIV

MISCELLANEOUS .......................................................................................................31
   Section 14.01  Supplements and Amendments.....................................................31
   Section 14.02  No Legal Title to Trust Property in Owner.................................31
   Section 14.03  Pledge of Collateral by Owner Trustee is Binding ...................31
   Section 14.04  Limitations on Rights of Others.....................................................31
   Section 14.05  Notices .................................................................................................32
   Section 14.06  Severability .........................................................................................32
   Section 14.07  Separate Counterparts .....................................................................32

Section 14.08 Successors and Assigns..................................................................32
Section 14.09 Headings ........................................................................................32
Section 14.10 Governing Law ..............................................................................32
Section 14.11 General Interpretive Principles ......................................................32

SCHEDULE A          CAPITAL CONTRIBUTIONS, INITIAL SHARING RATIOS AND PERCENTAGE INTERESTS
SCHEDULE B          LOAN ORIGINATORS
SCHEDULE C          LOAN PURCHASE AGREEMENTS
SCHEDULE D          GUARANTY AGREEMENTS

EXHIBIT 1          FORM OF TRUST CERTIFICATE
EXHIBIT 2          FORM OF ACCESSION AGREEMENT
EXHIBIT 3          FEE SCHEDULE

TRUST AGREEMENT, dated as of October 12, 2005, among The National Collegiate Funding LLC, a Delaware limited liability company (the "Depositor"), The Education Resources Institute, Inc., a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws, and Delaware Trust Company, National Association, a national banking association (the "Owner Trustee").

WHEREAS, the parties hereto intend to amend and restate that certain Interim Trust Agreement, dated as of September 3, 2005 (the "Interim Trust Agreement"), by and between the Depositor and the Owner Trustee, on the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the premises and of the mutual agreements herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto amend and restate the Interim Trust Agreement in its entirety and further agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01 Capitalized Terms. For all purposes of this Agreement, the following terms shall have the meanings set forth below:

"Administration Agreement" means the Administration Agreement, dated as of October 12, 2005, among the Trust, the Indenture Trustee, the Owner Trustee, the Depositor and First Marblehead Data Services, Inc., as Administrator, as it may be amended from time to time.

"Administrator" means First Marblehead Data Services, Inc., a Massachusetts corporation, as Administrator under the Administration Agreement, or any successor Administrator as appointed pursuant to the terms of the Administration Agreement.

"Affiliate" means, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" means this Trust Agreement, as it may be amended or restated from time to time.

"Assignment of Servicing Agreement" means the Servicer Consent Letter, dated as of October 12, 2005, among the Trust, The First Marblehead Corporation and the Pennsylvania Higher Education Assistance Agency, relating to the assignment of the Servicing Agreement to the Trust.

"Authorized Officer" means any officer of the Owner Trustee who is authorized to act for the Owner Trustee in matters relating to, and binding upon, the Trust and whose name appears

1

on a list of such authorized officers furnished by the Owner Trustee as such list may be amended or supplemented from time to time.

"Back-up Agreement" means the Back-up Administration Agreement, dated as of October 12, 2005, among the Trust, the Depositor, the Owner Trustee, the Administrator and U.S. Bank National Association.

"Bankruptcy Action" has the meaning set forth in Section 4.01(b)(iv)(G).

"Beneficial Interest" as to any Owner, means all or any part of the interest of that Owner in the Trust, including without limitation its (a) right to a distributive share of the Profit and Loss of the Trust, (b) right to a distributive share of the assets of the Trust, and (c) right to direct or consent to actions of the Owner Trustee and otherwise participate in the management of and control the affairs of the Trust.

"Business Day" means any day that is not a Saturday, Sunday or any other day on which commercial banking institutions in Delaware are authorized or obligated by law or executive order to be closed.

"Capital Account" means the Capital Account maintained for each Owner pursuant to Article VI of this Agreement.

"Capital Contribution" means the amount of money contributed or deemed to have been contributed by an Owner to the capital of the Trust, which shall be as set forth on Schedule A to this Agreement.

"Certificate of Trust" means the Certificate of Trust filed with the Secretary of State by the Owner Trustee on behalf of the Trust.

"Custodial Agreement" means the Custodial Agreement, dated as of October 12, 2005, among the Trust, the Indenture Trustee and the Pennsylvania Higher Education Assistance Agency.

"Deposit and Sale Agreement" means the Deposit and Sale Agreement, dated as of October 12, 2005, between the Depositor and the Trust.

"Deposit and Security Agreement" means the Deposit and Security Agreement, dated as of October 12, 2005, among the Administrator, TERI and the Trust.

"Depositor" means The National Collegiate Funding LLC, a Delaware limited liability company.

"Distribution Date" means the first Business Day following a day on which the Owner Trustee obtains receipt of funds or, if instructed by the Owners, such other Business Day as they shall specify in writing.

"Distribution Date Statement" means the statement described as such in Section 7.07.

2

TA346

"Distribution" means any money or other property distributed to an Owner with respect to its Beneficial Interest.

"Eligible Investments" means one or more of the following (it being acknowledged by the parties hereto that Eligible Investments will have the meaning set forth in the Indenture until such time as the Notes are no longer outstanding):

(a)    Obligations of or guaranteed as to principal and interest by the United States or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States;

(b)    Repurchase agreements on obligations specified in clause (a) maturing not more than one month from the date of acquisition thereof, provided that the unsecured obligations of the party agreeing to repurchase such obligations are at the time rated by each of the Rating Agencies in its highest short-term rating available;

(c)    Federal funds, certificates of deposit, demand deposits, time deposits and bankers' acceptances (which shall each have an original maturity of not more than 90 days and, in the case of bankers' acceptances, shall in no event have an original maturity of more than 365 days or a remaining maturity of more than 30 days) denominated in United States dollars of any U.S. depository institution or trust company incorporated under the laws of the United States or any state thereof or of any domestic branch of a foreign depository institution or trust company; provided that the debt obligations of such depository institution or trust company at the date of acquisition thereof have been rated by each of the Rating Agencies in its highest short-term rating available; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository institution or trust company shall exceed 30 days, the short-term rating of such institution shall have a credit rating in one of the two highest applicable categories from each of the Rating Agencies;

(d)    Commercial paper (having original maturities of not more than 365 days) of any corporation incorporated under the laws of the United States or any state thereof, which, on the date of acquisition has been rated by each of the Rating Agencies in its highest short-term rating available; provided that such commercial paper shall have a remaining maturity of not more than 30 days;

(e)    A money market fund rated by each of the Rating Agencies in its highest rating available which may be a money market fund of the Owner Trustee; and

(f)    Other obligations or securities that are acceptable to each of the Rating Agencies as an Eligible Investment hereunder;

provided, however, that no instrument shall be an Eligible Investment if it provides for either (i) the right to receive only interest payments with respect to the underlying debt instrument or (ii) the right to receive both principal and interest payments derived from the obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity greater than 120% of the yield to maturity at par of such underlying obligations; and provided further that so long as the Notes are outstanding, no instrument that is

3

not a permitted investment under the Indenture shall be an Eligible Investment for purposes of this Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Fiscal Year" means the twelve month period ending on June 30 each year or such portion thereof as the Trust may be in existence.

"Grantor Trust Certificateholders" means the holders of the grantor trust certificates issued by NCF Grantor Trust 2005-3.

"Grantor Trustee" means the bank or trust company acting as Grantor Trustee under the Grantor Trust Agreement dated as of October 12, 2005, between the Depositor and U.S. Bank National Association.

"Indemnification Agreements" means each of the Indemnification Agreements, dated as of October 12, 2005, between The First Marblehead Corporation and Bank of America, N.A. and JPMorgan Chase Bank, N.A., respectively.

"Indenture" means the Indenture between the Trust and U.S. Bank National Association, as Indenture Trustee, dated as of October 1, 2005, as amended or supplemented from time to time pursuant to which the Notes are to be issued.

"Indenture Trustee" means the bank or trust company acting as Indenture Trustee under the Indenture.

"Interested Noteholders" shall have the meaning set forth in the Indenture.

"Issuer Order" means the Issuer Order to the Indenture Trustee from the Trust dated October 12, 2005.

"Issuer Orders to Authenticate" means the Issuer Orders to Authenticate to the Indenture Trustee from the Trust dated October 12, 2005.

"Loan Originators" means each of the originators of the Student Loans, as set forth on Schedule B attached hereto, as amended or supplemented from time to time.

"Loan Purchase Agreements" means each of the loan purchase agreements entered into between each of the Loan Originators and The First Marblehead Corporation, as set forth on Schedule C attached hereto, as amended or supplemented from time to time.

"Net Cash Flow" means, with respect to any fiscal period of the Trust, all revenues of the Trust decreased by (a) cash expenditures for operating expenses (including interest on indebtedness of the Trust but not including expense items which do not require current cash outlay), (b) reserves for contingencies and working capital established in such amounts as the Owner Trustee, with the consent of the Owners, may determine, (c) repayments of principal on any Trust indebtedness, and (d) taxes.

4

"1933 Act" has the meaning set forth in Section 3.02(a).

"Notes" mean the collateralized student loan asset backed notes to be issued by the Trust pursuant to the Indenture.

"Noteholder" means any holder of the Notes.

"Owner" means each of the Depositor, TERI and any other Person who becomes an owner of a Beneficial Interest.

"Owner Trustee" means Delaware Trust Company, National Association, a national banking association with its principal place of business in the State of Delaware, not in its individual capacity but solely as trustee, or any successor thereto, duly appointed in accordance with Section 12.01 hereof.

"Percentage Interest" means the initial undivided beneficial interest in the Trust Property of an Owner expressed as a percentage of the total initial undivided beneficial interests in the Trust Property. References to Percentage Interests herein shall be solely for the purpose of certificating Owners' interests hereunder and for any other purpose specified in this Agreement.

"Periodic Filings" means any filings or submissions that the Trust is required to make with any state or Federal regulatory agency or under the Code.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, trust (including any beneficiary thereof), estate, custodian, nominee, unincorporated organization or government or any agency or political subdivision thereof.

"Plan" has the meaning set forth in Section 3.04(d).

"Plan Assets" has the meaning set forth in Section 3.04(d).

"Rating Agencies" means Moody's Investors Service, Inc., Fitch, Inc. and Standard & Poors Rating Services, a division of The McGraw-Hill Companies, Inc.

"Secretary of State" means the office of the Secretary of State of the State of Delaware.

"Servicer" means the Pennsylvania Higher Education Assistance Agency.

"Servicing Agreement" means (a) the Alternative Servicing Agreement, dated October 16, 2001, as amended, between the Pennsylvania Higher Education Assistance Agency and The First Marblehead Corporation.

"Sharing Ratio" means, with respect to any Owner, the ratio (expressed as a percentage) specified on Schedule A attached hereto.

"Statutory Trust Statute" means the Delaware Statutory Trust Act, 12 Del. Code §3801 et seq.

"Structuring Advisor" means The First Marblehead Corporation.

5

TA349

"Structuring Advisory Agreement" means the Structuring Advisory Agreement between the Structuring Advisor and the Trust, dated as October 12, 2005.

"Student Loans" means the education loans, to or for the benefit of students, originated under one of the Student Loan Programs.

"Student Loan Notes" means the promissory notes to be sold to the Trust by the Loan Originators pursuant to the Loan Purchase Agreements representing education loans, to or for the benefit of students, originated under the Student Loan Programs.

"Student Loan Programs" means each of the programs for the origination of the Student Loans by each of the Loan Originators pursuant to the Loan Purchase Agreements.

"Super-majority Owners" shall have the meaning set forth in Section 4.03.

"TERI" means The Education Resources Institute, Inc., a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws.

"TERI Deposit Account" means the special deposit account established by TERI pursuant to the Deposit and Security Agreement.

"TERI Guaranty Agreements" means each of the Guaranty Agreements entered into between each of the Loan Originators and TERI as set forth on Schedule D attached hereto, as amended or supplemented from time to time.

"TERI Guaranteed Loans" means Student Loans originated under the Student Loan Programs owned by the Trust and guaranteed by TERI pursuant to the Guaranty Agreements.

"Transfer" means the sale, transfer or other assignment of all of an Owner's right, title and interest in all or a portion of such Owner's Beneficial Interest.

"Trust" means The National Collegiate Student Loan Trust 2005-3 established by this Agreement.

"Trust Certificate" means a certificate evidencing the Beneficial Interest of an Owner in substantially the form attached hereto as Exhibit 1.

"Trust Property" means all right, title and interest of the Trust or the Owner Trustee on behalf of the Trust in and to any property contributed to the Trust by the Owners or otherwise acquired by the Trust, including without limitation all distributions, payments or proceeds thereon.

"Trust Related Agreements" means any instruments or agreements signed by the Owner Trustee on behalf of the Trust, including without limitation, the Indenture, the Loan Purchase Agreements, the Administration Agreement, the Deposit and Sale Agreement, the Deposit and Security Agreement, the Structuring Advisory Agreement, the Assignment of Servicing Agreement, the Back-up Agreement, the Custodial Agreement, the Notes, the Indemnification Agreements, the Issuer Order and the Issuer Orders to Authenticate.

6

TA350

<u>Tax Terms</u>:

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)    Credit to such Capital Account the minimum gain chargeback that such Partner is deemed to be obligated to restore pursuant to the penultimate sentences of sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations and the amount of such Partner's share of Partner Nonrecourse Debt Minimum Gain; and

(b)    Debit to such Capital Account the items described in sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Code" means the Internal Revenue Code of 1986, as amended.

"Nonrecourse Deductions" has the meaning set forth in section 1.704-2(b)(1) of the Regulations.

"Nonrecourse Liability" has the meaning set forth in section 1.704-2(b)(3) of the Regulations.

"Partner Nonrecourse Debt" has the meaning set forth in section 1.704-2(b)(4) of the Regulations.

"Partner Nonrecourse Debt Minimum Gain" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with section 1.704-2(i)(3) of the Regulations.

"Partner Nonrecourse Deductions" has the meaning set forth in sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

"Partners" means the Owners.

"Partnership" means the Trust.

"Partnership Minimum Gain" has the meaning set forth in sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

"Profit and Loss" means, for each Fiscal Year, an amount equal to the Partnership's taxable income or loss for such Fiscal Year, determined in accordance with section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated

7

TA351

separately pursuant to section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(a)    Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss pursuant to this definition shall be added to such taxable income or loss;

(b)    Any expenditures of the Partnership described in section 705(a)(2)(B) of the Code or treated as expenditures under section 705(a)(2)(B) of the Code pursuant to section 1.704-1(b)(2)(iv)(i) of the Regulations (other than expenses in respect of which an election is properly made under section 709 of the Code), and not otherwise taken into account in computing Profit or Loss pursuant to this definition, shall be subtracted from such taxable income or loss;

(c)    Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Section 7.03 or 7.04 shall not be taken into account in computing Profit or Loss.

The amounts of the items of Partnership income, gain, loss, or deduction available to be specially allocated pursuant to Sections 7.03 and 7.04 shall be determined by applying rules analogous to those set forth in clauses (a) and (b) above.

"Regulations" means the federal income tax regulations promulgated by the United States Treasury Department under the Code as such Regulations may be amended from time to time. All references herein to a specific section of the regulations shall be deemed also to refer to any corresponding provision of succeeding Regulations.

"Regulatory Allocations" has the meaning set forth in Section 7.04.

## ARTICLE II

## ORGANIZATION

Section 2.01 Name.    The Trust continued hereby shall be known as The National Collegiate Student Loan Trust 2005-3, in which name the Owner Trustee may take any action as provided herein.

Section 2.02 Office.    The principal place of business and principal office of the Trust shall be in care of the Owner Trustee, at the address set forth in Section 14.05. The Trust shall also have an office at 230 Park Avenue, New York, New York 10169.

Section 2.03 Purposes and Powers.

(a)    The purpose of the Trust is to engage in the following activities and only these activities:

(i)    To acquire a pool of Student Loans, to execute the Indenture and to issue the Notes;

8

TA352

(ii)     To enter into the Trust Related Agreements and to provide for the administration of the Trust and the servicing of the Student Loans;

(iii)     To engage in those activities and to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and

(iv)     To engage in such other activities as may be required in connection with conservation of the Trust Property and Distributions to Owners. Until the Indenture is discharged, the Trust shall not engage in any business or activities other than in connection with, or relating to, the foregoing and other than as required or authorized by the terms of this Agreement and the Indenture, except as are incidental to and necessary to accomplish such activities, unless the Interested Noteholders consent to the Trust engaging in other activities.

(b)     Until the Indenture is discharged, the operations of the Trust shall be conducted in accordance with the following standards:

(i)     The Trust will act solely in its own name and the Owner Trustee or other agents selected in accordance with this Agreement will act on behalf of the Trust subject to direction by the Owners as provided herein, but such action shall not be in violation of the terms of this Agreement;

(ii)     The Trust's funds and assets shall at all times be maintained separately from those of the Owners and any of their respective Affiliates;

(iii)     The Trust shall maintain complete and correct books, minutes of the meetings and proceedings of the Owners, and records of accounts;

(iv)     The Trust shall conduct its business at the office of the Owner Trustee and will use stationery and other business forms of the Trust under its own name and not that of the Owners or any of their respective Affiliates, and will avoid the appearance (A) of conducting business on behalf of any Owner or any Affiliate of an Owner or (B) that the assets of the Trust are available to pay the creditors of the Owner Trustee or any Owner;

(v)     The Trust's operating expenses shall be paid out of its own funds;

(vi)     The Trust shall not incur, guarantee or assume any debt (other than the Notes) nor hold itself out as being liable for the debts of any entity, including any Owner or any Affiliates of any Owner;

(vii)     For so long as any of the Notes are outstanding, the Trust shall not (A) merge or consolidate with or into any other entity, (B) convey or transfer all or substantially all of its assets to any other entity (other than to the Indenture Trustee pursuant to the Indenture), or (C) dissolve, liquidate or terminate in whole or in part; and

9

(viii)   For so long as any of the Notes are outstanding, the Trust shall not own or acquire any financial asset that requires the Trust, the Owners or the Administrator to make any decisions regarding such asset other than the servicing of the asset.

Section 2.04  Appointment of the Owner Trustee.  The Depositor hereby appoints the Owner Trustee as trustee of the Trust, to have all the rights, powers and duties set forth herein and in the Statutory Trust Statute.  The Owner Trustee acknowledges receipt in trust from the Depositor, of the sum of one dollar ($1), constituting the initial Trust Property.

Section 2.05  Declaration of Trust.  The Owner Trustee hereby declares that it will hold the Trust Property in trust upon and subject to the conditions set forth herein for the use and benefit of the Owners, subject to the obligations of the Owner Trustee under the Trust Related Agreements.  It is the intention of the parties hereto that the Trust constitute a statutory trust under the Statutory Trust Statute and that this Agreement constitute the governing instrument of the Trust.

Section 2.06  No Liability of Owners for Expenses or Obligations of Trust.  No Owner shall be liable for any liability, expense or other obligation of the Trust.

Section 2.07  Situs of Trust.  The Trust will be located and administered in the State of Delaware.  The Trust shall not have any employees in any state other than in the State of Delaware and payments will be received by the Owner Trustee on behalf of the Trust only in the State of Delaware and payments will be made by the Owner Trustee on behalf of the Trust only from the State of Delaware.

ARTICLE III

TRUST CERTIFICATES AND TRANSFER OF INTEREST

Section 3.01  Issuance of Trust Certificate.

(a)      As of the date hereof, as set forth on Schedule A attached hereto, the Depositor has been issued a Trust Certificate evidencing a percentage of the Beneficial Interest in the Trust and TERI has been issued a Trust Certificate evidencing a percentage of the Beneficial Interest in the Trust.

(b)      Each Trust Certificate shall be executed by manual signature on behalf of the Owner Trustee by one of its Authorized Officers.  Trust Certificates bearing the manual signature of an individual who was, at the time when such signature was affixed, authorized to sign on behalf of the Owner Trustee shall bind the Trust, notwithstanding that such individual has ceased to be so authorized prior to the delivery of such Trust Certificate or does not hold such office at the date of such Trust Certificate.  Each Trust Certificate shall be dated the date of its issuance.

Section 3.02  Registration and Transfer of Certificates.

(a)      The Owner Trustee shall maintain at its office referred to in Section 2.02, or at the office of any agent appointed by it and approved in writing by the Owners at the time of such

10

TA354

appointment, a register for the registration and Transfer of Trust Certificates. No Transfer of a Beneficial Interest shall be made unless such Transfer is made pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "1933 Act"), and state securities laws, or is exempt from the registration requirements under the 1933 Act and state securities laws.

(b)     The registered Owner of any Trust Certificate may Transfer all or any portion of the Beneficial Interest evidenced by such Trust Certificate upon surrender thereof to the Owner Trustee accompanied by the documents required by Section 3.04. Such Transfer may be made by the registered Owner in person or by its attorney duly authorized in writing upon surrender of the Trust Certificate to the Owner Trustee accompanied by a written instrument of Transfer and with such signature guarantees and evidence of authority of the Persons signing the instrument of Transfer as the Owner Trustee may reasonably require. Promptly upon the receipt of such documents and receipt by the Owner Trustee of the transferor's Trust Certificate, the Owner Trustee shall (i) record the name of such transferee as an Owner and its Percentage Interest in the Trust Certificate register and (ii) issue, execute and deliver to such Owner a Trust Certificate evidencing such Percentage Interest. In the event a transferor Transfers only a portion of its Beneficial Interest, the Owner Trustee shall register and issue to such transferor a new Trust Certificate evidencing such transferor's new Percentage Interest. Subsequent to a Transfer and upon the issuance of the new Trust Certificate or Trust Certificates, the Owner Trustee shall cancel and destroy the Trust Certificate surrendered to it in connection with such Transfer. The Owner Trustee may treat the Person in whose name any Trust Certificate is registered as the sole Owner of the Beneficial Interest in the Trust evidenced by such Trust Certificate.

(c)     As a condition precedent to any registration of Transfer, the Owner Trustee may require the payment of a sum sufficient to cover the payment of any tax or taxes or other governmental charges required to be paid in connection with such Transfer and any other reasonable expenses connected therewith.

Section 3.03  Lost, Stolen, Mutilated or Destroyed Certificates. If (i) any mutilated Trust Certificate is surrendered to the Owner Trustee, or (ii) the Owner Trustee receives evidence to its satisfaction that any Trust Certificate has been destroyed, lost or stolen, and upon proof of ownership satisfactory to the Owner Trustee together with such security or indemnity as may be requested by the Owner Trustee to save it harmless, the Owner Trustee shall execute and deliver a new Trust Certificate for the same Percentage Interest as the Trust Certificate so mutilated, destroyed, lost or stolen, of like tenor and bearing a different issue number, with such notations, if any, as the Owner Trustee shall determine. In connection with the issuance of any new Trust Certificate under this Section 3.03, the Owner Trustee may require the payment by the registered Owner thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the reasonable fees and expenses of the Owner Trustee) connected therewith. Any replacement Trust Certificate issued pursuant to this Section 3.03 shall constitute complete and indefeasible evidence of ownership of a Beneficial Interest, as if originally issued, whether or not the lost, stolen or destroyed Trust Certificate shall be found at any time.

11

Section 3.04 <u>Limitation on Transfer of Ownership Rights</u>.

(a)    No Transfer of all or any part of a Beneficial Interest shall be made to any Person unless (i) such Person delivers to the Owner Trustee an accession agreement substantially in the form of Exhibit 2 hereof, (ii) except for the initial transfer of the Beneficial Interest of the Depositor, the Owner Trustee shall have received a written opinion of counsel in form and substance satisfactory to the Owner Trustee stating that such Transfer is exempt from the 1933 Act and any applicable state securities laws.

(b)    At any time that there is more than one Owner, no Transfer of a Beneficial Interest shall be valid unless the Owner making such Transfer shall have received the prior written consent to such Transfer of the Owners holding at least 85% of both the Percentage Interests and the Sharing Ratios in the Trust at such time, which consent may not be unreasonably withheld; <u>provided</u>, <u>however</u>, that in calculating the total Beneficial Interests in the Trust the Beneficial Interest owned by the transferor or (unless the transferor and its Affiliates are the only Owners) any Affiliate thereof shall be excluded.

(c)    Except for the initial issuance of the Trust Certificates to the Depositor, no Transfer shall be valid if, as a result of such Transfer, (i) any Person would have a Percentage Interest or a Sharing Ratio of 100%, considering for such purpose all interests owned by any Affiliate of such Person as owned by such Person, or (ii) such Transfer would result in a termination of the Trust for Federal income tax purposes.

(d)    No Transfer of all or any part of a Beneficial Interest shall be made to any employee benefit plan or certain other retirement plans and arrangements, including individual retirement accounts and annuities, Keogh plans and bank collective investment funds and insurance company general or separate accounts in which such plans, accounts or arrangements are invested, that are subject to ERISA or Section 4975 of the Code (collectively, "Plan"), nor to any Person acting, directly or indirectly, on behalf of any such Plan or any Person acquiring the Beneficial Interest with "plan assets" of a Plan within the meaning of the Department of Labor regulation promulgated at 29 C.F.R. § 2510.3-101 ("Plan Assets") unless the Owner Trustee is provided with an opinion of counsel which establishes to the satisfaction of the Owner Trustee that the purchase of the Beneficial Interest is permissible under applicable law, will not constitute or result in any prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Owners, the Owner Trustee or the Trust to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to that undertaken in this Agreement, which opinion of counsel shall not be an expense of the Owners, the Owner Trustee or the Trust.

(e)    No Transfer of all or any part of a Beneficial Interest shall be permitted, and no such transfer shall be effective hereunder, if such transfer would cause the Trust to be classified as a publicly traded partnership, taxable as a corporation for federal income tax purposes, by causing the Trust to have more than 100 Owners at any time during any taxable year of the Trust.

Section 3.05 <u>Assignment of Right to Distributions</u>.    An Owner may assign all or any part of its right to receive distributions hereunder, but such assignment (in the absence of a permitted Transfer) shall effect no change in the ownership of the Trust.

TA356

## ARTICLE IV

## CONCERNING THE OWNERS

Section 4.01 <u>Action by Owners with Respect to Certain Matters.</u>

(a)     The Owner Trustee will take such action or refrain from taking such action under this Agreement or any Trust Related Agreement as it shall be directed pursuant to an express provision of this Agreement or such Trust Related Agreement or, with respect to nonministerial matters, as it shall be directed by all the Owners for so long as any of the Notes are outstanding.

(b)     Without limiting the generality of the foregoing, in connection with the following nonministerial matters, the Owner Trustee will take no action, and will not have authority to take any such action, unless it receives prior written approval from all the Owners for so long as any of the Notes are outstanding:

(i)     Initiate any claim or lawsuit by the Trust and compromise any claim or lawsuit brought by or against the Trust, except for claims or lawsuits initiated in the ordinary course of business by the Trust or its agents or nominees for collection on the Student Loans owned by the Trust;

(ii)     Amend, change or modify this Agreement or any Trust Related Agreement;

(iii)     File a voluntary petition in bankruptcy for the Trust, which in no event shall the Owner Trustee be permitted to do or be instructed to do until at least 367 days after the payment in full of the Outstanding Notes (as defined in the Indenture) issued by the Trust; and

(iv)     (A) Institute proceedings to have the Trust declared or adjudicated bankrupt or insolvent, (B) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (C) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (D) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (E) make any assignment for the benefit of the Trust's creditors, (F) cause the Trust to admit in writing its inability to pay its debts generally as they become due, or (G) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing (any of the above, a "Bankruptcy Action"). No Owner shall have the power to take, and no Owner shall take, any Bankruptcy Action with respect to the Trust or direct the Owner Trustee to take any Bankruptcy Action with respect to the Trust.

(c)     No Owner shall take any action to cause the filing of an involuntary petition in bankruptcy against the Trust.

TA357

Section 4.02 <u>Action Upon Instructions</u>.

(a)     The Owner Trustee shall take such action or actions as may be specified in this Agreement or in any instructions delivered in accordance with this Article IV or Article VIII; provided, however, that the Owner Trustee shall not be required to take any such action if it shall have reasonably determined, or shall have been advised by counsel, that such action (i) is contrary to the terms hereof or of any document contemplated hereby to which the Trust or the Owner Trustee is a party or is otherwise contrary to law, (ii) is likely to result in personal liability on the part of the Owner Trustee, unless the Owners shall have provided to the Owner Trustee indemnification or security reasonably satisfactory to the Owner Trustee against all costs, expenses and liabilities arising from the Owner Trustee's taking of such action, or (iii) would adversely affect the status of the Trust as a partnership for Federal income tax purposes.

(b)     No Owner shall direct the Owner Trustee to take or refrain from taking any action contrary to this Agreement or any Trust Related Agreement, nor shall the Owner Trustee be obligated to follow any such direction, if given.

(c)     Notwithstanding anything contained herein or in any Trust Related Agreement to the contrary, the Owner Trustee shall not be required to take any action in any jurisdiction other than in the State of Delaware if the taking of such action will (i) require the consent or approval or authorization or order for the giving of notice to, or the registration with or taking of any action in respect of, any state or other governmental authority or agency of any jurisdiction other than the State of Delaware; (ii) result in any fee, tax or other governmental charge under the laws of any jurisdiction or any political subdivision thereof in existence on the date hereof other than the State of Delaware becoming payable by the Owner Trustee; or (iii) subject the Owner Trustee to personal jurisdiction in any jurisdiction other than the State of Delaware for causes of action arising from acts unrelated to the consummation of the transactions by the Owner Trustee contemplated hereby.

(d)     The Owner Trustee shall not have the power to remove the Administrator under the Administration Agreement or appoint a successor Administrator pursuant to the Administration Agreement without written instruction by the Owners.

Section 4.03 <u>Super-majority Control</u>.  Except as otherwise expressly provided in this Agreement, any action which may be taken or consent or instructions which may be given by the Owners under this Agreement may be taken by the Owners holding in the aggregate at least 85% of both the Percentage Interests and the Sharing Ratios in the Trust at the time of such action (the "Super-majority Owners").  Any written notice of the Owners delivered pursuant to this Agreement shall be effective only if signed by the Super-majority Owners at the time of the delivery of such notice.

Section 4.04 <u>Representations and Warranties of the Depositor</u>.  The Depositor hereby represents and warrants to the Owner Trustee as follows:

(a)     Upon the receipt of the Trust Property by the Owner Trustee under this Agreement, the Owner Trustee on behalf of the Trust will have good title to the Trust Property free and clear of any lien.

14

TA358

(b)     The Trust is not and will not be, upon conveyance of the Trust Property to the Owner Trustee, an "Investment Company" or under the "control" of an "Investment Company," as such terms are defined in the Investment Company Act of 1940, as amended.

(c)     Except for the filing of the Certificate of Trust with the Secretary of State, no consent, approval, authorization or order of, or filing with, any court or regulatory, supervisory or governmental agency or body is required under current law in connection with the execution, delivery or performance by the Depositor of this Agreement or the consummation of the transactions contemplated hereby; provided, however, that no representation or warranty is made herein as to compliance with Federal securities laws or the securities or "blue sky" laws of any state.

(d)     This Agreement has been duly and validly authorized, executed and delivered by, and constitutes a valid and binding agreement of, the Depositor, enforceable in accordance with its terms.

Section 4.05  Power of Attorney.

(a)     General.  Each Owner hereby irrevocably constitutes and appoints the Administrator, with full power of substitution, such Owner's true and lawful attorney-in-fact, in such Owner's name, place and stead, with full power to act jointly and severally, to make, execute, sign, acknowledge, swear to, verify, deliver, file, record and publish the following documents:

(i)     Any certificate, instrument or document to be filed by the Owners under the laws of any state, or with any governmental agency in connection with this Agreement;

(ii)     Any certificate, instrument or document which may be required to effect the continuation or the termination of the Trust, including any amendments to this Agreement; provided such continuation or termination is in accordance with the terms of this Agreement; and

(iii)     Any written notice, instruction, instrument or document under Article XII of this Agreement.

(b)     Duration of Power of Attorney.  It is expressly intended by each of the Owners that the Power of Attorney granted under this Section 4.05 is coupled with an interest, and it is agreed that such Power of Attorney shall survive (i) the dissolution, death or incompetency of any Owner and (ii) the assignment by any Owner of the whole or any portion of such Owner's Beneficial Interest.

## ARTICLE V

## INVESTMENT AND APPLICATION OF TRUST FUNDS

Section 5.01  Investment of Trust Funds.  Unless otherwise directed in writing by the Owners, income with respect to and proceeds of the Trust Property which are received by the

15

Owner Trustee more than one day prior to a Distribution Date shall be invested and reinvested by the Owner Trustee in Eligible Investments. Interest earned from such investment and reinvestment shall be credited to the Trust Property.

Section 5.02 Application of Funds. Income with respect to and proceeds of Trust Property held by the Owner Trustee on a Distribution Date shall be remitted directly to the Indenture Trustee for application in accordance with the Indenture for so long as any of the Notes is outstanding, and thereafter shall be applied by the Owner Trustee on such Distribution Date in the following order:

(i)    First, to pay any amounts due to the Owner Trustee under this Agreement;

(ii)    Second, to pay any amounts due to the Administrator under the Administration Agreement and to the Structuring Advisor under the Structuring Advisory Agreement;

(iii)    Third, to pay any amounts then due to any Person under the Trust Related Agreements;

(iv)    Fourth, to pay any other expenses of the Trust; and

(v)    Fifth, to the Owners in accordance with Section 7.06.

All payments to be made under this Agreement by the Owner Trustee shall be made only from the income and proceeds of the Trust Property and only to the extent that the Owner Trustee has received such income or proceeds.

ARTICLE VI

CAPITAL

Section 6.01 Tax Characterization. It is intended that the Trust be characterized and treated as a partnership for federal income tax purposes. All references to a "Partner," the "Partners" and to the "Partnership" in this Agreement and in the provisions of the Code and Regulations cited in this Agreement shall be deemed to refer to an Owner, the Owners and the Trust, respectively. The Tax Matters Partner of the Trust shall be as set forth in Article XIII.

Section 6.02 Initial Capital Contributions of Owners. The Depositor shall make an initial Capital Contribution in the amount of one dollar ($1) upon execution of this Agreement. Upon their accession to this Agreement as Owners and the issuance of Trust Certificates to them in accordance with Section 3.01(a), the Owners will be deemed to have made initial Capital Contributions in the amounts set forth on Schedule A attached hereto.

Section 6.03 Capital Accounts. A capital account shall be maintained for each Owner throughout the term of the Trust in accordance with the rules of section 1.704-1(b)(2)(iv) of the Regulations as in effect from time to time, and, to the extent not inconsistent therewith, to which the following provisions apply:

16

TA360

(a)    To each Owner's Capital Account there shall be credited (i) the amount of money contributed by such Owner to the Trust (including each Owner's share of any liabilities of the Trust assumed by such Owner as provided in section 1.704-1(b)(2)(iv)(c) of the Regulations), (ii) the fair market value of any property contributed to the Trust by such Owner (net of liabilities secured by such contributed property that the Trust is considered to assume or take subject to under section 752 of the Code), and (iii) such Owner's share of Profit and items of income and gain that are specially allocated pursuant to Sections 7.03 and 7.04 (other than any income or gain allocated to such Owner pursuant to Section 7.03(f) in accordance with section 704(c) of the Code). The initial Capital Contributions of each Owner are set forth on Schedule A attached hereto.

(b)    To each Owner's Capital Account there shall be debited (i) the amount of money distributed to such Owner by the Trust (including any liabilities of such Owner assumed by the Trust as provided in section 1.704-1(b)(2)(iv)(c) of the Regulations) other than amounts that are in repayment of debt obligations of the Trust to such Owner, (ii) the fair market value of property distributed to such Owner (net of liabilities secured by such distributed property that such Owner is considered to assume or take subject to), and (iii) such Owner's share of Loss and items of loss or deduction that are specially allocated pursuant to Sections 7.03 and 7.04 (other than any deduction or loss allocated to such Owner pursuant to Section 7.03(f) in accordance with section 704(c) of the Code).

(c)    The Capital Account of a transferee Owner shall include the appropriate portion of the Capital Account of the Owner from whom the transferee Owner's interest was obtained.

(d)    In determining the amount of any liability, there shall be taken into account section 752(c) of the Code and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations.

Section 6.04  Interest.  No Owner shall be entitled to interest on its Capital Contribution or on any Profit retained by the Trust.

Section 6.05  No Additional Capital Contributions.  No Owner shall make an additional Capital Contribution to the Trust, or receive a distribution from the Trust, of property unless this Agreement shall have first been amended to the extent necessary to comply with the requirements of sections 704(b) and (c) of the Code regarding the distributive shares of, and the allocation of income, gain, loss, deduction and credit among, partners of a partnership.

Section 6.06  Investment of Capital Contributions.  The cash Capital Contributions of the Owners shall be invested by the Owner Trustee in accordance with Section 5.01.

Section 6.07  Repayment and Return of Capital Contributions.  The Owner Trustee shall have no personal liability for the repayment of any Capital Contributions of the Owners.

TA361

## ARTICLE VII

## ALLOCATION OF PROFIT AND LOSS; DISTRIBUTIONS

Section 7.01 Profit. After giving effect to special allocations set forth in Section 7.03 and Section 7.04, Profit for any Fiscal Year shall be allocated to the Owners in proportion to their respective Sharing Ratios.

Section 7.02 Loss. After giving effect to the special allocations set forth in Sections 7.03 and 7.04, Loss for any Fiscal Year shall be allocated as follows:

(a) Special Allocation of Loss Attributable to Note Defaults on TERI Guaranteed Loans. To the extent of any positive balance in TERI's Capital Account as an Owner, TERI shall be specially allocated all Losses for such Fiscal Year resulting from defaults, as determined pursuant to the TERI Guaranty Agreements, on the TERI Guaranteed Loans owned by the Trust to the extent that the Trust is not reimbursed for such Losses by TERI as a guaranty payment pursuant to the TERI Guaranty Agreements.

(b) Other Loss. All Loss not allocated pursuant to Section 7.02(a) shall be allocated to the Owners in proportion to their Sharing Ratios.

(c) Effect of Adjusted Capital Account Deficit. The Loss allocated pursuant to Section 7.02(a) and (b) shall not exceed the maximum amount of Loss that can be so allocated without causing any Owner to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some but not all of the Owners would have Adjusted Capital Account Deficits as a consequence of an allocation of Loss pursuant to Section 7.02(a) and (b), the limitation set forth in this Section 7.02(c) shall be applied on an Owner by Owner basis so as to allocate the maximum permissible Loss to each Owner under section 1.704-1(b)(2)(ii)(d) of the Regulations.

(d) Remaining Loss. In the event that there is any remaining Loss in excess of the limitation set forth in Section 7.02(c), such remaining Loss shall be allocated among the Owners in proportion to their respective Sharing Ratios.

Section 7.03 Special Allocations.

(a) Minimum Gain Chargeback. Except as otherwise provided in section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Section 7.03, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Owner shall be specially allocated items of Trust income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Owner's share of the net decrease in Partnership Minimum Gain, determined in accordance with section 1.704-2(g) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Owner pursuant thereto. The items to be so allocated shall be determined in accordance with sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This Section 7.03(a) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

18

TA362

(b)     Owner Minimum Gain Chargeback.  Except as otherwise provided in section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this Section 7.03, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Owner who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(4) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Partner pursuant thereto. The items to be so allocated shall be determined in accordance with sections 1.704-2(i)(4) and 1.704-2(i)(2) of the Regulations. This Section 7.03(b) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(c)     Qualified Income Offset.  In the event any Owner unexpectedly receives any adjustments, allocations, or distributions described in section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Trust income and gain shall be specially allocated to the Owner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Owner as quickly as possible, provided that an allocation pursuant to this Section 7.03(c) shall be made only if and to the extent that the Owner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article VII have been tentatively made as if this Section 7.03(c) were not in this Agreement.

(d)     Nonrecourse Deductions.  Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the Owners in proportion to their Sharing Ratios.

(e)     Partner Nonrecourse Deductions.  Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Owner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with section 1.704-2(i)(1) of the Regulations.

(f)     Mandatory Allocations Under Section 704(c) of the Code.  Notwithstanding the foregoing provisions of this Section 7.03, in the event section 704(c) of the Code or section 704(c) of the Code principles applicable under section 1.704-1(b)(2)(iv) of the Regulations require allocations of income, gain, deduction or loss in a manner different than that set forth above, the provisions of section 704(c) of the Code and the Regulations thereunder shall control such allocations. Any item of Trust income, gain, loss and deduction with respect to any property (other than cash) that has been contributed by a Partner to the capital of the Trust or which has been revalued for Capital Account purposes pursuant to section 1.744-1(b)(2)(iv) of the Regulations and which is required to be allocated to such Partner for income tax purposes under section 704(c) of the Code so as to take into account the variation between the tax basis of such property and its fair market value at the time of its contribution shall be allocated solely for income tax purposes in the manner required or permitted under section 704(c) of the Code using the "traditional method" described in section 1.704-3(b) of the Regulations, provided, however,

19

TA363

that curative allocations consisting of the special allocation of gain or loss upon the sale or other disposition of the contributed property shall be made in accordance with section 1.704-3(c) of the Regulations to the extent necessary to eliminate any disparity, to the extent possible, between the Partners' book and tax Capital Accounts attributable to such property; further provided, however, that any other method allowable under applicable Regulations may be used for any contribution of property as to which there is agreement between the contributing Partner and the Administrator.

(g)     Gross Income Allocation.  In the event any Owner has an Adjusted Capital Account Deficit, such Owner shall be specially allocated items of Trust income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 7.03(g) shall be made only if and to the extent that such Owner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 7.03 have been made as if Sections 7.03(c) and 7.03(g) were not in this Agreement.

Section 7.04  Curative Allocations.  The allocations set forth in Sections 7.02 and 7.03(a) through (e) (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations.  It is the intent of the Owners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Trust income, gain, loss, or deduction.  Therefore, notwithstanding any other provision of this Article VII (other than the Regulatory Allocations), offsetting special allocations of Trust income, gain, loss, or deduction shall be made so that, after such offsetting allocations are made, each Owner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Owner would have had if the Regulatory Allocations were not part of this Agreement and all Trust items were allocated pursuant to Sections 7.01 and 7.02.  In making such offsetting allocations, there shall be taken into account future Regulatory Allocations under Section 7.03(a) and (b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Section 7.03(d) and (e).

Section 7.05  Other Allocation Rules.

(a)     For purposes of determining the Profit, Loss, or any other items allocable to any period, Profit, Loss, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Owner Trustee, under the direction of the Super-majority Owners, using any method permissible under section 706 of the Code and the Regulations thereunder.

(b)     The Owners are aware of the income tax consequences of the allocations made by this Article VII and hereby agree to be bound by the provisions of this Article VII in reporting their shares of Trust income and loss for income tax purposes.

(c)     Solely for purposes of determining an Owner's proportionate share of the "excess nonrecourse liabilities" of the Trust within the meaning of section 1.752-3(a)(3) of the Regulations, the Owners' interests in Trust profits are in proportion to their Sharing Ratios.

(d)     To the extent permitted by section 1.704-2(h)(3) of the Regulations, the Owner Trustee shall endeavor to treat distributions of Net Cash Flow as having been made from the

20

TA364

proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Owner.

Section 7.06  Distribution of Net Cash Flow.  Except to the extent prohibited by any other agreement to which the Trust is a party or is otherwise bound, Net Cash Flow on each Distribution Date shall be distributed on such Distribution Date to each Owner in an amount equal to (i) the Profit allocated to such Owner under this Article VII and not previously distributed to such Owner less (ii) the amount of Losses allocated to such Owner to the extent such Losses were not applied in reduction of the amount of any previous distribution of Net Cash Flow to such Owner. All payments to be made under this Agreement by the Owner Trustee shall be made only from the income and proceeds of the Trust Property and only to the extent the Owner Trustee has received such income or proceeds.

Section 7.07  Distribution Date Statement.  With each distribution to an Owner pursuant to Section 7.06, the Owner Trustee shall deliver a Distribution Date Statement setting forth, for the period since the preceding Distribution Date:

(a)  Income and proceeds received by the Owner Trustee with respect to the Trust Property;

(b)  Amounts paid to the Owner Trustee;

(c)  Amounts paid to any Person pursuant to a Trust Related Agreement; and

(d)  Amounts paid for other expenses of the Trust.

Section 7.08  Allocation of Tax Liability.  In the event that any tax is imposed on the Trust, such tax shall be charged against amounts otherwise distributable to the Owners in proportion to their respective Sharing Ratios. The Owner Trustee is hereby authorized to retain from amounts otherwise distributable to the Owners sufficient funds to pay or provide for the payment of, and then to pay, such tax as is legally owed by the Trust (but such authorization shall not prevent the Owner Trustee from contesting any such tax in appropriate proceedings, and withholding payment of such tax, if permitted by law, pending the outcome of such proceedings).

Section 7.09  Method of Payment.  All amounts payable to an Owner pursuant to this Agreement shall be paid by the Owner Trustee to such Owner or a nominee therefor by check payable to such Owner, mailed first class to the address of such Owner appearing on the register maintained pursuant to Section 3.02, or by crediting the amount to be distributed to such Owner to an account maintained by such Owner with the Owner Trustee or by transferring such amount by wire transfer in immediately available funds to a banking institution with bank wire transfer facilities for the account of such Owner, as instructed in writing from time to time by such Owner. The Owner Trustee may require an Owner to pay any wire transfer fees incurred in connection with any wire transfer made to such Owner.

Section 7.10  No Segregation of Funds; No Interest.  Subject to Sections 2.03(b)(ii) and 5.01, funds received by the Owner Trustee hereunder need not be segregated in any manner

21

TA365

except to the extent required by law and may be deposited under such general conditions as may be prescribed by law, and the Owner Trustee shall not be liable for any interest thereon.

Section 7.11 Interpretation and Application of Provisions by the Administrator. The Owner Trustee shall appoint and authorize the Administrator to interpret and apply the provisions set forth in Articles V, VI, VII and XI regarding application of funds, allocations of Profit and Loss and Distributions of Net Cash Flow, to resolve any ambiguities that may result from such application and to provide the Owner Trustee and the Owners with clarification of any provision as may be necessary or appropriate. The determinations of the Administrator shall be binding upon the Owners.

## ARTICLE VIII

## AUTHORITY AND DUTIES OF THE OWNER TRUSTEE

Section 8.01 General Authority. The Owner Trustee is authorized to take all actions required or permitted to be taken by it pursuant to the terms of this Agreement, the Trust Related Agreements and the Statutory Trust Statute. The Owner Trustee is further authorized from time to time to take such action as the Administrator directs with respect to the Trust Related Agreements.

Section 8.02 Specific Authority. The Owner Trustee is hereby authorized and directed to take the following actions:

(a)     Execute the Certificate of Trust;

(b)     Execute and deliver the Administration Agreement and the Back-up Agreement and on behalf of the Trust, as well as the Trust Related Agreements, including without limitation, the Trust Certificates and any other document contemplated by the foregoing, in each case in such form as the Administrator shall approve, as evidenced conclusively by the Owner Trustee's execution thereof; and

(c)     Execute and deliver on behalf of the Trust any documents necessary or appropriate, in such form as the Administrator shall approve, as evidenced conclusively by the Owner Trustee's execution thereof, to cause the repurchase by TERI or the Trust, as the case may be, of any Student Loan Note required to be repurchased in accordance with the TERI Guaranty Agreements.

Section 8.03 General Duties. It shall be the duty of the Owner Trustee to discharge (or cause to be discharged) all of its responsibilities pursuant to the terms of this Agreement and to administer the Trust in the interest of the Owners. Notwithstanding the foregoing, the Owner Trustee shall be deemed to have discharged its duties and responsibilities hereunder and under the Trust Related Agreements to the extent the Administrator has agreed in the Administration Agreement to perform such acts or to discharge such duties of the Owner Trustee hereunder or under any Trust Related Agreement, and the Owner Trustee shall not be held liable for the default or failure of the Administrator to carry out its obligations under the Administration Agreement.

22

TA366

Section 8.04 <u>Accounting and Reports to the Owners, the Internal Revenue Service and Others</u>. The Administrator shall (a) maintain or cause to be maintained the books of the Trust on a fiscal year basis using the accrual method of accounting, (b) deliver to each Owner, within 60 days of the end of each Fiscal Year, or more often, as may be required by the Code and the Regulations thereunder, a copy of the annual financial statement of the Trust for such Fiscal Year and a statement in such form and containing such information as may be required by such Regulations, and as is necessary and appropriate to enable each Owner to prepare its federal and state income tax returns, (c) file such tax returns relating to the Trust, and make such elections, including an election for the first taxable year of the Trust, necessary for the Trust to qualify as a partnership, or as may from time to time be required under any applicable state or federal statute or rule or regulation thereunder, (d) cause such tax returns to be signed in the manner required by law, (e) collect or cause to be collected any withholding tax required by the Code to be withheld by the Owner Trustee with respect to distributions to Owners who are nonresident aliens or foreign corporations, and (f) cause to be mailed to each Owner copies of all such reports and tax returns of the Trust.

Section 8.05 <u>Signature of Returns</u>. The Owner Trustee shall sign on behalf of the Trust the tax returns and other Periodic Filings of the Trust, unless applicable law requires an Owner to sign such documents, in which case, so long as the Depositor is an Owner and applicable law allows the Depositor to sign any such document, the Depositor shall sign such document. At any time that the Depositor is not an Owner, or is otherwise not allowed by law to sign any such document, then the Owner required by law to sign such document shall sign.

Section 8.06 <u>Right to Receive and Rely Upon Instructions</u>. In the event that the Owner Trustee is unable to decide between alternative courses of action, or is unsure as to the application of any provision of this Agreement or any Trust Related Agreement, or such provision is ambiguous as to its application, or is or appears to be in conflict with any other applicable provision, or in the event that this Agreement or any Trust Related Agreement permits any determination by the Owner Trustee or is silent or is incomplete as to the course of action which the Owner Trustee is required to take with respect to a particular set of facts, the Owner Trustee may give notice (in such form as shall be appropriate under the circumstances) to the Owners requesting instructions and, to the extent that the Owner Trustee shall have acted or refrained from acting in good faith in accordance with any instructions received from the Owners, the Owner Trustee shall not be liable to any Person on account of such action or inaction. If the Owner Trustee shall not have received appropriate instructions within ten days of such notice (or within such shorter period of time as may be specified in such notice) the Owner Trustee may, but shall be under no duty to, take or refrain from taking such action, not inconsistent with this Agreement or the Trust Related Agreements, as the Owner Trustee shall deem to be in the best interests of the Owners, and the Owner Trustee shall have no liability to any Person for such action or inaction.

Section 8.07 <u>No Duties Except as Specified in this Agreement or in Instructions</u>. The Owner Trustee shall not have any duty or obligation to manage, make any payment in respect of, register, record, sell, dispose of or otherwise deal with the Trust Property, or to otherwise take or refrain from taking any action under, or in connection with, any document contemplated hereby to which the Owner Trustee or the Trust is a party, except as expressly provided by the terms of this Agreement, and no implied duties or obligations shall be read into this Agreement against

23

TA367

the Owner Trustee. The Owner Trustee nevertheless agrees that it will, at its own cost and expense, promptly take all action as may be necessary to discharge any liens on any part of the Trust Property which result from claims against the Owner Trustee personally that are not related to the ownership or the administration of the Trust Property or the transactions contemplated by the Trust Related Agreements.

Section 8.08 No Action Except Under Specified Documents or Instructions. The Owner Trustee shall not manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Property except (a) in accordance with the powers granted to and the authority conferred upon the Owner Trustee pursuant to this Agreement, and (b) in accordance with instructions delivered to the Owner Trustee pursuant to Section 8.06 and Article IV hereof.

Section 8.09 Restriction. Notwithstanding anything herein to the contrary, the Owner Trustee shall not take any action (a) that is inconsistent with the purposes of the Trust or (b) that would result in the Trust being treated as an association taxable as a corporation for Federal income tax purposes.

## ARTICLE IX

## CONCERNING THE OWNER TRUSTEE

Section 9.01 Acceptance of Trusts and Duties. The Owner Trustee accepts the trusts hereby created and agrees to perform its duties hereunder with respect to the same but only upon the terms of this Agreement. The Owner Trustee shall not be personally liable under any circumstances, except (a) for its own willful misconduct or gross negligence, (b) for liabilities arising from the failure by the Owner Trustee to perform obligations expressly undertaken by it in the last sentence of Section 8.07, or (c) for taxes, fees or other charges on, based on or measured by any fees, commissions or compensation received by the Owner Trustee in connection with any of the transactions contemplated by this Agreement or the Trust Related Agreements. In particular, but not by way of limitation:

(i)     The Owner Trustee shall not be personally liable for any error of judgment made in good faith by an Authorized Officer of the Owner Trustee;

(ii)     The Owner Trustee shall not be personally liable with respect to any action taken or omitted to be taken by the Owner Trustee in good faith in accordance with the instructions of the Administrator or the Owners;

(iii)     No provision of this Agreement shall require the Owner Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of any of its rights or powers hereunder if the Owner Trustee shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(iv)     Under no circumstance shall the Owner Trustee be personally liable for any indebtedness of the Trust under any Trust Related Agreement;

24

TA368

(v)     The Owner Trustee shall not be personally responsible for or in respect of the validity or sufficiency of this Agreement or for the due execution hereof by the Depositor, or for the form, character, genuineness, sufficiency, value or validity of any Student Loan or Trust Certificate (other than with respect to the due execution thereby by an Authorized Officer), or for or in respect of the validity or sufficiency of the Administration Agreement or the Trust Related Agreements; and

. (vi)    The Owner Trustee shall not be liable for the default or misconduct of the Administrator under any of the Trust Related Agreements or otherwise and the Owner Trustee shall have no obligation or liability to perform the obligations of the Trust hereunder or under any Trust Related Agreement that are required to be performed by the Administrator under the Administration Agreement.

Section 9.02 <u>Furnishing of Documents</u>. The Owner Trustee shall furnish to the Owners, promptly upon receipt thereof, duplicates or copies of all material reports, notices, requests, demands, certificates, financial statements and any other instruments furnished to the Owner Trustee hereunder (other than documents originated by or otherwise furnished to such Owners).

Section 9.03 <u>Reliance; Advice of Counsel</u>.

(a)     The Owner Trustee shall incur no liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, note or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties. The Owner Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect. As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, the Owner Trustee may for all purposes hereof rely on a certificate, signed by the president or any vice president or by the treasurer or any assistant treasurer or the secretary of the relevant party, as to such fact or matter, and such certificate shall constitute full protection to the Owner Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

(b)     In the exercise or administration of the trusts hereunder and in the performance of its duties and obligations under any of the Trust Related Agreements, the Owner Trustee (i) may act directly or, at the expense of the Trust, through agents or attorneys pursuant to agreements entered into with any of them, and the Owner Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Owner Trustee with reasonable care; and (ii) may, at the expense of the Trust, consult with counsel, accountants and other skilled persons to be selected with reasonable care and employed by it, and the Owner Trustee shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons.

Section 9.04 <u>Not Acting in Individual Capacity</u>. Except as expressly provided in this Article IX, in accepting the trusts hereby created, the Owner Trustee acts solely as trustee hereunder and not in its individual capacity, and all Persons having any claim against the Owner

TA369

Trustee by reason of the transactions contemplated by this Agreement or the Trust Related Agreements shall look only to the Trust Property for payment or satisfaction thereof.

Section 9.05 Representations and Warranties of Owner Trustee. The Owner Trustee represents and warrants to the Depositor that (a) the Owner Trustee meets the requirements of (i) Rule 3(a)(7) promulgated under the Investment Company Act of 1940, as amended, and (ii) section 3807 of the Statutory Trust Statute and (b) the Owner Trustee or the Owner Trustee's parent entity has a combined capital and surplus of at least $50,000,000.

## ARTICLE X

## COMPENSATION OF OWNER TRUSTEE

Section 10.01 Owner Trustee's Fees and Expenses. The Owner Trustee shall receive compensation from the Administrator and, to the extent not paid by the Administrator, from the Trust Property for its services hereunder as set forth on the fee schedule attached hereto as Exhibit 3. The Owner Trustee shall be entitled to be reimbursed by the Administrator and, to the extent not paid by the Administrator, from the Trust Property for its reasonable expenses hereunder, including the reasonable compensation, expenses and disbursements of such agents, representatives, experts and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and duties under this Agreement and the Trust Related Agreements.

Section 10.02 Indemnification. The National Collegiate Funding LLC and The Education Resources Institute, Inc. shall be jointly and severally liable for, and hereby agree to, indemnify Delaware Trust Company, National Association, individually and as Owner Trustee, and its successors, assigns, agents and servants, from and against any and all liabilities, obligations, losses, damages, taxes (other than taxes incurred as the result of the payment of fees and expenses pursuant to Section 10.01), claims, actions, suits, costs, expenses and disbursements (including legal fees and expenses) of any kind and nature whatsoever which may be imposed on, incurred by or asserted at any time against the Owner Trustee (whether or not indemnified against by other parties) in any way relating to or arising out of this Agreement, any Trust Related Agreement, the administration of the Trust Property or the action or inaction of the Owner Trustee hereunder, except only that the Owners shall not be required to indemnify the Owner Trustee for expenses arising or resulting from any of the matters described in the second sentence of Section 9.01. The indemnities contained in this Section 10.02 shall survive the termination of this Agreement. The obligations of The National Collegiate Funding LLC and The Education Resources Institute, Inc. pursuant to this Section 10.02 shall be borne in proportion to their respective Percentage Interests. The indemnities contained in this Section 10.02 extend only to the Owner Trustee in its individual capacity.

Section 10.03 Lien on Trust Property. Following the retirement of the Notes, the Owner Trustee shall have a lien on the Trust Property for any compensation or expenses and indemnity due hereunder which lien shall be prior to all other liens.

26

TA370

Section 10.04 Payments to the Owner Trustee. Any amounts paid to the Owner Trustee from the Trust Property pursuant to this Article X shall be deemed not to be part of the Trust Property immediately after such payment.

## ARTICLE XI

## TERMINATION OF TRUST

Section 11.01 Termination of Trust.

(a)     The trust created hereby shall dissolve and terminate and, except as otherwise provided in this Article XI, this Agreement shall be of no further force or effect, upon the earlier of (i) if the Notes are no longer outstanding, the unanimous consent of the Owners, (ii) if the Notes are no longer outstanding, the sale or other final disposition by the Owner Trustee of the Trust Property and the final distribution by the Owner Trustee of all funds or other property or proceeds of the Trust Property in accordance with the terms of this Agreement and the Trust Related Agreements, and (iii) 21 years less one day after the death of the survivor of the descendants living on the date of this Agreement of Joseph P. Kennedy, the late Ambassador of the United States to the Court of St. James.

(b)     The bankruptcy, death, incapacity, dissolution or termination of any Owner shall not operate to dissolve or terminate this Agreement, nor entitle such Owner's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust Property, nor otherwise affect the rights, obligations and liabilities of the parties hereto.

(c)     Upon the termination of the Trust pursuant to this Article XI, the Owner Trustee shall cause a Certificate of Termination to be filed with the Secretary of State.

Section 11.02 Distribution of Assets. Upon dissolution and termination of the Trust, the Owner Trustee shall take full account of the Trust assets and liabilities, shall liquidate the assets as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds therefrom in the following order:

(a)     To the payment of the expenses of liquidation and the debts and liabilities of the Trust;

(b)     To the setting up of reserves which the Owner Trustee may deem necessary or appropriate for anticipated obligations or contingencies of the Trust arising out of or in connection with the operation of the Trust. Such reserves may be paid over by the Owner Trustee to an escrow agent or trustee selected by the Owner Trustee to be disbursed by such escrow agent or trustee in payment of any of such obligations or contingencies and, if any balance remains at the expiration of such period as the Owner Trustee shall deem advisable, to be distributed by such escrow agent or trustee in the manner hereinafter provided;

(c)     To each of the Owners, other than TERI, in accordance with the positive balances in each such Owner's Capital Account to the extent of the aggregate unreturned Capital Contributions of such Owner credited therein; and

27

TA371

(d)    To the Owners, the balance of any proceeds in accordance with the positive balances in their respective Capital Accounts; provided that with respect to any distribution to TERI, such distribution shall be reduced by the amount of money paid to TERI by the Trust in accordance with paragraph 4 of the Section 2.05 Supplement to Master Loan Guaranty Agreement between TERI and The First Marblehead Corporation dated April 30, 2001 less the amount by which aggregate Distributions to TERI of Net Cash Flow pursuant to Section 7.06 hereof have been reduced by the application of subsection (iii) thereof, and any such reduction shall be distributed to the Owners other than TERI in accordance with the positive balances in their respective Capital Accounts.

If, at the time of liquidation, the Owner Trustee shall determine that an immediate sale of some or all of the assets would cause undue loss to the Owners, the Owner Trustee may, in order to avoid such loss and with the consent of the Owners, defer liquidation.

Section 11.03  No Termination by Depositor or Owners.  Except as provided in Section 11.01, neither the Depositor nor the Owners shall be entitled to terminate or revoke the Trust established hereunder.

## ARTICLE XII

## SUCCESSOR OWNER TRUSTEES AND ADDITIONAL OWNER TRUSTEES

Section 12.01  Resignation of Owner Trustee; Appointment of Successor.

(a)    The Owner Trustee may resign at any time without cause by giving at least 60 days' prior written notice to the Administrator, the Owners and the Administrative Agent, such resignation to be effective upon the acceptance of appointment by a successor Owner Trustee under Section 12.01(b).  In addition, the Super-majority Owners may at any time remove the Owner Trustee without cause by an instrument in writing delivered to the Owner Trustee and the Administrator, such removal to be effective upon the acceptance of appointment by a successor Owner Trustee under Section 12.01(b).  In case of the resignation or removal of the Owner Trustee, the Owners may appoint a successor Owner Trustee by an instrument signed by the Owners.  If a successor Owner Trustee shall not have been appointed within 30 days after the giving of written notice of such resignation or the delivery of the written instrument with respect to such removal, the Owner Trustee or the Owners may apply to any court of competent jurisdiction to appoint a successor Owner Trustee to act until such time, if any, as a successor Owner Trustee shall have been appointed as provided above. Any successor Owner Trustee so appointed by such court shall immediately and without further act be superseded by any successor Owner Trustee appointed as above provided within one year from the date of the appointment by such court.

(b)    Any successor Owner Trustee, however appointed, shall execute and deliver to the predecessor Owner Trustee an instrument accepting such appointment, and thereupon such successor Owner Trustee, without further act (except for the filing required under clause (e) below), shall become vested with all the estates, properties, rights, powers, duties and trust of the predecessor Owner Trustee in the trusts hereunder with like effect as if originally named the Owner Trustee herein; but nevertheless, upon the written request of such successor Owner

28

Trustee and the payment of all fees and indemnities due the predecessor Owner Trustee, such predecessor Owner Trustee shall execute and deliver an instrument transferring to such successor Owner Trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, duties and trusts of such predecessor Owner Trustee, and such predecessor Owner Trustee shall duly assign, transfer, deliver and pay over to such successor Owner Trustee all funds or other property then held or subsequently received by such predecessor Owner Trustee upon the trusts herein expressed.

(c) Any successor Owner Trustee, however appointed, shall be a bank or trust company (i) that meets the requirements of (A) Rule 3(a)(7) promulgated under the Investment Company Act of 1940, as amended, and (B) section 3807 of the Statutory Trust Statute and (ii) whose parent entity has a combined capital and surplus of at least $50,000,000, if there be such an institution willing, able and legally qualified to perform the duties of the Owner Trustee hereunder upon reasonable or customary terms.

(d) Any corporation into which the Owner Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Owner Trustee shall be a party, or any corporation to which substantially all the corporate trust business of the Owner Trustee may be transferred, shall, subject to the terms of Section 12.01(c), be the Owner Trustee under this Agreement without further act.

(e) Any successor Owner Trustee appointed pursuant to this Article XII shall file an amendment to the Certificate of Trust with the Secretary of State reflecting the name and principal place of business of such successor Owner Trustee.

Section 12.02 <u>Appointment of Additional Owner Trustees</u>. At any time or times for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Trust Property may at the time be located, the Owner Trustee and the Administrator, acting jointly, by an instrument in writing, may appoint one or more individuals or corporations approved by the Administrator and the Owner Trustee to act as separate trustee or separate trustees of all or any part of the Trust Property to the full extent that local law makes it necessary or appropriate for such separate trustee or separate trustees to act alone. If the Administrator shall not have joined in such appointment within fifteen days after the receipt of such request, the Owner Trustee, acting alone, shall have the power to make such appointment.

## ARTICLE XIII

## TAX MATTERS PARTNER

Section 13.01 <u>Tax Matters Partner</u>. The tax matters partner (within the meaning of section 6231(a)(7) of the Code and applicable Regulations) of the Trust for all federal income tax purposes set forth in the Code shall be The National Collegiate Funding LLC. Subject to Section 13.08, the tax matters partner shall have the authority to represent the Trust and perform the duties imposed on the tax matters partner under the Code, and as set forth in this Article XIII.

TA373