Section 13.02 <u>Notice of Tax Audit</u>. The tax matters partner shall give prompt notice to the Owners upon receipt of advice that the Internal Revenue Service intends to examine Trust income tax returns for any year.

Section 13.03 <u>Authority to Extend Period for Assessing Tax</u>. Subject to Section 13.08, the tax matters partner shall have the authority to extend the period for assessing any tax imposed on any Owner under the Code by any agreement as provided for under section 6229(b)(1)(B) of the Code.

Section 13.04 <u>Choice of Forum for Filing Petition for Readjustment</u>. Any petition for readjustment may, but is not required to, be filed by the tax matters partner in accordance with section 6226(a) of the Code in the United States District Court for the district in which the Trust's principal place of business is located, or the United States Claims Court.

Section 13.05 <u>Authority to Bind Owners by Settlement Agreement</u>. Subject to Section 13.08, the tax matters partner shall enter into a settlement agreement in accordance with section 6224(c)(3) of the Code as directed by the Owners.

Section 13.06 <u>Notices Sent to the Internal Revenue Service</u>. The tax matters partner shall use its best efforts to furnish to the Internal Revenue Service the name, address, profits interest and taxpayer identification number of each Owner and any additional information it receives from each Owner regarding any change in that Owner's name, address, profits interest and taxpayer identification number. In no event shall the tax matters partner be liable, responsible or accountable in damages or otherwise to the Owner for any loss in connection with furnishing such information to the Internal Revenue Service if the tax matters partner acts in good faith and is not guilty of fraud or gross negligence.

Section 13.07 <u>Indemnification of Tax Matters Partner</u>. The Trust shall indemnify and save harmless the tax matters partner against any loss, damage, cost or expense (including attorneys' fees) incurred by it as a result of any act performed or omitted on behalf of the Trust or any Owner or in furtherance of the Trust's interests or the interests of the Owner, in its capacity as tax matters partner, without, however, relieving the tax matters partner of liability for bad faith, fraud or gross negligence.

Section 13.08 <u>Approval of Tax Matters Partner's Decisions</u>. The tax matters partner shall call a meeting of the Owners at any time in order to discuss any decisions the tax matters partner may propose to make, notice of which shall be included in the notice of such meeting. The tax matters partner shall make no decision and take no action with respect to the determination, assessment or collection of any tax imposed by the Code on the Owners unless and until such decision has been approved by the Owners.

Section 13.09 <u>Participation by Owners in Internal Revenue Service Administrative Proceedings</u>. Nothing contained in this Article XIII shall be construed to take away from any Owner any right granted to such person by the Code to participate in any manner in administrative proceedings of the Internal Revenue Service.

TA374

## ARTICLE XIV

## MISCELLANEOUS

Section 14.01 <u>Supplements and Amendments</u>.

(a)     This Agreement may be amended only by a written instrument signed by the Owner Trustee and all of the Owners at the time of such amendment and upon satisfaction of the Rating Agency Condition (as defined in the Indenture); provided, however, that if, in the opinion of the Owner Trustee, any instrument required to be so executed adversely affects any right, duty or liability of, or immunity or indemnity in favor of, the Owner Trustee under this Agreement or any of the documents contemplated hereby to which the Owner Trustee or the Trust is a party, or would cause or result in any conflict with or breach of any terms, conditions or provisions of, or default under, the charter documents or by-laws of the Owner Trustee or any document contemplated hereby to which the Owner Trustee is a party, the Owner Trustee may in its sole discretion decline to execute such instrument. The Certificate of Trust shall be amended (except as required by the Statutory Trust Statute) only upon satisfaction of the Rating Agency Condition (as defined in the Indenture). The Owner Trustee shall be fully protected in relying upon a certificate of the Administrator in determining if the Rating Agency Condition (as defined in the Indenture) has been satisfied.

(b)     The Trust shall not change its jurisdiction of formation without first satisfying the Rating Agency Condition (as defined in the Indenture).

Section 14.02 <u>No Legal Title to Trust Property in Owner</u>.  Legal title to all Trust Property shall be vested at all times in the Trust as a separate legal entity, except where the laws of any jurisdiction require title to be vested in a trustee in which case legal title shall be vested in the Owner Trustee on behalf of the Trust. The Owners shall not have legal title to any part of the Trust Property and shall only have an undivided beneficial interest therein. No transfer, by operation of law or otherwise, of any right, title and interest of the Owners in and to their undivided Beneficial Interests in the Trust Property hereunder shall operate to terminate this Agreement or the trusts hereunder or entitle any successor transferee to an accounting or to the transfer to it of legal title to any part of the Trust Property.

Section 14.03 <u>Pledge of Collateral by Owner Trustee is Binding</u>.  The pledge of any Trust Property to any Person by the Owner Trustee made under any Trust Related Agreement and pursuant to the terms of this Agreement shall bind the Owners and shall be effective to transfer or convey the rights of the Owner Trustee and the Owners in and to such Trust Property to the extent set forth in such Trust Related Agreement. No purchaser or other grantee shall be required to inquire as to the authorization, necessity, expediency or regularity of such pledge or as to the application of any proceeds with respect thereto by the Owner Trustee.

Section 14.04 <u>Limitations on Rights of Others</u>.  Nothing in this Agreement, whether express or implied, shall be construed to give to any Person other than the Owner Trustee, the Administrator and the Owners any legal or equitable right, remedy or claim in the Trust Property or under or in respect of this Agreement or any covenants, conditions or provisions contained herein provided, however, that for so long as any of the Notes or Grantor Trust Certificates are

31

TA375

outstanding or any amounts are owed to the Indenture Trustee, the Grantor Trustee, the Noteholders and the Grantor Trust Certificateholders, are third party beneficiaries hereof.

Section 14.05 <u>Notices</u>. Unless otherwise expressly specified or permitted by the terms hereof, all notices shall be in writing and delivered by hand or mailed by certified mail, postage prepaid, if to the Owner Trustee, addressed to: Delaware Trust Company, National Association, 300 Delaware Avenue, 9th Floor, Wilmington, Delaware 19801, Attention: Corporate Trust Administration, or to such other address as the Owner Trustee may have set forth in a written notice to the Owners; and if to an Owner, addressed to it at the address set forth for such Owner in the register maintained by the Owner Trustee. Whenever any notice in writing is required to be given by the Owner Trustee hereunder, such notice shall be deemed given and such requirement satisfied 72 hours after such notice is mailed by certified mail, postage prepaid, addressed as provided above; any notice given by an Owner to the Owner Trustee shall be effective upon receipt by an Authorized Officer of the Owner Trustee. A copy of any notice delivered to the Owner Trustee shall also be delivered to the Administrator, addressed to: First Marblehead Data Services, Inc., The Prudential Tower, 800 Boylston Street - 34th Floor, Boston, MA 02199-8157, Attention: Ms. Rosalyn Bonaventure, with a copy to First Marblehead Corporation, The Prudential Tower, 800 Boylston Street - 34th Floor, Boston, MA 02199-8157, Attention: Mr. Richard P. Zermani, or to such other addresses as the Administrator may have set forth in a written notice to the Owner Trustee.

Section 14.06 <u>Severability</u>. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 14.07 <u>Separate Counterparts</u>. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 14.08 <u>Successors and Assigns</u>. All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Owner Trustee and its successors and assigns and each Owner and its successors and permitted assigns, all as herein provided. Any request, notice, direction, consent, waiver or other instrument or action by an Owner shall bind the successors and assigns of such Owner.

Section 14.09 <u>Headings</u>. The headings of the various Articles and Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

Section 14.10 <u>Governing Law</u>. This Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of Delaware (excluding conflict of law rules), including all matters of construction, validity and performance.

Section 14.11 <u>General Interpretive Principles</u>. For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

32

TA376

(a)     The defined terms in this Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include any other gender;

(b)     Accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date hereof;

(c)     References herein to "Articles," "Sections," "paragraphs" and other subdivisions without reference to a document are to designated Articles, Sections, paragraphs and other subdivisions of this Agreement;

(d)     A reference to a paragraph without further reference to a Section is a reference to such paragraph as contained in the same Section in which the reference appears, and this rule shall also apply to subparagraphs and other subdivisions;

(e)     The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)     The term "include" or "including" shall mean without limitation by reason of enumeration.

TA377

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

DELAWARE TRUST COMPANY, NATIONAL ASSOCIATION, not in its individual capacity except as expressly provided herein, but solely as Owner Trustee

By: _____
    Name: Sterling C. Correia
    Title: Vice President

THE NATIONAL COLLEGIATE FUNDING, as Depositor and Owner

By:  GATE Holdings, Inc., Member

    By:_____
      Name:
      Title:

THE EDUCATION RESOURCES INSTITUTE, Inc., as Owner

By:_____
    Name: Micheal Gambee
    Title: Treasurer

ACKNOWLEDGED WITH RESPECT TO THE POWER OF ATTORNEY GRANTED IN SECTION 4.05

FIRST MARBLEHEAD DATA SERVICES, INC.

By: _____
    Name:
    Title:

**Trust Agreement**

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

DELAWARE TRUST COMPANY, NATIONAL ASSOCIATION, not in its individual capacity except as expressly provided herein, but solely as Owner Trustee

By: _____
     Name:
     Title:

THE NATIONAL COLLEGIATE FUNDING, as Depositor and Owner

By:  GATE Holdings, Inc., Member

By: _____
     Name:   Donald R. Peck
     Title:    Treasurer and Secretary

THE EDUCATION RESOURCES INSTITUTE, Inc., as Owner

By: _____
     Name:
     Title:

ACKNOWLEDGED WITH RESPECT TO THE POWER OF ATTORNEY GRANTED IN SECTION 4.05

FIRST MARBLEHEAD DATA SERVICES, INC.

By: _____
   Name:  John A. Hupalo
   Title:  Vice President

**Trust Agreement**

TA379

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

DELAWARE TRUST COMPANY,
NATIONAL ASSOCIATION, not in its
individual capacity except as expressly
provided herein, but solely as Owner
Trustee

By:_____
    Name:
    Title:

THE NATIONAL COLLEGIATE
FUNDING LLC, as Depositor and Owner

By: GATE Holdings, Inc., Member

    By:_____
        Name:
        Title:

THE EDUCATION RESOURCES
INSTITUTE, Inc., as Owner

By:_____
    Name: Michael Gambee
    Title: Treasurer

ACKNOWLEDGED WITH RESPECT
TO THE POWER OF ATTORNEY
GRANTED IN SECTION 4.05

FIRST MARBLEHEAD DATA SERVICES, INC.

By:_____
    Name:
    Title:

**Trust Agreement**

TA380

## SCHEDULE A

| Owners | Capital Contribution ($) | Sharing Ratio (%) | Percentage Interest (%) |
|---|---|---|---|
| The National Collegiate Funding LLC | $1.00 | 87.87%* | 87.87%* |
| The Education Resources Institute, Inc. | None | 12.13%* | 12.13%* |

* Subject to final reconciliation.

TA381

**SCHEDULE B**
*Loan Originators*

- Bank of America, N.A.

- Bank One, N.A.

- Charter One Bank, N.A.

- Chase Manhattan Bank USA, N.A.

- Citizens Bank of Rhode Island

- GMAC Bank

- HSBC Bank USA, National Association

- The Huntington National Bank

- Manufacturers and Traders Trust Company

- PNC Bank, N.A.

- Sovereign Bank

- SunTrust Bank

TA382

## SCHEDULE C

*Loan Purchase Agreements*

Each of the Note Purchase Agreements, as amended or supplemented, was entered into by and between The First Marblehead Corporation and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's BAGEL Loan Program, CEDU Loan Program and ISLP Loan Program.
- Bank of America, N.A., dated June 30, 2003, for loans that were originated under Bank of America's Direct to Consumer Loan Program.
- Bank One, N.A., dated May 1, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program and EDUCATION ONE Loan Program.
- Bank One, N.A., dated July 26, 2002, for loans that were originated under Bank One's M&T REFERRAL Loan Program
- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.
- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's (AMS) TuitionPay Diploma Loan Program.
- Charter One Bank, N.A., dated July 15, 2003, for loans that were originated under Charter One's Brazos Alternative Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's CFS Direct to Consumer Loan Program.
- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Flexible Education Loan Program.
- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.
- Charter One Bank, N.A., dated December 4, 2002, for loans that were originated under Charter One's Comerica Alternative Loan Program.
- Charter One Bank, N.A., dated December 1, 2003, for loans that were originated under Charter One's Custom Educredit Loan Program.
- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated under Charter One's Edfinancial Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's Education Assistance Services Loan Program.
- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's ESF Alternative Loan Program.
- Charter One Bank, N.A., dated September 15, 2003, for loans that were originated under Charter One's Extra Credit II Loan Program (North Texas Higher Education).
- Charter One Bank, N.A., dated September 20, 2003, for loans that were originated under Charter One's M&I Alternative Loan Program.
- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.

- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's Navy Federal Alternative Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.
- Charter One Bank, N.A., dated March 26, 2004, for loans that were originated under Charter One's NextStudent Private Consolidation Loan Program.
- Charter One Bank, N.A., dated March 17, 2003, for loans that were originated under Charter One's PNC Bank Resource Loan Program.
- Charter One Bank, N.A., dated May 1, 2003, for loans that were originated under Charter One's SAF Alternative Loan Program.
- Charter One Bank, N.A., dated September 20, 2002, for loans that were originated under Charter One's Southwest Loan Program.
- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's START Education Loan Program.
- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's WAMU Alternative Student Loan Program.
- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program and Axiom Alternative Loan Program.
- Chase Manhattan Bank USA, N.A., dated September 30, 2003, as amended on March 1, 2004, September 8, 2004 and February 25, 2005, for loans that were originated under Chase's Chase Extra Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's DTC Alternative Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Navy Federal Referral Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Xanthus Loan Program.
- GMAC Bank, dated May 30, 2003, as amended on March 1, 2005, for loans that were originated under GMAC Bank's GMAC Alternative Loan Program.
- HSBC Bank USA, National Association, dated April 17, 2002, as amended on June 2, 2003 and August 1, 2003, for loans that were originated under the HSBC Loan Program.
- The Huntington National Bank, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.
- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's Alternative Loan Program.
- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Conforming Loan Program.
- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.
- SunTrust Bank, dated March 1, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

## SCHEDULE D

*Guaranty Agreements*

Each of the following Guaranty Agreements, as amended or supplemented, was entered into by and between The Education Resources Institute, Inc. and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's BAGEL Loan Program, CEDU Loan Program and ISLP Loan Program.
- Bank of America, N.A., dated June 30, 2003, for loans that were originated under Bank of America's Direct to Consumer Loan Program.
- Bank One, N.A., dated May 13, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program and EDUCATION ONE Loan Program.
- Bank One, N.A., dated July 26, 2002, for loans that were originated under Bank One's M&T REFERRAL Loan Program
- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.
- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's (AMS) TuitionPay Diploma Loan Program.
- Charter One Bank, N.A., dated July 15, 2003, for loans that were originated under Charter One's Brazos Alternative Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's CFS Direct to Consumer Loan Program.
- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Flexible Education Loan Program.
- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.
- Charter One Bank, N.A., dated December 4, 2002, for loans that were originated under Charter One's Comerica Alternative Loan Program.
- Charter One Bank, N.A., dated December 1, 2003, for loans that were originated under Charter One's Custom Educredit Loan Program.
- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated under Charter One's Edfinancial Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's Education Assistance Services Loan Program.
- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's ESF Alternative Loan Program.
- Charter One Bank, N.A., dated September 15, 2003, for loans that were originated under Charter One's Extra Credit II Loan Program (North Texas Higher Education).

- Charter One Bank, N.A., dated September 20, 2003, for loans that were originated under Charter One's M&I Alternative Loan Program.
- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.
- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's Navy Federal Alternative Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.
- Charter One Bank, N.A., dated March 26, 2004, for loans that were originated under Charter One's NextStudent Private Consolidation Loan Program.
- Charter One Bank, N.A., dated March 17, 2003, for loans that were originated under Charter One's PNC Bank Resource Loan Program.
- Charter One Bank, N.A., dated May 1, 2003, for loans that were originated under Charter One's SAF Alternative Loan Program.
- Charter One Bank, N.A., dated September 20, 2002, for loans that were originated under Charter One's Southwest Loan Program.
- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's START Education Loan Program.
- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's WAMU Alternative Student Loan Program.
- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program and Axiom Alternative Loan Program.
- Chase Manhattan Bank USA, N.A., dated September 30, 2003, as amended on March 1, 2004 and February 25, 2005, for loans that were originated under Chase's Chase Extra Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's DTC Alternative Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Navy Federal Referral Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Xanthus Loan Program.
- GMAC Bank, dated May 30, 2003, as amended on March 1, 2004, as amended on March 1, 2005, for loans that were originated under GMAC Bank's GMAC Alternative Loan Program.
- HSBC Bank USA, National Association, dated April 17, 2002, as amended on August 1, 2003 and May 14, 2004, for loans that were originated under the HSBC Loan Program.
- The Huntington National Bank, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's Alternative Loan Program.
- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Conforming Loan Program.
- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.
- SunTrust Bank, dated March 1, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

## EXHIBIT 1

## FORM OF TRUST CERTIFICATE

### THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3

### TRUST CERTIFICATE

THE BENEFICIAL INTEREST IN THE TRUST REPRESENTED BY THIS TRUST CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAW, AND MAY NOT BE DIRECTLY OR INDIRECTLY OFFERED OR SOLD OR OTHERWISE DISPOSED OF (INCLUDING PLEDGED) BY THE HOLDER HEREOF UNLESS IN THE OPINION OF COUNSEL SATISFACTORY TO THE OWNER TRUSTEE, SUCH TRANSACTION IS EXEMPT FROM REGISTRATION UNDER THE ACT AND STATE SECURITIES LAWS. THE TRANSFER OF THIS TRUST CERTIFICATE WILL NOT BE EFFECTIVE UNLESS THE TRANSFEREE HAS DELIVERED TO THE OWNER TRUSTEE A LETTER IN THE FORM REQUIRED BY SECTION 3.04(A) OF THE TRUST AGREEMENT AND THE TRANSFEREE PROVIDES THE OWNER TRUSTEE WITH EVIDENCE SATISFACTORY TO THE OWNER TRUSTEE DEMONSTRATING THE TRANSFEROR'S COMPLIANCE WITH SECTION 3.04(B) OF THE TRUST AGREEMENT.

### TRUST CERTIFICATE
### UNDER THE TRUST AGREEMENT, DATED
as of October 12, 2005

Certificate No. _____

Delaware Trust Company, National Association, not in its individual capacity, but solely as owner trustee (the "Owner Trustee") under the Trust Agreement, dated as of October 12, 2005, with The National Collegiate Funding LLC and The Education Resources Institute, Inc., on behalf of the holders from time to time (each an "Owner") of beneficial interests in the trust created thereby (the "Trust Agreement"), hereby certifies that _____ is the owner of an undivided beneficial interest equal to the percentage listed on Schedule A to the Trust Agreement in the Trust Property provided for and created by the Trust Agreement. This Trust Certificate is issued pursuant to and is entitled to the benefits of the Trust Agreement, and each Owner by acceptance hereof shall be bound by the terms of the Trust Agreement. Reference is hereby made to the Trust Agreement for a statement of the rights and obligations of the Owner hereof. The Owner Trustee may treat the person shown on the register maintained by the Owner Trustee pursuant to Section 3.02 of the Trust Agreement as the absolute Owner hereof for all purposes.

Capitalized terms used herein without definition have the meanings ascribed to them in or by reference in the Trust Agreement.

Transfer of this Trust Certificate is subject to certain restrictions and limitations set forth in the Trust Agreement, including the requirement that any transfer requires the prior consent of

owners of at least 85% of the Percentage Interests in the Trust. In the manner more fully set forth in, and as limited by, the Trust Agreement, this Trust Certificate may be transferred upon the books of the Owner Trustee by the registered Owner in person or by his attorney duly authorized in writing upon surrender of this Trust Certificate to the Owner Trustee accompanied by a written instrument of transfer and with such signature guarantees and evidence of authority of the Persons signing the instrument of transfer as the Owner Trustee may reasonably require, whereupon the Owner Trustee shall issue in the name of the transferee a Trust Certificate or Trust Certificates evidencing the amount and extent of interest of the transferee.

The Owner hereof, by its acceptance of this Trust Certificate, warrants and represents to the Owner Trustee and to the Owners of the other Trust Certificates issued under the Trust Agreement and agrees not to transfer this Trust Certificate except in accordance with the Trust Agreement.

This Trust Certificate and the Trust Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of Delaware (excluding conflict of law rules), including all matters of construction, validity and performance.

TA389

IN WITNESS WHEREOF, the Owner Trustee, pursuant to the Trust Agreement, has caused this Trust Certificate to be issued as of the date hereof.

> DELAWARE TRUST COMPANY, NATIONAL ASSOCIATION, not in its individual capacity, but solely as Owner Trustee
>
> By:_____
>     Name:
>     Title:

Dated: October 12, 2005

**EXHIBIT 2**

**FORM OF ACCESSION AGREEMENT**

_____, _____

Delaware Trust Company, National Association
300 Delaware Avenue, 9th Floor
Wilmington, Delaware 19801
Attention: Corporate Trust Administration

Dear Sirs:

We refer to the Trust Agreement, dated as of October 12, 2005 (the "Trust Agreement"), among The National Collegiate Funding LLC (the "Company"), The Education Resources Institute, Inc. and Delaware Trust Company, National Association, a national banking association (in its capacity as trustee thereunder, the "Owner Trustee"). We propose to purchase a beneficial interest in The National Collegiate Student Loan Trust 2005-3, a Delaware statutory trust (the "Trust") formed pursuant to the Trust Agreement. Capitalized terms used herein without definition have the meanings given them in the Trust Agreement.

1. We understand that our Trust Certificate is not being registered under the Securities Act of 1933, as amended (the "1933 Act"), or any state securities or "Blue Sky" law and is being sold to us in a transaction that is exempt from the registration requirements of the 1933 Act and any applicable state laws.

2. We have knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Trust, we are able to bear the economic risk of investment in the Trust and we are an "accredited investor" as defined in Regulation D under the 1933 Act.

3. We acknowledge that none of the Trust, the Company or the Owner Trustee has advised us concerning the federal or state income tax consequences of owning a beneficial interest in the Trust, including the tax status of the Trust or the likelihood that distributions from the Trust would be characterized as "unrelated business income" for federal tax purposes, and we have consulted with our own tax advisor with respect to such matters.

4. We are acquiring our Trust Certificate for our own account and not for the benefit of any other person and not with a view to any distribution of our beneficial interest in the Trust subject, nevertheless, to the understanding that disposition of our property shall at all times be and remain within our control.

5. We agree that our beneficial interest in the Trust must be held indefinitely by us unless subsequently registered under the 1933 Act and any applicable state securities or "Blue Sky" law or unless exemptions from the registration requirements of the 1933 Act and applicable state laws are available.

TA391

6. We agree that in the event that at some future time we wish to dispose of or exchange any of our beneficial interest in the Trust, we will not transfer or exchange any of our beneficial interest in the Trust unless we have obtained the prior written consent to such transfer or exchange pursuant to Section 3.04 of the Trust Agreement, and either:

(A) (1) the transfer or exchange is made to an Eligible Purchaser (as defined below), (2) a letter to substantially the same effect as this letter is executed promptly by such Eligible Purchaser, and (3) all offers or solicitations in connection with the sale (if a sale), whether made directly or through any agent acting on our behalf, are limited only to Eligible Purchasers and are not made by means of any form of general solicitation or general advertising whatsoever; or

(B) our beneficial interest in the Trust is sold in a transaction that does not require registration under the 1933 Act and any applicable State "Blue Sky" law.

"Eligible Purchaser" means a corporation, partnership or other entity which we have reasonable grounds to believe and do believe can make representations with respect to itself to substantially the same effect as the representations set forth herein.

7. We understand that our Trust Certificate bears a legend to substantially the following effect:

THE BENEFICIAL INTEREST IN THE TRUST REPRESENTED BY THIS TRUST CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAW, AND MAY NOT BE DIRECTLY OR INDIRECTLY OFFERED OR SOLD OR OTHERWISE DISPOSED OF (INCLUDING PLEDGED) BY THE HOLDER HEREOF UNLESS IN THE OPINION OF COUNSEL SATISFACTORY TO THE OWNER TRUSTEE SUCH TRANSACTION IS EXEMPT FROM REGISTRATION UNDER THE ACT AND STATE SECURITIES LAWS. THE TRANSFER OF THIS TRUST CERTIFICATE WILL NOT BE EFFECTIVE UNLESS THE TRANSFEREE HAS DELIVERED TO THE OWNER TRUSTEE A LETTER IN THE FORM REQUIRED BY SECTION 3.04(A) OF THE TRUST AGREEMENT AND THE TRANSFEREE PROVIDES THE OWNER TRUSTEE WITH EVIDENCE SATISFACTORY TO THE OWNER TRUSTEE DEMONSTRATING THE TRANSFEROR'S COMPLIANCE WITH SECTION 3.04(B) OF THE TRUST AGREEMENT.

8. We agree to be bound by all terms and conditions of our Trust Certificate and the Trust Agreement.

Very truly yours,

_____

Name of Purchaser

By:_____

     Name:

     Title:

Accepted and Acknowledged this
_____ th day of _____, _____.

DELAWARE TRUST COMPANY, NATIONAL
ASSOCIATION, not in its individual capacity,
but solely as Owner Trustee

By:_____

    Name:

    Title:

# EXHIBIT 3

## FEE SCHEDULE

Initial Fee - $2,000

Annual Administration Fee - $2,500

# EXHIBIT 2

TA395

# APPENDIX A

## DEFINITIONS AND USAGE

### Usage

The following rules of construction and usage shall be applicable to any instrument that is governed by this Appendix:

(a)     All terms defined in this Appendix shall have the defined meanings when used in any instrument governed hereby and in any certificate or other document made or delivered pursuant thereto unless otherwise defined therein.

(b)     As used herein, in any instrument governed hereby and in any certificate or other document made or delivered pursuant thereto, accounting terms not defined in this Appendix or in any such instrument, certificate or other document, and accounting terms partly defined in this Appendix or in any such instrument, certificate or other document to the extent not defined, shall have the respective meanings given to them under generally accepted accounting principles as in effect on the date of such instrument.  To the extent that the definitions of accounting terms in this Appendix or in any such instrument, certificate or other document are inconsistent with the meanings of such terms under generally accepted accounting principles, the definitions contained in this Appendix or in any such instrument, certificate or other document shall control.

(c)     The words "hereof," "herein," "hereunder" and words of similar import when used in an instrument refer to such instrument as a whole and not to any particular provision or subdivision thereof; references in an instrument to "Article," "Section" or another subdivision or to an attachment are, unless the context otherwise requires, to an article, section or subdivision of or an attachment to such instrument; and the term "including" means "including without limitation."

(d)     The definitions contained in this Appendix are equally applicable to both the singular and plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

(e)     Any agreement, instrument or statute defined or referred to below or in any agreement or instrument that is governed by this Appendix means such agreement or instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein.  References to a Person are also to its permitted successors and assigns.

TA396

## Definitions

"<u>Accountant</u>" means PricewaterhouseCoopers LLP and any other independent certified public accountant as may be selected by the Issuer and satisfying the Rating Agency Condition.

"<u>Act</u>" has the meaning specified in Section 11.03(a) of the Indenture.

"<u>Additional Fundings</u>" means the moneys transferred from the Pre-Funding Account on Subsequent Transfer Dates during the Funding Period, and shall consist of amounts paid to the applicable Seller to acquire Subsequent Student Loans as of the applicable Subsequent Cut-off Dates, and to pay capitalized interest on the Student Loans, as applicable.

"<u>Administration Agreement</u>" means the Administration Agreement dated as of October 12, 2005, among the Issuer, the Indenture Trustee, the Owner Trustee, the Depositor and the Administrator.

"<u>Administration Fee</u>" has the meaning specified in Section 3 of the Administration Agreement.

"<u>Administrator</u>" means First Marblehead Data Services, Inc., a Massachusetts corporation, in its capacity as administrator of the Issuer and the Financed Student Loans, and its successors and permitted assigns.

"<u>Administrator Default</u>" means the occurrence of any event specified in Section 8(d) of the Administration Agreement.

"<u>Advance</u>" has the meaning specified in Section 8.11(b) of the Indenture.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"<u>Applicable Index</u>" means with respect to each Class of Notes, One-Month LIBOR; *provided, however*, with respect to the initial Interest Period, the Applicable Index shall be determined by the following formula:

$$X + 16/30 * (Y-X)$$

Where: $X$ = Two-Month LIBOR, and

$Y$ = Three-Month LIBOR, in each case, as of the second Business Day before the start of the initial Interest Period.

"Applicable Note Margin" means for the following Classes of Notes as follows:

| Note Class | Applicable Note Margin | Note Class | Applicable Note Margin |
|---|---|---|---|
| Class A-1 | 0.07% | Class A-5-12 | 5.18% from October 12, 2005 to October 24, 2010 and 0.38% thereafter |
| Class A-2 | 0.20% | Class A-5-13 | 5.18% from October 12, 2005 to November 24, 2009 and 0.38% thereafter |
| Class A-3 | 0.24% | Class A-5-14 | 5.18% from October 12, 2005 to December 27, 2009 and 0.38% thereafter |
| Class A-4 | 0.28% | Class A-5-15 | 5.18% from October 12, 2005 to January 24, 2010 and 0.38% thereafter |
| Class A-5-1 | 5.18% from October 12, 2005 to November 24, 2009 and 0.38% thereafter | Class A-5-16 | 5.18% from October 12, 2005 to February 24, 2010 and 0.38% thereafter |
| Class A-5-2 | 5.18% from October 12, 2005 to December 27, 2009 and 0.38% thereafter | Class A-5-17 | 5.18% from October 12, 2005 to March 24, 2010 and 0.38% thereafter |
| Class A-5-3 | 5.18% from October 12, 2005 to January 24, 2010 and 0.38% thereafter | Class A-5-18 | 5.18% from October 12, 2005 to April 25, 2010 and 0.38% thereafter |
| Class A-5-4 | 5.18% from October 12, 2005 to February 24, 2010 and 0.38% thereafter | Class A-5-19 | 5.18% from October 12, 2005 to May 24, 2010 and 0.38% thereafter |
| Class A-5-5 | 5.18% from October 12, 2005 to March 24, 2010 and 0.38% thereafter | Class A-5-20 | 5.18% from October 12, 2005 to June 24, 2010 and 0.38% thereafter |
| Class A-5-6 | 5.18% from October 12, 2005 to April 25, 2010 and 0.38% thereafter | Class A-5-21 | 5.18% from October 12, 2005 to July 25, 2010 and 0.38% thereafter |
| Class A-5-7 | 5.18% from October 12, 2005 to May 24, 2010 and 0.38% thereafter | Class A-5-22 | 5.18% from October 12, 2005 to August 24, 2010 and 0.38% thereafter |
| Class A-5-8 | 5.18% from October 12, 2005 to June 24, 2010 and 0.38% thereafter | Class A-5-23 | 5.18% from October 12, 2005 to September 26, 2010 and 0.38% thereafter |
| Class A-5-9 | 5.18% from October 12, 2005 to July 25, 2010 and 0.38% thereafter | Class A-5-24 | 5.18% from October 12, 2005 to October 24, 2010 and 0.38% thereafter |
| Class A-5-10 | 5.18% from October 12, 2005 to August 24, 2010 and 0.38% thereafter | Class B | 0.50% |
| Class A-5-11 | 5.18% from October 12, 2005 to September 26, 2010 and 0.38% thereafter | Class C | 0.71% |

Applicable Procedures" has the meaning specified in Section 2.04(j)(i) of the Indenture.

Appendix A-3

SSL-DOCS2 70240931v7

"Authorized Officer" means, with respect to any Person, any Person who is authorized to act for such Person in matters relating to the Basic Documents and whose action is binding upon such Person. With the respect to the Issuer, "Authorized Officer" means any officer of the Owner Trustee and/or the Administrator who is authorized to act for the Owner Trustee and/or the Administrator in matters relating to the Issuer. With respect to the Indenture Trustee, "Authorized Officer" means any officer of the Indenture Trustee customarily performing functions similar to those performed by any of the above designated officers and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"Available Funds" means, with respect to any Distribution Date or any other distribution date pursuant to Section 5.04 of the Indenture, the sum of the following amounts received with respect to the then elapsed portion of the related Collection Period to the extent not previously distributed:

        (i)     all collections received by the Servicer on the Financed Student Loans, (including any Guarantee Payments received) but net of any applicable administrative fees, late fees or similar fees received from a borrower;

        (ii)    all Liquidation Proceeds and all Recoveries in respect of Liquidated Student Loans which were written off in prior Collection Periods or prior months of such Collection Period;

        (iii)   the aggregate Purchase Amounts received for Financed Student Loans repurchased by a Seller or the Servicer or under an obligation which arose during the elapsed portion of such Collection Period;

        (iv)   Investment Earnings for such Distribution Date;

        (v)    amounts withdrawn from the Reserve Account in excess of the Specified Reserve Account Balance and deposited into the Collection Account;

        (vii)   amounts transferred from the Pre-Funding Account to the Collection Account;

        (viii)  Advances and Optional Deposits, if any; and

        (ix)   any proceeds received in connection with the sale of the Student Loans, or sums collected by the Indenture Trustee pursuant to Sections 5.03 or 5.04(a) of the Indenture; *provided, however,* that Available Funds will exclude all payments and proceeds (including Liquidation Proceeds) of any Financed Student Loans, the related Purchase Amount of which has been included in Available Funds, for a prior Distribution Date; *provided, further,* that if on any Distribution Date there would not be sufficient funds, after application of Available Funds and amounts available from the Reserve Account and the Pre-Funding Account, to pay any of the items specified in clauses (1) through (5) of Section 8.02(d) of the Indenture for such Distribution Date, then Available Funds for such Distribution Date will include, in addition to the Available Funds, amounts being held

SSL-DOCS2 70240931v7

pursuant to Section 8.01 of the Indenture, or on deposit in the Collection Account, with respect to Available Funds relating to such Distribution Date which would have constituted Available Funds for the Distribution Date succeeding such Distribution Date, up to the amount necessary to pay the items specified in clause (1) through (5) of Section 8.02(d) of the Indenture, and the Available Funds, for such succeeding Distribution Date will be adjusted accordingly.

"Back-up Administration Agreement": means the Back-up Administration Agreement dated as of October 12, 2005 among the Issuer, Back-up Administrator, the Owner Trustee, the Administrator and the Depositor.

"Back-up Administration Fee" means the fee payable to the Back-up Administrator pursuant to the Back-up Administration Agreement.

"Back-up Administrator" means U.S Bank National Association, a national banking association, in its capacity as back-up administrator of the Issuer and the Financed Student Loans, and its successors and permitted assigns.

"Back-up Administrator Default" means the occurrence of any event specified in Section 8(d) of the Administration Agreement.

"Basic Documents" means the Trust Agreement, the Grantor Trust Agreement, the Indenture, all Student Loan Purchase Agreements, the Deposit and Sale Agreement, the Servicing Agreements, the Administration Agreement, the Back-up Administration Agreement, the Custodial Agreements, the Note Depository Agreement, the Guarantee Agreements, the TERI Deposit and Security Agreement, any Program Manual and other documents and certificates delivered in connection with any thereof.

"Beneficial Owner" means, with respect to a Note, the Person who is the beneficial owner of such Note, as reflected on the books of the Depository or on the books of a Person maintaining an account with such Depository (directly or as an indirect participant, in accordance with the rules of such Depository), as the case may be.

"Book-Entry Note" means a beneficial interest in the Notes, ownership and transfers of which shall be made through book entries by a Clearing Agency as described in Section 2.10 of the Indenture.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banking institutions or trust companies in New York City or the city in which the designated corporate trust office of the Indenture Trustee is located, are authorized or obligated by law, regulation or executive order to remain closed.

"Certificates" means the Trust Certificates issued pursuant to the Trust Agreement, substantially in the form of Exhibit 1 thereto.

"Certificateholders" means the Persons in whose names Certificates are registered.

"Class" means reference to any of the Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class B or Class C Notes, as applicable.

"Class A Notes" means the Class A-1 Notes, Class A-2 Notes, Class A-3 Notes, Class A-4 Notes, Class A-5-1 Notes, Class A-5-2 Notes, Class A-5-3 Notes, Class A-5-4 Notes, Class A-5-5 Notes, Class A-5-6 Notes, Class A-5-7 Notes, Class A-5-8 Notes, Class A-5-9 Notes, Class A-5-10 Notes, Class A-5-11 Notes, Class A-5-12 Notes, Class A-5-13 Notes, Class A-5-14 Notes, Class A-5-15 Notes, Class A-5-16 Notes, Class A-5-17 Notes, Class A-5-18 Notes, Class A-5-19 Notes, Class A-5-20 Notes, Class A-5-21 Notes, Class A-5-22 Notes, Class A-5-23 Notes, Class A-5-24 Notes and Class A-5-25 Notes.

"Class A Percentage" means at any time the percentage equivalent of a fraction, the numerator of which is the Outstanding Amount of the Class A Notes and the denominator of which is the sum of the Outstanding Amount of all the Notes.

"Class A-1 Note" means a Class A-1 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-1 thereto.

"Class A-2 Note" means a Class A-2 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-2 thereto.

"Class A-3 Note" means a Class A-3 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-3 thereto.

"Class A-4 Note" means a Class A-4 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-4 thereto.

"Class A-5 Notes" means the Class A-5-1, Class A-5-2, Class A-5-3 Notes, Class A-5-4 Notes, Class A-5-5 Notes, Class A-5-6 Notes, Class A-5-7 Notes, Class A-5-8 Notes, Class A-5-9 Notes, Class A-5-10 Notes, Class A-5-11 Notes, Class A-5-12 Notes, Class A-5-13 Notes, Class A-5-14 Notes, Class A-5-15 Notes, Class A-5-16 Notes, Class A-5-17 Notes, Class A-5-18 Notes, Class A-5-19 Notes, Class A-5-20 Notes, Class A-5-21 Notes, Class A-5-22 Notes, Class A-5-23 Notes, Class A-5-24 Notes and Class A-5-25 Notes.

"Class A-5-1 Note" means a Class A-5-1 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-2 Note" means a Class A-5-2 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-3 Note" means a Class A-5-3 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-4 Note" means a Class A-5-4 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-5 Note" means a Class A-5-5 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

Appendix A-6

"Class A-5-6 Note" means a Class A-5-6 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-7 Note" means a Class A-5-7 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-8 Note" means a Class A-5-8 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-9 Note" means a Class A-5-9 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-10 Note" means a Class A-5-10 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-11 Note" means a Class A-5-11 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-12 Note" means a Class A-5-12 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-13 Note" means a Class A-5-13 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-14 Note" means a Class A-5-14 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-15 Note" means a Class A-5-15 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-16 Note" means a Class A-5-16 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-17 Note" means a Class A-5-17 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-18 Note" means a Class A-5-18 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-19 Note" means a Class A-5-19 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-20 Note" means a Class A-5-20 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-21 Note" means a Class A-5-21 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

SSL-DOCS2 70240931v7

"Class A-5-22 Note" means a Class A-5-22 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-23 Note" means a Class A-5-24 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-24 Note" means a Class A-5-24 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class A-5-25 Note" means a Class A-5-25 Note issued pursuant to the Indenture, substantially in the form of Exhibit A-5 thereto.

"Class B Note" means a Class B Note issued pursuant to the Indenture, substantially in the form of Exhibit A-6 thereto.

"Class B Percentage" means at any time the percentage equivalent of a fraction, the numerator of which is the Outstanding Amount of the Class B Notes and the denominator of which is the sum of the Outstanding Amount of all the Notes.

"Class B Note Interest Trigger" means on any Distribution Date, if the Cumulative Default Rate as of each of the dates listed below equals or exceeds the respective percentage listed below for that date:

| Date | Cumulative Default Rate |
|------|-------------------------|
| October 1, 2006 | 2.75% |
| January 1, 2007 | 3.00% |
| January 1, 2008 | 7.75% |
| January 1, 2009 | 14.75% |
| January 1, 2010 | 20.50% |
| January 1, 2011 | 26.25% |
| January 1, 2012 | 30.00% |
| January 1, 2013 | 32.75% |
| Date | Cumulative Default Rate |
| January 1, 2014 | 33.25% |

provided, however, that a Class B Note Interest Trigger will not be deemed to be in effect if (a) on the last day of the related Collection Period, the aggregate Outstanding Amount of the Class A Notes is less than the sum of the Pool Balance plus the amount on deposit in the Reserve Account (excluding the sum of (i) the amount on deposit in the TERI Pledge Fund and (ii) the amount of any Noteholders' Interest Carryover Shortfall for the Class B Notes) or (b) TERI is continuing to pay claims on Defaulted Student Loans that have met TERI's due diligence requirements and TERI is solvent.

Appendix A-8

TA403

"Class C Note" means a Class C Note issued pursuant to the Indenture, substantially in the form of Exhibit A-7 thereto.

"Class C Note Interest Trigger" means on any Distribution Date, if the Cumulative Default Rate as of each of the dates listed below equals or exceeds the respective percentage listed below for that date:

| Date | Cumulative Default Rate |
|------|-------------------------|
| October 1, 2006 | 1.50% |
| January 1, 2006 | 2.00% |
| January 1, 2007 | 5.75% |
| January 1, 2008 | 11.75% |
| January 1, 2009 | 15.75% |
| January 1, 2010 | 19.00% |
| January 1, 2012 | 21.00% |
| January 1, 2013 | 22.50% |

provided, however, that a Class C Note Interest Trigger will not be deemed to be in effect if (a) on the last day of the related Collection Period, the aggregate Outstanding Amount of the Class A Notes and the Class B Notes is less than the sum of the Pool Balance plus the amount on deposit in the Reserve Account (excluding the sum of (i) the amount on deposit in the TERI Pledge Fund and (ii) the amount of any Noteholders' Interest Carryover Shortfall for the Class B Notes and the Class C Notes) or (b) TERI is continuing to pay claims on Defaulted Student Loans that have met TERI's due diligence requirements and TERI is solvent.

"Class C Percentage" means at any time the percentage equivalent of a fraction, the numerator of which is the Outstanding Amount of the Class C Notes and the denominator of which is the sum of the Outstanding Amount of all the Notes.

"Clearing Agency" means an organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Clearing Agency Participant" means a broker, dealer, bank, other financial institution or other Person for whom from time to time a Clearing Agency effects book-entry transfers and pledges of securities deposited with the Clearing Agency.

"Clearstream" means Clearstream Banking, a société anonyme, a limited liability company organized under the laws of Luxembourg.

"Closing Date" means October 12, 2005.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and Treasury Regulations promulgated thereunder.

TA404

"Collateral" has the meaning specified in the Granting Clause of the Indenture.

"Collection Account" means the account designated as such, established and maintained pursuant to Section 8.02(a)(i) of the Indenture.

"Collection Period" means, with respect to the first Distribution Date, the period beginning on October 1, 2005 and ending on November 30, 2005, and with respect to each subsequent Distribution Date, the Collection Period means the calendar month immediately following the end of the previous Collection Period.

"Corporate Trust Office" means (i) with respect to the Indenture Trustee and the Note Registrar (so long as the Indenture Trustee is the Note Registrar), the designated office of the Indenture Trustee at which at any particular time its corporate trust business shall be administered, which office at the Closing Date is located at One Federal Street, 3rd Floor, Boston, Massachusetts 02110, Attention: The National Collegiate Student Loan Trust 2005-3 (facsimile: (617) 603-6638) or at such other address as the Indenture Trustee may designate from time to time by notice to the Noteholders, the Administrator, and the Depositor, or the principal corporate trust office of any successor Indenture Trustee (the address of which the successor Indenture Trustee will notify the Noteholders, the Administrator, and the Depositor) and (ii) with respect to the Owner Trustee, the principal corporate trust office of the Owner Trustee located at 300 Delaware Avenue, 9th Floor, Wilmington, Delaware 19801, Attention: Corporate Trust Administration (facsimile: (302) 552-3129); or at such other address as the Owner Trustee may designate by notice to the Certificateholders, the Administrator and the Depositor, or corporate trust office of any successor Owner Trustee (the address of which the successor Owner Trustee will notify the Certificateholders, the Administrator, the Back-up Administrator and the Depositor).

"Cost of Issuance Account" means the account designated as such, established and maintained pursuant to Section 8.06 of the Indenture.

"Credit-Worthy Cosigned Loan" means a loan made to a borrower to pay the costs of attendance at a school approved under the Student Loan Programs, which loan (i) was originated and underwritten to a credit-worthy standard as set forth in the related Program Manual with at least two signatures on the note evidencing such Student Loan, and (ii) is guaranteed by TERI.

"Credit-Worthy Non-Cosigned Loan" means a loan made to a borrower to pay the costs of attendance at a school approved under the Student Loan Programs, which loan (i) was originated and underwritten to a credit-worthy standard as set forth in the related Program Manual with one signature on the note evidencing such Student Loan, and (ii) is guaranteed by TERI.

"Credit-Ready Loan" means a loan made to a borrower to pay the costs of attendance at a school approved under the Student Loan Programs, which loan (i) was originated and underwritten to a credit-ready standard as set forth in the related Program Manual with one signature on the note evidencing such Student Loan, and (ii) is guaranteed by TERI.

Appendix A-10

TA405

"Cumulative Default Rate" means, as of any Distribution Date, the percentage equivalent of the fraction (a) the numerator of which is the aggregate principal balance of the Financed Student Loans which are Defaulted Student Loans, and (b) the denominator of which is the aggregate principal balance of the Initial Financed Student Loans and the aggregate initial principal balance of all Subsequent Student Loans.

"Custodial Agreements" means, the Custodial Agreements, dated as of October 12, 2005, each between the Servicer and the Indenture Trustee.

"Cutoff Date" means with respect to the Initial Financed Student Loans, September 30, 2005.

"Default" means any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"Defaulted Student Loan" means a Financed Student Loan for which a TERI Guaranty Event has occurred.

"Definitive Notes" has the meaning specified in Section 2.10 of the Indenture.

"Delivery" or "Deliver" when used with respect to Trust Account Property means the following and such additional or alternative procedures as may hereafter become appropriate to effect the complete transfer of ownership of any such Collateral to the Indenture Trustee, free and clear of any adverse claims, consistent with changes in applicable law or regulations or the interpretation thereof:

(a)     with respect to bankers' acceptances, commercial paper, negotiable certificates of deposit and other obligations that constitute instruments and are susceptible of physical delivery ("Physical Property"):

(b)     transfer of possession thereof to the Indenture Trustee endorsed to, or with respect to a certificated security:

       (i)     delivery thereof in bearer form to the Indenture Trustee; or

       (ii)     delivery thereof in registered form to the Indenture Trustee and

          (A)     the certificate is endorsed to the Indenture Trustee or in blank by effective endorsement; or

          (B)     the certificate is registered in the name of the Indenture Trustee, upon original issue or registration of transfer by the issuer;

(c)     with respect to an uncertificated security:

       (i)     the delivery of the uncertificated security to the Indenture Trustee; or

Appendix A-11

(ii)     the issuer has agreed that it will comply with instructions originated by the Indenture Trustee, without further consent by the registered owner;

(d)     with respect to any security issued by the U.S. Treasury, the Federal Home Loan Mortgage Corporation or by the Federal National Mortgage Association that is a book-entry security held through the Federal Reserve System pursuant to Federal book-entry regulations:

(i)     a Federal Reserve Bank by book entry credits the book-entry security to the securities account (as defined in 31 CFR Part 357) of a participant (as defined in 31 CFR Part 357) which is also a securities intermediary; and

(ii)     the participant indicates by book entry that the book-entry security has been credited to the Indenture Trustee's securities account, as applicable;

(e)     with respect to a security entitlement:

(i)     the Indenture Trustee, becomes the entitlement holder; or

(ii)     the securities intermediary has agreed that it will comply with entitlement orders originated by the Indenture Trustee;

(f)     without further consent by the entitlement holder for the purpose of clauses (b) and (e) hereof "delivery" means:

(i)     with respect to a certificated security:

(A)     the Indenture Trustee, acquires possession thereof;

(B)     another person (other than a securities intermediary) either acquires possession thereof on behalf of the Indenture Trustee or, having previously acquired possession thereof, acknowledges that it holds for the Indenture Trustee; or

(C)     a securities intermediary acting on behalf of the Indenture Trustee acquires possession of thereof, only if the certificate is in registered form and has been specially endorsed to the Indenture Trustee by an effective endorsement;

(ii)     with respect to an uncertificated security:

(A)     the issuer registers the Indenture Trustee as the registered owner, upon original issue or registration of transfer; or

(B)     another person (other than a securities intermediary) either becomes the registered owner thereof on behalf of the Indenture Trustee, or, having previously become the registered owner, acknowledges that it holds for the Indenture Trustee;

Appendix A-12

(g)     for purposes of this definition, except as otherwise indicated, the following terms shall have the meaning assigned to each such term in the UCC:

        (i)     "certificated security"

        (ii)    "effective endorsement"

        (iii)   "entitlement holder"

        (iv)    "instrument"

        (v)     "securities account"

        (vi)    "securities entitlement"

        (vii)   "securities intermediary"

        (viii)  "uncertificated security"

(h)     in each case of Delivery contemplated herein, the Indenture Trustee shall make appropriate notations on its records, and shall cause same to be made of the records of its nominees, indicating that securities are held in trust pursuant to and as provided in this Agreement.

"Deposit and Sale Agreement" means the Deposit and Sale Agreement dated as of October 12, 2005, between the Depositor and the Issuer pursuant to which the Depositor transfers Student Loans to the Issuer.

"Depositor" means The National Collegiate Funding LLC, as depositor under the Trust Agreement and any successor thereto or assignee thereof.

"Depository" means The Depository Trust Company, a New York corporation, its successors and assigns.

"Depository Participant" means a Person for whom, from time to time, the Depository effects book-entry transfers and pledges of securities deposited with the Depository.

"Determination Date" means, with respect to any Distribution Date, the third Business Day preceding such Distribution Date.

"Distribution Date" means, the 25th calendar day of each month or if such day is not a Business Day, the next Business Day, commencing December 27, 2005.

"DTC" means the Depository Trust Company, a New York corporation.

"DTC Custodian" means the Indenture Trustee as a custodian for DTC.

"Eligible Deposit Account" means either (a) a segregated account with an Eligible Institution, (b) a segregated trust account with the corporate trust department of a depository

institution organized under the laws of the United States of America or any one of the States (or any domestic branch of a foreign bank), having corporate trust powers and acting as trustee for funds deposited in such account, so long as any of the securities of such depository institution have a credit rating from at least two nationally recognized Rating Agencies in one of their respective generic rating categories which signifies investment grade, or (c) any other account that is acceptable to the Rating Agencies (as evidenced by written confirmation to the Indenture Trustee from each Rating Agency that the use of such account satisfies the Rating Agency Condition).

"Eligible Institution" means a depository institution (which may be, without limitation, the Indenture Trustee or any Affiliate of the Indenture Trustee) organized under the banking laws of the United States of America or any one of the States (or any domestic branch of a foreign bank), (a) which has (i) a short-term senior unsecured debt rating of "P-1" or better by Moody's, (ii) either (A) a long term senior unsecured debt rating of "AAA" by S&P or (B) a short-term senior unsecured debt rating "A-1+" by S&P, and (iii) a short-term senior unsecured debt rating of "F-1" or better by Fitch or any other long-term, short-term or certificate of deposit rating acceptable to the Rating Agencies, and (b) whose deposits are insured by the FDIC.

"Eligible Investments" mean book-entry securities, negotiable instruments or securities represented by instruments in bearer or registered form which evidence:

(a)     direct obligations of, and obligations fully guaranteed as to timely payment by, the United States of America;

(b)     demand deposits, time deposits or certificates of deposit of any depository institution or trust company incorporated under the laws of the United States of America or any State (or any domestic branch of a foreign bank) and subject to supervision and examination by Federal or state banking or depository institution authorities (including depository receipts issued by any such institution or trust company as custodian with respect to any obligation referred to in clause (a) above or portion of such obligation for the benefit of the holders of such depository receipts); *provided, however,* that (i) each such investment has an original maturity of less than 365 days and (ii) at the time of the investment or contractual commitment to invest therein (which shall be deemed to be made again each time funds are reinvested following each Distribution Date, as the case may be), the commercial paper or other short-term senior unsecured debt obligations (other than such obligations the rating of which is based on the credit of a Person other than such depository institution or trust company) thereof shall have a credit rating from Moody's, S&P and Fitch in the highest investment category granted thereby;

(c)     commercial paper having an original maturity of less than 365 days and having, at the time of the investment or contractual commitment to invest therein, a rating from Moody's, S&P and Fitch in the highest investment category granted thereby;

(d)     investments in money market funds (including funds for which the Indenture Trustee or the Owner Trustee or any of their respective Affiliates is an investment manager or advisor) that (i) maintain a stable $1.00 net asset value per share, (ii) are freely transferable on a daily basis, (iii) invests only in other Eligible Investments, and (iv) have a rating from Moody's, S&P and Fitch in the highest investment category granted thereby;

SSL-DOCS2 70240931v7

(e)     bankers' acceptances having an original maturity of less than 365 days and issued by any depository institution or trust company referred to in clause (b) above; and

(f)     any other investment permitted by each of the Rating Agencies and as set forth in writing delivered to the Indenture Trustee; provided that such investment is consistent with the definition of an "eligible investment" contained in FASB 140, Paragraph 35.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Euroclear" means the Euroclear System, or any successor thereto.

"Event of Default" has the meaning specified in Section 5.01 of the Indenture.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Executive Officer" means, with respect to any corporation, the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, any Executive Vice President, any Senior Vice President, any Vice President, the Secretary, the Assistant Secretary or the Treasurer of such corporation; and with respect to any partnership, any general partner thereof.

"FASB" means the Financial Accounting Standards Board.

"FDIC" means the Federal Deposit Insurance Corporation.

"Final Maturity Date" means for the (i) Class A-1 Notes, the March 26, 2018 Distribution Date, (ii) Class A-2 Notes, the September 25, 2025 Distribution Date, (iii) Class A-3 Notes, the July 25, 2028 Distribution Date, (iv) Class A-4 Notes, the April 25, 2029 Distribution Date, (v) Class A-5-1 Notes, the October 25, 2033 Distribution Date, (vi) Class A-5-2 Notes, the October 25, 2033 Distribution Date, (vii) Class A-5-3 Notes, the October 25, 2033 Distribution Date, (viii) Class A-5-4 Notes, the October 25, 2033 Distribution Date, (ix) Class A-5-5 Notes, the October 25, 2033 Distribution Date, (x) Class A-5-6 Notes, the October 25, 2033 Distribution Date, (xi) Class A-5-7 Notes, the October 25, 2033 Distribution Date, (xii) Class A-5-8 Notes, the October 25, 2033 Distribution Date, (xiii) Class A-5-9 Notes, the October 25, 2033 Distribution Date, (xiv) Class A-5-10 Notes, the October 25, 2033 Distribution Date, (xv) Class A-5-11 Notes, the October 25, 2033 Distribution Date, (xvi) Class A-5-12 Notes, the October 25, 2033 Distribution Date, (xvii) Class A-5-13 Notes, the October 25, 2033 Distribution Date, (xviii) Class A-5-14 Notes, the October 25, 2033 Distribution Date, (xix) Class A-5-15 Notes, the October 25, 2033 Distribution Date, (xx) Class A-5-16 Notes, the October 25, 2033 Distribution Date, (xxi) Class A-5-17 Notes, the October 25, 2033 Distribution Date, (xxii) Class A-5-18 Notes, the October 25, 2033 Distribution Date, (xxiii) Class A-5-19 Notes, the October 25, 2033 Distribution Date, (xxiv) Class A-5-20 Notes, the October 25, 2033 Distribution Date, (xxv) Class A-5-21 Notes, the October 25, 2033 Distribution Date, (xxvi) Class A-5-22 Notes, the October 25, 2033 Distribution Date, (xxvii) Class A-5-23 Notes, the October 25, 2033 Distribution Date, (xxviii) Class A-5-24 Notes, the October 25, 2033 Distribution Date, (xxix) Class A-5-25 Notes, the October 25, 2033 Distribution Date, (xxx) Class B Notes, July 27, 2037 Distribution Date, and (xxxi) Class C Notes, the August 25, 2037 Distribution Date.

"Financed Student Loans" means the collective reference to the Initial Financed Student Loans and the Subsequent Student Loans.

"Financed Student Loan Note" means the original fully executed copy of the note (or a copy of a fully executed master promissory note) evidencing each Financed Student Loan.

"FMC" means The First Marblehead Corporation.

"Fitch" means Fitch, Inc., and its successors and assigns.

"Funding Period" means the period beginning on the Closing Date and ending on the first to occur of (a) the date on which an Event of Default, a Servicer Default or an Administrator Default occurs, (b) the date on which an Insolvency Event occurs with respect to the Depositor or the Administrator, (c) the first date on which amounts on deposit in the Pre-Funding Account is zero, after giving effect to the purchase of Subsequent Student Loans and related transfers of funds pursuant to Section 8.10 hereof, and (d) November 30, 2005.

"Global Note" means any Note registered in the name of the Depository or its nominee, beneficial interests of which are reflected on the books of the Depository or on the books of a Person maintaining any account with such Depository (directly or as an indirect participant in accordance with the rules of such Depository). The Global Note shall include the Rule 144A Global Notes and the Regulation S Global Notes.

"Grant" means mortgage, pledge, bargain, sell, warrant, alienate, remise, release, convey, assign, transfer, create, and grant a lien upon and a security interest in and right of set-off against, deposit, set over and confirm pursuant to the Indenture. A Grant of the Collateral or of any other agreement or instrument shall include all rights, powers and options (but none of the obligations) of the Granting party thereunder, including the immediate and continuing right to claim for, collect, receive and give receipt for principal and interest payments in respect of the Collateral and all other moneys payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the Granting party or otherwise and generally to do and receive anything that the Granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Grantor Trust" means NCF Grantor Trust 2005-3.

"Grantor Trustee" means U.S. Bank National Association, not in its individual capacity but solely as Grantor Trustee under the Grantor Trust Agreement.

"Grantor Trust Agreement" means the Grantor Trust Agreement dated as of October 12, 2005 between the Depositor and the Grantor Trustee.

"Grantor Trust Certificates" means the Class A-5-1 Certificates, Class A-5-2 Certificates, the Class A-IO-1 Certificates and the Class A-IO-2 Certificates issued pursuant to the Grantor Trust Agreement, substantially in the form of Exhibits A through D thereto.

SSL-DOCS2 70240931v7

"Guarantee" means with respect to a Student Loan, the insurance or guarantee of the Guarantee Agency pursuant to such Guarantee Agency's Guarantee Agreement.

"Guarantee Agency" means TERI.

"Guarantee Agreements" means the TERI Guarantee Agreements.

"Guarantee Payment" means any payment made by the Guarantee Agency pursuant to the Guarantee Agreement in respect of a Financed Student Loan.

"Indenture" means the Indenture dated as of October 1, 2005, between the Issuer and the Indenture Trustee.

"Indenture Trustee" means U.S. Bank National Association, not in its individual capacity but solely as Indenture Trustee under the Indenture.

"Indenture Trust Estate" means all money, instruments, rights and other property that are subject or intended to be subject to the lien and security interest of the Indenture for the benefit of the Noteholders (including all property and interests granted to the Indenture Trustee), including all proceeds thereof.

"Independent" means, when used with respect to any specified Person, that the Person (a) is in fact independent of the Issuer, any other obligor upon the Notes, the Depositor, the Administrator, the Back-up Administrator and any Affiliate of any of the foregoing Persons, (b) does not have any direct financial interest or any material indirect financial interest in the Issuer, any such other obligor, the Depositor, the Administrator, the Back-Up Administrator or any Affiliate of any of the foregoing Persons and (c) is not connected with the Issuer, any such other obligor, the Depositor, the Administrator, the Back-Up Administrator or any Affiliate of any of the foregoing Persons as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions. Whenever it is herein provided that any Independent Person's Opinion of Counsel or certificate shall be furnished to the Indenture Trustee, such Person shall be appointed by the Issuer or the Indenture Trustee, as the case may be, and such Opinion of Counsel or certificate shall state that the signer has read this definition and that the signer is Independent within the meaning hereof.

"Index Maturity" means, (i) for One-Month LIBOR, one month, (ii) for Two-Month LIBOR, two months, and (ii) for Three-Month LIBOR, three months.

"Indirect Participant" means any financial institution for whom any Participant holds an interest in any Note.

"Individual Note" means any Note registered in the name of a holder other than the Depository or its nominee.

"Initial Financed Student Loans" means the Student Loans identified as such in each of the pool supplements dated as of the Closing Date between the Trust and a Seller, transferred to the Trust as of the Closing Date and listed on the Schedule of Initial Financed

Student Loans on the Closing Date as set forth in <u>Schedule A</u> to the Indenture (which Schedule may be in the form of microfiche or computer disk or tape).

"<u>Insider</u>" means, with respect to an entity, any officer, director or person privy to material information, including, but not limited to, contracts or agreements concerning such entity that are not available to the general public.

"<u>Insolvency Event</u>" means, with respect to a specified Person, (a) the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person or any substantial part of its property in an involuntary case under any applicable Federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or ordering the winding-up or liquidation of such Person's affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days; or (b) the commencement by such Person of a voluntary case under any applicable Federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by such Person to the entry of an order for relief in an involuntary case under any such law, or the consent by such Person to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or the making by such Person of any general assignment for the benefit of creditors, or the failure by such Person generally to pay its debts as such debts become due, or the taking of action by such Person in furtherance of any of the foregoing.

"<u>Interest Collections</u>" shall have the meaning specified in Section 8.07 of the Indenture.

"<u>Interest Period</u>" means, with respect to a Distribution Date for a Class of Notes, the period from and including the Closing Date or the most recent Distribution Date for that Class of Notes on which interest on the Notes has been distributed to but excluding the current Distribution Date.

"<u>Interested Noteholders</u>" means the Class A Noteholders (until such time as all Class A Notes have been paid in full), then the Class B Noteholders (until such time as all Class B Notes have been paid in full), and finally the Class C Noteholders). Notwithstanding the foregoing, any Notes owned by the Administrator, the Depositor or any of their respective Affiliates or agents designated for such purpose, shall not be voted by such entity nor considered in determining any specified voting percentage of the Interested Noteholders, unless otherwise set forth in the Indenture.

"<u>Investment Earnings</u>" means, with respect to any Distribution Date, the investment earnings (net of losses and investment expenses) on amounts on deposit in the Trust Accounts to be deposited into the Collection Account on or prior to such Distribution Date pursuant to Section 8.02(b) of the Indenture.

"<u>Irish Paying Agent</u>" means Custom House Administration and Corporate Services Limited, and its successors and assigns, and any other entity serving in such capacity.

"Irish Paying Agent Agreement" means Irish Paying Agency Agreement dated as of October 12, 2005 between the Irish Paying Agent and the Administrator on behalf of the Issuer and the Grantor Trust.

"Issuer" means The National Collegiate Student Loan Trust 2005-3 until a successor replaces it and, thereafter, means the successor.

"Issuer Order" and "Issuer Request" means a written order or request signed in the name of the Issuer by any one of its Authorized Officers and delivered to the Indenture Trustee.

"LIBOR" means the London interbank offered rate for deposits in U.S. dollars for a specified maturity.

"LIBOR Determination Date" means, with respect to each Interest Period, the second Business Day prior to the commencement of such Interest Period. For purposes of this definition, a "Business Day" is any day on which banks in London and New York City are open for the transaction of business.

"Lien" means a security interest, lien, charge, pledge, equity or encumbrance of any kind, other than tax liens and any other liens, if any, which attach to the respective Financed Student Loan by operation of law as a result of any act or omission by the related Obligor.

"Liquidated Student Loan" means any defaulted Financed Student Loan, liquidated by the Servicer.

"Liquidation Proceeds" means, with respect to any Liquidated Student Loan, the moneys collected in respect thereof from whatever source, other than Recoveries or Guarantee Payments received, net of the sum of any amounts expended by the Servicer in connection with such liquidation and any amounts required by law to be remitted to the borrower on such Liquidated Student Loan.

"Moody's" means Moody's Investors Service, Inc., and its successors and assigns.

"Note Depository Agreement" means the blanket issuer letter of representations dated as of October 11, 2005 relating to the Notes, executed by the Issuer and received and accepted by The Depository Trust Company, as the initial Clearing Agency.

"Note Interest Rate" means, with respect to any Interest Period and in the case of each Class of Notes, the interest rate per annum equal to the sum of (x) the Applicable Index plus (y) the Applicable Note Margin for such Class. The interest rate per annum for each Class of Notes will be computed on the basis of the actual number of days elapsed in the related Interest Period divided by 360.

"Note Owner" means, with respect to a Book-Entry Note, the Person who is the owner of such Book-Entry Note, as reflected on the books of the Clearing Agency, or on the books of a Person maintaining an account with such Clearing Agency (directly as a Clearing

Agency Participant or as an indirect participant, in each case in accordance with the rules of such Clearing Agency).

"Note Parity Trigger" means on any Distribution Date if (a) the sum of the Pool Balance plus amounts on deposit in the Reserve Account (excluding amounts on deposit in the TERI Pledge Fund) at the end of the preceding Collection Period is less than (b) 101% of the Outstanding Amount of the Notes after payments on that Distribution Date.

"Note Register" and "Note Registrar" have the respective meanings specified in Section 2.04 of the Indenture.

"Noteholders" means each Person in whose name a Note is registered in the Note.

"Noteholders' Interest Carryover Shortfall" means, with respect to any Distribution Date and any Class of Notes, the excess of (i) the sum of the related Noteholders' Interest Distribution Amount with respect to that Class of Notes, on the preceding Distribution Date for the Class of Notes over (ii) the amount of interest actually distributed to the holders of that Class of Notes on such preceding Distribution Date, plus interest on the amount of such excess interest due to the holders of that Class of Notes to the extent permitted by law, at the then current Note Interest Rate for that Class of Notes from such preceding Distribution Date for that Class of Notes to the current Distribution Date for that Class of Notes.

"Noteholders' Interest Distribution Amount" means, with respect to any Distribution Date and any Class of Notes, the sum of (i) the aggregate amount of interest accrued at the applicable Note Interest Rate for the related Interest Period on the outstanding principal balance of such Class of Notes on the immediately preceding Distribution Date after giving effect to all principal distributions, to such Noteholders of such Class on such date (or, in the case of the first Distribution Date, on the Closing Date) and (ii) the Noteholders' Interest Carryover Shortfall for such Class and such Distribution Date.

"Noteholders' Principal Distribution Amount" means, with respect to any Distribution Date, the amount necessary, so that after distributing such amount to the Notes, (a) the sum of the Pool Balance, as of the last day of the related Collection Period, plus amounts on deposit in the Pre-Funding Account and the Reserve Account (excluding amounts on deposit in the TERI Pledge Fund) in each case as of the last day of the related Collection Period, equals (b) 103% of the Outstanding Amount of the Notes; *provided, however,* that the Noteholders' Principal Distribution Amount will not exceed the Outstanding Amount of the Notes. In addition, (a) on the Final Maturity Date for each related Class of Notes, the principal required to be distributed to such Class of Notes will include the amount required to reduce the Outstanding Amount of such Class of Notes to zero.

"Notes" means collectively, the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class A-5-1 Notes, the Class A-5-2 Notes, Class A-5-3 Notes, Class A-5-4 Notes, Class A-5-5 Notes, Class A-5-6 Notes, Class A-5-7 Notes, Class A-5-8 Notes, Class A-5-9 Notes, Class A-5-10 Notes, Class A-5-11 Notes, Class A-5-12 Notes, Class A-5-13 Notes, Class A-5-14 Notes, Class A-5-15 Notes, Class A-5-16 Notes, Class A-5-17 Notes, Class A-5-18 Notes, Class A-5-19 Notes, Class A-5-20 Notes, Class A-5-21 Notes, Class

SSL-DOCS2 70240931v7

A-5-22 Notes, Class A-5-23 Notes, Class A-5-24 Notes and Class A-5-25 Notes, the Class B Notes, and the Class C Notes.

"Obligor" on a Financed Student Loan means the borrower or co-borrowers of such Financed Student Loan and any other Person who owes payments in respect of such Financed Student Loan, including the Guarantee Agency thereof.

"Officers' Certificate" means, with respect to the Issuer or the Administrator, a certificate signed by one of its Authorized Officers.

"One-Month LIBOR," "Two-Month LIBOR" and "Three-Month LIBOR" means, with respect to any Interest Period, the London interbank offered rate for deposits in U.S. dollars having the Index Maturity which appears on Telerate Page 3750 as of 11:00 a.m., London time, on such LIBOR Determination Date. If such rate does not appear on Telerate Page 3750, the rate for that day will be determined on the basis of the rates at which deposits in U.S. dollars, having the Index Maturity and in a principal amount of not less than U.S. $1,000,000, are offered at approximately 11:00 a.m., London time, on such LIBOR Determination Date to prime banks in the London interbank market by the Reference Banks. The Administrator will request the principal London office of each of such Reference Banks to provide a quotation of its rate. If at least two such quotations are provided, the rate for that day will be the arithmetic mean of the quotations. If fewer than two quotations are provided, the rate for that day will be the arithmetic mean of the rates quoted by major banks in New York City, selected by the Administrator, at approximately 11:00 a.m., New York City time, on such LIBOR Determination Date for loans in U.S. dollars to leading European banks having the Index Maturity and in a principal amount of not less than U.S. $1,000,000; provided that if the banks selected as aforesaid are not quoting as mentioned in this sentence, LIBOR in effect for the applicable Interest Period for the applicable Index Maturity will be LIBOR in effect for the previous Interest Period for that Index Maturity.

"Opinion of Counsel" means a written opinion of an attorney at law or firm of attorneys selected by the Person obliged to deliver an opinion on the subject in question, reasonably acceptable to the Person who is to receive the same hereunder, duly admitted to the practice of law before the highest court of any state of the United States of America or the District of Columbia.

"Optional Deposit" has the meaning specified in Section 8.11(a) of the Indenture.

"Original Principal Balance" means, for any Class of Notes, the original principal balance for such Class on the Closing Date, as set forth in Section 2.02 of the Indenture.

"Outstanding" means, as of the date of determination, all Notes theretofore authenticated and delivered under the Indenture except:

        (i)   Notes theretofore canceled by the Note Registrar or delivered to the Note Registrar for cancellation;

        (ii)   Notes or portions thereof the payment for which money in the necessary amount has been theretofore deposited with the Indenture Trustee or any Paying Agent in trust for the Noteholders thereof;

Appendix A-21

TA416

(iii)     Notes in exchange for or in lieu of other Notes which have been authenticated and delivered pursuant to the Indenture unless proof satisfactory to the Indenture Trustee is presented that any such Notes are held by a bona fide purchaser;

provided that in determining whether the Noteholders of the requisite Outstanding Amount of the Notes have given any request, demand, authorization, direction, notice, consent or waiver hereunder or under any other Basic Document, Notes owned by the Issuer, any other obligor upon the Notes, the Depositor, the Administrator, the Servicer, or any Affiliate of any of the foregoing Persons shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Indenture Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that a Responsible Officer of the Indenture Trustee either actually knows to be so owned or has received written notice thereof shall be so disregarded. Notes so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Indenture Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Issuer, any other obligor upon the Notes, the Depositor, the Administrator, the Servicer, or any Affiliate of any of the foregoing Persons.

"Outstanding Amount" means the aggregate principal amount of all Notes (or, if the context so indicates, one or more Classes of Notes) Outstanding at the date of determination.

"Owner Trustee" means Delaware Trust Company, National Association, not in its individual capacity but solely as Owner Trustee under the Trust Agreement, and any successor thereto or assigned thereof.

"Participant" means a Person that has an account with DTC.

"Paying Agent" means (i) the Indenture Trustee or any other Person that meets the eligibility standards for the Indenture Trustee specified in Section 6.11 of the Indenture and is authorized by the Issuer to make the payments to and distributions from the Collection Account and payments of principal of and interest and any other amounts owing on the Notes on behalf of the Issuer and (ii) the Irish Paying Agent.

"Person" means any individual, corporation, estate, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Physical Property" has the meaning assigned to such term in the definition of "Delivery" above.

"Pool Balance" means, at any time, the aggregate principal balance of the Financed Student Loans at the end of the preceding Collection Period (including accrued interest thereon for such Collection Period to the extent such interest will be capitalized upon commencement of repayment or during deferment or forbearance).

"Predecessor Note" means, with respect to any particular Note, every previous Note evidencing all or a portion of the same debt as that evidenced by such particular Note; and,

SSL-DOCS2 70240931v7

TA417

for the purpose of this definition, any Note authenticated and delivered under Section 2.05 of the Indenture and in lieu of a mutilated, lost, destroyed or stolen Note shall be deemed to evidence the same debt as the mutilated, lost, destroyed or stolen Note.

"Pre-Funded Amount" means, with respect to any Distribution Date, the amounts on deposit in the Pre-Funding Account.

"Pre-Funding Account" means the account designated as such, established and maintained pursuant to Section 8.02(a)(iii) of the Indenture.

"Prepayment Penalty" means, on any Distribution Date on which the Class A-5-1, Class A-5-2 Notes, Class A-5-3 Notes, Class A-5-4 Notes, Class A-5-5 Notes, Class A-5-6 Notes, Class A-5-7 Notes, Class A-5-8 Notes, Class A-5-9 Notes, Class A-5-10 Notes, Class A-5-11 Notes and the Class A-5-12 Notes are Outstanding, if the amount listed as the Notional Amount for that Distribution Date on the following schedule exceeds the Outstanding Amount of such Class A-5 Notes immediately prior to such Distribution Date, an amount equal to the interest accrued on such excess at the rate of 4.80% per annum for the applicable Interest Period:

| Distribution Dates | Notional Amount |
|---|---|
| December 2005-November 2009 | $440,948,000 |
| December 2009 | $430,741,000 |
| January 2010 | $411,753,000 |
| February 2010 | $392,764,000 |
| March 2010 | $375,774,000 |
| April 2010 | $351,789,000 |
| May 2010 | $328,803,000 |
| June 2010 | $304,817,000 |
| July 2010 | $283,830,000 |
| August 2010 | $263,842,000 |
| September 2010 | $244,853,000 |
| October 2010 | $227,863,000 |
| November 2010 and thereafter | $0 |

Prepayment Penalties shall not be deemed payments of interest and/or principal of the Class A-5 Notes.

Appendix A-23

"Private Notes" means the Class A-5 Notes.

"Proceeding" means any suit in equity, action at law or other judicial or administrative proceeding.

"Program Manuals" means the program manual attached as an exhibit to each TERI Guarantee Agreement together with the student loan program guidelines of each of the Sellers which describe their credit and collection policies for the origination, acquisition, financing and servicing of Financed Student Loans, as amended, revised or supplemented from time to time; *provided, however,* that no such amendment, revision or supplement shall (a) reduce in any manner the amount of, or delay the timing of, collections of payments with respect to Financed Student Loans or (b) reduce the underwriting standards with respect to Financed Student Loans acquired or to be acquired by the Issuer, in each case without satisfying the Rating Agency Condition.

"Purchase Amount" means, as of the close of business on the last day of a Collection Period, 100% of the amount required to prepay in full the respective Financed Student Loan, in each case under the terms thereof including all accrued interest thereon expected to be capitalized upon commencement of repayment or during deferment or forbearance.

"Purchased Student Loan" means a Financed Student Loan purchased by the Servicer or repurchased by a Seller from the Issuer.

"Qualified Institutional Buyer" has the meaning ascribed to such term in Rule 144A under the Securities Act.

"Rating Agency" means each of Moody's, S&P and Fitch. If any such organization or successor is no longer in existence, "Rating Agency" shall be a nationally recognized statistical rating organization or other comparable Person designated by the Issuer, notice of which designation shall be given to the Indenture Trustee and the Owner Trustee.

"Rating Agency Condition" means, with respect to any action, that each Rating Agency shall have been given 10 days' prior notice thereof (or such shorter period as shall be acceptable to the Rating Agencies) and that none of the Rating Agencies shall have notified the Administrator and the Indenture Trustee, in writing that such action will in and of itself result in a reduction or withdrawal of the then current rating of the Notes, based upon the review by each such Rating Agency of payment and default performance of the Financed Student Loans, financial information relating to the Trust, the Indenture Trust Estate, the Guarantee Agency, the Servicer or the Administrator, and such other information that such Rating Agency determines to review.

"Realized Losses" means the excess of the aggregate principal balance of any Liquidated Student Loan plus accrued but unpaid interest thereon over the related Liquidation Proceeds to the extent allocable to principal.

"Record Date" means with respect to a Class of the Notes, the close of business on the Business Day immediately preceding a Distribution Date for such Class of Notes.

Appendix A-24

TA419

"Recoveries" means, with respect to any Liquidated Student Loan, moneys collected in respect thereof, from whatever source, during any Collection Period following the Collection Period in which such Financed Student Loan, became a Liquidated Student Loan, net of the sum of any amounts expended by the Servicer for the account of any Obligor and any amounts required by law to be remitted to the Obligor.

"Reference Bank" means a leading bank (i) engaged in transactions in Eurodollar deposits in the international Eurocurrency market, (ii) not controlling, controlled by or under common control with the Administrator and (iii) having an established place of business in London.

"Regulation S" means Regulation S under the Securities Act.

"Regulation S Global Notes" means the Private Notes sold in offshore transactions in reliance on Regulation S and represented by one or more Global Notes deposited with the Indenture Trustee as custodian for the Depository.

"Regulation S Investor" means, with respect to a transferee of a Regulation S Global Note, a transferee that acquires such Private Note pursuant to Regulation S.

"Regulation S Transfer Certificate" means a letter substantially in the form attached to the Indenture as Exhibit G or Exhibit H.

"Rehabilitated Student Loans" means Financed Student Loan purchased by TERI due to a TERI Guaranty Event, that the Trust will repurchase, (to the extent there are Available Funds), if TERI succeeds, after purchase, in obtaining from the borrower three full consecutive on-time monthly payments pursuant to the TERI Guarantee Agreements, and the borrower is within thirty days of being current on the Financed Student Loan.

"Reserve Account" means the account designated as such, established and maintained pursuant to Section 8.02(a)(ii) of the Indenture.

"Reserve Account Initial Deposit" means $316,333,988.

"Responsible Officer" means, with respect to the Indenture Trustee or the Owner Trustee, any officer within the Corporate Trust Office of the Indenture Trustee or the Owner Trustee, including any Vice President, Assistant Vice President, Secretary, Assistant Secretary, or any other officer of the Indenture Trustee or the Owner Trustee customarily performing functions similar to those performed by any of the above designated officers, with direct responsibility for the administration of the Indenture (or the Trust Agreement, as amended from time to time, as applicable to the Owner Trustee) and the other Basic Documents on behalf of the Indenture Trustee or the Owner Trustee and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"Restricted Period" means the 40-day period prescribed by Regulation S commencing on the later of (a) the date upon which Private Notes are first offered to Persons

TA420

other than the Underwriters and any other distributor (as such term is defined in Regulation S) of the Private Notes and (b) the Closing Date.

"Rule 144A" means Rule 144A under the Securities Act.

"Rule 144A Certification" means a letter substantially in the form attached to the Indenture as Exhibit D.

"Rule 144A Global Notes" means the Private Notes sold within the United States to U.S. Persons, initially issued to Qualified Institutional Buyers in the form of beneficial interests in one or more Global Notes, deposited with the Indenture Trustee as custodian for the Depository.

"S&P" means Standard and Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

"Schedules of Financed Student Loans" means the listing of the Financed Student Loans set forth in Schedule A to the Indenture (which Schedule may be in the form of microfiche or file or computer disk tape), as amended or supplemented on each Subsequent Transfer Date to reflect the sale to the Trust of the Subsequent Student Loans.

"SEC" means the United States Securities and Exchange Commission.

"Securities" means the Notes.

"Securities Act" means the Securities Act of 1933, as amended.

"Securities Legend" means the following legend: "THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE SECURITIES OR BLUE SKY LAW OF ANY STATE. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES THAT THIS NOTE MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND ONLY (1) PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A") TO A PERSON THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A (A "QIB"), PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF A QIB, WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (2) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (3) PURSUANT TO ANOTHER EXEMPTION AVAILABLE UNDER THE SECURITIES ACT AND IN ACCORDANCE WITH ANY APPLICABLE STATE SECURITIES LAWS, OR (4) PURSUANT TO A VALID REGISTRATION STATEMENT."

"Seller" means any person authorized to sell Student Loans to the Depositor pursuant to a Student Loan Purchase Agreement.

"Servicer" means the Pennsylvania Higher Education Assistance Agency, Great Lakes Educational Loan Services, Inc., and any other loan servicer satisfying the Rating Agency Condition.

"Servicer Default" means any default event specified in the Servicing Agreement.

"Servicer's Report" means any report of the Servicer delivered pursuant to the Servicer's Servicing Agreement, substantially in the form acceptable to the Administrator.

"Servicing Agreement" means the agreement by which the Pennsylvania Higher Education Assistance Agency will act as the Servicer, dated as of October 16, 2001, as amended, between FMC and the Pennsylvania Higher Education Assistance Agency, which agreement will be assigned to the Trust concurrent with the initial purchase of Financed Student Loans, or any other servicing agreement between the Issuer and a servicer under which such servicer agrees to service Financed Student Loans included in the Indenture Trust Estate, which servicing agreement shall satisfy the Rating Agency Condition.

"Servicing Fee" means the fee payable to the Servicer pursuant to the Servicer's Servicing Agreement as in effect on the Closing Date; such fee may be increased upon satisfying the Rating Agency Condition.

"Specified Reserve Account Balance" means, on any Distribution Date beginning with the Distribution Date in November 2006 (after giving effect to all deposits or withdrawals therefrom on that Distribution Date) the greatest of (a) the respective amount listed below for that Distribution Date:

| Distribution Date | Amount | Distribution Date | Amount |
|---|---|---|---|
| November 2006 | $307,310,000 | October 2008 | $40,794,000 |
| December 2006 | $285,554,000 | November 2008 | $38,074,000 |
| January 2007 | $266,517,000 | December 2008 | $35,355,000 |

| Distribution Date | Amount | Distribution Date | Amount |
|---|---|---|---|
| February 2007 | $250,199,000 | January 2009 | $32,635,000 |
| March 2007 | $233,882,000 | February 2009 | $29,916,000 |
| April 2007 | $217,565,000 | March 2009 | $28,556,000 |
| May 2007 | $203,967,000 | April 2009 | $27,196,000 |
| June 2007 | $190,369,000 | May 2009 | $25,836,000 |
| July 2007 | $176,772,000 | June 2009 | $24,476,000 |
| August 2007 | $163,174,000 | July 2009 | $23,117,000 |
| September 2007 | $152,296,000 | August 2009 | $21,757,000 |
| October 2007 | $138,698,000 | September 2009 | $20,397,000 |
| November 2007 | $130,539,000 | October 2009 | $19,037,000 |
| December 2007 | $119,661,000 | November 2009 | $17,678,000 |

Appendix A-27

TA422

| | | | |
|---|---|---|---|
| January 2008 | $111,502,000 | December 2009 | $16,318,000 |
| February 2008 | $100,624,000 | January 2010 | $14,958,000 |
| March 2008 | $92,465,000 | February 2010 | $13,598,000 |
| April 2008 | $81,587,000 | March 2010 | $12,238,000 |
| May 2008 | $76,148,000 | April 2010 | $10,879,000 |
| June 2008 | $67,989,000 | May 2010 | $9,519,000 |
| July 2008 | $62,550,000 | June 2010 | $8,443,000 |
| August 2008 | $54,392,000 | July 2010 and thereafter | $0 |
| September 2008 | $48,952,000 | | |

(b)     1.25% of the Outstanding Amount of the Notes as of the last day of the immediately preceding Collection Period, and (c) $8,443,000.

"State" means any one of the 50 States of the United States of America or the District of Columbia.

"Stepdown Date" means the November 2011 Distribution Date.

"Student Loan" means (a) a Credit-Worthy Cosigned Loan, (b) a Credit-Worthy Non-Cosigned Loan, or (c) a Credit-Ready Loan.

"Student Loan Acquisition Certificate" means the Student Loan Acquisition Certificate in substantially the form attached as Exhibit B to the Indenture, as such Exhibit B may be amended or supplemented from time to time.

"Student Loan Files" means

(a)     the original fully executed copy of the note evidencing the Financed Student Loan (including the original loan application fully executed by the Obligor); and

(b)     any and all other documents and computerized records that the Servicer shall keep on file, in accordance with its customary procedures, relating to such Financed Student Loan or any borrower with respect thereto.

"Student Loan Programs" means the student loan programs sponsored by the Depositor and its Affiliates for the origination, acquisition, holding, servicing and financing of Student Loans, which programs are governed by the Program Manuals.

"Student Loan Purchase Agreements" means, collectively, the student loan purchase agreements and any other similar agreement providing for the sale of Student Loans from the Sellers to the Depositor for deposit into the Indenture Trust Estate, including the pool supplement relating thereto by and among the applicable Seller, the Depositor and FMC. On the Closing Date, the Student Loan Purchase Agreements shall be as listed in Schedule D to the Indenture.

"Subordinate Note Principal Trigger" means if (a) a Note Parity Trigger occurs and is continuing or (b) the Cumulative Default Rate exceeds 10%, provided, however, that a

Subordinated Note Principal Trigger will not be deemed to be in effect if TERI is continuing to pay claims on Defaulted Student Loans that have met TERI's due diligence requirements and TERI is solvent.

"Subsequent Cutoff Date" means the day specified in the related Subsequent Transfer Agreement as of which principal and interest accruing with respect to a Subsequent Student Loan is to be transferred to the Issuer.

"Subsequent Student Loans" means the Student Loans purchased by the Trust from the Depositor, and the Depositor from the Sellers with proceeds in the Pre-Funding Account, each Subsequent Student Loan to be identified on Schedule B to the Indenture (which may be in the form of microfiche or computer tape).

"Subsequent Transfer Date" means each day during the Funding Period on which Subsequent Student Loans are conveyed to the Issuer.

"Supplemental Indenture" means any amendment of or supplement to this Indenture made in accordance with Article IX hereof.

"Telerate Page 3750" means the display page so designated on the Bridge Telerate Service (or such other page as may replace that page on that service for the purpose of displaying comparable rates or prices) or such comparable page on a comparable service.

"TERI" means The Education Resources Institute, Inc., a Massachusetts non-profit corporation, or its successors and assigns.

"TERI Deposit and Security Agreement" means the Deposit and Security Agreement dated as of October 12, 2005, by and among the Issuer, TERI and the Administrator with respect to the issuance of the Notes hereunder.

"TERI Guaranty Agreement" means, with a respect to a Student Loan Program, a guaranty agreement between a Seller and TERI, together with the acknowledgment by TERI relating thereto. On the Issue Date, the TERI Guarantee Agreements shall be as listed on Schedule B to the Indenture.

"TERI Guaranty Amount" means, pursuant to the TERI Guaranty Agreements, Financed Student Loans are guaranteed 100% as to payment of principal and interest.

"TERI Guaranty Event" means a claim for payment on a Financed Student Loan made under the TERI Guaranty Agreements if (a) the Obligor has failed to make monthly principal and/or interest payments on such loan when due, provided such failure continues for a period of 150 consecutive days, (b) the Obligor has filed a Chapter 13 petition in a bankruptcy or, in a Chapter 7 proceeding has filed an adversary proceeding pursuant to 11 U.S.C. § 523(a)(8), or (c) the Obligor has died.

"TERI Pledge Fund" means the fund by the name created in the TERI Deposit and Security Agreement whereby TERI will pledge a portion of its guaranty fees to the Trust, by deposit into a special trust account with the Indenture Trustee.

SSL-DOCS2 70240931v7

"Three-Month LIBOR" see "One-Month LIBOR" herein

"Treasury Regulations" means regulations, including proposed or temporary regulations, promulgated under the Code. References in any document or instrument to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

"Trust" means the Issuer, established pursuant to the Trust Agreement.

"Trust Account Property" means the Trust Accounts, all amounts and investments held from time to time in any Trust Account (whether in the form of deposit accounts, Physical Property, book-entry securities, uncertificated securities or otherwise), including the Reserve Account Initial Deposits and all proceeds of the foregoing.

"Trust Accounts" has the meaning specified in Section 8.02(b) of the Indenture.

"Trust Agreement" means the Trust Agreement, dated as of October 12, 2005, among the Depositor, TERI and the Owner Trustee.

"Trust Certificates" means the Certificates.

"Trust Indenture Act" or "TIA" means the Trust Indenture Act of 1939, as amended from time to time.

"Turbo Trigger" means any Distribution Date on which (a) the outstanding aggregate Pool Balance is equal to or less than 10% of the sum of the aggregate principal balance as of the Cutoff Date of the Initial Financed Student Loans plus the aggregate initial principal balance of all Subsequent Student Loans; or (b) the Cumulative Default Rate exceeds 10%; provided, however, that with respect to clause (b), a Turbo Trigger will not have occurred if TERI is continuing to pay claims on Defaulted Student Loans that have met TERI's due diligence requirements and TERI is solvent.

"Two-Month LIBOR" see "One-Month LIBOR" herein

"UCC" means, unless the context otherwise requires, the Uniform Commercial Code, as in effect in the relevant jurisdiction, as amended from time to time.

"Underwriters" means Deutsche Bank Securities Inc., Goldman, Sachs & Co., J.P. Morgan Securities Inc., Citigroup Global Markets Inc., Credit Suisse First Boston LLC, Greenwich Capital Markets, Inc., and UBS Securities LLC.

SSL-DOCS2 70240931v7

**SERVICER CONSENT LETTER**

June 10, 2004

Pennsylvania Higher Education Assistance Agency
1200 North Seventh Street
Harrisburg, Pennsylvania 17102-1444

Attention: Senior Vice President, Marketing & Client Affairs

Dear Sir or Madam:

Reference is hereby made to the Alternative Servicing Agreement, dated October 16, 2001, as amended (the "Servicing Agreement"), by and between the Pennsylvania Higher Education Assistance Agency (the "Servicer") and The First Marblehead Corporation ("FMC"), a copy of which is attached hereto as Exhibit A. Capitalized terms not otherwise defined herein shall have the meanings set forth in the Servicing Agreement. The parties hereto agree as follows:

1.     FMC hereby assigns its interest in the Servicing Agreement with respect to the Student Loans identified on the attached Schedule 1 (the "Student Loans") to The National Collegiate Student Loan Trust 2004-1 (the "Issuer"), and the Servicer hereby consents thereto.

2.     The Servicer hereby consents to the assignment and to the grant by the Issuer of a security interest in the Servicing Agreement to U.S. Bank National Association (the "Indenture Trustee"), as provided in the Indenture (the "Indenture"), dated as of June 1, 2004, by and between the Issuer and the Indenture Trustee, for the benefit of the holders of the Student Loan Asset Backed Notes (the "Notes") of the Issuer.

3.     The Servicer hereby confirms that it will not terminate the Servicing Agreement until the appointment of a successor servicer by the Issuer, unless such termination is due to a default by the Issuer under Section 6.2 or 12.3 thereof, or unless the Servicing Agreement otherwise expires in accordance with Section 12.1 thereof.

4.     The Issuer hereby confirms that it will not terminate the Servicer for cause pursuant to Section 12.2 of the Servicing Agreement until a successor servicer is appointed.

5.     The Servicer hereby confirms that it has complied with all the terms and satisfied all the conditions on its part to be performed or satisfied under the Servicing Agreement.

6.     It is expressly understood and agreed by the parties hereto that (i) this servicer consent letter is executed and delivered by Wachovia Trust Company, National Association (the "Owner Trustee"), not individually or personally, but solely as owner trustee of the Issuer under the Trust Agreement dated as of June 10, 2004 among The National Collegiate Funding LLC, The Education Resources Institute, Inc. and the Owner Trustee, in the exercise of the powers and authority conferred and vested in it, (ii) each of the representations, undertakings and agreements herein made on the part of the Issuer is made and intended not as a personal representation, undertaking and agreement by the Owner Trustee, but is made and intended for the purpose of binding only the Issuer, (iii) nothing herein contained shall be construed as creating any personal or individual liability on the Owner Trustee, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereby and by any person claiming by, through, or under the parties hereto, and (iv) under no circumstances shall the Owner Trustee be personally liable for the payment of any indebtedness or expenses of the Issuer or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Issuer under this Agreement or any other documents related to the Notes.

7.     Any breach of the Servicer's obligations under this Servicer Consent Letter shall constitute a material breach of the Servicing Agreement.

8.     The parties hereto acknowledge and agree that for so long as any Notes are outstanding, the Indenture Trustee is a third party beneficiary hereof and of the Servicing Agreement, and the Indenture Trustee shall have the right to exercise all rights of the Issuer under the Servicing Agreement.

9.     The Servicer will execute and deliver to FMC (or its nominee) and the Owner Trustee annually on or before July 31 of each year, and at such other times as FMC (or its nominee) and the Owner Trustee (or either of them) are required to provide certification to the Securities and Exchange Commission under the Securities Exchange Act of 1934 in connection with servicing related activities, a certificate of a senior officer of the Servicer in the form attached hereto as Exhibit B.

[Signature Pages Follow]

2

NCSLT-00000007

TA427

Please acknowledge your acceptance and agreement to the foregoing by signing below.

Very truly yours,

THE FIRST MARBLEHEAD CORPORATION

By:_____
   Name: John A. Hupalo
   Title: Executive Vice President

ACCEPTED AND AGREED:

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY

By:_____
   Name:
   Title:

THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1

By:  WACHOVIA TRUST COMPANY, NATIONAL ASSOCIATION,
     not in its individual capacity but solely as Owner Trustee

   By:_____
      Name:
      Title:

**Servicer Consent Letter (PHEAA)**

Please acknowledge your acceptance and agreement to the foregoing by signing below.

Very truly yours,

THE FIRST MARBLEHEAD CORPORATION

By:_____
    Name:
    Title:

ACCEPTED AND AGREED:

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY

By: _____
    Name: *Richard E. Whiley*
    Title: *President and CEO*

THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1

By: WACHOVIA TRUST COMPANY, NATIONAL ASSOCIATION,
    not in its individual capacity but solely as Owner Trustee

By:_____
    Name:
    Title:

Please acknowledge your acceptance and agreement to the foregoing by signing below.

Very truly yours,

THE FIRST MARBLEHEAD CORPORATION

By:_____
    Name:
    Title:

ACCEPTED AND AGREED:

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY

By:_____
    Name:
    Title:

THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1

By:  WACHOVIA TRUST COMPANY, NATIONAL ASSOCIATION,
     not in its individual capacity but solely as Owner Trustee

By:_____
    Name:  STERLING C. CORREIA
    Title:    VICE PRESIDENT

**Servicer Consent Letter (PHEAA)**

<u>Exhibit A</u>

Servicing Agreement

See supplemental Pierce Atwood CD.

<u>Exhibit B</u>

FORM CERTIFICATION TO BE
PROVIDED TO DEPOSITOR BY SERVICER

Re: [Registrant]

I, [identify the certifying individual], a [title] of [Servicer], as Servicer of the [Student Loans], hereby certify to _____ (the "Depositor") and its officers, directors and affiliates, and with the knowledge and intent that they will rely upon this certification, that:

1.     Based on my knowledge, the information in the annual statement of compliance delivered pursuant to Section 5.6 of the Servicing Agreement and all servicing reports, officer's certificates and other information relating to the servicing of the [Student Loans] prepared by the Servicer taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading as of the last day of the period covered by the annual report on Form 10-K of the Registrant;

2.     The servicing information required to be provided by the Servicer under the Servicing Agreement has been provided;

3.     I am responsible for reviewing the activities performed by the Servicer under the Servicing Agreement and based upon the review required by the annual statement of compliance delivered pursuant to Section 5.6 of the Servicing Agreement, and except as disclosed in such annual statement of compliance, the annual independent public accountant's servicing report delivered pursuant to Section 5.7 of the Servicing Agreement and all servicing reports, officer's certificates and other information relating to the servicing of the [Student Loans] submitted by the Servicer to the Depositor, the Servicer has, as of the last day of the period covered by the annual report on Form 10-K of the Registrant, fulfilled its obligations under the Servicing Agreement; and

4.     I have disclosed to the Depositor all significant deficiencies relating to the Servicer's compliance with the minimum servicing standards in accordance with a review conducted in compliance with the Servicing Agreement.

Date: _____

[SERVICER], as Servicer


By: _____
Name:
Title

5

     NCSLT-00000012

TA432

## SCHEDULE 1
### Student Loans

See supplemental loan roster CD.

TA433

# EXHIBIT

# E

NCLST 0241
TA434

# AMENDED AND RESTATED PRIVATE STUDENT LOAN SERVICING AGREEMENT

## BETWEEN

## PENNSYLVANIA HIGHER EDUCATION ASSISTANCE-AGENCY

## AND

## THE FIRST MARBLEHEAD CORPORATION

THIS AMENDED AND RESTATED PRIVATE STUDENT LOAN SERVICING AGREEMENT (this "Agreement") is made and dated as of September 28, 2006 (the "Effective Date"), by and between the Pennsylvania Higher Education Assistance Agency (d/b/a American Education Services), a public corporation and governmental instrumentality organized under the laws of the Commonwealth of Pennsylvania, 1200 North Seventh Street, Harrisburg, Pennsylvania 17102 ("Servicer"), and The First Marblehead Corporation, having an address at 800 Boylston Street, 34th Floor, Boston, Massachusetts 02199 ("FMC"), and amends and restates that certain Alternative Servicing Agreement between Servicer and FMC dated as of October 16, 2001 ("Old Servicing Agreement").

## RECITALS

WHEREAS, the Servicer is in the business of servicing privately insured student loans and other education loans for lenders; and

WHEREAS, Program Lender (defined below) and FMC have created a group of education loan programs, all of which are described in the Program Guidelines (defined below), pursuant to which education loans are funded by Program Lender and purchased by FMC or an SPE (defined below); and

WHEREAS, in order to ensure the integrity of the education loans at the time they are purchased by FMC or an SPE, FMC desires to oversee the servicing of such education loans prior to purchase; and

WHEREAS, FMC desires to utilize the expertise of the Servicer to service such education loans as and when they are purchased by FMC or an SPE;

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement and the fees to be paid by FMC to the Servicer, and intending to be legally bound, the parties to this Agreement do hereby agree to the following:

## SECTION 1. DEFINITIONS

1.01    "Account" means the Student Loans collectively of an individual Borrower.

1.02    "Agreement" means this Amended and Restated Private Student Loan Servicing Agreement, including each Schedule and Exhibit provided for herein and each amendment hereafter adopted.

1.03    "Borrower" means an individual who is the maker of a Credit Agreement and who obtains a Student Loan or a Committed Student Loan. "Borrower" includes both the

1

NCLST 0242
TA435

primary obligor and any cosigner.

1.04 "Business Days" means a day of the year other than a Saturday or Sunday, or a day on which the Servicer or FMC is required or authorized by law to remain closed, and on which either does remain closed.

1.05 "Change of Control" means the sale to any other entity, individual or group of all or substantially all of the entity's assets used to perform the Services.

1.06 "Committed Student Loans" means any of and "Committed Student Loans" means all, the Private Student Loans which FMC is obligated to or has the right to purchase under third-party agreements with Program Lender and which, upon the occurrence of such purchase, will become Student Loans.

1.07 "Confidential Information" has the meaning assigned to it in Section 11.02.

1.08 "Consumer Information" has the meaning assigned to it in Section 11.03.

1.09 "Credit Agreement" shall mean the promissory note or credit agreement executed by a Borrower evidencing a Student Loan or a Committed Student Loan.

1.10 "Customer" has the meaning assigned to it in Section 11.03.

1.11 "Customer Information" has the meaning assigned to it in Section 11.03.

1.12 "Customer Service Schedule" means the schedule of that name attached hereto and as amended by agreement of the parties.

1.13 "Disaster Recovery and Business Continuity Plans" has the meaning given to it in Section 11.05.

1.14 "Failed Standard" shall have the meaning given to it in Section 4.02.

1.15 "Fee Schedule" means the schedule of that name attached hereto and as amended by agreement of the parties.

1.16 "FMC" means The First Marblehead Corporation in its capacity as "FMC" and "Securitization Sponsor," (as those roles are defined in the Program Guidelines), and as a party entitled to Servicing of Committed Student Loans and Student Loans.

1.17 "FMDS" has the meaning given to it in Section 4.14.

1.18 "FMER" means First Marblehead Education Resources, Inc., a wholly owned subsidiary of FMC.

1.19 "Force Majeure" has the meaning given to it in Section 10.01.

NCLST 0243
TA436

1.20  "Identity Theft Procedures" means the Procedures for Fraud Notification set forth in the Servicing Guidelines and as amended by agreement of the parties.

1.21  "Information Security Program" has the meaning given to it in Section 11.03.

1.22  "Insurer" means The Education Resources Institute, Inc. ("TERI") or such other private insurance agencies as the parties may mutually agree upon from time to time.

1.23  "Late Fees" has the meaning given to it in Section 4.14.

1.24  "Material Adverse Change" means any condition or event that is reasonably likely to have a material adverse effect on (i) the business operations, property or condition (financial or otherwise) or prospects of the Servicer, or (ii) the validity or enforceability of this Agreement or any of the Schedules or Exhibits hereunder.

1.25  "Milestone" shall have the meaning given to it in Section 4.03(d).

1.26  "Non-Peak Application Periods" means the months other than June, July, August and September.

1.27  "Old Servicing Agreement" has the meaning set forth above.

1.28  "Operations Meeting" shall have the meaning given to it in Section 4.09 of this Agreement.

1.29  "Original Credit Agreement" means the signed first or first two pages of the Credit Agreement (beginning with the Borrower and Program Lender name and ending with a signature or signatures).

1.30  "Owner" means with respect to a Student Loan, Program Lender prior to a Securitization Transaction and then FMC or any Permitted Assignee that purchases such Student Loans or any interest therein from Program Lender or from another Permitted Assignee in a Securitization Transaction.

1.31  "Peak Application Periods" means the months of June, July, August and September.

1.32  "Permitted Assignee" means a Special Purpose Entity (as defined below), or any financial institution, bond insurer, guaranty agency, indenture trustee, lender's collateral agent or other substantially similar party to whom rights under this agreement are assigned as security in a financing transaction to which the Special Purpose Entity is a party.

1.33  "Person" means a natural person, limited or unlimited liability corporation, limited liability company, limited liability partnership, partnership, association, trust or any other legal entity having the capacity to contract.

NCLST 0244
TA437

1.34 "Program Guidelines" means, solely for purpose of identifying Private Student Loan programs to be Serviced under the Agreement, the Underwriting, Origination and Loan Term Guidelines for one or more Private Student Loan programs identified by the parties from time to time in a writing signed by both parties. At the time of this Agreement, Program Guidelines includes the Underwriting, Origination and Loan Term Guidelines for those Private Student Loan programs set forth on Schedule A attached hereto.

1.35 "Program Lender" means one or more lenders to be specified by the parties in writing, signed by both parties from time to time. At the time of execution of this Agreement, Program Lenders include the following: Bank of America, N.A.; JPMorgan Chase Bank, N.A.; Charter One Bank, N.A.; Chase Manhattan Bank USA, N.A.; Citizens Bank of Rhode Island; GMAC Bank; HSBC Bank USA, N.A.; The Huntington National Bank; Insurbanc; KeyBank, National Association; Manufacturers and Traders Trust Company (M&T Bank); National City Bank; PNC Bank, N.A.; Sovereign Bank; and SunTrust Bank.

1.36 "Program Manual" has the meaning assigned to it in Section 4.09.

1.37 "Program Year" means the period from May 1 to April 30.

1.38 "Private Student Loan" or "PSL" means an education loan to finance the costs of higher education (or private K-12 education) that is not (a) guaranteed by the United States Department of Education nor by any agency of any state or (b) a Guaranteed Access to Education (GATE) Loan program (other than the Bank of America GATE Education Loan (BAGEL) Program that is guaranteed by TERI).

1.39 "Proprietary Information" has the meaning given to it in Section 11.01.

1.40 "Remedial Action Plan" has the meaning given to it in Section 4.03(d).

1.41 "Required Reports Schedule" means the schedule of that name attached hereto and as amended by the agreement of the parties.

1.42 "Securitization Transaction" means the purchase of a pool of Student Loans by an SPE.

1.43 "Service", "Services", "Serviced", "Servicing" shall mean to perform, in full compliance with applicable federal and state laws and regulations, the terms and conditions of the Credit Agreements, the Servicing Guidelines, the Program Manual, and the terms and conditions of this Agreement, including without limitation the Service Level Agreement: duties, obligations, and procedures that are required of Servicer hereunder in connection with Student Loans and Committed Student Loans.

1.44 "Service Level Agreement" means the Service Level Agreement attached hereto as Exhibit C and as amended by agreement of the parties.

-4-

NCLST 0245
TA438

1.45 "Servicer Consent Letter" means a letter substantially in the form of Exhibit A, to be executed by Servicer, FMC, and an SPE in connection with each Securitization Transaction.

1.46 "Servicing Guidelines" means the Servicing Guidelines for one or more Private Student Loan programs that have been issued by Insurer and approved by FMC and Servicer attached hereto as Exhibit B and as may amended by agreement of the parties pursuant to the terms thereof.

1.47 "Special Purpose Entity" or "SPE" means a trust, corporation or limited liability company organized by FMC and engaged solely in the business of purchasing Private Student Loans and engaging in financing and/or securities transactions to obtain funds to purchase such Private Student Loans.

1.48 "Student Loan" means any of, and "Student Loans" means all, the Private Student Loans executed by a Borrower, funded by Program Lender, purchased by FMC or an SPE and which are Serviced by the Servicer pursuant to this Agreement.

1.49 "System Access Schedule" means the schedule of that name attached hereto and as amended by agreement of the parties.

1.50 "Trustee" means the Permitted Assignee having a lien or security interest in a pool of Student Loans, which lien or security interest is held for the benefit of investors or lenders providing funds in such Securitization Transactions.

## SECTION 2. SCOPE OF AGREEMENT

2.01 **Old Servicing Agreement.** On the Effective Date, this Amended and Restated Servicing Agreement shall supersede and replace the Old Servicing Agreement in its entirety. Pursuant to Section 13.02, this Agreement has been assigned in part to SPEs with respect to pools of Student Loans. The Servicing of such Student Loans shall be governed by this Agreement upon receipt by Servicer of the written consent of an SPE who has become a party to this Agreement by virtue of such assignment; provided, however, that FMC shall be solely responsible for obtaining the written consents of SPEs for Servicing under this Agreement.

2.02 **Services.** The Servicer agrees, in consideration of certain fees, to perform the Services set forth in this Agreement, including each Schedule and Exhibit hereto, and any additional Services which FMC requests and the Servicer agrees to provide with respect to the Servicing of Student Loans in accordance with the Servicing Guidelines, for which account information and/or documentation shall be delivered to the Servicer.

2.03 **Role of FMC.** Servicer acknowledges that FMC has, under third-party agreements, the obligation or the right to purchase the Committed Student Loans and FMC, as the parent company of the Insurer's agent, FMER, has an obligation to the Insurer to ensure the adequate conversion of the Committed Student Loans from FMER's origination system

NCLST 0246
TA439

to Servicer's Servicing system. In light of the foregoing, Servicer further acknowledges that FMC has a present interest in Committed Student Loans and Servicer agrees to provide product setup and conversion Services for such loans pursuant to this Agreement. Such rights of FMC pursuant hereto shall be in addition to, and not in derogation of, the rights of Program Lender as Owner of such Committed Student Loans. FMC shall not have liability under this Agreement for any Student Loan unless and until FMC becomes an Owner of such Student Loan.

Servicer agrees that upon assignment of FMC's rights with respect to a pool of Student Loans to an SPE or other Permitted Assignee: (i) all obligations of FMC under this Agreement with respect to such Student Loans, including without limitation the obligation to pay the fees set forth in the Fee Schedule, shall cease upon assumption of that obligation by any SPE and (ii) all of FMC's rights under this Agreement, other than the right to receive Services with respect to such pool of Student Loans, shall be retained by FMC, including without limitation those rights relating to product setup and conversion of Committed Student Loans, and audits that relate to continuing Services.

## SECTION 3. TERM OF AGREEMENT

This Agreement shall commence on the date first set forth above and shall continue, with respect to Student Loans which are subject to this Agreement (including loans serviced under the Old Servicing Agreement and new Student Loans serviced on and after the effective date of this Agreement), in accordance with Section 14.01, unless earlier terminated by either Party pursuant to the provisions of this Agreement. With respect to product setup and conversion services and the fees charged for the Services, this Agreement shall continue for a period of three (3) years from the date first set forth above, unless earlier terminated by either Party pursuant to the provisions of this Agreement, and shall automatically renew for an additional one (1) year period, unless terminated by any Party by written notice of non-renewal to the other given at least one hundred and eighty (180) days prior to the end of the then current term. The expiration or termination of this Agreement as to the addition of new Student Loans shall in no way affect the rights or obligations of Servicer with respect to Student Loans that have become subject to this Agreement by partial assignment of this Agreement to an SPE.

## SECTION 4. Servicing Duties

4.01 **Servicing Duties.** Servicer shall provide and perform the Services in full compliance with: the terms of this Agreement, including without limitation the Service Level Agreement (as amended by the parties from time to time in accordance with the terms thereof) ; the Servicing Guidelines; the Program Manual; the terms and conditions of the Credit Agreements; and all federal and state laws and regulations applicable to Servicer or Program Lender or any Owner.

4.02 **Failed Service Levels; Notice and Cure** Servicer shall notify FMC through the reports required by Exhibit C to this Agreement, which reports shall be made in accordance with Section 5.04 hereof, of any failure to meet any Servicing standard set forth in the Service

-6-

NCLST 0247
TA440

Level Agreement other than standards defined therein as "Servicer's Service Objective" (a "Failed Standard"). In the event that the Servicer shall fail to perform the same Servicing standard for thirty (30) days thence (the second consecutive Failed Standard), then the Owner shall be entitled to a reduction (or rebate if already paid) of two and one-half percent (2.5%) of the Servicing Fees due the Servicer pursuant to Section II of the Fee Schedule (a "Fee Reduction") with respect to the months in which the Failed Standard shall have occurred. The Owner shall continue to be entitled to a Fee Reduction for each subsequent consecutive month in which the Servicer shall fail to perform the same standard. Notwithstanding the foregoing, no reduction or rebate shall be made with respect to any Failed Standard that occurs prior to March 1, 2007. This Section 4.02 shall be effective from the Effective Date through August 31, 2007, and shall then be open for negotiation. If no changes are proposed or agreed to in writing, this Section 4.02 shall remain in effect.

4.03    **Product Setup and Conversion.** Servicer agrees, in accordance with the existing practices and procedures of the parties, to perform product set-up and conversion Services with respect to the Committed Student Loans as set forth in the Product Setup and Conversion Service Level Agreement which shall include, without limitation, the following:

(a)    <u>Credit Agreement Forms.</u> Servicer shall promptly review promissory note or credit agreement forms that are proposed by FMC and/or Program Lender and, after mutual resolution of any comments thereon that affect the Servicing of such forms, accept such forms for purposes of product set-up and conversion.

(b)    <u>Servicing System Adaptation.</u> Servicer shall promptly review education loan product terms and pricing matrices proposed by FMC and/or Program Lender and shall establish appropriate Servicing matrices and programs to support such product terms and pricing as of a mutually agreed product launch date. The parties shall publish a mutually agreeable program launch date for each program within each Program Year. Servicer shall make every effort to meet live program dates requested by FMC, which date shall be no less than thirty (30) days from the date Servicer accepts the product and pricing matrix (or similar document containing the same information) for such program; provided, however, that the Servicer agrees to use commercially reasonable efforts to complete the set-up process in a shorter time frame on a case-by-case basis in order to accommodate the business needs of FMC (or its clients). FMC shall have the right to audit Servicer's Servicing matrices and program setup as set forth in Section 4.03(d) below.

(c)    <u>Conversion.</u> Servicer agrees to accurately convert all Committed Student Loan origination data necessary for servicing hereunder onto its Servicing System in accordance with Section VI of the Service Level Agreement. Servicer shall also, in a timely manner, return to the Servicer Relations Group at FMC all loan files sent to the Servicer in error.

(d)    <u>Periodic Audit.</u> Servicer agrees that, no less than twenty (20) days after receipt of

–7–

NCLST 0248
TA441

written notice, shall cooperate with audits by FMC of the product set-up and conversion Services and communication and other protocols necessary for the efficient and accurate performance thereof. If any audit reveals any failure to adequately perform any such matter, Servicer shall within thirty (30) days of its receipt of the results of such audit, publish a remedial action plan that includes a schedule of tasks and objectives to be completed (each such task or objective, a "Milestone") and provides for reports to FMC with respect to each Milestone ("Remedial Action Plan") and provide the same to FMC. Upon completion of the Remedial Action Plan, FMC may, at a time mutually agreeable to the parties, perform an additional audit to validate successful completion of the Remedial Action Plan.

4.04    Custody Procedure. The Servicer shall hold all Original Credit Agreements and related documents Serviced hereunder on behalf of the Owner and shall retain each such Credit Agreement and related documents until five (5) years after the earlier of (a) the date upon which the Student Loan evidenced by such Credit Agreement and related documents is paid in full or (b) the date upon which the Student Loan is deconverted from Servicer's Servicing System. The Servicer shall maintain all Original Credit Agreements that have an original, wet signature in a fire resistant vault equipped with a fire suppression system which is connected to an alarm and a security locking system. Servicer shall create microfilm or electronic records of all Original Credit Agreements and related documents at no additional cost to FMC and shall maintain such microfilm or electronic records on-site at the Servicer's Servicing center  at Harrisburg, PA and at an off-site facility in a fire resistant vault equipped with (a) a fire suppression system which is connected to an alarm and (b) with a security locking system at least 100 miles away from the on site facility used to house the Original Credit Agreements and related documents. The Servicer shall supply FMC, upon request, microfilm or electronic copies of Original Credit Agreements and related documents. FMC or its designated agent shall have the right to inspect all security procedures during Servicer's regular business hours. The Servicer shall provide FMC with sixty (60) days advance notice of any change in the physical location, of the Original Credit Agreements and related documents or any relocation of the Servicer's Servicing center. All Original Credit Agreements at all times shall be stored in a state other than the State of Louisiana.

4.05    Lost or Damaged Records. In the event that records or other data submitted to the Servicer for Servicing should be lost or damaged while in the possession, control or custody of the Servicer or its agents, such lost or damaged records or data shall be reproduced by the Servicer at the Servicer's own cost and expense from microfilm or image duplicates in the Servicer's possession or under the Servicer's control and the Servicer shall pay the Owner's expenses associated with such lost or damaged records or data, including but not limited to reasonable attorney's fees.  In the event that a Student Loan becomes uncollectible, unenforceable or loses the guarantee of the Insurer or other entity which pays default claims on Student Loans, due to loss or destruction of records or data in the possession, control or custody of the Servicer or its agents then the Servicer shall, on demand, pay to the Owner the principal balance (including capitalized interest) plus any unpaid interest due on any such Student Loan and the Owner shall thereupon

-8-

assign all of its right, title and interest in any such loan to the Servicer.

4.06   **System Changes**. The Servicer has the right to change any part or all of its equipment, its Servicing system, computer programs, and its procedures relating to the manner of or the methodology used in servicing the Student Loans, subject to the following:

    (a)   In no event shall such change abrogate or in any way modify the obligations of the Servicer to Service the Student Loans or the Committed Student Loans in full compliance with all applicable federal and state laws and regulations, the terms and conditions of the Credit Agreements, the Servicing Guidelines, the Program Manual or the terms of this Agreement, including without limitation the Service Level Agreement, or the quality of the Service.

    (b)   As part of the quarterly meeting discussed in Section 4.09 below, the technical and operational staffs of Servicer and FMC shall discuss upcoming system changes for each party and to follow up on any emergency changes implemented during the prior quarter under subsection (d) below. The parties agree that they shall provide reasonable information about the nature and effect of changes that the parties reasonably believe may affect the operations or processes of the other and shall determine the extent to which the other party needs to be involved in the testing of changes to its own system. At each meeting, the parties shall also discuss proposed implementation dates for system changes and shall make best efforts to avoid implementation dates that will have a material adverse impact on the operations of the other party.

    (c)   Servicer shall test, prior to implementation, each system change that will affect the Servicing of Student Loans to determine that such change will not result in adverse consequences to its obligations under this Agreement. Servicer will document all changes and corresponding testing of such changes.

    (d)   If the need to make any emergency changes arises, Servicer shall notify FMC of such need as soon as is reasonably possible but in all cases prior to the implementation of any change. Servicer shall track all emergency changes.

4.07   **System Access**. Servicer shall, at the direction of FMC and only at the direction of FMC, provide FMC, FMDS on behalf of each Owner, TERI, and FMER as agent for TERI with web-based access to Student Loan and Committed Student Loans files, or portions thereof, in accordance with the terms of the System Access Schedule, which shall set forth, without limitation, the type of access and/or online services that must be available to each type of user and the minimum user access security requirements that must be implemented on Servicer's Servicing system. Servicer shall at all times maintain the security of user access to its Servicing system in conformity with the security provisions of the System Access Schedule, which shall include, without limitation, Servicer's review of the individual user access rights of Servicer employees and other users no less frequently than every ninety (90) days.

-9-

NCLST 0250
TA443

4.08    **System Parameters.** The Servicer is responsible for designing, implementing and maintaining its Servicing system in accordance with the requirements of this Agreement, including without limitation the System Requirements Service Level Agreement.

4.09    **Operations Meetings; Procedures Manual.** The Servicer and FMC agree that they shall mutually schedule and conduct a joint meeting of their operational staffs no less frequently than once per calendar quarter for the discussion, tracking, and resolution of any operational issues relevant to the Servicing of Student Loans under this Agreement (each such meeting, an "Operations Meeting").

As part of the series of operational meetings, the Servicer and FMC shall create and maintain a procedures manual for all aspects of Servicing which shall comply fully with the terms of this Agreement, including without limitation the Service Level Agreement, the Servicing Guidelines, the terms and conditions of the Credit Agreements, and all applicable federal and state laws ("Program Manual"). Servicer and FMC shall collaborate on the Program Manual and shall complete the same within 180 days of the execution of this Agreement. The final version of the Program Manual shall be negotiated, mutually agreed upon, and distributed between the Parties. The Program Manual shall be subject to the provisions of Section 11.01 (confidentiality). As a condition precedent to the effectiveness of any provision of the Program Manual that has an impact on the Servicing Guidelines, the Servicing Guidelines must be amended pursuant to the terms thereof to contain such provision. System changes that are needed as a consequence of any provision of the Program Manual will be completed within a timely manner and in accordance with a schedule adopted by the parties at an Operations Meeting.

The parties shall review the Program Manual annually for revisions and updates. The parties anticipate that the Program Manual may include, without limitation, the following information:

(a)    Description of all loan product terms relevant to Servicing for all Student Loans, including a history of Program Year changes which shall commence upon execution of this Agreement;

(b)    Borrower communications letter bank;

(c)    Due diligence procedures;

(d)    Procedures for delinquency and default, including but not limited to bankruptcy and death;

(e)    Forbearance procedures and forms;

(f)    Cancellation policies and procedures;

(g)    Disbursement procedures;

(h)    Deferment processing and enrollment confirmation requirements;

(i)    Skip tracing procedures;

(j)    Consumer Reporting Agency reporting;

NCLST 0251
TA444

    (k)    Service levels, including without limitation

        (i)    Customer Service for phone, web and paper communications, including issue resolution and quality control

        (ii)    Payment processing

        (iii)    Origination Processing (as applicable)

        (iv)    Conversion Processing (as applicable) and,

        (v)    System Availability and Parameters;

    (l)    Default Prevention (as applicable);

    (m)    Fraud detection; Identity theft and fraud claim processing (FACT Act);

    (n)    Servicer "cure" procedures;

    (o)    Escalation procedures for Disaster Recovery and Business Continuity Plans;

    (p)    Servicing reports; and

    (q) Secure communication protocol for borrower level data.

4.10    **Training.** Servicer will assume responsibility, at its expense, for training of its staff to meet the requirements of this Agreement, including all Schedules and Exhibits hereto.

4.11    **Customer Service.** Servicer shall implement, maintain and monitor all Services which interface with Borrowers in accordance with the Customer Service Schedule, which shall include without limitation

    (a)    Minimum customer service hours of operation;

    (b)    Call monitoring and quality control; and,

    (c)    Borrower customer satisfaction surveys.

4.12    **Borrower Correspondence.** FMC shall have the right to request changes to, and approve the form and substance of, all correspondence sent to Borrowers that is customizable by the Servicer at the Owner level (as opposed to a guarantor level), including but not limited to pre-repayment letters and collection correspondence that Servicer is required to send to Borrowers pursuant to the Servicing Guidelines or any federal or state regulation. Servicer's inability to customize at the Owner level shall not excuse its obligation to comply with all applicable laws. Borrower correspondence approved pursuant to this Section 4.12 shall become part of the Program Manual. Requested changes to letters shall be completed within a timely manner in accordance with a schedule adopted at an Operations Meeting.

4.13    **Collections.** All sums received by the Servicer with respect to any Student Loans, whether attributable to principal or interest shall be received in trust for the benefit of the

NCLST 0252
TA445

Owner. All funds received on behalf of Borrowers shall be deposited in a Servicer-owned and maintained clearing account, that is a separate account in which funds are not commingled with Servicer's non-collection account funds. Within two (2) Business Days, all available funds from Student Loans shall be electronically transmitted to an account designated by FMC.

4.14    **Late Fees.** FMC and Servicer agree that a Borrower in repayment status (which refers to a Borrower's Student Loan Serviced under the terms of this Agreement for which, under the terms of the Borrower's Credit Agreement(s), the repayment period has commenced, and includes Accounts in post-grace period deferment or forbearance) may be assessed late fees when payments are overdue, to the extent allowed by applicable law and the terms of the Credit Agreement(s), subject to FMC's approval of late fee systems, and in accordance with the terms of this Section (herein referred to as "Late Fees"). FMC or FMC's affiliate First Marblehead Data Services, Inc ("FMDS"), in its capacity as SPE administrator, shall notify Servicer, in writing, of the Late Fees criteria which such party desires the Servicer to apply to each Student Loan type. Such criteria shall include, but not be limited to, Late Fee amounts, time period and applicable state law in which Late Fees will be assessed to Student Loan Accounts. FMC or FMDS, as applicable, may establish different Late Fee criteria for Student Loans having different owner codes. FMC or FMDS, as applicable, directions as to Late Fee criteria shall apply to all loans, including those owned by an SPE. Late Fee criteria for some product types may include "no late fee." The Servicer reserves the right to submit questions pertaining to the requirements regarding the assessment of Late Fees to a particular Student Loan portfolio and FMC or FMDS, as applicable, shall respond to Servicer's questions within thirty (30) days. Late Fees shall be deducted from any payment(s) received from Borrowers as directed by FMC or FMDS, as applicable. FMC agrees that Late Fees shall not be included in the amount of a claim if a default claim is submitted to the Insurer.

4.15    **Privacy Policies.** Servicer shall mail Owner's privacy policy statement (a) to the Borrower(s) on each Student Loan, within 45 days after the Owner purchases such loan, and (b) annually thereafter to all Borrowers. The Servicer will amend this process as necessary to comply with any changes to this law.

4.16    **Reports and Forms.** During the term of this Agreement, the Servicer shall promptly and routinely furnish to FMC, sorted by SPE Owner, and to each Owner copies of all material reports, records, and other documents and data as required by the Servicing Guidelines or as otherwise required by this Agreement, including the reports set forth on the Required Reports Schedule. All monthly reports shall be delivered in accordance with (a) the data security requirements of the Secure Communication Protocol made a part of the Program Manual, and (b) the Required Reports Schedule, unless otherwise expressly provided for herein. In the event that any reports are not delivered to FMC as provided for herein, all fees due and owing the Servicer under this Agreement may be withheld until such reports are received by FMC. The Servicer shall not have failed this standard if reports are delayed for any reason beyond its control. The Servicer shall furnish in good condition all forms and supplies necessary or appropriate to perform the Services, such as letters, invoices, and forbearance applications, as specified in the Schedule(s) and any written

-12-

NCLST 0253
TA446

and signed amendments thereto.

**4.17** <u>Governmental Reporting</u>.  The preparation and submission of any and all governmental reports or requests for data shall be the responsibility of FMC.  The Servicer shall, however, supply supporting data and reports as required by this Agreement, including all Schedules and Exhibits hereto, without additional charge. Subject to Servicer's reasonable charges, Servicer shall also provide such other information (not otherwise required hereunder) as may be reasonably required under applicable law or this Agreement to enable FMC to fulfill Insurer or governmental reporting requirements, and otherwise for FMC's business.  Servicer shall provide reports on form 1098E and 1099 to borrowers and the U.S. Internal Revenue Service.

**4.18** <u>Reports to Consumer Reporting Agencies</u>.  The Servicer shall provide any and all reports on Accounts serviced hereunder required by the applicable law, this Agreement, including without limitation the Servicing Guidelines, to the appropriate Consumer Reporting Agencies or credit information service and shall correct any errors caused by the incorrect reporting of information, in a timely manner not to exceed thirty (30) days. Servicer shall report to all national Consumer Reporting Agencies, which are currently Experian, Equifax, and Transunion.  After any sale of Committed Student Loans to an SPE, Servicer shall promptly, but not later than the end of the reporting period for that month, correct its reporting to show the correct name of the new Owner in the report, together with the name of the originating Program Lender. If FMC directs Servicer to make a report or correction of credit information to a Consumer Reporting Agency that is outside the Servicer's customary practices, including but not limited to as part of a legal settlement with a Borrower, then the Servicer may condition making such report or correction on the completion of an acceptable writing that allocates the compliance, regulatory, and legal risk of making the requested report or correction.

**4.19** <u>Data Error Correction; Account Adjustment</u>.  In the event that any data file transmitted to FMC or any Owner or any Account contains a material error, Servicer shall, within one (1) calendar day of discovery of such error, notify FMC or the affected Owners of such error. Servicer shall use best efforts to provide a corrected file as soon as possible but no later than three (3) calendar days. For purposes of this Section 4.19, a material error includes, without limitation:

(a)     Failure to follow data format requirements or file naming conventions established by the parties

(b)     Data corruption

(c)     More than one percent (1%) of the entries in the file are substantively incorrect (e.g., misposting)

(d)     Failure of the file properly to link data to other files delivered by Servicer, or

(e)     Any systemic error in the file (e.g., failure to update LIBOR Index).

Without limiting the foregoing, if FMC or any Owner requests that the Servicer make any correction or adjustment to any Account, the Servicer shall provide written confirmation

-13-

NCLST 0254
TA447

that the correction or adjustment has been made.

4.20   **Identity Theft Procedures.** The parties hereby adopt the Identity Theft Procedures, as set forth in the Servicing Guidelines attached hereto and as amended from time to time by agreement of the parties or as required by applicable law. FMC and the Servicer may suggest changes to the Identity Theft Procedures from time to time or as required by applicable law.

## SECTION 5. AFFIRMATIVE COVENANTS

From the date hereof, Servicer covenants and agrees to the following:

5.01   **Government Approvals.** The Servicer shall maintain all licenses, permits, approvals and qualifications necessary to carry out its obligations under this Agreement.

5.02   **Insurance.** Servicer and subcontractors engaged by Servicer to provide Services under this Agreement shall also be required to maintain the insurance described herein at limits acceptable to Servicer and FMC:

(a) Commercial General Liability insurance on an occurrence basis, on Insurance Services Office ("I.S.O.") form CG 00 01 or its equivalent, at a limit not less than $1,000,000 per occurrence/$2,000,000 aggregate. This insurance shall be endorsed to include as Additional Insured "FMC and its subsidiary and affiliated companies, as their interests may appear." The required limits may be arranged through a combination of primary and excess policies, as needed. A copy of the additional insured endorsement must be attached to the certificate of insurance Servicer provides to FMC.

(b) Automobile Liability insurance for any vehicles operated by the Servicer or its employees in connection with work or Services performed under this Agreement, including owned, non-owned, borrowed, and hired autos, at limits not less than $1,000,000 per accident.

(c) For contracts where Servicer's personnel will have access to or control over physical or electronic property of FMC or Owner and/or their customers and/or clients, Employee Dishonesty coverage (also known as a Fidelity Bond), covering all employees and agents of the Servicer, at a limit not less than $10,000,000 for each occurrence . This policy shall be endorsed to include as Loss Payees "Owner and its subsidiary and affiliated companies, as their interests may appear," and shall extend to the misappropriation of physical or electronic property of others in the possession or control of Service Personnel. Servicer shall provide FMC with a copy of this policy prior to commencing work upon FMC's request, and thereafter annually upon FMC's reasonable request. A copy of the Loss Payee endorsement or provisions shall also be attached to any certificate of insurance Servicer provides to FMC as evidence of this coverage.

All coverage shall be maintained with insurers licensed to transact insurance business in

-14-

NCLST 0255
TA448

the state(s) where Servicer maintains offices or operations. The insurers shall have an A. M. Best rating of A- or better; deviations from that standard are subject to review and approval by FMC. Servicer shall furnish Certificates of Insurance and any required copies of policies or endorsements prior to commencing any work under this Agreement and thereafter within 10 days of the renewal or replacement of any of the insurance policies described in the Certificates. Certificates of Insurance shall include an undertaking by the insurer to provide 30 days prior written notice of cancellation or material change in coverage(s).

Upon FMC's request, Servicer shall provide FMC with a copy of any policy or endorsement required hereunder. Regardless of any limitations to any indemnification of FMC or Owner by Servicer as may be stated elsewhere in this Agreement, Servicer expressly understands and agrees that if Servicer fails to maintain any of the required insurance coverages, Servicer shall be directly liable for claims that would otherwise be covered by the insurance required of Servicer, its vendors and/or subcontractors. Servicer shall also be responsible for the payment of any applicable deductibles.

5.03   **Notification.** Servicer shall promptly notify FMC in writing of (a) the occurrence of any event which, if it had existed on the date of this Agreement, would have required qualification of the representations and warranties set forth in Section 6 (Representations and Warranties) herein; (b) a Material Adverse Change, including but not limited to, material financial difficulty, other catastrophic event, material change in strategic goals, or significant staffing changes; or (c) any material litigation which if adversely determined would cause a Material Adverse Change.

5.04   **Accuracy of Reports.** All reports, transmittals, records or data files required, maintained or provided by Servicer hereunder shall be accurate in all material respects, and FMC shall have the right to rely thereon.

5.05   **Work Performed in United States.** Unless this Agreement specifically provides otherwise, all Services must be performed in the United States and all Proprietary Information and Customer Information, must be stored, maintained, accessed from, and utilized only by employees and sub-contractors in the United States.

5.06   **No Subcontractors.** With the exception of skip tracing services, the Servicer shall not utilize or engage a subcontractor to perform any Services under this Agreement without the prior written consent of FMC. To the extent subcontractors perform any services under this Agreement, the Servicer shall be liable for the performance of such subcontractors. Any subcontractors who are approved by FMC and persons hired by Servicer for skip tracing services must sign FMC's standard form of Confidentiality Agreement and are subject to the confidentially and privacy and security obligations of Section 14.07 hereof. Servicer shall advise FMC upon periodic request of the entities to which it has subcontracted skip tracing services.

5.07   **OFAC Check.** All Servicer employees performing Services or supporting Servicer activities under this Agreement, regardless of their location, shall be validated by Servicer to not be on any list published and maintained by the Government of the United

-15-

States of America of persons or entities with whom any U.S. person or entity is prohibited from conducting business. Currently, the lists of such persons or entities can be found on the following web site:

The Specialty Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control – Department of Treasury at http://www.ustreas.gov/offices/enforcement/ofac/sdn/index.html.

In the event of Servicer becoming aware of any Servicer employee involved in providing Services being included in the list of prohibited persons or entities, Servicer shall provide FMC with immediate notice thereof.

Servicer shall conduct periodic reviews, no less frequently than quarterly, of the lists mentioned above. Servicer shall report to FMC immediately if the name of any Servicer employee performing the Services matches with the name of any person listed on any list published by the Government of the U. S. of persons or entities with whom any U. S. person or entity is prohibited from doing business.

5.08 **FACT Act, PATRIOT Act and OFAC Check.** Servicer's performance of its Servicing obligations under this Agreement in conformity with all applicable laws shall include, without limitation, compliance with the requirements imposed on Owner and Insurer as users and furnishers of consumer report information under the Fair and Accurate Credit Transactions Act of 2003 and all regulations issued pursuant thereto, including, without limitation, timely and lawful response to any identity theft report received from any Borrower or consumer reporting agency and the obligation to respond to a credit report reinvestigation request in accordance with the Identity Theft Procedures. Servicer shall notify Owner if it becomes aware that any Borrower is on any list published and maintained by the government of the United States of America of persons or entities with whom the Owner's transaction of business is restricted, as those lists are currently set forth in Section 5.07 above and as may be hereafter required by applicable law.

5.09 **Further Assurances.** At any time, upon the reasonable request of FMC (or its nominee) or any Owner (or its nominee), and subject to Servicer's reasonable charges and reimbursement of any out-of-pocket expenses, Servicer shall execute and deliver to such requesting party or its designee such other certificates, agreements and instruments and take such actions as such requesting party or its designee may reasonably request in connection with its compliance with any legal or regulatory requirements, including, without limitation, any certifications required to be delivered by such requesting party under any Securities and Exchange Commission or other securities requirement or in connection with the Sarbanes-Oxley Act of 2002.

## SECTION 6. REPRESENTATIONS AND WARRANTIES

The Servicer represents and warrants to FMC (and these warranties and representations shall be deemed continuing and repeated as of the date each Student Loan shall become subject to this Agreement) as follows:

-16-

NCLST 0257
TA450

**6.01** **Existence.** The Servicer is a public corporation duly organized and validly existing and in good standing under the laws of the Commonwealth of Pennsylvania, and is duly qualified to do business in all jurisdictions where its failure to so qualify would materially impair its ability to perform its obligations under this Agreement.

**6.02** **Right to Act.** No registration with or approval of any governmental agency (except for approval as to form and legality by the Attorney General for the Commonwealth of Pennsylvania) is required for the due execution and delivery or enforceability of this Agreement. The Servicer has legal power to execute and deliver this Agreement under the laws of Pennsylvania and to perform such Services and observe the provisions herein under the laws of Pennsylvania. By executing and delivering this Agreement, and by performing and observing the provisions of this Agreement, the Servicer will not violate any existing provision of its Articles of Incorporation or its bylaws or any applicable law or violate or otherwise become in default under any existing contract or other obligation binding upon the Servicer. The officers executing and delivering this Agreement have been duly authorized to do so, and this Agreement is legally binding upon the Servicer and enforceable against the Servicer in every respect.

**6.03** **Intellectual Property and Software Rights.** Servicer's performance of its obligations under this Agreement will not infringe any patent, trademark, copyright, or any trade secret or other proprietary right of any third party. Servicer is the lawful owner or licensee of any software programs or other materials used by Servicer in the performance of the Services called for in this Agreement.

**6.04** **Accuracy and Continued Validity of Servicer's Financial Status.** The Servicer has furnished to FMC financial reports, which in the opinion of the Servicer fairly and accurately reflect the financial operations of the Servicer and there has been no Material Adverse Change in the Servicer's financial prospects since the date the report was provided which would require revision of the same. No representation or warranty made by the Servicer under this Agreement and no statement made by the Servicer in any financial statement, certification, report, exhibit or document furnished by the Servicer to FMC pursuant to or in connection with this Agreement is false or misleading in any material respect (including by omission of material information necessary to make such representation, statement or warranty not misleading) as of the date given or made.

**6.05** **OFAC Check.** Neither Servicer ,nor any of its subsidiaries, Affiliates, directors, officers, agents, or employees is

(a) an individual or entity that is listed in the annex to, or is otherwise subject to the prohibitions contained in, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order") or the Office of Foreign Asset Control ("OFAC") regulations;

(b) an individual or entity with whom FMC is prohibited from dealing or otherwise engaging in business under any U.S. law, regulation, executive order and/or lists published by OFAC (including those executive orders and lists published by

-17-

NCLST 0258
TA451

OFAC);

(c) an individual or entity that is named on the most current list of "Specially Designated Nationals and Blocked Persons" published by OFAC on its official website or any replacement website or other replacement official publication of such list; or

(d) an individual or entity with which any financial institution is prohibited from dealing or otherwise engaging in any transaction under any laws or regulations related to terrorism or money laundering.

6.06 **Ongoing Obligation.** If at any time during the term of this Agreement, any of the representations contained in this Section 6 are no longer true, Servicer will immediately notify FMC, and FMC shall have the immediate right to terminate this Agreement, without further obligation or penalty. FMC will not be required to pay any Early Termination or Record Return/Deconversion fee if this Agreement is terminated pursuant to this Section 6.06.

## SECTION 7. INSPECTIONS: AUDITS

7.01. **FMC Audit of Books and Records.** FMC, its accountants, auditors, representatives and any Federal, state or local governmental or quasi-governmental officials with regulatory authority over FMC or FMC Affiliates shall have the absolute right, at FMC's expense, upon not less than twenty (20) days prior notice (or such shorter notice period as required by law), at any time during or after the term hereof:

(i) to audit or examine all books, records, documents, other writings, information, whether in hard copies, electronic form or otherwise, relating to Services to be provided by Servicer under this Agreement at the location(s) where Servicer maintains such books, records, documents, writings and information; and

(ii) to conduct such other examinations, tests or investigations with respect to the Services to be provided under this Agreement as FMC may deem necessary or desirable in FMCs sole and absolute discretion and at FMC's expense, it being acknowledged and agreed by Servicer that FMC shall have full and unrestricted rights of access to books, records, documents, other writings and information, whether in hard copies, electronic form or otherwise, relating to the Services to be provided by Servicer under this Agreement, at any time during normal business hours.

7.02. **Sarbanes Oxley Compliance.** If requested by FMC, Servicer shall participate in Sarbanes-Oxley Act of 2002 ("Sarbanes Oxley") compliance testing conducted by FMC with respect to the Services on a quarterly basis and shall provide documents and information as reasonably requested by FMC to conduct such compliance testing. Servicer agrees to provide any assistance reasonably requested by FMC to enable FMC to comply with Sarbanes Oxley, the rules of the Public Company Accounting Oversight Board and rules of the Securities and Exchange Commission relating to disclosure controls and procedures and inquiries by the SEC or other regulatory agency. Such

-18-

NCLST 0259
TA452

assistance shall include but shall not be limited to: (i) documenting Servicer's controls and procedures relating to the Services; (ii) cooperating with FMC's auditors in connection with the testing of such controls and procedures; (iii) making quarterly representations or certifications to FMC regarding any material changes to such controls and procedures; (iv) remediating any material weakness or significant deficiency that would prevent FMC from complying with Sarbanes Oxley or any rules or regulations promulgated thereunder; and (v) providing an unqualified SAS 70 Type 2 Report issued by an independent certified public accounting (CPA) firm in connection with its provision of the Services.

7.03.    <u>SAS 70 Audit.</u> Servicer will engage, at its expense, an independent CPA firm that adheres to professional standards established by the American Institute of Certified Public Accountants (AICPA) to conduct reviews of Servicer's general controls associated with Servicer's facilities, as well as the controls associated with the Services and the programs used to provide the Services, including but not limited to controls over information technology and related processes. The scope of the audit shall include all such matters as Servicer's auditor deems necessary or required to meet regulatory compliance standards, including but not limited to an examination of the record keeping system and other equipment and software used by Servicer. Such reviews shall be performed at such frequency and times as Servicer shall determine, but shall be performed at least once annually. Within thirty (30) days of its receipt by Servicer, Servicer shall provide FMC with a copy of each report submitted by Servicer's independent accountants regarding any of the matters set forth in this paragraph. All such reviews shall comply with AICPA Statement on Auditing Standards (SAS) No. 70, and the reports obtained shall be of the type generally referred to (depending on the publication) as either Type "II" or "B". In a Type II report, the Servicer auditor will express an opinion on (1) whether the Servicer's organization description of its controls presents fairly, in all material respects, the relevant aspects of the Servicer's organization controls that had been placed in operation as of a specific date, and (2) whether the controls were suitably designed to achieve specified control objectives, and (3) whether the controls that were tested were operating with sufficient effectiveness to provide reasonable, but not absolute, assurance that the control objectives were achieved during the period specified. If the Servicer's auditor procedures reveal exceptions or control deficiencies, then Servicer shall take steps to correct the control objective, at no cost to FMC.

7.04.    <u>Operational Audits.</u> Upon twenty (20) days notice from FMC, and subject to Servicer's reasonable security requirements, Servicer shall provide to FMC (and FMC's internal and external auditors, inspectors, regulators and other representatives that FMC may designate from time to time) access at reasonable hours to Servicer's personnel, to the facilities at or from which Services are then being provided, and to Servicer's records and other pertinent information, all to the extent relevant to the Services and Servicer's obligations under this Agreement. Such access shall be provided for the purpose of performing audits and inspections of Servicer and its businesses and to examine Servicer's performance of loan servicing under this Agreement including (i) verifying the integrity of the Servicer data; (ii) examining the controls (e.g., organizational controls, input/output controls, system modification controls, system design controls and access controls) and the security, disaster recovery and back-up practices and procedures; (iii)

NCLST 0260
TA453

examining Servicer's measurement, monitoring and management tools; and (iv) enabling FMC to meet applicable legal, regulatory and contractual requirements. Servicer shall provide any assistance reasonably requested by FMC or its designee in conducting any such audit.

7.05  Regulatory Audits. Within thirty (30) days of its receipt, Servicer shall provide FMC with a summary of any audit results performed by a federal or state regulator concerning the Services provided under this Agreement, including but not limited to the Department of Education. The content of any such summary shall be subject to Servicer's reasonable security requirements. When the regulatory auditor's procedures reveal exceptions or control deficiencies, then Servicer shall take steps to correct the control design deficiency or operating effectiveness deficiency in all material respects. If such audit reveals that the services provided by Servicer do not cause Servicer's operations to meet the auditor's recommendation, then Servicer shall provide such further services as are necessary to bring its operations into conformance with the auditor's recommendations to such level and degree, at no cost to FMC.

7.06.  Financial and Other Information. Servicer shall provide FMC with the following:

(a) Within forty-five (45) days after the end of each of the first three quarters of each fiscal year, unaudited financial statements of Servicer for such quarter, setting forth the information called for as of the end of, and for such quarter as described in paragraph (b) of this Section 7; and

(b) Within 120 days after the close of each fiscal year of Servicer, a copy of an annual report as to the obligations and activities of Servicer during such fiscal year, and financial statements for such fiscal year, setting forth in reasonable detail:

(i) the balance sheet for Servicer and its programs showing the assets and liabilities of the programs at the end of such fiscal year;

(ii) a statement of Servicer's revenues and expenses in accordance with the categories or classifications established by Servicer for its operating and program purposes and showing the revenues and program expenses during such fiscal year; and

(iii) a statement of changes in financial position, including changes in financial position of Servicer's programs, as of the end of such fiscal year.

The annual report shall be accompanied by an Independent Auditor's Report stating that the financial statements present fairly, in all material respects, the net assets of the Servicer as of the years stated, and its changes in net assets and cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

7.07.  Annual Statement as to Compliance. The Servicer shall deliver an annual report to FMC on or prior to March 31 of each year commencing March 31, 2006, signed by the Chief Executive Officer ("CEO") or Executive Vice President ("EVP") of the Servicer,

-20-

NCLST 0261
TA454

stating that (a) a review of the activities of the Servicer, and the Servicer's Performance under this Agreement, for the previous twelve (12) months ending September 30 has been made under such CEO's or EVP's supervision and (b) to the best of such CEO''s or EVP's knowledge, based on such review, the Servicer has or has caused to be performed all of its obligations under this Agreement throughout such year and that no default has occurred, or if such a default has occurred and is continuing, specifying each such event, the nature and status thereof and the steps necessary to remedy such affair. In the event that the Servicer has delegated any servicing responsibilities with respect to the Student Loans to a subservicer or subcontractor, the Servicer shall deliver a similar annual report by any such subservicer or subcontractor as described above as and when required with respect to the Servicer.

7.08.  **Annual Independent Public Accountant's Servicing Reports; Assessments of Compliance and Attestation Reports.** On and after January 1, 2006, the Servicer shall service and administer all Student Loans in accordance with all applicable requirements of the servicing criteria set forth in Item 1122(d) (the "Servicing Criteria") of Regulation AB (17 C.F.R. §§ 229.1100 - 229.1123) ("Regulation AB") promulgated by the Securities and Exchange Commission (the "SEC") under the Securities Act of 1934, as amended (the "Exchange Act").  Pursuant to Rules 13a-18 and 15d-18 of the Exchange Act and Item 1123 of Regulation AB, the Servicer shall deliver to FMC, the related Trustee and any other Permitted Assignee, at the cost and expense of FMC, the Trustee, or a Permitted Assignee, on or before August 31 of each year commencing in 2006, a report regarding the Servicer's assessment of compliance (an "Assessment of Compliance") with the Servicing Criteria during the previous twelve (12) months ending June 30.  The Assessment of Compliance must be reasonably satisfactory to the related Trustee, and as set forth in Regulation AB, the Assessment of Compliance must contain the following:

(a)     A statement by a Servicing officer of such Servicing officer's responsibility for assessing compliance with the Servicing Criteria applicable to the Servicer;

(b)     An assessment by such Servicing officer of the Servicer's compliance with the applicable Servicing Criteria for the period consisting of the previous twelve (12) months ending June 30, including disclosure of any material instance of noncompliance with respect thereto during such period, which assessment shall be based on the activities the Servicer performs with respect to asset-backed securities transactions taken as a whole involving the Servicer, that are backed by the Student Loans;

(c)     A statement that a registered public accounting firm has issued an attestation report on the Servicer's Assessment of Compliance for the period consisting of the previous twelve (12) months ending June 30; and

(d)     On or before August 31 of each year commencing in 2006, the Servicer shall furnish to FMC, the related Trustee and any other Permitted Assignee a report (an "Attestation Report") by a registered public accounting firm that attests to, and reports on, the Assessment of Compliance made by the Servicer, as required by

-21.-

NCLST 0262
TA455

Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122(b) of Regulation AB, which Attestation Report must be made in accordance with standards for attestation reports issued or adopted by the Public Company Accounting Oversight Board.

The Servicer shall cause any subservicer, and any subcontractor determined by the Servicer to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, to deliver to FMC, the related Trustee and any other Permitted Assignee an Assessment of Compliance and Attestation Report as and when provided above.

Each of the parties to this Agreement acknowledges and agrees that the purpose of this Section 7.08 of this Agreement is to facilitate compliance with the provisions of Regulation AB, as such may be amended from time to time and subject to clarification and interpretive advice as may be issued by the staff of the SEC from time to time. Therefore, each of the parties agrees that (a) the obligations of the parties hereunder shall be interpreted in such a manner as to accomplish that purpose, (b) the parties' obligations hereunder will be supplemented and modified as necessary to be consistent with any such amendments, interpretive advice or guidance, convention or consensus among active participants in the asset-backed securities markets, advice of counsel, or otherwise in respect of the requirements of Regulation AB, (c) the parties shall comply with requests made by FMC, the Administrator, any Trustee or other Permitted Assignee for delivery of additional or different information as FMC, the Administrator, any Trustee or other Permitted Assignee may determine in good faith is necessary to comply with the provisions of Regulation AB, and (d) no amendment of this Agreement shall be required to effect any such changes in the parties' obligations as are necessary to accommodate evolving interpretations of the provisions of Regulation AB.

7.09    **Cooperation with Audits; Follow-Up.** Servicer shall fully cooperate with any audit(s) conducted by either FMC, FMC's agent, or a U.S. federal agency pursuant to this Agreement. Servicer shall not charge FMC for the management hours or fees with respect to the time spent by Servicer's management and employees reasonably necessary in providing assistance to FMC, FMC's internal and external auditors, or any governmental authority performing any audits, compliance, security and control testing. If any audit report establishes that Servicer's performance of the Services is not in compliance with the terms of this Agreement, Servicer shall submit to FMC within thirty (30) days of its receipt of the relevant audit report a plan to improve Servicer's performance to the level required by this Agreement. In the event that any financial audit report reveals that any changes or expenses have been overbilled or underbilled, then FMC shall make adjustment in the fees and invoices as necessary on a prospective basis in future months as necessary to correct errors or maintain compliance with the Agreement, or Servicer or FMC shall render a payment to the other party as necessary to correct the discrepancy.

7.10    **Accelerated and Emergency Audits.** In the event that FMC has the right to terminate this Agreement under Section 14 (Termination), whether or not such right is exercised, FMC shall have the right to perform or cause to be performed any audit, examination or inspection described in this Agreement, without any limitations or requirements as to

-22-

NCLST 0263
TA456

notice, frequency, duration, business interruption, or other such limitation or requirement for the benefit of the Servicer. All costs of such an accelerated or emergency audit shall be borne by FMC.

## SECTION 8.  CHARGES AND PAYMENTS.

8.01    **Fees.**  The Servicer shall provide all aspect of the Services at its sole cost and expense, except as otherwise provided in this Agreement, and shall be compensated as set forth this Agreement, including without limitation the Fee Schedule.

8.02    **Rate Change.**  To the extent that an increase occurs in the costs incurred by the Servicer in providing the Services hereunder due to: (a) changes in the Servicing Guidelines or this Agreement, including without limitation the Service Level Agreement, (b) legislative and regulatory changes beyond the control of the Servicer which pertain to the manner of servicing of the Student Loans in accordance with Section 4.01 herein, (c) changes in United States Postal Service postage rates, or (d) material changes requested by FMC in the Services provided herein, including but not limited to changes contemplated in Section 4.09 hereof, the Servicer shall have the right to make a compensating increase to the Servicing fees set forth herein and in the Fee Schedule.

Such increase shall be limited to Servicer's actual incremental cost increase resulting from such changes.  Servicer shall give FMC ninety (90) days prior written notice before implementing any such increase in Servicing fees pursuant to this Section. Such notice shall set forth the bases of, as well as the computation used in determining, any increase.

8.03    **Invoices.**  Invoices for the Servicer's Services, including the collection of Late Fees collected on behalf of FMC or any Owner as set forth in Section 4.14 herein and the Fee Schedule, shall be rendered by the Servicer after each month end with payment to be paid by FMC or the Owner, and shall be delivered electronically, or, upon request by FMC or the Owner, as a paper copy. Separate invoices shall be rendered for each Owner.  All invoices are payable net forty-five (45) days from the date of the invoice.  If full payment is not received within sixty (60) days of the invoice date, except as to amounts which are under good faith dispute, the Servicer may assess an interest charge of 1.25 % per month (15% annual percentage rate) on the unpaid balance from the date of the initial billing until fully paid. FMC or the affected Owner shall report any disputes to the Servicer regarding an invoice for Servicing within sixty (60) days of the invoice, and the Servicer shall research the disputed item and respond to FMC or the affected Owner(s).

## SECTION 9. LIABILITY

The Servicer agrees to pay for any claim, loss, liability or expense, including reasonable attorney's fees, which arises out of or relates to the Servicer's acts or omissions with respect to the Services provided under this Agreement (including, without limitation, any refusal of the Insurer to pay any claim based on Servicer's failure to conform to the Servicing Guidelines), where the final determination of liability on the part of the Servicer is established by an arbitrator, by a court of law with competent jurisdiction over the Servicer or by way of settlement agreed to by the Servicer. This provision shall not be construed to limit the Servicer's

-23-

NCLST 0264
TA457

or FMC's rights, obligations, liabilities, claims or defenses which arise as a matter of law or pursuant to any other provision of this Agreement. This provision shall take effect as of the date on which each individual Student Loan is converted to the Servicer's servicing system and shall apply to default claims rejected or paid subject to penalty due to errors on the part of the Servicer which occur after the date of conversion to the Servicer's system. Furthermore, nothing herein shall be read or construed as a waiver of the sovereign immunity of the Commonwealth of Pennsylvania, except to the extent authorized by the laws of said Commonwealth.

The Commonwealth of Pennsylvania has created the Board of Claims, pursuant to the provisions of the act of May 20, 1937, P.L. 728, as amended by the act of October 5, 1978, Act No. 260, 72 P.S. 4651-1 et seq., for the adjustment of claims arising from contracts entered into by the Commonwealth or an agency of the Commonwealth. Subject to the statutory jurisdictional requirements, any and all claims against PHEAA respecting any matter pertaining to this Agreement or any part thereof may be instituted in the Board of Claims.

FMC agrees to pay for any claim, loss, liability or expense, including reasonable attorney's fees and court costs, arising out of or relating to FMC's acts or omissions with respect to the Student Loans covered by this Agreement, where the final determination of liability on the part of FMC is established by an arbitrator, by a court of law or by way of settlement agreed to by FMC. This provision shall not be construed to limit FMC's or the Servicer's rights, obligations, liabilities, claims or defenses which arise as a matter of law or pursuant to any other provision of this Agreement.

If the Insurer rejects a claim on account of Servicer's failure to conform to the Servicing Guidelines in Servicing a Student Loan, the Servicer will start the cure process described in the Servicing Guidelines for the purpose of reinstating FMC's or any Owner's claim against the Insurer. (Student Loans in such status are hereinafter referred to as Student Loans in "Cure Status"). An indicator will be placed in the Student Loan record indicating the start (and the date) of Cure Status. Within twelve (12) months of the initiation of Cure Status, if Insurance has not been reinstated in accordance with the Servicing Guidelines, the Servicer shall purchase any such Student Loan by paying to FMC or the Owner (as applicable) an amount equal to the principal balance and all accrued and unpaid interest through the date of purchase. The Owner will assign its right, title and interest in any Credit Agreement to the Servicer where the Servicer has purchased such note. Within thirty (30) days after a final determination pursuant to Section 9 that Servicer was not responsible for causing the loss of Insurance, FMC will repurchase any and all such uninsured Student Loans for an amount equal to the purchase price plus any other costs incurred by Servicer in their purchase.

## SECTION 10. FORCE MAJEURE

10.01   Neither Servicer nor FMC shall be liable for any failure or delay in the performance of its obligations under this Agreement to the extent such failure or delay is caused by any acts of war, terrorism, civil riots or rebellions, quarantines, embargoes and other similar unusual governmental actions, extraordinary elements of nature or acts of God, judicial or governmental action, emergency regulation or labor dispute or unrest, provided that and only to the extent that Servicer or FMC could not reasonably circumvent the failure or delay through the use of commercially reasonable alternate sources, workaround plans or other means ("Force Majeure"). An event shall not be considered a Force Majeure event

NCLST 0265
TA458

to the extent that proper implementation of the Business Continuity Plan (as defined below) would have enabled the Servicer to continue performance hereunder in a timely manner. The occurrence of a Force Majeure event shall not excuse the Servicer from having in place reasonable safeguarding plans and procedures adequate for protecting all Proprietary Information and Customer Information of FMC and any Owner.

Notwithstanding any other provision of this Section, a Force Majeure event shall obligate and require Servicer to commence its Disaster Recovery Plan (as defined below). If any Force Majeure event prevents, hinders or delays performance of the critical Services for more than three (3) days or results in data loss in excess of forty-eight (48) hours, FMC may procure any affected Services from an alternate source at FMC's cost and expense. If the Force Majeure event continues to prevent, hinder or delay performance of any Services which are of a critical nature for an additional four (4) days, FMC shall have the right to terminate this Agreement on not less than fifteen (15) days prior written notice to Servicer, provided that Servicer will be responsible to continue Services up to the effective date of such termination. FMC shall not be required to pay any Early Termination or Record Return/Deconversion Fees for a termination of this Agreement pursuant to this Section.

10.02  Without limiting Servicer's obligations under this Agreement, whenever a Force Majeure event causes Servicer to allocate limited resources between or among Servicer's customers, FMC and any Owner, as applicable, shall be treated at least as favorably as Servicer's most favored customers.

## SECTION 11.  CONFIDENTIAL INFORMATION/PRIVACY/SECURITY

**11.01.  Proprietary/Confidential Information.**  Each party understands and acknowledges that in the performance of this Agreement, each party (the "Recipient") will gain access to certain nonpublic information, material and data, hereinafter referred to as "Proprietary Information", relating to the other party (the "Disclosing Party"), which may include, but not be limited to, FMC's customer information, the Disclosing Party's technical and financial data, design, process, procedures, formula, business logic, presentation or strategy, new products and marketing plans that are commercially valuable to such Disclosing Party and all trade secrets, ideas, know-how, data, compilations, inventions, literary, artistic, graphical or other works and improvements, in each case whether or not patentable, copyrightable or otherwise subject to intellectual or industrial property protection, and whether or not registrable or subject to any registrations or applications therefor, and any of the same relating to or owned by any subsidiary or affiliate of the Disclosing Party.

(i)     Recipient agrees to keep all such Proprietary Information confidential, and not disclose, transfer, use, copy, or allow any employees or any third parties access to any such Proprietary Information, except for those who have a need to know such Proprietary Information in order for the Recipient to accomplish the requirements of this Agreement and who are individually bound by contractual obligations of confidentiality and limitation of use sufficient to give effect to this Section 11. Recipient will (a) keep all documents and any other material containing or incorporating any of the Proprietary Information at the usual place of business of

-25-

NCLST  0266
TA459

Recipient, subject to physical access restrictions acceptable to Disclosing Party, (b) not use, reproduce, transform or store any of the Proprietary Information in any externally accessible computer or electronic information retrieval system unless such system is adequately protected against unauthorized access, and (c) make copies of the Proprietary Information only to the extent that the same is required pursuant to the purposes of this Agreement. In no event shall Recipient disclose any such Proprietary Information to any competitors of Disclosing Party. In the event of a joint venture between Servicer and another entity, Servicer agrees to maintain the confidentiality of all such Proprietary Information of FMC and not to disclose the same in any manner to the joint venture entity without the prior written consent of FMC. Upon request by the Disclosing Party and upon termination of this Agreement, the Recipient shall promptly return all such Proprietary Information retaining no copies and remove any copies of the Proprietary Information in any form whatsoever on the Recipient's computer and information storage systems. Recipient shall also provide to the Disclosing Party a written certification of destruction signed by an officer of the Recipient duly authorized to legally bind the Recipient certifying and warranting that no copies of the Proprietary Information have been retained. Recipient agrees and understands that the Disclosing Party retains all right, title and interest in and to all of its Proprietary Information and any intellectual property and industrial rights therein, including (without limitation) any patents, copyrights and registrations thereof and applications therefor, and the Disclosing Party will have all the rights and remedies available to it as a result of such right, title and interest. This Agreement does not grant or constitute an assignment of or license in or to any such Proprietary Information or intellectual or industrial property, including, without limitation, for the development, manufacture or sale by Recipient of products or services based on Proprietary Information or for any other use of Proprietary Information by Recipient except as expressly provided herein.

(ii)     Recipient's duty hereunder shall not extend to such Proprietary Information which (a) is rightfully received by Recipient from a third party under no duty of confidentiality to the Disclosing Party; (b) is approved in writing by Disclosing Party for disclosure; (c) is already in the public domain or which, after disclosure, becomes part of the public domain or otherwise generally available to the public through publication or otherwise through no fault of the Recipient (d) the Recipient can show is lawfully in its possession at the time of disclosure and was not acquired, directly or indirectly, from the Disclosing Party or anyone else who, to the knowledge of the Recipient, was subject to any obligations of confidentiality to the Disclosing Party, (e) developed independently from the Disclosing Party and which the Recipient can show by contemporaneous records were developed without reference to the Disclosing Party's Proprietary Information or (f) is compelled by a validly issued subpoena, court order, governmental request or request of a law enforcement agency.

(iii)     Recipient acknowledges that the Disclosing Party shall have the right to take all reasonable steps to protect their interests in keeping the Proprietary Information and the Confidential Information confidential, including, but not limited to, injunctive relief and any other remedies as may be available at law or in equity in the event Recipient does not fulfill its obligations under this Section 6.

11.02  **Privacy.**     Each Party shall comply with all federal and state laws, and rules and regulations of applicable regulatory agencies, protecting the Confidential Information and

NCLST 0267
TA460

privacy rights of FMC, its customers and consumers, including, without limitation, Title V of the federal Gramm-Leach-Bliley Act and federal regulations implementing such act, Interagency Guidelines Establishing Standards For Safeguarding Customer Information and codified at 12 C.F.R. Parts 30, 208, 211, 225, 263, 308, 364, 568, and 570. and the federal Economic Espionage Act (18 U.S.C. Section 1831 et seq). Servicer will not directly or indirectly reuse or redisclose to any Affiliate (as defined below), or any unaffiliated entity or person, any Confidential Information, including but not limited to, any personally identifiable consumer information, provided by FMC under this Agreement for any purpose other than to perform the activities contemplated by this Agreement. All Confidential Information in the possession of Servicer, other than information independently obtained by Servicer and not derived in any manner from information obtained under or in connection with this Agreement, is and shall remain confidential and proprietary information of FMC, TERI, and/or the applicable Program Lender. If Servicer proposes to disclose Customer Information to any person or entity to assist Servicer to perform its duties under this Agreement, Servicer shall first enter into a written confidentiality agreement with such person or entity under which that person or entity would be restricted from disclosing, using or duplicating such Customer Information, except as contemplated under this Agreement. Notwithstanding any such confidentiality agreement, Servicer shall remain liable to FMC, Program Lender or any Owner, as applicable, for any failure of such person or entity to comply with such confidentiality agreement to the extent that such noncompliance, if engaged in by Servicer, would be a breach of this Agreement.

For purposes of this Agreement "Affiliates" means all current or future corporations that directly or indirectly, through one or more intermediaries, Control (as defined below) or are Controlled by, or are under common Control with, FMC or Servicer or that are successors (whether by change of name, dissolution, merger, consolidation, reorganization or otherwise) to any such corporations or their businesses and assets. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity through the majority ownership of voting securities.

For purposes of this Agreement, "Confidential Information" shall mean all data; records; correspondence; reports; borrower lists; documents; any personally identifiable information or records in any form (oral, written, graphic, electronic, machine-readable, or otherwise) relating to a Borrower, including, but not limited to: a Borrower's name, address, telephone number, social security number, account number, loan payment or transactional account history, account status, and the fact that the Borrower has a relationship with a Program Lender and Owner; other Borrower information; or other documentation received by Servicer pursuant to the Agreement from FMC, or from the Borrower, or from the school which Borrower attends, or information prepared and maintained by Servicer in the course of its activities under this Agreement.

Servicer agrees not to utilize any Confidential Information, including but not limited to the marketing of products or services to, or the solicitation of business from, Borrowers, unless it is necessary to do so in order to fulfill an obligation under this Agreement. Servicer also agrees that it will not sell, disclose, transfer, or rent any Confidential Information to any third party nor will it use any Confidential Information on behalf of any third party, without the express written permission of FMC and the relevant Borrower. Servicer shall use a digital certificate on the web

-27-

NCLST 0268
TA461