server to enable the use of SSL and HTTPS protocols. All internet transfers of Confidential Information and screen images of the same shall be encrypted.

Servicer acknowledges that money damages may be both incalculable and an insufficient remedy for any breach of this provision by Servicer and that any such breach may cause FMC irreparable harm. Accordingly, Servicer agrees that in the event of any breach or threatened breach of this Section, FMC, in addition to any other remedies at law or in equity that it may have, shall be entitled without requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance without proof of actual damages.

**11.03 Security Program.** Notwithstanding anything herein to the contrary, Servicer may receive or otherwise have access to "Customer Information" (as defined in Appendix B to 12 CFR §30), in connection with providing Services to FMC pursuant to the terms of the Agreement. Servicer shall implement and maintain an appropriate security program for Customer Information designed to meet the following Objectives, as defined below, of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information pursuant to the authority of Section 501(b) of the Gramm-Leach-Bliley Act of 1999 ("Information Security Program"). "Objectives" means a program designed to (i) ensure the security and confidentiality of Customer Information (as defined below); (ii) protect against any anticipated threats or hazards to the security or integrity to Customer Information, and (iii) protect against unauthorized access to or use of Customer Information that could result in substantial harm or inconvenience to any "Customer" (as defined in 12 CFR § 40.3 (h)). Servicer shall provide FMC on or prior to the Effective Date and thereafter, upon request, with a copy of its information security and assurance policy and any updates or amendments thereto. Servicer agrees that upon reasonable notice and at Servicer's convenience, FMC may come to Servicer's place of business and review the specifics of Servicer's security plan with Servicer. It is understood and agreed that Servicer shall not be required to have an Information Security Program in place that implements every security measure listed in each paragraph of Section III C of Appendix A to 12 CFR § 30; provided that Servicer's Information Security Program is appropriate to address the level of risk and otherwise meets the Objectives. FMC, its internal and external auditors and regulatory agencies ("Auditors") shall be permitted, during normal business hours, to audit the Servicer's Information Security Program upon provision of sixty (60) days prior notice and provision of an agenda for the audit requirements. Servicer shall provide to the Auditors, upon request, a copy of a CyberTrust Certification Letter and a Type II SAS 70 Report which report shall include the operating controls associated with Servicer's Information Security Program and tests of those operating controls. Servicer shall be subject to said audits as long as Servicer continues to maintain, store or have access to Customer Information.

As part of its information security program, Servicer shall take appropriate measures to properly dispose of "Consumer Information" and "Customer Information" as defined in The Interagency Guidelines Establishing Standards for Information Security (as revised, 12/28/04), 12 CFR Part 30 (Appendix B), whether such information is in paper, electronic or other form. These measures should, at a minimum include:

NCLST 0269
TA462

(i)     Burning, pulverizing or shredding of papers containing Consumer Information and Customer Information so that the information cannot practicably be read or reconstructed;

(ii)    Ensuring the destruction or erasure of electronic media containing Consumer Information and Customer Information so that the information cannot practicably be read or reconstructed; and/or

(iii)   Ensuring that any third party who performs the activities described in (a) and (b) on behalf of Servicer above does so in a manner consistent with this Section.

Servicer shall ensure that it does not retain Customer Information or Consumer Information for longer than it needs such information to perform its obligations hereunder. Servicer's disposal policy shall require that such information is reviewed and destroyed on a routine basis consistent with the Servicer's disposal policy.

Servicer shall have in place and follow a routine destruction policy for all FMC Confidential Information, FMC data, deliverables and any working papers, correspondence, notes, memoranda, drafts or other material (whether in electronic, paper or other form) related to Servicer's performance under this Agreement. No such materials will be retained longer than such period as is set forth in Servicer's policy period for retention unless mandated under this Agreement or by applicable law.

This Section is intended only to describe how to properly dispose of Consumer Information and Customer Information. Requirements related to when Customer Information and Consumer Information must be retained or destroyed are found elsewhere in this Agreement or under applicable law.

11.04   Security Breach.   In the event Servicer knows or reasonably believes that there has been any unauthorized acquisition of or access to data that compromises the security, confidentiality, or integrity of "non-public personal information" maintained by or for Servicer (a "Breach"), Servicer shall take the following actions:

(i)     Immediately notify FMC of such Breach.

(ii)    Identify to FMC at no cost to FMC what specific data, by customer and/or account number has or may have been Breached.

(iii)   Monitor any affected accounts for any unusual activity (if appropriate).

(iv)    Take measures to contain and control the incident to prevent further unauthorized access.

(v)     Remedy the circumstances that permitted such Breach to occur.

(vi)    Cooperate with FMC as necessary to facilitate FMC's compliance with any applicable federal or state law regarding unauthorized access of customer personal information.

For the purposes of this section, "non-public personal information" shall include any two of the following: a person's name, address, social security number, telephone number, driver's license or state ID number, account number, credit/debit card account number, access code, password, identification number, or security code. Servicer shall fully reimburse FMC for the actual costs of mailing notices to individuals whose data has or may have been Breached, where

NCLST 0270
TA463

such Breach is the direct result, in whole or in part, of Servicer's breach of this Agreement, Servicer's failure to conform to applicable law, or Servicer's negligence.

**11.05  Business Continuity and Site Disaster Recovery Plans**  Servicer shall maintain and test at least once annually plans to continue business in the event of an interruption to its business or unavailability of any site from which Services are being performed (the "Disaster Recovery and Business Continuity Plans"). The Servicer agrees that its Disaster Recovery and Business Continuity Plan shall include, among other things, provision for the remote storage of computer software and data, for the remote storage of copies of Student Loan documentation in conformance with Section 4.04 (Custody), the availability of a location for off-site computer services and procedures covering all of the Servicer's facilities used in connection with the Services in order to insure continuance of Services in the event of a disaster affecting any such Servicer facility and storage of a complete system image tape of both object code and source code for its student loan servicing software at an off-site storage location designated by the Servicer and disclosed to FMC.

The Servicer covenants and agrees that it shall create on a daily basis electronically stored backup data for all Student Loan data for the particular day. At a minimum, the Servicer's core processing facilities and operations will include redundant backup and security to ensure minimal exposure to systems failure or unauthorized access. The Servicer will take commercially available measures to ensure the continuity of operations via tape or other off-site backup mechanism. Power backup will be maintained throughout the core processing facilities which affect performance of the Services should a power outage occur. The Business Continuity Plan must meet the Recovery Time Objective (RTO) and Recovery Point Objective (RPO) as defined below:

> The Service will be available within a three (3) day period following any significant outage/incident (RTO = 72 hours) with a maximum of forty-eight (48) hours of data loss (RPO = 48 hours).

Servicer shall test both its Disaster Recovery Plan and Business Continuity Plan on an annual basis and send its annual Overview of Business Recovery Exercise report to FMC. Servicer agrees that upon reasonable notice and at Servicer's convenience, FMC may come to Servicer's place of business and review the specifics of Servicer's Disaster Recovery and Business Continuity Plans with Servicer. If any testing hereunder establishes that Servicer's performance of the Services is not in compliance with the terms of this Agreement, Servicer shall within thirty (30) days of its receipt of the results of such testing, publish a Remedial Action Plan and provide the same to FMC. Such Remedial Action Plan shall include a schedule of Milestones and shall provide for reports to FMC with respect to each Milestone. An event shall not be considered a force majeure event to the extent that proper implementation of the Disaster Recovery and Business Continuity Plans would have enabled Servicer to continue performance hereunder in a timely manner. The occurrence of a force majeure event or disaster shall not excuse Servicer from having in place reasonable safeguarding plans and procedures adequate for protecting all FMC Confidential or Proprietary Information and Customer Information and Consumer Information. In the event of a natural or other disaster beyond the Servicer's control that interrupts the Servicer's performance of any such Services for any period, the Servicer shall

NCLST 0271
TA464

promptly respond to such disaster in accordance with the procedures contained in the Disaster Recovery and Business Continuity Plans in order to resume performance of such Services.

**11.06  Servicer Firewall(s).**

(i)     Servicer will create its firewall rules based on the principle of least access needed. This means that the firewall(s) will only pass the traffic necessary for the system applications utilized by Servicer in providing Services hereunder to function to the backend servers, and any unnecessary traffic will be blocked.

(ii)    Servicer will segregate the Internet environment used to provide service to its clients from the intranet environment used by internal Servicer personnel.

(iii)   An encrypted session will be used for connectivity between FMC and Servicer over the internet.

**11.07  User Authentication Processes.**  Servicer will follow its existing policies, procedures, and standards for authentication. Servicer will provide FMC with access to such policies and procedures at Servicer's place of business.

**11.08  Intrusion Detection.**  Servicer will maintain a current industry standard intrusion detection monitoring system that protects its infrastructure against system risk from outside users and vendors. Servicer will actively monitor the intrusion monitoring system and develop escalation procedures to notify FMC personnel in the event of a security breach pursuant to Section 11.04.

**11.09  Risk Assessment.**  Servicer shall comply with industry best practices and standards regarding information security. In addition to Servicer's annual Type II SAS 70 audit, it shall partner with an external vendor for the purpose of receiving a certification on Servicer's information security practices and protocols. The external vendor shall at a minimum conduct external and internal scans and audits of the Servicer's network. On an on-going basis the external vendor shall provide to Servicer notification of any malicious code, viruses or known threats so that Servicer may protect its network accordingly. Additionally, on an annual basis, Servicer shall engage external vendors to conduct blind intrusion testing to verify Servicer's then current information security, controls, standards, and procedures. Upon request from the FMC, Servicer shall provide a certification letter from its external vendors certifying Servicer's compliance with industry best practices and standards. For each external vendor providing services described in this Section 11.09, Servicer shall provide FMC with a summary of such vendor's reports and shall respond to any of FMC's reasonable follow-up questions with respect to such summaries. Any information provided to FMC under this Section shall be deemed Proprietary Information.

**11.10.Survival.** The obligations set forth in this Section 11 as they pertain to Proprietary Information, Confidential Information, Customer and Consumer Information shall survive termination of this Agreement and continue for so long as the relevant information remains

NCLST  0272
TA465

Proprietary Information, Confidential Information, Customer Information or Consumer Information.

## SECTION 12. DISPUTES

In the event of any dispute or disagreement between the parties hereto either with respect to the interpretation of any provision of this Agreement or with respect to the performance hereunder by the Servicer or by FMC, each of the parties will appoint, no later than thirty (30) days after the dispute or disagreement has arisen as evidenced in writing by one of the parties, a designated officer to meet for the purpose of endeavoring to resolve such dispute or to negotiate for an adjustment to such provision. In case no agreement is reached, a third designated person may be appointed upon mutual agreement to resolve such dispute or to negotiate with the previously designated officers to negotiate for an adjustment to such provision. No formal proceedings for the judicial resolution of the initially designated dispute may be commenced until either of the designated officers concludes in good faith that amicable resolution through continued negotiations of the matter in issue does not appear likely. In no event shall such dispute resolution procedure continue for more than sixty (60) days after the appointment of the initially designated officers, after which period of time either party may choose to seek a final determination of liability on the part of the other party by a court of law as set forth in Section 9 (Liability) herein.

## SECTION 13. ASSIGNMENT.

13.01   Assignment by the Servicer.  This Agreement and all the rights and obligations of the Servicer hereunder may not without the prior written consent of FMC, which consent shall not be unreasonably withheld, be assigned or subcontracted by the Servicer. Any successor must acquire substantially all of the assets or business of the Servicer, have the ability to perform the Services under the terms and conditions hereof, and be approved by the Insurer and reasonably acceptable to any Trustee.

13.02   Assignment to Permitted Assignee.  The parties contemplate that:

    (a)    pools of Committed Student Loans will be sold by the Program Lender to SPEs in Securitization Transactions sponsored by FMC from time to time, and Permitted Assignees will receive a collateral assignment of the Committed Student Loans in each Securitization Transaction; and

    (b)    at the same time and as part of the same transaction, FMC will assign its rights under this Agreement to obtain Servicing of said Student Loans to said SPEs, which rights may be further assigned to Permitted Assignees, so that said Student Loans will be Serviced by Servicer under the terms of this Agreement, following execution by the parties of a Servicer Consent Letter.

13.03   Effect of Assignment.  Servicer agrees that upon the assignment of FMC's rights under this Agreement with respect to a pool of Student Loans to a Permitted Assignee and the execution by the parties of a Servicer Consent Letter, all obligations of FMC under this

-32-

NCLST 0273
TA466

Agreement with respect to ongoing Servicing of such Student Loans, including without limitation the obligation to pay fees set forth in the Fee Schedule, shall cease, all rights and obligations of FMC under this Agreement with respect to such Student Loans shall inure to the SPE and the Permitted Assignees, and any all references to FMC in this Agreement, to the extent it has been so partially assigned, shall be deemed to refer to said SPE. Notwithstanding the foregoing, FMC shall retain rights under this Agreement that do not relate to ongoing Servicing of such Student Loans, as set forth in Section 2.03 (Role of FMC).

13.04    Notice Requirement prior to Sale of Student Loans.  FMC shall use reasonable efforts to notify the Servicer, in writing, sixty (60) days prior to any sale of Student Loans, and shall notify Servicer, in writing, no less than forty-five (45) days prior to any sale of Student Loan, currently housed on the Servicing system as to (a) the anticipated sale date and (b) the characteristics of the exact Student Loans to be sold. The actual sale date will be provided five (5) days prior to the sale. Upon receipt of the above initial notice, the Servicer will provide FMC with available transfer dates within thirty (30) days.  Actual transfer dates shall be mutually agreed upon.

13.05    Servicing Obligations after Sale of Student Loans (to third party other than an SPE).

(a)    The Servicer's Offer of Continued Servicing.  With respect to any Student Loans which are sold, assigned or transferred by a Permitted Assignee (other than a trustee under Section 13.02), upon the Servicer's receipt of a notice from such Permitted Assignee that it intends to sell, assign or transfer any or all of the Student Loans which are being Serviced hereunder, the Servicer shall contact the intended purchaser, assignee or transferee (collectively, the "Transferee") and offer to Service such Student Loans for the Transferee for the balance of the term of this Agreement (and, at the option of the Transferee, any extensions thereof) as follows: (i) if the Transferee or an affiliate, parent, subsidiary or other entity related to the Transferee (collectively, a "Related Entity") has entered into a servicing agreement with the Servicer, under the terms and conditions of any such agreement, or (ii) otherwise, under terms and conditions which are no less favorable than those terms and conditions which are contained in this Agreement. This subsection shall not apply to an assignment to a Permitted Assignee pursuant to Section 13.02.

(b)    Liability of Permitted Assignee upon Transferee's Acceptance of Servicer's Offer to Service Student Loans.  If the Transferee accepts the offer described in 13.05(a)(i) or (ii), the Permitted Assignee shall have no further obligation or liability to the Servicer hereunder with respect to such Student Loans, and the Early Termination Fees set forth in the Fee Schedule shall not be due and payable. If the Transferee does not elect to have the Servicer continue Servicing the Student Loans, the Permitted Assignee shall pay the Early Termination Fees set forth in the Fee Schedule.  This subsection shall not apply to an assignment to a Permitted Assignee pursuant to subsection 13.02.

-33-

NCLST 0274
TA467

## Section 14. TERMINATION

**14.01  Borrower's Student Loan.**  This Agreement shall terminate as to a specific Borrower's Student Loan on the earliest of:

(a)  the month following the month during which (i) the principal, interest, and Late Fees, if any, have been fully paid and remitted to the Owner, and (ii) the Borrower has been notified that the Student Loan has been paid in full;

(b)  the end of the month during which notification is given to the Servicer that a claim for guarantee/insurance relating to the Student Loan has been paid by the Insurer; or

(c)  the end of the month following the month during which the sale or transfer of such Student Loan occurs where Servicer does not continue Servicing such Student Loan subject to the provisions set forth in Section 13 (Assignment) hereof.

**14.02.  Termination by FMC.**  This Agreement may be terminated at the option of FMC upon the occurrence of any of the following:

(a)  Any of the representations or warranties made in or pursuant to this Agreement are not true or are erroneous in any material respect;

(b)  The Servicer's failure to perform or observe any of the provisions or covenants of this Agreement and its referenced schedules and exhibits, in any material respect (including, without limitation, any breach of the provisions of Section 4.13 (Collections), all of which shall be deemed material);

(c)  If the Servicer shall (i) discontinue business, or (ii) generally not pay its debts as such debts become due, or (iii) make a general assignment for the benefit of creditors, or (iv) admit by answer, default or otherwise the material allegations of petitions filed against it in any bankruptcy, reorganization, insolvency or other proceedings (whether federal or state), relating to relief of debtors, or (v) suffer or permit to continue unstayed and in effect for thirty (30) consecutive days, any judgment, decree or order, entered by a court of competent jurisdiction, which approves a petition seeking its reorganization or appoints a receiver, custodian, trustee, interim trustee or liquidator for itself or all or a substantial part of its assets, or (vi) take or omit any action in order thereby to effect any of the foregoing;

(d)  Change of Control.  Notwithstanding 13.01 (Assignment by Servicer), if Servicer is the subject of a Change of Control, FMC shall have the right to terminate this Agreement upon a minimum of twenty (20) business days prior written notice. Such right of termination may be exercised any time beginning upon the earlier of consummation of the Change of Control transaction or public announcement that such a transaction is pending. Following Servicer's receipt of notice and information to support the termination hereunder from FMC, Servicer shall work diligently with FMC to carry out the deconversion of the Student Loans off of the Servicer's Servicing system within a timeframe reasonably agreeable to the

-34-

NCLST 0275
TA468

parties but in any event shall be begun within ninety (90) business days from the Servicer's receipt of notice and the parties shall use their best efforts to complete the deconversion process within 24 months from the date it begins. There will be no charge to FMC of Early Termination Fees as detailed in the Fee Schedule attached hereto arising from FMC's termination of the Agreement pursuant to this Section. FMC shall be responsible for any and all fees arising under this Agreement and the attached Fee Schedule that are incurred by FMC hereunder prior to FMC's termination of this Agreement pursuant to this Section.

(c) Termination for Insufficient Volume. In the event that the total original principal amount of Student Loans being Serviced pursuant to this Agreement shall be less than fifty million dollars ($50,000,000) as of the May 1 that occurs at least twenty-four months after the first Student Loan is Serviced hereunder, then FMC and all Owners acting in concert may, by written notice to Servicer, terminate this Agreement. Such termination shall be on six (6) months written notice . Servicer shall cooperate fully in the deconversion and transfer of such Student Loans to another Servicer.

In the event of an event of default as set forth in Section 14.02(a) or (b) above, the Servicer shall have the right to cure any such breach or error to FMC's full satisfaction within thirty (30) days of written notice from FMC. Notwithstanding the foregoing, Servicer shall have the right to cure any breach of Section 4.13 (Collections) or any failure to conform to a Milestone in a Remedial Action Plan within five (5) (not thirty (30)) days after written notice from FMC.

In the event that: (i) Servicer fails to cure such default and the Agreement is terminated pursuant to Section 14.02 (a) or (b) or (ii) this Agreement is terminated pursuant to Section 14.01 or 14.02 (c), or Sections 4.02, 4.03(d), 6.06, 10.01, there will be no charge to FMC for Early Termination Fees or Record Return/Deconversion Fees. In the event the Agreement is terminated prior to the end of the initial term for any reason other than stated above (including termination under Section 14.02(d), FMC shall be responsible for the payment of Early Termination Fees and Record Return/Deconversion Fees as detailed in the Fee Schedule.

14.03. Termination by the Servicer. This Agreement may be terminated at the option of the Servicer upon the occurrence of any of the following:

(a) FMC's failure to perform or observe any of the material provisions or covenants of this Agreement; or

(b) If FMC shall (a) discontinue business, or (b) generally not pay its debts as such debts become due, or (c) make a general assignment for the benefit of creditors, or (d) admit by answer, default or otherwise the material allegations of petitions filed against it in any bankruptcy, reorganization, insolvency or other proceeding (whether federal or state) relating to relief of debtors, or (e) suffer or permit to continue unstayed and in effect for thirty (30) consecutive days, any judgment,

-35-

NCLST 0276
TA469

decree or order, entered by a court of competent jurisdiction, which approves a petition seeking its reorganization or appoints a receiver, custodian, trustee, interim trustee or liquidator for itself or all or a substantial part of its assets, or (f) take or omit any action in order thereby to effect any of the foregoing; or

In the event of an event of default as set forth in Section 14.03(a) or (b) above, FMC shall have the right to cure any such breach or error to Servicer's full satisfaction within thirty (30) days of written notice from Servicer.

In the event FMC fails to cure such default and the Agreement is terminated pursuant to Section 14.03(a) or (b), FMC shall pay Servicer the Early Termination Fees and Record Return/Deconversion Fees set forth in the Fee Schedule.

14.04. **Record Return/Deconversion**. Upon termination of this Agreement or upon termination of this Agreement with respect to any particular Student Loan or Loans whether by virtue of the passage of time or otherwise, the Servicer shall, regardless of any FMC default or any other reason, return to FMC all records, data processing records, reports, documents and correspondence, including Original Credit Agreements, applications, payment histories, due diligence histories, and copies of microfilm documents maintained by the Servicer in connection with the Servicing of the Student Loans (or such Student Loans as applicable). Servicer shall maintain a copy of all records and reports which related to the Servicing of Student Loans generally for five years after any deconversion. Upon the return of the Student Loan records, FMC agrees to pay the Record Return/Deconversion Fee, as set forth in the Fee Schedule, except under the circumstances specifically set forth in this Agreement, and such records will be returned to FMC by Servicer as provided below or as otherwise mutually agreed upon by the parties. Upon any termination or expiration of this Agreement, any deconversion and transfer of the Accounts to FMC or its new servicer shall be on an orderly schedule reasonably determined by the Servicer, with FMC's approval. To the extent that the Servicer continues to provide Servicing for any Accounts after the termination or expiration date pending such scheduled deconversion and transfer, the terms of this Agreement shall remain in effect and the Servicer's fees shall continue to be paid hereunder with respect to such Accounts during such period.

14.05 **Transition Period Rights.** If this Agreement is terminated pursuant to Sections 14.02(a), (b), (c) or (d) or 4.02, 4.03(d), 6.06, or 10.01, then FMC or any Owner shall have the right to demand continued Servicing of the Student Loans by Servicer at the rates set forth in the Fee Schedule until such time as all loans have been successfully deconverted. FMC shall have the right to access the Servicer's facilities and access to Student Loan data in the same manner as was permitted during the term of this Agreement. Servicer has the obligation upon termination or expiration to provide, and FMC or any Owner has the absolute right to obtain, all of its Proprietary Information and Customer Information at any time.

## SECTION 15. MISCELLANEOUS PROVISIONS

15.01 **Notices**. All notices, approvals, consents, requests or other written communications regarding this Agreement are to be addressed as noted below.

-36-

NCLST 0277
TA470

<table>
<tr><td>If to FMC:</td><td>President<br>The First Marblehead Corporation<br>The Prudential Tower<br>800 Boylston Street, 34th Floor<br>Boston, Mass. 02199-8157</td></tr>
</table>

If to FMC:     President

The First Marblehead Corporation

The Prudential Tower

800 Boylston Street, 34th Floor

Boston, Mass. 02199-8157

If to Servicer:     Executive Vice President, Marketing & Client Affairs

Pennsylvania Higher Education Assistance Agency

1200 North Seventh Street

Harrisburg, Pennsylvania 17102

15.02 **Relationship.** The parties to this Agreement intend that the Servicer shall render the Services contemplated by this Agreement as an independent contractor. The Servicer and its employees, agents, and servants are not to be considered agents or employees of FMC, for any purpose whatsoever. Nothing herein contained, nor any action taken by the Servicer under this Agreement, shall be deemed or construed to give the Servicer any right, title or interest either in law or in equity in and to any Student Loan being Serviced by Servicer.

15.03 **Non-Exclusive Agreement for FMC.** Nothing contained herein shall be construed to create an exclusive arrangement as to FMC. The Servicer understands and agrees that FMC may enter into other agreements for the servicing of Private Student Loans in the future.

15.04 **Survival.** The representations and warranties of each party shall survive the termination of this Agreement and the obligations and duties of each party (including, without limitation, the obligations under Sections 9 (Liability) and 14 (Confidentiality)) shall survive the termination or expiration of this Agreement.

15.05 **Entire Understanding.** This Agreement herewith including all Schedules and Exhibits attached thereto, represent the entire understanding of the parties with respect to their subject matter, and supersede all previous discussions and correspondence with respect thereto, and no representations, warranties or agreements, express or implied, of any kind with respect to such subject matter have been made by either party to the other, except as expressly set forth herein or in such other agreements.

15.06 **Interpretation of Documents.** In the event of a conflict between this Amended and Restated Private Student Loan Servicing Agreement and a Schedule or Exhibit attached hereto, this Agreement shall control.

15.07 **Cooperation.** FMC and the Servicer agree that they will cooperate fully with one

NCLST 0278
TA471

another in order to carry out the terms and provisions of the Agreement during the term of this Agreement and during all periods in which Committed Student Loans and Student Loans are processed and Serviced by Servicer. Cooperation under this Section shall include, but not be limited to, each party using reasonable means to ensure successful, normal, daily processing of Committed Student Loans and Student Loans and related operations and functions. Each party agrees to support the reasonable routine efforts of the other party and to work to resolve any disputes which may arise during such periods referenced above, and to continue to work together in a professional, business-like manner during all phases, functions and processes defined in this Agreement.

15.08 <u>Authorization.</u> Each of the undersigned represent that he or she has the authority to execute this Agreement on behalf of the respective party.

15.09 <u>Amendments; Changes; Modifications.</u> This Agreement, Exhibits or Schedules (a) may be amended, supplemented, or modified only by written instrument duly executed by FMC and the Servicer; (b) shall be incorporated into this Agreement; and (c) shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

15.10 <u>No Waiver.</u> Any failure by FMC or the Servicer to insist upon the strict performance by the other of any of the terms and provisions of this Agreement shall not be deemed to be a continuing waiver of any such terms and provisions, and notwithstanding any such failure, such party shall have the right thereafter to insist upon the resumption of strict performance by the other of any and all of the terms and provisions hereof. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.

15.11 <u>Opinion of Outside Counsel.</u> Upon request by FMC, in connection with a Securitization Transaction, the Servicer agrees to provide to FMC an opinion of its outside counsel, in form and substance satisfactory to counsel for FMC, that :

    (a)    The agreement has been duly authorized by all necessary action of the Servicer.

    (b)    The agreement does not violate the chartered documents or other constituent documents governing the Servicer or any other applicable law.

    (c)    The agreement has been duly executed by an authorized officer of the Servicer.

    (d)    The agreement is a valid and binding obligation of the Servicer, enforceable in accordance with its terms.

Servicer may provide the opinion of its in-house corporate counsel, in lieu of outside counsel, unless FMC agrees to pay the reasonable fees of Servicer's outside counsel in connection with such opinion.

15.12 <u>Law Governing.</u> This Agreement is being delivered in and shall be construed in accordance with the laws of the Commonwealth of Pennsylvania, without regard to any principles of conflict of laws.

15.13 <u>Waiver of Jury Trial.</u> THE PARTIES HEREBY EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR ANY OTHER DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR IN

NCLST 0279
TA472

ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE
DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT
OR ANY SUCH DOCUMENT OR AGREEMENT, OR THE SERVICES AND
TRANSACTION RELATED HERETO OR THERETO, WHETHER NOW EXISTING
OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT OR
OTHERWISE.

15.14 **Counterparts.** This Agreement may be executed in any number of counterparts, each of
which shall be deemed to be an original and all of which together shall be deemed to be
one of and the same document.

15.15 **Unenforceability.** If any provision of this Agreement shall be held to be invalid or
unenforceable, such invalidity or unenforceability shall not affect or impair the validity or
enforceability of the remaining provisions of this Agreement, which shall remain in full
force and effect, and the Parties hereto shall continue to be bound thereby.


[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]

NCLST 0280
TA473

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the month, day and the year first-above written.

PENNSYLVANIA HIGHER EDUCATION
ASSISTANCE AGENCY

THE FIRST MARBLEHEAD
CORPORATION

Name: Richard E. Willey

Name: Anne Bowen

Title:  President and CEO

Title:  Executive Vice President and
Chief Administrative Officer

Date: September 28, 2006

Date: September 28, 2006

-40-

NCLST 0281
TA474

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the month, day and the year first-above written.

PENNSYLVANIA HIGHER EDUCATION
ASSISTANCE AGENCY

THE FIRST MARBLEHEAD
CORPORATION

_Anne Bowen_

Name: Richard E. Willey

Name: Anne Bowen

Title:  President and CEO

Title:  Executive Vice President and
Chief Administrative Officer

Date: September 28, 2006

Date: September 28, 2006

**NCLST  0282**
TA475

## INDEX TO SCHEDULES AND EXHIBITS

Fee Schedule

System Access Schedule

Customer Service Schedule

Required Reports Schedule

Schedule A – Existing Program Guidelines


Exhibit A – Servicer Consent Letter

Exhibit B – TERI Servicing Guidelines

Exhibit C – Service Level Agreement

**NCLST 0283**
TA476

FEE SCHEDULE FOR
AMENDED AND RESTATED PRIVATE STUDENT LOAN SERVICING AGREEMENT
DATED SEPTEMBER 28, 2006
BETWEEN
PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY
AND
THE FIRST MARBLEHEAD CORPORATION ("AGREEMENT")

This Fee Schedule shall be effective from the Effective Date for a period of three years (the "Initial Term") and shall then be open for negotiation. If no changes are proposed or agreed to in writing, this Fee Schedule shall automatically renew for an additional one (1) year periods.

I.    DEFINITIONS:

Capitalized terms used in this Fee Schedule have the meanings assigned to them in the Agreement. In addition to the words and terms elsewhere defined in this Agreement, the following terms shall have the following meanings unless the Agreement indicates a contrary meaning or intent:

A.    An "Account" is to refer to the Credit Agreements collectively of an individual Borrower of a particular Student Loan type in the same status.

B.    An "Interim Account" is to refer to Credit Agreements collectively of an individual Borrower that constitute (1) an In-School (Enrolled) Account, or (2) a Grace Account.

C.    A "Repayment Account" is to refer to the Credit Agreements of an individual Borrower under the terms of which the repayment period has commenced, but which is not an In-School (Enrolled) Account.

D.    An "In-School (Enrolled) Account" is to refer to the Credit Agreements collectively of an individual Borrower with respect to which principal and interest payments are deferred because the Borrower is enrolled at an eligible institution, whether before of after the repayment period begins.

E.    A "Grace Account" is to refer to the Credit Agreements collectively of an individual Borrower (1) with respect to which the Borrower has ceased to be enrolled at an eligible institution, and (2) under the terms of which the repayment period has not yet commenced.

F.    "Standard Conversion" means the conversion of a Borrower's Account from data provided in hard-copy format or by electronic means.

G.    "On-System Conversion" means the conversion of a Borrower's account that the Servicer is currently Servicing for an owner or holder other than the proposed new owner or holder.

-42-

NCLST 0284
TA477

## II.  SERVICING FEES:

1.  Monthly Servicing Fees—Interim Account Status:

The Servicing fee for Student Loans in Interim Account status shall be payable by the Owner on a pro-rated monthly basis and shall be equal to twelve and one-half (12.5) basis points per annum based upon the ending principal balance of the Student Loans at month end.

(.00125 x ending principal balance at month end divided by 12)

2.  Monthly Servicing Fees—Repayment Account Status (other than Student Loans in Owner-caused Cure status):

(a) *Ending Principal Balance < $5 Billion*. If the ending principal balance of the Student Loans (including Student Loans in Interim Account status and Repayment Account status) at month end is less than five billion dollars ($5,000,000,000), then the Servicing fee for loans in Repayment Account status shall be payable by the Owner on a pro-rated monthly basis and shall be equal to thirty eight (38) basis points per annum based upon the ending principal balance of the Student Loans at each month end.

(.0038 x ending principal balance at month end divided by 12)

(b) *Ending Principal Balance > or Equal to $5 Billion and < or Equal to $10 Billion*. If the ending principal balance of the Student Loans (including Student Loans in Interim Account status and Repayment Account status) at month end is five billion dollars ($5,000,000,000) or more, but less than or equal to ten billion dollars ($10,000,000,000), then the Servicing fee for loans in Repayment Account status shall be payable by the Owner on a pro-rated monthly basis and shall be equal to thirty four (34) basis points per annum based upon the ending principal balance of the Student Loans at each month end.

(.0034 x ending principal balance at month end divided by 12)

(c) *Ending Principal Balance > $10 Billion*. If the ending principal balance of the Student Loans (including Student Loans in Interim Account status and Repayment Account status) at month end is greater than ten billion dollars ($10,000,000,000), then the Servicing fee for loans in Repayment Account status shall be payable by the Owner on a pro-rated monthly basis and shall be equal to (i) for the first $10,000,000,000.00 of the ending principal balance of the Student Loans, thirty four (34) basis points per annum based upon the ending principal balance of the Student Loans at each month end; and (ii) for the ending principal balance of the Student Loans in excess of $10,000,000,000.00, thirty two (32) basis points per annum based upon the ending principal balance of the Student Loans at each month end.

For the first $10,000,000,000.00:
(.0034 x ending principal balance at month end divided by 12)

For amounts in excess of $10,000,000,000.00

– 43 –

NCLST  0285
TA478

(.0032 x ending principal balance at month end divided by 12)

(d) *Delinquent Accounts*. Notwithstanding subsections (a), (b), and (c) above, the Servicing fee for loans in Repayment Account status shall be fifty (50) basis points for all Student Loans thirty (30) days or more delinquent until the Student Loan is placed for pre-claims assistance, and for Student Loans placed for pre-claims assistance, the Servicing fee for loans in Repayment Account status shall be thirty four (34) basis points.

(.0050 x ending principal balance of Student Loans 30 or more days delinquent divided by 12)

(.0034 x ending principal balance of Student Loans placed for pre-claims divided by 12)

3.    High or Low Average Balance. Notwithstanding the existence of the Initial Term, the Servicing fees in this Section II may be renegotiated at any time the average principal balance of the Student Loans is less than three thousand five hundred dollars ($3,500) or greater than eighteen thousand five hundred dollars ($18,500). If, at the conclusion of any such negotiation, no changes are proposed or agreed to in writing, the Fee Schedule shall remain in effect unchanged.

## III.    CONVERSION FEES

1.    Interim Account—External

|   |   |   |
|---|---|---|
| a. | Initial Exam: | $6.50 per loan |
| b. | Serial Exam: | $3.50 per loan |
| c. | Abbreviated Note Exam: | $5.60 per loan |

2.    Interim Account—On System

|   |   |   |
|---|---|---|
| a. | Full Note Exam: | $3.00 per loan |
| b. | Waived Exam: | No charge |

3.    Repayment Account:            Quote

4.    Reconversion Fee:             $50.00 per loan

5.    Rehabilitation Reconversion Fee    $15.00 per loan

## IV.    DUE DILIGENCE/PRE-CLAIMS/CLAIMS PROCESSING

1.    Skip Trace

|   |   |   |
|---|---|---|
| a. | Placement: | No charge |
| b. | Locate: | $1.00 per loan |

2.    Late Fees:    20% of all collected late fee revenue on delinquent accounts

-44-

NCLST  0286
TA479

3.   Third Party Referral (referral to third party under contract with the Servicer for core/collection after successful location):   $75.00 per Borrower per bond issue

4.   Claim Processing:

    a.   The Owner shall pay a claim processing fee of $35.00 for each defaulted Student Loan per claim package filed. Claim processing shall include, without limitation, presentation to Insurer of all documentation required under the Servicing Guidelines, in the form required thereunder.  Servicer will provide DDB Certification and Closed School Certification at no charge.

V.   CURE SERVICING--Owner-Caused Cures

| | | |
|---|---|---|
| 1. | Monthly fee | $5.00 per account |
| 2. | Skip Tracing--Locate | $5.00 per account |
| 3. | Third Party Referral | $50.00 per account |
| 4. | Guaranty Reinstated/ Default Claim Paid | $50.00 per account |
| 5. | Correction of Owner Error | $5.00 per error |

VI.   MISCELLANEOUS FEES

| | | |
|---|---|---|
| 1. | Deconversion to Owner | $15.00 per loan |
| 2. | Return of Records to Owner | $15.00 per loan |
| 3. | Early Termination | $45.00 per Account |

4.   Ad Hoc Projects/Reporting (fees to be pre-identified by the Servicer and billed as identified)

| | | |
|---|---|---|
| a. | Computer Programmer | $115.00/hour |
| b. | Computer Analyst | $125.00/hour |
| c. | CPU Run Time | $0.00/hour |
| d. | Staff Services | $75.00/hour |
| e. | Legal Services | $220/hour |
| f. | GLB extract files | 2 for no charge $1,000 for each in excess of two |

5.   Securitization (Financing, Bond Issue)

| | | |
|---|---|---|
| a. | Set-up Fee | $20,000 per financing (includes 25 hours of legal services per financing) |
| b. | Financing Legal Services | $220/hour (in excess of 25 hours per financing) |
| c. | Post Closing, Loan Transfer within | |

NCLST 0287
TA480

|                       |                              |                                |
|-----------------------|------------------------------|--------------------------------|
|                       | a financing                  | $1.00 per Borrower per transfer |

6.  <u>Mailings</u>

    a.  GLB privacy notices    $0.50 per notice
    b.  IRS Form 1098      $0.55 per notice
    c.  Other mailings or notices/
        Special delivery notices   Quote

7.  <u>Basic Monthly Reporting</u>   No charge

8.  <u>SAS 70 Audit</u>       No charge

9.  <u>Lender's Audit Guide</u>    No charge

10. <u>Borrower Incentive Programs</u>  Quote

-46-

**NCLST  0288**
TA481

IN WITNESS WHEREOF, the parties hereto have caused this Fee Schedule to be duly executed as of the month, day and the year first-above written.

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY

By: _____

Name:  Richard E. Willey

Title:   President and CEO


Date: September 28, 2006

THE FIRST MARBLEHEAD CORPORATION

By: _____

Name: Anne Bowen

Title: Executive Vice President and Chief Administrative Officer

Date: September 28, 2006

–47–

NCLST 0289
TA482

IN WITNESS WHEREOF, the parties hereto have caused this Fee Schedule to be duly executed as of the month, day and the year first-above written.

PENNSYLVANIA HIGHER EDUCATION
ASSISTANCE AGENCY

By:_____
Name: Richard E. Willey
Title:   President and CEO

Date: September 28, 2006


THE FIRST MARBLEHEAD
CORPORATION

By:_____
Name: Anne Bowen
Title: Executive Vice President and Chief
Administrative Officer
Date: September 28, 2006

NCLST 0290
TA483

# AMENDED AND RESTATED PRIVATE STUDENT LOAN SERVICING AGREEMENT

## BETWEEN

## PENNSYLVANIA HIGHER EDUCATION ASSISTANCE-AGENCY

## AND

## THE FIRST MARBLEHEAD CORPORATION

## SYSTEM ACCESS SCHEDULE

All system access for FMC, TERI, and FMER employees shall be limited to view only option.

### 1. FMC.

Servicer shall provide FMC with web-based, view-only Account access, which shall include the ability to view loan servicing screens including but not limited to Borrower information, Account history and due diligence records.

Individual FMC users shall obtain remote access within five (5) Business Days of receipt of notice from FMC that such individual requires remote access.

### 2. BORROWERS.

Servicer shall provide Borrowers and Co-Borrowers with limited access to their Account information. Access should be limited to view-only, with the ability to submit queries and request or print forms as necessary.

### 3. TERI.

Servicer shall provide TERI, and its agent FMER, with access to all TERI guaranteed loans. Access shall be limited to view-only and shall include the ability to view all loan servicing screens including but not limited to borrower information, Account History, due diligence records, and access requests.

### 4. FMC/FMER/TERI USER ACCESS SECURITY REQUIREMENTS

Servicer Relations at FMC will be responsible for notifying AES to add and delete employees who need, or no longer need, access as appropriate. On a quarterly basis, AES will provide FMC with a report of FMC, FMER, and TERI employees who have system access to Borrower information at AES. FMC shall be responsible for the accuracy of such reports and shall be liable for the inaccuracy thereof in accordance with Section 9 (Liability) of this Agreement.

**NCLST 0291**
TA484

AMENDED AND RESTATED PRIVATE STUDENT LOAN SERVICING AGREEMENT
BETWEEN
PENNSYLVANIA HIGHER EDUCATION ASSISTANCE-AGENCY
AND
THE FIRST MARBLEHEAD CORPORATION

CUSTOMER SERVICE SCHEDULE

1. Call Monitoring.

Servicer shall monitor on a monthly basis a minimum of 1% of the calls received per customer service representative for quality. Such monitoring shall include the use of the Call Monitoring Scorecard as shown in Exhibit C (Service Level Agreement).

FMC shall, upon reasonable notice to Servicer, have the ability to monitor calls both on-site and remotely, at times and in a manner acceptable to both parties, as established in an Operations Meeting (see Section 4.09).

2. Customer Service Hours of Operation

The Servicer shall maintain minimum customer service hours of operation from 7:30 a.m. to 9:00 p.m., Eastern Standard Time, Monday through Friday. FMC reserves the right to request an increase and/or decrease in these hours upon written notice to Servicer, and Servicer agrees to accommodate such requests to the extent feasible under the circumstances.

3. Collections Hours of Operation

Servicer shall maintain minimum hours of operations for collection activities as follows:

- Monday through Thursday, 8:00 a.m. to 9:00 p.m., Eastern Standard Time
- Friday, 8:00 a.m. to 9:00 p.m., Eastern Standard Time
- Saturday, 8:00 a.m. to 1:00 p.m., Eastern Standard Time

4. Borrower Satisfaction Surveys

The Servicer shall work with FMC to develop telephonic borrower satisfaction surveys to measure the customer experience through various channels including mail, internet, and Voice Response Unit. If surveys demonstrate customer service issues that require remedial action, Servicer shall collaborate with FMC to resolve such issues.

5. Borrower Correspondence/Complaints

All correspondence received by Servicer relating to individual Borrower Accounts shall be maintained by the Servicer and shall be made available to FMC during Servicer's normal

NCLST 0292
TA485

business hours. Servicer shall be responsible for handling all customer service complaints. Copies of escalated customer complaints from Borrowers and Servicer's response thereto are to be forwarded to FMC on a weekly basis. Complaints with respect to Student Loans and/or Borrowers received from any regulatory body or federal or state agency shall be handled as exceptions and Service shall contact FMC immediately.

NCLST 0293
TA486

# AMENDED AND RESTATED PRIVATE STUDENT LOAN SERVICING AGREEMENT

## BETWEEN

## PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY

## AND

## THE FIRST MARBLEHEAD CORPORATION

### REQUIRED REPORTS SCHEDULE

Servicer shall electronically deliver to FMC and/or all Owners, as applicable, within the time periods specified below, the data elements that are, as of the Effective Date, contained in the reports specified below:

1. A report of all Committed Student Loans on Servicer's system that are fully disbursed, including (at least): Unique loan identifier, Current principal balance, Current interest balance, and Fully disbursed indicator, delivered to FMC ten (10) business days prior to a scheduled Securitization Transaction,

2. The same report as set forth in Item 1 above, updated through the closing date, delivered to FMC within five (5) days after the closing date of a Securitization Transaction scheduled under Section 13.04 of the Agreement,

3. MR-01 Report, delivered weekly to FMC and all Owners.

4. MR-50 Report, delivered to all Owners within three (3) calendar days after the end of each calendar month.

5. MR-53 Report, delivered to all Owners within three (3) calendar days after the end of each calendar month

6. Such other reports identified and mutually adopted at Operations Meetings and made part of the Program Manual (see Section 4.09 of this Agreement).

NCLST 0294
TA487

SCHEDULE A

EXISTING LOAN PROGRAM GUIDELINES

AMENDED AND RESTATED PRIVATE STUDENT LOAN SERVICING AGREEMENT
BETWEEN
PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY
AND
THE FIRST MARBLEHEAD CORPORATION

| Program | Programs Covered |
|---|---|
| Bank of America BAGEL | Bank of America GATE Education Loan Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the prepGATE Loan Program, the Bank of America GATE Undergraduate Loan Program, and the Bank of America GATE Graduate Loan Program. |
| Bank of America School Channel (non-BAGEL) | TERI Alternative Loan Program Guidelines for Bank of America, including the Underwriting, Origination and Loan Term Guidelines for the TERI Alternative Loan Program and the Professional Education Program. |
| Bank of America programs that were formerly Fleet programs | Underwriting, Origination and Loan Term Guidelines for the Bank of America Continuing Education and Health Professions Alternative Loan Programs and the Bank of America CVS Education Loan Program. |
| Bank of America Direct-to-Consumer Loan Program | Bank of America Education Maximizer Loan Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the Bank of America Education Maximizer Undergraduate Loan Program, Bank of America Education Maximizer Graduate Loan Program, Bank of America Education Maximizer Continuing Education Loan Program, and Bank of America Education Maximizer K-12 Loan Program. |
| Bank One (JPMorgan Chase) Education One and Campus One | Bank One (JPMorgan Chase) Loan Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the Education One and Campus One Undergraduate Loan Programs, Education One and Campus One Graduate Loan Programs, Education One and Campus One Continuing Education Loan Programs, |

-52-

NCLST 0295
TA488

| | |
|---|---|
| | Education One K-12 Loan Program, and Campus One Health Professions Program. |
| Bank One (JPMorgan Chase) Corp Adv. | Bank One Corporate Advantage Loan Programs, and purchased by FMC or an SPE, as loans covered by the Agreement. "Bank One Corporate Advantage Loan Programs" are those offered under the Program Guidelines (as that term is defined in the Agreement), as amended from time to time, but involving discounted consumer pricing and marketed by Bank One and its corporate partners, including any corporate or affinity groups proposed by Bank One to TERI to which TERI consents in writing. |
| Bank One M&T | M&T Referral Loan Program Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the M&T Referral K-12 Loan Program, the M&T Referral Undergraduate Loan Program, the M&T Referral Graduate Loan Program, and the M&T Referral Continuing Education Loan Program. |
| Charter One | Underwriting, Origination and Loan Term guidelines, for each program whereby Charter One Bank, N.A. originates (both directly and/or through approved referral marketers) alternative student loans guaranteed by TERI, which include, as of the Effective Date, the AAASNE Alternative Loan Program, the AES EducationGAIN Alternative Loan Program, the AMS TuitionPay Diplome Alternative Loan Progran, the astriveAlliance and Astrive Alternative Loan Programs, the Axiom Alternative Loan Program, the CFS Alternative Loan Program, the Citibank SLC Alternative Loan Program, the College Loan Corporation Alternative Loan Program, the Collegiate Solutions Alternative Loan Program, the Creditron Alternative Loan Program, the M&I Bank Alternative Loan Program, the National Education Alternative Loan Program, the NextStudent Alternative Loan Program, the North Texas (HESC) Alternative Loan Program, the UPromise Alternative Loan Program, and the WAMU Alternative Loan Program. |
| Chase Extra | Chase Extra Loan Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the Chase Extra, Extra Gold, Education Finance Direct, and Education Finance Direct Employee Undergraduate Loan Program, Chase Extra, Extra Gold, |

NCLST 0296
TA489

| | |
|---|---|
| | Education Finance Direct, and Education Finance Direct Employee Graduate Loan Program, Chase Extra, Extra Gold, Education Finance Direct, and Education Finance Direct Employee K-12 Loan Program, Chase Extra, Extra Gold, Education Finance Direct, and Education Finance Direct Employee Continuing Education Loan Program, Chase Extra, Extra Gold, and Extra Medical Health Professions Loans. |
| Citizens/ Penn State | Penn State Undergraduate and Continuing Education Loan Program Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the Penn State Undergraduate and Continuing Education Loan Program. |
| Citizens Bank | Citizens Bank DTC Loan Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the Citizens Bank DTC Undergraduate Loan Program, Citizens Bank DTC Graduate Loan Program, and Citizens Bank DTC Continuing Education Loan Program, and Underwriting, Origination and Loan Term guidelines, for each program whereby Citizens Bank of Rhode Island originates (both directly and/or through approved referral marketers) alternative student loans guaranteed by TERI, which include, as of the Effective Date, the Compass Bank Alternative Loan Program, the FinanSure Alternative Loan Program, the Navy Federal Alternative Loan Program, and the Xanthus Alternative Loan Program. |
| GMAC Bank | GMAC Bank Alternative Loan Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the GMAC TERI Undergraduate Loan Program, GMAC TERI Graduate Loan Program, and GMAC TERI Continuing Education Loan Program. |
| HSBC Bank USA, N.A. | HSBC Alternative Loan Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the HSBC TERI Undergraduate Loan Program, HSBC TERI Graduate Loan Program, and HSBC TERI Continuing Education Loan Program. |
| The Huntington National Bank | Huntington Bank Alternative Loan Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the Huntington TERI K-12 Loan Program, Huntington TERI Undergraduate Loan |

NCLST 0297
TA490

| | |
|---|---|
| | Program, Huntington TERI Graduate Loan Program, and Huntington TERI Continuing Education Loan Program. |
| Insurbanc | Insurbanc Alternative Loan Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the Insurbanc Undergraduate Loan Program, Insurbanc Graduate Loan Program, Insurbanc Continuing Education Loan Program, and Insurbanc K-12 Loan Program. |
| KeyBank, N.A. | KeyBank Alternative Loan Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the KeyBank Undergraduate Loan Program, KeyBank Graduate Loan Program, KeyBank Continuing Education Loan Program, and KeyBank K-12 Loan Program. |
| M&T Bank | M&T Bank Alternative Loan Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the M&T Bank Alternative Undergraduate Loan Program, M&T Bank Alternative Graduate Loan Program, M&T Bank Alternative K-12 Loan Program, and M&T Bank Alternative Continuing Education Loan Program. |
| Medbest/M&T Bank | Medbest Medical Loan Program Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the Medbest Medical Loan Program. |
| National City Bank | National City Loan Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the National City Undergraduate Loan Program, National City Graduate Loan Program, National City Continuing Education Loan Program, National City Health Professions Loan Program, and National City K-12 Loan Program all as approved and adopted by TERI, and Underwriting, Origination and Loan Term guidelines for each program whereby Citizens Bank of Rhode Island originates (both directly and/or through approved referral marketers) alternative student loans guaranteed by TERI, which include, as of the Effective Date, the Monster.com Alternative Loan Program. |
| PNC Bank | PNC Bank Alternative Loan Program Guidelines, including the Underwriting, Origination and Loan Term |

NCLST 0298
TA491

| | |
|---|---|
| | Guidelines for the PNC Bank Alternative Undergraduate Loan Program, PNC Bank Alternative Graduate Loan Program, PNC Bank Alternative K-12 Loan Program, and PNC Bank Alternative Continuing Education Loan Program, and Underwriting, Origination and Loan Term guidelines for each program whereby Citizens Bank of Rhode Island originates (both directly and/or through approved referral marketers) alternative student loans guaranteed by TERI, which include, as of the Effective Date, the Edvisors "ACT" Education Alternative Loan Program, the Brazos Alternative Loan Program, the GE Money Bank Alternative Loan Program, the Old National Bank Alternative Loan Program, and the Regions Bank Alternative Loan Program.. |
| Sovereign Bank | Sovereign Bank Alternative Loan Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the Sovereign Bank Undergraduate Loan Program, Sovereign Bank Graduate Loan Program, Sovereign Bank Continuing Education Loan Program, Sovereign Health Professions Loan Program, and Sovereign Bank K-12 Loan Program. |
| Suntrust Bank | SunTrust Alternative Loan Program Guidelines, including the Underwriting, Origination and Loan Term Guidelines for the SunTrust TERI Undergraduate Loan Program, SunTrust TERI Graduate Loan Program, and SunTrust TERI Continuing Education Loan Program. |

NCLST 0299
TA492

Exhibit A – Servicer Consent Letter

## SERVICER CONSENT LETTER

[DATE]

Pennsylvania Higher Education Assistance Agency
1200 North Seventh Street
Harrisburg, Pennsylvania 17102-1444

Attention: Senior Vice President, Marketing & Client Affairs

Dear Sir or Madam:

Reference is hereby made to the Amended and Restated Private Student Loan Servicing Agreement, dated September 28, 2006, as amended (the "Servicing Agreement"), by and between the Pennsylvania Higher Education Assistance Agency (the "Servicer") and The First Marblehead Corporation ("FMC"), a copy of which is attached hereto as Exhibit A. Capitalized terms not otherwise defined herein shall have the meanings set forth in the Servicing Agreement. The parties hereto agree as follows:

1.      FMC hereby assigns its interest in the Servicing Agreement with respect to the Student Loans identified on the attached Schedule 1 (the "Student Loans") to The National Collegiate Student Loan Trust [TRUST NAME] (the "Issuer"), and the Servicer hereby consents thereto.

2.      The Servicer hereby consents to the assignment and to the grant by the Issuer of a security interest in the Servicing Agreement to U.S. Bank National Association (the "Indenture Trustee"), as provided in the Indenture (the "Indenture"), dated as of [INDENTURE DATE], by and between the Issuer and the Indenture Trustee, for the benefit of the holders of the Student Loan Asset Backed Notes (the "Notes") of the Issuer.

3.      The Servicer hereby confirms that it will not terminate the Servicing Agreement until the appointment of a successor servicer by the Issuer, unless such termination is due to a default by the Issuer under Section 14.03 thereof, or unless the Servicing Agreement otherwise expires in accordance with Section 3 thereof.

4.      The Issuer hereby confirms that it will not terminate the Servicer for cause pursuant to Section 14.02 of the Servicing Agreement until a successor servicer is appointed.

5.      The Servicer hereby confirms that it has complied with all the terms and satisfied all the conditions on its part to be performed or satisfied under the Servicing Agreement.

NCLST 0300
TA493

6.     It is expressly understood and agreed by the parties hereto that (i) this servicer consent letter is executed and delivered by [OWNER TRUSTEE] (the "Owner Trustee"), not individually or personally, but solely as owner trustee of the Issuer under the Trust Agreement dated as of [TRUST AGREEMENT DATE] among The National Collegiate Funding LLC, The Education Resources Institute, Inc. and the Owner Trustee, in the exercise of the powers and authority conferred and vested in it, (ii) each of the representations, undertakings and agreements herein made on the part of the Issuer is made and intended not as a personal representation, undertaking and agreement by the Owner Trustee, but is made and intended for the purpose of binding only the Issuer, (iii) nothing herein contained shall be construed as creating any personal or individual liability on the Owner Trustee, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereby and by any person claiming by, through, or under the parties hereto, and (iv) under no circumstances shall the Owner Trustee be personally liable for the payment of any indebtedness or expenses of the Issuer or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Issuer under this Agreement or any other documents related to the Notes.

7.     Any breach of the Servicer's obligations under this Servicer Consent Letter shall constitute a material breach of the Servicing Agreement.

8.     The parties hereto acknowledge and agree that for so long as any Notes are outstanding, the Indenture Trustee is a third party beneficiary hereof and of the Servicing Agreement, and the Indenture Trustee shall have the right to exercise all rights of the Issuer under the Servicing Agreement.

9.     The Servicer will execute and deliver to FMC (or its nominee) and the Owner Trustee annually on or before July 31 of each year, and at such other times as FMC (or its nominee) and the Owner Trustee (or either of them) are required to provide certification to the Securities and Exchange Commission under the Securities Exchange Act of 1934 in connection with servicing related activities: (i) a Report on Assessment of Compliance Statement, as required by paragraph (a) of Item 1122 of Regulation AB of the Securities and Exchange Commission ("Regulation AB"), in the form attached hereto as Exhibit B; and (ii) a Servicer Compliance Statement, as required by Item 1123 of Regulation AB, in the form attached hereto as Exhibit C. In addition, annually on or before July 31 of each year, the Servicer will cause a registered public accounting firm to execute and deliver a Registered Public Accounting Firm Attestation Report, as required by paragraph (b) of Item 1122 of Regulation AB. All costs associated with the performance of the obligations under this paragraph 9 shall be by the Issuer.

[Signature Pages Follow]

-58-

NCLST 0301
TA494

Please acknowledge your acceptance and agreement to the foregoing by signing below.

Very truly yours,

THE FIRST MARBLEHEAD CORPORATION

By:_____
Name:
Title:

ACCEPTED AND AGREED:

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY

By:_____
   Name:
   Title:

THE NATIONAL COLLEGIATE STUDENT LOAN TRUST [TRUST NAME]

By: [OWNER TRUSTEE],
    not in its individual capacity but solely as Owner Trustee

    By:_____
      Name:
      Title:

**NCLST 0302**
TA495

Exhibit A to Servicer Consent Letter

[TO BE ADDED AT EACH SECURITIZATION]

NCLST 0303
TA496

FORM OF REPORT ON ASSESSMENT OF COMPLIANCE STATEMENT


[DATE]

[ACCOUNTANT'S ADDRESS]

The National Collegiate Student Loan Trust 20__-_
[ADDRESS]


In connection with the Annual Report on Form 10-K of The National Collegiate Student Loan Trust 20__-_ for the fiscal year ending June 30, 20__ (the "Report") and as required by Item 1122 of Regulation AB of the Securities and Exchange Commission ("Regulation AB"), the undersigned, a duly authorized officer of the [SERVICER] (the "Servicer"), does hereby certify and represent as follows:


1.  A review of the activities of the Servicer for the period that is the subject of the Report has been made under the supervision of the undersigned;

2.  The applicable criteria required in paragraph (d) of Item 1122 of Regulation AB, as listed on Schedule A, attached hereto, (the "Servicing Criteria") were used to assess compliance of the Servicer;

3.  To the best knowledge of the undersigned, based on such review, the Servicer has substantially fulfilled all its material obligations under the applicable Servicing Criteria;

4.  To the best knowledge of the undersigned, based on such review, the undersigned has identified no material instances of noncompliance of the Servicer with the applicable Servicing Criteria; and

5.  The registered public accounting firm of [FIRM] has issued an attestation report on this Report on Assessment of Compliance for the period that is the subject of the Report.

NCLST 0304
TA497

IN WITNESS WHEREOF, the undersigned has executed this Report of the Servicer as of
_____, 20__.

[SERVICER], as Servicer

By: _____
Name:
Title

62

**NCLST 0305**
TA498

Pursuant to Instruction 1 of Item 1122 of Regulation AB, the following list of Servicing Criteria has been "Reviewed" or deemed "Not Applicable" by the Servicer, as marked.

| | General Servicing Considerations | Reviewed | Not Applicable |
|---|---|---|---|
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | | X |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | | X |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the Pool Assets are maintained. | | X |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | X | |
| | **Cash Collection and Administration** | | |
| 1122(d)(2)(i) | Payments on pool assets are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified in the transaction agreements. | X | |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | | X |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | | X |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of over collateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | X | |
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1(b)(1) of the Securities Exchange Act. | X | |
| 1122(d)(2)(vi) | Unissued checks are safeguarded so as to prevent unauthorized access. | X | |
| 1122(d)(2)(vii) | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | X | |
| | **Investor Remittances and Reporting** | | |
| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; | | |

63

| | | Reviewed | Not Applicable |
|---|---|---|---|
| | (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of Pool Assets serviced by the Servicer. | | X |
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | | X |
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the Servicer's investor records, or such other number of days specified in the transaction agreements. | | X |
| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | | X |
| | **Pool Asset Administration** | | |
| 1122(d)(4)(i) | Collateral or security on pool assets is maintained as required by the transaction agreements or related pool asset documents. | | X |
| 1122(d)(4)(ii) | Pool assets and related documents are safeguarded as required by the transaction agreements | X | |
| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. | | X |
| 1122(d)(4)(iv) | Payments on pool assets, including any payoffs, made in accordance with the related pool asset documents are posted to the Servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related pool asset documents. | X | |
| 1122(d)(4)(v) | The Servicer's records regarding the pool assets agree with the Servicer's records with respect to an obligor's unpaid principal balance. | X | |
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's pool assets (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents. | X | |
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. | X | |
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a pool asset is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent pool assets including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). | X | |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for pool assets with variable rates are computed based on the related pool asset documents. | X | |
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such funds are analyzed, in accordance with the obligor's pool asset documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable pool asset documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full | | X |

64

**NCLST 0307**
TA500

| | | Reviewed | Not Applicable |
|---|---|---|---|
| | repayment of the related pool assets, or such other number of days specified in the transaction agreements. | | |
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. | | X |
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the Servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. | | X |
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two business days to the obligor's records maintained by the servicer, or such other number of days specified in the transaction agreements. | | X |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. | X | |
| 1122(d)(4)(xv) | Any external enhancement or other support, identified in Item 1114(a)(1) through (3) or Item 1115 of Regulation AB, is maintained as set forth in the transaction agreements. | | X |

65

Exhibit C to Servicer Consent Letter

FORM OF SERVICER COMPLIANCE STATEMENT FOR
THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 20__-_

[DATE]

The National Collegiate Student Loan Trust 20__-_
[ADDRESS]

In connection with the Annual Report on Form 10-K of The National Collegiate Student Loan Trust 20__-_ for the fiscal year ending June 30, 20__ (the "Report"), the undersigned, a duly authorized officer of the [SERVICER] (the "Servicer"), does hereby certify and represent as follows:

1.  A review of the activities and performance of the Servicer under the Servicing Agreement dated as of [_____], as amended, between the Servicer and The First Marblehead Corporation (the "Servicing Agreement") for the period that is the subject of the Report has been made under the supervision of the undersigned;

2.  To the best knowledge of the undersigned, based on such review, the Servicer has fulfilled all of its obligations under the Servicing Agreement in all material respects throughout the period that is the subject of the Report; and

3.  To the best knowledge of the undersigned, based on such review, there have been no failures to fulfill any such obligation in any material respect.

   IN WITNESS WHEREOF, the undersigned has executed this Servicer Compliance Statement as of [ ], 20__.

                          [SERVICER], as Servicer


                          By: _____
                          Name:
                          Title

NCLST 0309
TA502

**Exhibit B – TERI Servicing Guidelines**

**NCLST 0310**
TA503

# EXHIBIT C
## SERVICE LEVEL AGREEMENTS
## FOR TERI LOAN PROGRAMS
## SERVICED AT
## PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY
## (d/b/a AMERICAN EDUCATION SERVICES)

Servicer agrees to adhere to the Service Level Agreement (SLA) outlined below. Servicer's failure to adhere to the standards in this SLA shall result in the penalties set forth in Section 4.02 of the Agreement, under the terms and conditions set forth in that Section.

The Servicer will provide First Marblehead Corporation (FMC) with monthly reports setting forth Servicer's performance relative to the below SLA for the month covered by the report, the month prior to the month covered by the report, and the Servicer's year-to-date average performance level through the month covered by the report. These reports will be made available to FMC no later than fifteen (15) business days following the last day of the month covered by the report.

I.    Customer Service Standards:

Telephone and Internet Chat Standards:

- Average Speed of Answer: 60 seconds or less.
- Abandonment Percentage: Average not greater than 4%.
- Call Blockage: 5% or less.
- Call Quality Assessment: Average rating not less than 94% – utilizing Servicer's evaluation form as set forth and incorporated herein at Exhibit 1.
- Borrower Satisfaction: Average rating in annual survey not less than 90%.

Correspondence Standards

- Mail sorted and distributed within: Servicer's Service Objective: 80% within one business day not to exceed two business days on average.
- General Borrower correspondence answered within 8 business days of receipt on average – Servicer's Service Objective: 6 days. During peak processing months of January through March, August, and October, correspondence answered within 10 business days of receipt on average. (This standard shall not apply to any correspondence involving death, disability, or bankruptcy Accounts.)
- Borrower Email Correspondence: Answered within an average of 2 business days of

receipt.

- School Correspondence: Answered within 8 business days of receipt on average – Servicer's Service Objective: 6 days. During peak processing months of January through March, July, and September school correspondence answered within 10 business days of receipt on average.

- Clearinghouse Correspondence (Manual Processing Only): Answered within 8 business days of receipt on average – Servicer's Service Objective: 6 days. During peak processing months of January through March, June, and October through November Clearinghouse correspondence answered within 20 business days of receipt on average.

- Deferment Processing: Processed within 8 business days of receipt on average – Servicer's Service Objective: 6 days. During peak processing months of February and August through November deferments processed within 10 business days of receipt on average.

- Forbearance Processing: Processed within 8 business days of receipt on average – Servicer's Service Objective: 6 days. During peak processing months of January through March, August, November through December forbearances processed within 10 business days of receipt on average.

- Miscellaneous Account Reviews and adjustments completed within 15 business days of receipt on average – there are exceptions to this process.

II.    Payment Processing

- Non-Exception Loan Payments: Posted within an average of 1 business day of receipt – 90% of the time.

- Exception Loan Payments: Processed/resolved within an average of 3 business days of receipt – 90% of the time

III.   Fraud Prevention

Fraud notification to FMC within 3 business days of initial notification.

IV.    Default Prevention

- Collection contacts (left message or right party contact only) as a % of all delinquent accounts attempted per bucket:

    o   31 - 60 day bucket at least 50%

    o   61 - 90 day bucket at least 40%

- Promise to pay rate not less than 40% of all delinquent accounts attempted greater than 30 days delinquent.

- Skip-trace locate rate not less than 75% of all accounts coded as requiring skip-trace activities.

V.    System Requirements

- System Availability (scheduled CICS system up time): 99% or better. This standard shall not include the measurement for web based applications, batch processes, or scheduled CICS down time including but not limited to Sunday maintenance.

- Screen Navigation - Servicer shall provide an average internal CICS response time of less than one (1) second. This measurement shall only be applicable to Servicer's provision of screen navigation and shall not be impacted nor include measurement relative to users' internet based access to the screens because AES/PHEAA has no ability to control response times for users' ISP connections or internal network performance. Servicer shall report the internal average response time on a monthly basis for the CICSL0PA system including the availability percentage for that system for normal scheduled hours of usage.

VI.  Conversion

- Servicer shall convert all Committed Student Loan origination data necessary for servicing hereunder onto its Servicing System within seventy-five (75) days of receipt of complete Student Loan files containing critical and non-critical documentation from TERI or from FMER on TERI's behalf.

**TRUST RECEIPT**

December 7, 2006

The undersigned, an authorized officer of the Pennsylvania Higher Education Assistance Agency ("PHEAA"), as Custodian under the Custodial Agreement, dated as of December 7, 2006 (the "Agreement"), among PHEAA, The National Collegiate Student Loan Trust 2006-4 (the "Issuer") and U.S. Bank National Association, as indenture trustee (the "Indenture Trustee"), hereby acknowledges receipt and possession of the Loan Documents pertaining to the Student Loan Notes with respect to the Student Loans listed on Schedule I attached hereto and agrees to hold and safekeep such Loan Documents pursuant to the Agreement. Capitalized terms used but not defined herein shall have the same meanings that are assigned to them in the Agreement.

PENNSYLVANIA HIGHER EDUCATION
ASSISTANCE AGENCY, Custodian

By: _____

Name:   Richard E. Willey
Title:    President & CEO

{F0001193.1 }

**Schedule I**

Student Loans

[See list of PHEAA loans in Tab 28]

**NCLST 0315**
TA508

 **usbank.**

🔲 CORPORATE TRUST

P.O. Box 960778
Boston, MA 02196-0778

March 6, 2012

Mr. Donald Uderitz
President
VCG Securities
24 W. 40th Street
New York, NY 10018

      Re:    The National Collegiate Student Loan Trusts

Dear Mr. Uderitz:

      This is in response to your letter dated February 28, 2012, and the letter dated February 22, 2012, from Karsten Giesecke of Kaye Scholer LLP, indicating that he is writing on behalf of VCG Securities LLC (the "VCG") (collectively, the "Letters") pursuant to which we are advised that VCG is the beneficial owner of certificates representing the majority, and in some cases the "Super Majority" of the beneficial ownership interest of certain trusts identified as the "15 National Collegiate Student Loan Trusts" (the "Trusts").

      As you know, U.S. Bank National Association is serving as indenture trustee ("Indenture Trustee") under a separate indenture with each of The National Collegiate Student Loan Trusts. As Indenture Trustee, we have undertaken to perform our express obligations under the Indentures, subject to the terms and provisions thereof. However, to be clear, we do not assume or undertake any obligation beyond what is required of us by the applicable Indenture.

      As such, we are sharing copies of your letters with the Wilmington Trust Company as owner trustee for the Trusts as it is the owner trustee (and not the Indenture Trustee) that acts on behalf of and takes direction from the owners of the Trust. We are also sharing copies of your letters with the First Marblehead Data Services and First Marblehead Education Resources, Inc. so that they may be aware of your concerns.

      Please feel free to contact the undersigned if you have any questions.

                    Very truly yours,

                    David Duclos
                    Vice President
                    U.S. Bank National Association, as Trustee



CONFIDENTIAL

# RE: Response

| | |
|---|---|
| **From:** | Jim Sabella <jsabella@gelaw.com> |
| **To:** | Jorge Rodriguez-Lugo <jorge@vcg.cc> |
| **Cc:** | Michael Manuel <mmanuel@gelaw.com> |
| **Date:** | Tue, 20 Dec 2016 14:43:46 -0500 |

REDACTED

*James J. Sabella*
Director
Grant & Eisenhofer P.A.
485 Lexington Avenue
New York, NY 10017
646-722-8520
jsabella@gelaw.com

**From:** Jorge Rodriguez-Lugo [mailto:jorge@vcg.cc]
**Sent:** Tuesday, December 20, 2016 2:42 PM
**To:** Jim Sabella
**Cc:** Michael Manuel
**Subject:** Fwd: Response

REDACTED

Begin forwarded message:

**From:** Ken Ruggiero <kruggiero@goalsolutions.com>
**Subject: RE: Response**
**Date:** June 28, 2012 at 8:20:58 PM EDT
**To:** Don Uderitz <don@vcg.cc>
**Cc:** Peter Sadowski <psadowski@goalsolutions.com>, Alan Amico <aamico@goalsolutions.com>, Brett Atkins <batkins@goalsolutions.com>, "Giesecke, Karsten (Karsten.Giesecke@kayescholer.com)" <Karsten.Giesecke@kayescholer.com>, JORGE RODRIGUEZ-LUGO <jorgejrl@mac.com>

Don

We are writing in response to your email below dated June 4, 2012.

We believe the Special Servicing Agreement you referenced was executed in accordance with the Trust Related Agreements (as defined in each applicable Administration Agreement). Under each applicable Indenture, a "Servicer" includes any servicer that satisfies the Rating Agency Condition and a "Servicing Agreement" is any servicing agreement between the Issuer and a servicer under which such servicer agrees to service Financed Student Loans included in the Indenture Trust Estate and that satisfies the Rating Agency Condition. The Special Servicing Agreement is between FMER and the Issuer. The Rating Agency Condition has been met; none of the Rating Agencies have either notified the Administrator or the Indenture Trustee that execution of the Special Servicing Agreement would, in and of itself, result in a reduction or withdrawal of the then current rating of the Notes (as defined in each applicable Indenture) or published any notice of such rating action since the Special Servicing

Agreement was executed. Accordingly, we believe that FMER is a valid Servicer, and that the Special Servicing Agreement constitutes a valid Servicing Agreement, under the applicable Indentures.

If you have further requests for information regarding this matter, please advise us of the purpose of your inquiry and what, if any, issue you may have with the special servicing arrangement currently in place.

Ken

---

**From:** Don Uderitz [mailto:don@vcg.cc]
**Sent:** Tuesday, June 26, 2012 9:54 AM
**To:** Ken Ruggiero
**Cc:** Peter Sadowski; Alan Amico; Brett Atkins; Giesecke, Karsten (Karsten.Giesecke@kayescholer.com);
JORGE RODRIGUEZ-LUGO
**Subject:** RE: Response

Ken,

Nearly 3 weeks have passed since I requested responses to the questions below. Do you still intend to answer?

Don

---

**From:** Don Uderitz
**Sent:** Thursday, June 07, 2012 7:51 PM
**To:** 'Ken Ruggiero'
**Cc:** Peter Sadowski; Alan Amico; Brett Atkins; Giesecke, Karsten ( Karsten.Giesecke@kayescholer.com );
JORGE RODRIGUEZ-LUGO
**Subject:** RE: Response

Ken,

The information may or may not be outside the scope of what needs to be provided, I will consider. In the meantime, can you attest that the specific covenants and obligations of the Stock Purchase Agreement will not have any effect on the performance of the NCSLT Trusts? For example, does the Stock Purchase Agreement include any scenario whereupon GS2 or any of its affiliates will perform any of the duties of the Special Servicer, either directly or indirectly?

If you want to discuss this, please call me at 561-330-6999.

Don

---

**From:** Ken Ruggiero [mailto:kruggiero@goalsolutions.com]
**Sent:** Thursday, June 07, 2012 7:29 PM
**To:** Don Uderitz
**Cc:** Peter Sadowski; Alan Amico; Brett Atkins
**Subject:** Response

Don

Attached is our response to your letter. Additionally, with respect to your question below, we are looking into the matter and will respond under separate cover.

---

**From:** Don Uderitz [mailto:don@vcg.cc]
**Sent:** Monday, June 04, 2012 1:55 PM
**To:** Ken Ruggiero
**Cc:** Giesecke, Karsten ( Karsten.Giesecke@kayescholer.com ); JORGE RODRIGUEZ-LUGO; Bob Fasulo

CONFIDENTIAL

**Subject:** Immediate Action Requested

Ken,

Please see the attached letter requesting information relating to the sale of FMDS to Goal.

Also, please see the attached Instruction Letter whereby FMDS instructed Wilmington Trust to authorize and execute the Special Servicing Agreement dated May 1, 2009, entered into by and among First Marblehead Education Resources, Inc. ("FMER"), U.S. Bank and Ambac. With regard to this letter, on what authority did FMDS, in its capacity as Administrator, direct the Owner Trustee to execute the referenced Special Servicing Agreement. As you are aware, I became the Owner in March 2009. As such, I have no record of having given such direction nor did I provide consent for this Special Servicing Agreement to be executed. Given the recent events surrounding the resignation of FMER, I believe we should address this matter immediately before any of the parties to this invalid agreement take any action that would negatively affect the performance of the deals.

I am available anytime to discuss this matter and suggest we do so immediately.

Don

This electronic mail message and any attached files contain information intended for the exclusive use of the addressee and may contain information that is proprietary, privileged or confidential. If you are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or distribution of this information may be subject to legal restriction or sanction. Please notify the sender, by electronic mail or telephone, of any unintended recipients and delete the original message without making any copies.

This communication is not intended to constitute any offer or solicitation to buy or sell securities. Offers of securities or investment advisory services may be made only pursuant to appropriate offering or other disclosure documents, and only after prospective investors have had the opportunity to discuss all matters concerning the prospective investment or engagement with their adviser, the issuers of the securities, or VCG Securities, LLC. We do not represent that this information is complete or accurate and it should not be relied upon as such. Before entering into any transaction you should ensure that you independently determine that it is appropriate for you given your objectives, experience, financial resources, and other relevant circumstances and fully understand its potential risks and rewards. VCG Securities, LLC, is a registered broker/dealer, member FINRA and SIPC. VCG Securities, LLC does not accept order and/or instructions regarding your account by e-mail, voice mail, fax or any alternate method. Transactional details do not supersede normal trade confirmations or statements. Investments in hedge funds are speculative and entail a high degree of risk. Investors in hedge funds could lose their entire investment. No representation or guarantee is made that any indicative performance or return indicated will be achieved in the future. All information is subject to change without notice.

This electronic mail message and any attached files contain information intended for the exclusive use of the addressee and may contain information that is proprietary, privileged or confidential. If you are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or distribution of this information may be subject to legal restriction or sanction. Please notify the sender, by electronic mail or telephone, of any unintended recipients and delete the original message without making any copies.

This communication is not intended to constitute any offer or solicitation to buy or sell securities. Offers of securities or investment advisory services may be made only pursuant to appropriate offering or other disclosure documents, and only after prospective investors have had the opportunity to discuss all matters concerning the prospective investment or engagement with their adviser, the issuers of the securities, or VCG Securities, LLC. We do not represent that this information is complete or accurate and it should not be relied upon as such. Before entering into any transaction you should ensure that you independently determine that it is appropriate for you given your objectives, experience, financial resources, and other relevant circumstances and fully understand its potential risks and rewards. VCG Securities, LLC, is a registered broker/dealer, member FINRA and SIPC. VCG Securities, LLC does not accept order and/or instructions regarding your account by e-mail, voice mail, fax or any alternate method. Transactional details do not supersede normal trade confirmations or statements. Investments in hedge funds are speculative and entail a high degree of risk. Investors in hedge funds could lose their entire investment. No representation or guarantee is made that any indicative performance or return indicated will be achieved in the future. All information is subject to change without notice.

# AGENDA

VCG / Citi Strategy Meeting

------------------------------------------

June 12,2014

## Overview

VCG and Citi together represent 100% of the Owners of the Beneficial Interest in the 15 NCSLT deals issued by FMC. As such we have the right to direct or consent to actions of the Owner Trustee and otherwise participate in the management of and control the affairs of the Trust. As a result of the recent economic collapse in the U.S and the resulting slowdown in economic opportunity for the borrowers the deals have experienced an unprecedented level of defaulted and "charged off loans".

The existing Administration Agreements and Servicing Agreements (including the Special Servicing Agreements) did not anticipate such an occurrence and thus do not provide an clear or adequate strategy to deal with the management of these loans to the maximum benefit of the Noteholders and the Owners.

## History of the Transaction

From 2001 until 2011 First Marblehead Corp (FMC) was the Issuer, Depositor, Administrator (FMDS) , and after the TERI bankruptcy the Special Servicer (FMER) of the deals. All of the existing Trust Related Agreements were designed, drafted and executed by and between FMC ( in their various capacities) and the related counterparts prior to both VCG and Citi becoming owners of any Beneficial Interest.

-In 2009 VCG became the Beneficial Owner of approximately 80-85% of each of the deals.

-In 2009 concurrent with the TERI bankruptcy, FMER became the Special Servicer through the Special Servicing Agreements that were signed that year.

-In 2010 Citi purchased the TERI portion of the Beneficial Interest not owned by VCG.

-In 2011 First Marblehead Corp. sold the Administration (FMDS) to Goal and resigned as Special Servicer.

## Status of the deals /Charged off Loans

There are currently over $4 billion loans that have defaulted and have been charged off. Over $2.7 billion have never made a payment and over $600 million have gone past the collection Statute of Limitation.

-As a result of FMDS and FMER having sold their interest or resigned from the deals and U.S. Bank decision as Successor Special Servicer to appoint Turnstile as Subservicer, Goal Structured Solutions and their affiliate Turnstile are in complete control of the collection process.

-NCO has announced their exit from the space.

(Continue in next page)

## Discussion Materials

1.Trust Agreements, Administration Agreements, Indentures, Servicing Agreements, including the Special Servicing Agreements.

2.NCSLT Strategy PowerPoints parts I&II, provided by VCG.

3.Draft of proposed Servicing Agreement.

## Other Resources

Odyssey presentation materials and other analysis prepared in response to loan level and collection process information provided by GSS.

TA514

-GSS and US Bank have taken the position that under the existing Trust Related Agreements the Owners have no right or ability to direct or participate in the decisions related to the servicing of the loans.

## Strategy

Owners will cause the Issuer to enter into a Servicing Agreement with Odyssey Education Resources LLC. By which the Servicer will agree to manage and dispose of the Charged off Loans included in the Trust Estate in accordance with the Trust Related Agreements and under the direction and control of the Owners.
Such agreement will become effective when the appointment of Odyssey and the Servicing Agreement meet the Rating Agency Condition.

## Evaluation

Implementation of this strategy is entirely allowed and provisioned for by the Trust Related Agreements and is a more conservative and methodical way to achieve the desired result of maximizing the management of the Charged off Loans than challenging existing agreements or the performance of the existing vendors to the deals.

-The Servicing Agreement must be designed to meet the Rating Agency Condition.

-The Servicing Agreement must resolve any conflict between any other existing Servicing Agreements and or Administration Agreements.

-The Servicing Agreement must follow and comply with all the requirements of the Trust Related Agreements.



**AUTHORIZATION AND DIRECTION LETTER**

November 13, 2014

Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-0001
Attn: Corporate Trust Administration

Re:     Authorization re: National Collegiate Student Loan Trusts

Ladies and Gentlemen:

Pursuant to Section 4.02 of the Trust Agreements listed in Exhibit A (the "Trust Agreements"), among National Collegiate Funding LLC, a Delaware limited liability company, as depositor (the "Depositor"), The Education Resources Institute, Inc., a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws, and Wilmington Trust Company, a Delaware trust company, as successor to Delaware Trust Company National Association, as trustee (the "Owner Trustee), the undersigned hereby authorizes and directs the Trustee to take the following action:

1.  Execute on behalf of the Trusts, the Servicing Agreement attached hereto as Exhibit B (the "Servicing Agreement") appointing Odyssey Education Resources LLC;

2.  Present the Servicing Agreement to the Rating Agencies (as defined in the Trust Agreements) in furtherance of satisfying the Rating Agency Condition;

3.  Upon satisfaction of the Rating Agency Condition present the Servicing Agreement to the Indenture Trustee and Administrator to obtain their written acknowledgement;

4.  Take any and all additional action as may be required by the documents identified in items 1 above; and

5.  In the event that the Rating Agencies request additional information or contact you concerning this matter, direct them to Don Uderitz at (561) 330-6999 or Tom Glanfield at (954) 832-3556.

NC Owners LLC agrees to indemnify, defend and hold harmless Wilmington Trust Company and the Owner Trustee and any of the officers, directors, employees and agents of Wilmington Trust Company (collectively, the "Indemnified Persons") from and against any and all losses, damages, liabilities, claims, actions, suits, costs, expenses, disbursements (including all reasonable fees and expenses of its counsel, agents and other experts), taxes and penalties of any kind and nature whatsoever (collectively "Expenses"), to the extent that such Expenses arise out of or are imposed upon or asserted at any time against such Indemnified Person in connection with the actions taken by the Owner Trustee pursuant to

CONFIDENTIAL

NCSLT-00001551

TA516

this Authorization and Direction Letter. The indemnity contained herein shall survive the resignation or removal of the Owner Trustee or the termination of the Trust Agreement.

The undersigned confirms in accordance with Section 4.02 of the Trust Agreement that all action requested to be taken by the Owner Trustee in connection with this Authorization and Direction Letter is not contrary to the Trust Agreement or any Trust Document.

Capitalized terms used herein and not otherwise defined are used as defined in the Trust Agreement.

Very truly yours,

NC OWNERS LLC, as Majority Owner

by NC RESIDUALS OWNERS TRUST, as Sole Member

    by VCG SECURITIES LLC, as Agent

      by: _____
      Name: _Donald Uderitz_
      Title: _Authorized Signatory_

Pursuant to Section 3.07(e) of the Amended and Restated Trust Agreement (the "Declaration") of NC Residuals Owners Trust dated May 14, 2009, the undersigned responsible officer of VCG Securities LLC, as Agent, hereby certifies that all conditions precedent, if any, provided for in the Declaration and any applicable Transaction Document (as defined in the Declaration) relating to the proposed action have been complied with.

by _____
Name: _Donald Uderitz_
Title: _Authorized Signatory_

SL Resid Holdings LLC hereby consents to and approves the authorization and direction given by NC OWNERS LLC to Wilmington Trust Company set forth herein and hereby consents to any direction given by NC Owners LLC with respect to the servicing, sale, transfer or other disposition of any Financed Student Loans provided such Financed Student Loans are serviced, sold, transferred or otherwise disposed of pursuant to the terms of the Servicing Agreement.

SL Resid Holdings LLC

by _____
Name:
Title:

CONFIDENTIAL

this Authorization and Direction Letter. The indemnity contained herein shall survive the resignation or removal of the Owner Trustee or the termination of the Trust Agreement.

The undersigned confirms in accordance with Section 4.02 of the Trust Agreement that all action requested to be taken by the Owner Trustee in connection with this Authorization and Direction Letter is not contrary to the Trust Agreement or any Trust Document.

Capitalized terms used herein and not otherwise defined are used as defined in the Trust Agreement.

Very truly yours,

NC OWNERS LLC, as Majority Owner

by NC RESIDUALS OWNERS TRUST, as Sole Member

by VCG SECURITIES LLC, as Agent

by:
Name: _Donald Uderitz_
Title: _Authorized Signatory_

Pursuant to Section 3.07(e) of the Amended and Restated Trust Agreement (the "Declaration") of NC Residuals Owners Trust dated May 14, 2009, the undersigned responsible officer of VCG Securities LLC, as Agent, hereby certifies that all conditions precedent, if any, provided for in the Declaration and any applicable Transaction Document (as defined in the Declaration) relating to the proposed action have been complied with.

by
Name: _Donald Uderitz_
Title: _Authorized Signatory_

SL Resid Holdings LLC hereby consents to and approves the authorization and direction given by NC OWNERS LLC to Wilmington Trust Company set forth herein and hereby consents to any direction given by NC Owners LLC with respect to the servicing, sale, transfer or other disposition of any Financed Student Loans provided such Financed Student Loans are serviced, sold, transferred or otherwise disposed of pursuant to the terms of the Servicing Agreement.

SL Resid Holdings LLC

by
Name:
Title:

CONFIDENTIAL

## TRUSTS

- National Collegiate Student Loan Trust 2003-1, created pursuant to the Trust Agreement dated as of December 1, 2003

- National Collegiate Student Loan Trust 2004-1, created pursuant to the Trust Agreement dated as of June 10, 2004

- National Collegiate Student Loan Trust 2004-2, created pursuant to the Trust Agreement dated as of October 28, 2004

- National Collegiate Student Loan Trust 2005-1, created pursuant to the Trust Agreement dated as of February 23, 2005

- National Collegiate Student Loan Trust 2005-2, created pursuant to the Trust Agreement dated as of June 9, 2005

- National Collegiate Student Loan Trust 2005-3, created pursuant to the Trust Agreement dated as of October 12, 2005

- National Collegiate Student Loan Trust 2006-1, created pursuant to the Trust Agreement dated as of March 9, 2006

- National Collegiate Student Loan Trust 2006-2, created pursuant to the Trust Agreement dated as of June 8, 2006

- National Collegiate Student Loan Trust 2006-3, created pursuant to the Trust Agreement dated as of September 28, 2006

- National Collegiate Student Loan Trust 2006-4, created pursuant to the Trust Agreement dated as of December 7, 2006

- National Collegiate Student Loan Trust 2007-1, created pursuant to the Trust Agreement dated as of March 8, 2007

- National Collegiate Student Loan Trust 2007-2, created pursuant to the Trust Agreement dated as of June 14, 2007

NCSLT-00001554

SERVICING AGREEMENT

*[BEGINNING ON NEXT PAGE]*

CONFIDENTIAL

## SERVICING AGREEMENT

This Servicing Agreement, dated as of November ___, 2014 (this "Agreement"), is entered into by and among Odyssey Education Resources LLC ("Odyssey"), as the Servicer (together with its successors and assigns, the "Servicer"), and each of the Trusts listed on Schedule A attached hereto (the "Trusts"). Any capitalized terms used, but not defined herein shall have the meaning given to such term set forth in the Basic Documents (as that term is defined in the Indenture applicable to each such Trust, the "Basic Documents").

WHEREAS, the Trusts desire to, from time to time, dispose of certain defaulted Financed Student Loans;

WHEREAS, pursuant to the Indenture applicable to each Trust, Financed Student Loans may only be sold, transferred or otherwise disposed of to a servicer at a disposition price specified under the applicable Servicing Agreement;

WHEREAS, each of the Trusts has previously appointed other entities as the servicer of certain Financed Student Loans and accordingly Odyssey is likely not performing all of the servicing responsibilities with respect to the Financed Student Loans;

WHEREAS, none of the existing servicers of the Financed Student Loans nor their applicable Servicing Agreements have a mechanism currently in place to dispose of Financed Student Loans;

WHEREAS, Odyssey will utilize employees and agents (appointed from time to time by it, as provided herein) who are experts in the management of collections on and the disposition of Financed Student Loans;

WHEREAS, each of the Trusts is appointing Odyssey as a Servicer under each Trust's respective Trust Agreement, to perform certain limited duties with respect to certain Financed Student Loans owned by the Trusts that are defaulted or Loans Eligible For Sale (as defined below); and

WHEREAS, Servicer is being engaged pursuant hereto to purchase Loans from each Trust as directed or permitted by the applicable Trust.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties agree as follows:

Section 1.      Definitions.    Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Basic Documents. For purposes of this Agreement, the following capitalized terms shall have the respective meanings set forth below:

"Loans Eligible For Sale" means Financed Student Loan(s) owned by a Trust for which the borrower of such Financed Student Loan has failed to repay such Financed Student Loan according to the terms agreed to in the applicable controlling loan documents and agreements, and such Borrower(s) shall have been delinquent in its repayment obligations for no less than 180 days.

"Defaulted Loan" means any Financed Student Loan owned by a Trust for which the borrower of such Financed Student Loan has failed to repay such Financed Student Loan according to the terms agreed to in the applicable controlling loan documents and agreements, provided however, that such Borrower shall have been delinquent in its repayment obligations for no less than 31 days;

"Default Prevention Services" means such services determined by the Servicer to be desirable to collect and seek enforcement of Financed Student Loans that are greater than 30 days past due and less than 180 days past due.   Default Prevention Services may include both telephonic and mail correspondence and related monthly reporting.

"Early Awareness Services" means such services determined by the Servicer to be desirable to reduce the number and percentage of Financed Student Loans becoming delinquent in the repayment process prior to the initial payment due date, including without limitation, services that are intended to alert borrowers and co-borrowers to their repayment obligations, available borrower benefits (such as ACH automatic payments) and contact information for the Servicer. Early Awareness Services may include both telephonic and mail contacts, as well as address verification and skip tracing.

Section 2.    Appointment:    Servicing Duties.

A. Appointment. Each of the Trusts hereby hires, designates and appoints the Servicer as a Servicer under each Trust's applicable, respective Indenture to perform the servicing duties (as defined below) with respect to Loans Eligible For Sale and Defaulted Loans, and the Servicer accepts such appointment and agrees to perform such duties with respect to the Loans Eligible For Sale and Defaulted Loans in accordance with the terms of this Agreement and each Indenture.

B. Services. The Servicer shall take such actions as it shall deem reasonably necessary or appropriate to administer and oversee the enforcement and collection of Loans Eligible For Sale and Defaulted Loans, and to provide recommendations to the relevant Trust with respect to those Loans Eligible For Sale to be sold by the terms hereof, to maximize the collection of amounts payable on the Financed Student Loans (collectively, the "Services"), including without limitation:

(i)     Retaining and entering into agreements with licensed collection agencies, loan brokers and other legally authorized persons (the "Subservicers") engaged in providing default prevention and collection services and loan sale services, in form and substance satisfactory to the Servicer, pursuant to which the Subservicers, for and on behalf of the applicable Trust, will contact borrowers with respect to the Loans Eligible For Sale and Defaulted Loans, and seek enforcement and collection of such Loans Eligible For Sale and Defaulted Loans, including without limitation Early Awareness Services and Default Prevention Services when applicable;

(ii)    At the sole discretion of the Servicer, (a) performing periodic audits of Subservicers for compliance and performance reviews and (b) providing oversight of the activities of Subservicers with regard to account management, litigation assistance, and/or settlement strategies;

(iii)   Replacing any Subservicer who, in the sole judgment of the Servicer, is deemed to be deficient or negligent in performing the duties outlined in its subservicing agreement with the Servicer;

(iv)    Requiring in the applicable subservicing agreement that the Subservicers provide certain monthly reports to the Servicer with respect to Loans Eligible For Sale and Defaulted Loans serviced by such Subservicer, in each case, in a form and substance satisfactory to the Servicer;

(v)     With respect to Loans Eligible For Sale and Defaulted Loans, reviewing claim packages as described in subparagraph (xi);

(vi)    With respect to Loans Eligible For Sale and Defaulted Loans being serviced by the Servicer or Subservicers, remitting within two (2) days of receipt to the Odyssey Collection Account (as hereinafter defined) for the receipt of all cash collected by Servicer and for the receipt of collections from a Subservicer for the benefit of the respective Trusts.

(vii)   With respect to Loans Eligible For Sale or Defaulted Loans (a) roll or reassign such loans being serviced by Servicer into a default recovery queue for collection effort or a queue for sale efforts in accordance with the provisions of Section 2(C) below, (b) direct any Subservicer to roll or reassign any loans that become Charge-Off Loans to the Servicer for