Tracy Wan, CFA
Senior Director
Asset Backed Securities
Fitch Ratings
212-908-9171 (phone)
tracy.wan@fitchratings.com

Charlene M. Davis
Asset Backed Securities
US Structured Finance
charlene.davis@fitchratings.com
(212) 908-0213 (phone)

January 8, 2015 Teleconference Call

Attendees:
Tracy Wan, Fitch
Charlene Davis, Fitch
Don Uderitz, Odyssey
Jorge Rodriguez, Odyssey
Tom Glanfield, Odyssey

**Re: NCSLT 2006-1, 2006-2, 2006-3, 2006-4, 2007-1, and 2007-2**

On January 8, 2015 at 11:00 am, Tracy Wan and Charlene Davis of Fitch Ratings, and Don Uderitz, Jorge Rodriguez and Tom Glanfield of Odyssey Education Resources spoke via teleconference with respect to the process of satisfying the Rating Agency Confirmation requirement given each of the NCSLT Trusts' desire to engage Odyssey as a new Servicer.

Following is a summary of the questions posed by Fitch with corresponding replies:

1. Why did the original request include 12 NCSLT Trusts and then change to 6 NCSLT Trusts?

    a. The documents only require a positive action from the Rating Agencies on these 6 NCSLT Trusts requested;
    b. The requirement for satisfying the Rating Agency Condition with respect to these 6 Trusts engaging a new Servicer is "...that each Rating Agency shall have confirmed to the Administrator and the Indenture Trustee, in writing that such action will not in and of itself result in a reduction or withdrawal of the then current rating of the Notes, based upon the review by each such Rating Agency of payment and default performance of the Financed Student Loans, financial information relating to the Trust, the Indenture Trust Estate, the Guarantee Agency, the Servicers or the Administrator, and such other information that such Rating Agency determines to review."

2. What is the "main service" of the Odyssey Servicing Agreement?

    a. The Odyssey Servicing Agreement is a new Servicing Agreement, not an amendment to the existing Special Servicing Agreement. The existing Special Servicing Agreement with U.S. Bank (as successor Special Servicer to FMER) will remain in full force and effect.
    b. The Odyssey Servicing Agreement mirrors the existing Special Servicing Agreement in terms of the primary duties and responsibilities. There are 3 main differences:
        i. To keep from adding any additional fees to the NCSLT Trusts, the Odyssey

Agreement does not pay Odyssey the 1bp Special Servicing Fee;

    ii. To prevent duplicity of work and overlap between the existing Special Servicing Agreement and the Odyssey Agreement, the Odyssey Agreement only provides for <u>newly</u> Defaulted Loans (as defined in the Odyssey Agreement) to be allocated to Odyssey;

    iii. The Odyssey Servicing Agreement provides a mechanism for loans to be sold in accordance with the governing documents of the NCSLT Trusts. The existing Special Servicing Agreement does not include this directive. It is important to note that this is simply putting in place the ability of a Servicer to sell loans when deemed appropriate, it is not a mandate to sell loans. The standard of performance (which is to maximize net collections to the NCSLT Trusts) is the same for all Servicers.

    iv. A blackline comparison of the Odyssey Servicing Agreement and the existing Special Servicing Agreement is attached (Odyssey Servicing Agreement Final.v15 (blackline vs. original.docx).

3. What is the purpose of giving a Servicer the ability to sell loans?

    a. Loans must be sold in accordance with the specific provisions of the governing documents of the NCSLT Trusts. The existing Special Servicing Agreement does not contain the necessary instructions to allow for loans to be sold properly. As such, it was necessary to engage a new Servicer with an agreement that contains the adequate instruction.

    b. The existing vendor agreements (e.g., the Special Servicing Agreement and the Administration Agreements) pay fees based on the total principal balance of the NCSLT Trusts. As such, there is no economic incentive for those vendors to sell loans as it would result in a reduction of their fees. There are currently loans (notably the loans that have expired out of their collection statute of limitations) whereby the NCSLT Trusts pay more in fees annually than can be expected to ever be collected from the borrowers. This is an obvious example of loans that could be sold that would result in a higher net margin for the NCSLT Trusts (via the reduction in fees on the portion of the loans sold).

    c. The calculus of selling loans as a means to increase net recoveries to the NCSLT Trusts will also include an analysis of the relative fees and commissions paid. For example, in accordance with the Odyssey Servicing Agreement, if a loan sale yields $1 and pays a 10% commission, the NCSLT Trusts net 90 cents. If the ultimate collections on the same loans yield $1 and pay a 25% - 40% commission (the current range of collection commissions being paid under the existing Special Servicing Agreement), the NCSLT Trusts yield 75 – 60 cents. So the ultimate collections would have to be much higher than the sale price for the NCSLT Trusts to break even. PLUS, all of the vendor fees are being paid while the NCSLT Trusts wait (years) for ultimate collections.

    d. With regard to paragraph c. above, it is our belief that the same vendors who have an economic disincentive to sell loans also have an economic interest in the 25% - 40% collection commissions currently being paid. So the economic incentives are, in the absence of this Odyssey Servicing Agreement, further skewed toward not selling loans, even if a loan sale were to produce a higher net collection for the NCSLT Trusts.

4. What is the general purpose of hiring the new Servicer (Odyssey)?

    a. Odyssey is a best in class servicer with a proven track record in this asset class. Odyssey has demonstrated better net collections on substantially similar loans.

    b. Adding the ability to properly analyze and sell loans corrects current economic disincentives and is another effective tool to maximize net collections for the NCSLT

CONFIDENTIAL
In the Matter of NCSLT, Fitch000005

TA562

Trusts.
- Odyssey's Agency Monitoring prevents deficiencies, promptly identifies and corrects procedural or training errors within an agency's operations, and ensures agencies are compliant with the BPA contract and the responsibilities of the Agency Management Program ("AMP")
- Agency Monitoring is conducted by the Collections Manager, Financial Analysts, and Compliance Administrator, with assistance from the Financial Manager, Collections Administrator, and Legal Administrator
- Agency Monitoring is broken out into four focus areas: Implementations; Routine Monitoring; Risk Based Periodic Monitoring; Annual Audit

### Implementation of Agency Management Program
- Agency Implementation of AMP takes place during onboarding, during any change or update to policies and procedures, and on an annual basis
- Agency Implementation reinforces policies and procedures, familiarizes agencies on recent developments, and ensures compliance with the BPA contract and AMP responsibilities
- Agency Implementation periods are documented and include testing on report reconciliation, procedural compliance, and adherence to contractual obligations

### Routine Monitoring
- Routine Monitoring is performed on a continual basis
- Routine Monitoring includes monthly reviews and oversight of account reconciliation, progression, balance verification, complaint management, and recoveries
- Monthly agency management calls are conducted after the reports are submitted and reconciled. The agency management calls discuss operations and performance
- Weekly progression reports are exchanged between the agencies and BPA
- Daily email and phone calls pertaining to account level compliance

### Risk Based Periodic Monitoring
- A Random selection of accounts are audited on a monthly to quarterly basis
- Agencies are scored on operations, compliance, and performance
- Call recordings are reviewed and agencies are scored on compliance
- Deficiencies are identified and reported to agencies for correction

### Annual Audit
- The Annual Audit assesses the quality of the agency's compliance management systems, including its internal controls and policies and procedures, for its debt collection business
- It identifies acts or practices that materially increases the risk of violations of the BPA contract, Service Level Agreement, or Consumer Financial Laws in connection with debt collection
- Facts about the agency are gathered, which help determine whether an agency, in its acts or practices, violates the requirements of the BPA contract or Consumer Financial Laws
- The Annual Audit determines, in accordance with BPA's internal service provider requirements, whether any violation of the BPA contract or

CONFIDENTIAL
In the Matter of NCSLT, Fitch000006

Consumer Financial Laws have occurred and whether further supervisory, disciplinary, or corrective actions are appropriate

**Agency Evaluation**
- Agency Evaluation is conducted in sync with Agency Monitoring
- Agencies are evaluated and scored on a monthly, quarterly, and annual basis
- Evaluation is based on collection performance, call efforts, and compliance

**Corrective Action**
- When monitoring reviews identify weaknesses, corrective action is implemented
- Findings are documented, root causes are identified, and corrective action plans are created
- Routine Monitoring encompasses all corrective action plans implemented and validates that the necessary actions are complied with so that the error is resolved timely and effectively
- Corrective Action is managed by the Compliance Administrator with Collections Manager oversight

**Agency Profile Maintenance**
- From the onset of the agency relationship with BPA, documents are maintained for reference and compliance purposes. These documents are a collection of agency policies and procedures, certifications, data security and disaster recovery plans, as well as other training and sample materials
- These documents are reviewed in accordance with our Agency Management Program and updated on a regular basis

5. What is the time series of performance, both historical collection and recoveries data, for the NCSLT Trusts?

    a. See attached analysis (Defaults & Recoveries.xlsx).

6. How do we forecast which loans will be sold versus continued collections?

    a. On a loan-by-loan basis, Odyssey will forecast net collections from both a loan sale and continued collection efforts and strategies and will pursue the strategy that results in the highest net collection for the NCSLT Trusts.
    b. In the decision to continue collections or sell a loan, Odyssey's overall strategy is to maximize the value of loans based upon the scoring models. That is, on a loan-by-loan basis, Odyssey monitors which loans will yield a higher net collection from a sale versus continued collections. Each loan is valued based on borrower, loan, and historical performance characteristics. Cash flows are measured and compared to market prices for each loan and loan pools identified for sale are those meeting client specific requirements. Odyssey will run a competitive bid process with debt buyers to achieve the best execution and price for portfolio sales.
    c. Typically three loan categories are established to determine sale strategy:
        i. High Value "Keeper" Loans: These loans make somewhat consistent payments and have amortization characteristics that create a high NPV. These best cash flowing loans do not currently obtain high enough prices to sell (as compared to the NPV of future projected collections).
        ii. "Sale" Pool Loans: These loans project lower net collections and have lower NPV's compared to a higher market value/sale price.

CONFIDENTIAL
In the Matter of NCSLT, Fitch000007

iii. Low Value "Keeper" Loans are typically non-performing and would realize the lowest sale price. Recommendation is to hold these loans until they are re-performing so that they can achieve a higher sales price. Sale price is below potential cash flowing NPV. Needs further rehabilitation effort with intention to secure payments to move up to High Value and Sale Pools

7. What is the Odyssey comparative recovery analysis?

   a. See attached case studies (Odyssey Education Resources Company Overview 1-2015.pdf).

8. How will we go about deciding which loans will be serviced by U.S. Bank under the existing Special Servicing Agreement and which loans will be serviced by Odyssey under the Odyssey Servicing Agreement?

   a. The existing Special Servicing Agreement will stay in full force and effect. The loans that are currently being serviced under that agreement will continue to be serviced under that agreement.
   b. Upon execution of the Odyssey Servicing Agreement, the Administrator will direct the primary servicers to allocate only newly defaulted loans to Odyssey under the Odyssey Servicing Agreement.

9. Why is Goal earning the same 1bp as US Bank?

   a. When U.S. Bank became the successor Special Servicer upon the resignation of FMER, it was revealed at that time that U.S. Bank (unknown to several parties to the original Special Servicing Agreement) had a side letter agreement with Goal Structured Solutions (through it's affiliate, Turnstile) that contractually obligated Goal to perform the duties and responsibilities of the Special Servicing Agreement. To date, while they acknowledge it's existence, U.S. Bank and Goal will not disclose that side letter agreement. Attached herewith is a copy of the original Special Servicing Agreement (Special Servicing Agreement – Original.pdf), the executed Special Subservicing Agreement between U.S. Bank and Goal/Turnstile that describes the arrangement between U.S. Bank and Goal/Turnstile whereby Goal/Turnstile is acting as the Special Servicer and earning the 1bp fee (USB_Goal-Turnstile Sub-Servicing Agreement (executed 9-7-12).pdf).
   b. It is also important to note that Goal also acquired the Administration rights to the NCSLT deals when it acquired FMDS from First Marblehead for $15 million.
   c. Paragraphs a. and b. help describe the economic disincentives to sell loans.
   d. It is believed (but not yet confirmed) that Goal has also acquired an economic interest in the NCO spin-off entity that is currently the exclusive Subservicer to the NCSLT Trusts (NCO Agreement_3rd Amendment (executed 9-7-12)-1.pdf). It is our belief that this creates another set of economic incentives not necessarily aligned with maximizing net collections to the NCSLT Trusts.

10. Recoveries Snapshot

    a. See attached analysis (Defaults & Recoveries.xlsx).

11. Fitch correctly noted that they are not a party to the governing NCSLT agreements.

    a. While the governing NCSLT agreements require each of the Rating Agencies (including Fitch) to satisfy the Rating Agency Condition, Fitch itself is not a party to those agreements and is thus not contractually obligated to provide a letter to Odyssey.

CONFIDENTIAL
In the Matter of NCSLT, Fitch000008

TA565

b. Other options to disclose the Fitch analysis were discussed and will be discussed further.

12. Describe Odyssey including a company overview, ownership and operative documents as well as future prospects.

    a. See attached presentation (Odyssey Education Resources Company Overview 1-2015.pdf and Odyssey Credentials.docx).

13. Additional Diligence

    a. The possibility of further diligence was discussed including a site visit.