# Standard and Poor's

## Due Diligence Questions

February 3, 2015

## Due Diligence Questionnaire

1. <u>General</u>
   a. Can you confirm which trusts will need RAC? Will the agreement only impact those trusts (i.e. can the new servicing arrangement have an impact on the trusts that do not require RAC)?
      - NCSLT 2006-1, 2006-2, 2006-3, 2006-4, 2007-1 and 2007-2 require "...that each Rating Agency shall have confirmed to the Administrator and the Indenture Trustee, in writing that such action will not in and of itself result in a reduction or withdrawal of the then current rating of the Notes, based upon the review by each such Rating Agency of payment and default performance of the Financed Student Loans, financial information relating to the Trust, the Indenture Trust Estate, the Guarantee Agency, the Servicers or the Administrator, and such other information that such Rating Agency determines to review."
      - NCSLT 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, and 2005-3 do not require any action from the Rating Agencies. The Odyssey Servicing Agreement has already been executed for these deals.
      - The NCMSLT (Master Trust) and the NCSLT 2007-3 and 2007-4 have AMBAC insurance and require AMBAC to consent to the Odyssey Servicing Agreement. We have not discussed the possibility of those deals with AMBAC yet, but intend after we satisfy RAC for these deals.
   b. Can you share a schedule of the existing residual certificate holders and note holders for the trusts?
      - VCG Securities LLC ("VCG") and SL Resid Holdings, Inc. ("Citibank") together own 100% of the beneficial ownership of the NSCLT Trust certificates (the "Residuals"). Attached is a schedule showing the respective ownership percentages of each NCSLT Trust (Ownership Percentages.xlxs).
      - We do not have a schedule of Noteholders.
   c. For the trusts affected, can you confirm whether Noteholder consent is required and has been received?
      - Noteholder consent is not required to engage Servicers. Servicers are engaged by the Owners in accordance with the purposes and powers of the Trust Agreements (Section 2.03 (a)(ii)). VCG and Citi collectively own 100% of the beneficial interest in the Trusts and are (by definition) the Owners. VCG and Citi have given their 100% consent and have notified the Owner Trustee (Wilmington Trust) accordingly. Please see attached sample Trust Agreement (Trust Agreement.pdf).
   d. Confirm role of US Bank and Goal Solutions (Special Servicer since resignation of First Marblehead) going forward.
      - The existing Special Servicing Agreement (U.S. Bank and Goal) will stay in full force and effect. The loans that are currently being serviced under that agreement will continue to be serviced under that agreement (see Special Servicing Agreement – original.pdf, USB_Goal-Turnstile Sub-Servicing Agreement (executed 9-7-12).pdf, and NCO Agreement_3rd Amendment (executed 9-7-12)-1.pdf).
      - Upon execution of the Odyssey Servicing Agreement, the Administrator will direct the primary servicers to allocate only newly defaulted loans to Odyssey under the Odyssey Servicing Agreement (Odyssey Servicing Agreement Final.v15 (blackline vs. original).

2. <u>Key Participant Summary</u>
   a. Provide update information on Odyssey Education Resources and Boston Portfolio to highlight:
      - Entities primary role in the servicing arrangement

- o Business overview
- o Experience in student loan industry
- o Leadership/Management team bios
  - See attached presentations (Odyssey Education Resources Company Overview – 1-2015.pdf and Odyssey Credentials.docx).

## 3. Enforcement of Collections

a. Discuss collection enforcement process. Do you expect borrower rehabilitation to play a meaningful role in the collection strategy?

- o Currently, the existing Special Servicer does not pursue loan rehabilitation efforts. However, given the economic conditions today, rehabilitation efforts can be the optimal method of increasing the value of certain loans. Odyssey assigns a Prioritization Score to each loan based on loan and borrower level information as well as information gained from previous collection efforts. Odyssey then pursues the optimal resolution strategy based on these variables and the resulting projection of net collections. When loans meet the criteria for rehabilitation, Odyssey will pursue that course because loans with effective rehabilitation factors yield significantly higher net collections for the Trusts.

b. Provide overview of strategy for working with collection agencies (i.e. roll/reassign metrics).

- Odyssey's Agency Monitoring prevents deficiencies, promptly identifies and corrects procedural or training errors within an agency's operations, and ensures agencies are compliant with the BPA contract and the responsibilities of the Agency Management Program ("AMP")
- Agency Monitoring is conducted by the Collections Manager, Financial Analysts, and Compliance Administrator, with assistance from the Financial Manager, Collections Administrator, and Legal Administrator
- Agency Monitoring is broken out into four focus areas: Implementations; Routine Monitoring; Risk Based Periodic Monitoring; Annual Audit

  **Implementation of Agency Management Program**
  - Agency Implementation of AMP takes place during onboarding, during any change or update to policies and procedures, and on an annual basis
  - Agency Implementation reinforces policies and procedures, familiarizes agencies on recent developments, and ensures compliance with the BPA contract and AMP responsibilities
  - Agency Implementation periods are documented and include testing on report reconciliation, procedural compliance, and adherence to contractual obligations

  **Routine Monitoring**
  - Routine Monitoring is performed on a continual basis
  - Routine Monitoring includes monthly reviews and oversight of account reconciliation, progression, balance verification, complaint management, and recoveries
  - Monthly agency management calls are conducted after the reports are submitted and reconciled. The agency management calls discuss operations and performance
  - Weekly progression reports are exchanged between the agencies and BPA
  - Daily email and phone calls pertaining to account level compliance

  **Risk Based Periodic Monitoring**
  - A Random selection of accounts are audited on a monthly to quarterly basis
  - Agencies are scored on operations, compliance, and performance
  - Call recordings are reviewed and agencies are scored on compliance
  - Deficiencies are identified and reported to agencies for correction

**Annual Audit**

- The Annual Audit assesses the quality of the agency's compliance management systems, including its internal controls and policies and procedures, for its debt collection business
- It identifies acts or practices that materially increases the risk of violations of the BPA contract, Service Level Agreement, or Consumer Financial Laws in connection with debt collection
- Facts about the agency are gathered, which help determine whether an agency, in its acts or practices, violates the requirements of the BPA contract or Consumer Financial Laws
- The Annual Audit determines, in accordance with BPA's internal service provider requirements, whether any violation of the BPA contract or Consumer Financial Laws have occurred and whether further supervisory, disciplinary, or corrective actions are appropriate

**Agency Evaluation**

- Agency Evaluation is conducted in sync with Agency Monitoring
- Agencies are evaluated and scored on a monthly, quarterly, and annual basis
- Evaluation is based on collection performance, call efforts, and compliance

**Corrective Action**

- When monitoring reviews identify weaknesses, corrective action is implemented
- Findings are documented, root causes are identified, and corrective action plans are created
- Routine Monitoring encompasses all corrective action plans implemented and validates that the necessary actions are complied with so that the error is resolved timely and effectively
- Corrective Action is managed by the Compliance Administrator with Collections Manager oversight

**Agency Profile Maintenance**

- From the onset of the agency relationship with BPA, documents are maintained for reference and compliance purposes. These documents are a collection of agency policies and procedures, certifications, data security and disaster recovery plans, as well as other training and sample materials
- These documents are reviewed in accordance with our Agency Management Program and updated on a regular basis

4. **Loan Sales**

   a. Discuss strategy/process for recommending which Loans Eligible for Sale should be sold. What entity ultimately makes the decision to pursue loan liquid?

      o Generally, on a loan-by-loan basis, Odyssey can estimate and forecast the timing of projected net collections from collection and rehab strategies (net of all fees and collection commissions) based on loan and borrower/co-borrower level data and information gained from previous collection efforts. Odyssey can also estimate net proceeds (net of all fees and commissions) from a loan sale. The decision to either continue collection efforts or to sell a loan will be based on which action results in the highest net collection for the NCSLT Trusts.

      o A simple example to demonstrate the economic value of Odyssey's collection and rehabilitation strategies compared to a loan sale might look like this:

         - Continued Collections: Assume a $19,000 defaulted loan balance with an expected gross collection rate of 20%. Assume the 20% gross recovery will occur in year 5. If the collection commission equals 30% (the current range of collection commissions are 25% - 40%), the net collection would be $2,655 (after also deducting the $5 of fees paid over the 5 years (Administrator, Trustee and Servicing Fees)). If we discount this amount at 8% over 5 years, the present value is approximately $1,807.

         - Loan Sale: Assume the same $19,000 defaulted loan balance and assume Odyssey sells the loan for the same 20% expected recovery. This loan sale results in a net collection of $3,420 to the NCSLT Trusts (after

a 10% commission). In this example, the loan sale results in a higher net collection to the Trusts by $765 or 29% on a non-PV basis or $1,613 or 89% on a PV-basis.

- o One very specific and obvious example that demonstrates the analytical framework for deciding to continue collection efforts or sell a loan are the loans for which the statute of limitations on collections have expired. There is approximately $850 million of principal balance of such loans. For most (if not all) of these loans, the prospects for collections are small and remote. Yet currently, fees (trustee fees, special servicing fees, administration fees, etc.) are being paid on the full principal balance. In fact, there are more fees being paid annually on these expired statute loans than will ever be collected. A loan sale is an obvious action to take because after taking into account fees, the NCSLT Trusts will receive higher net proceeds from the sale AND will benefit from reduced fees going forward (improved net interest margin).

- o The ultimate decision to sell loans is that of the Owners, which have contracted that decision to the Odyssey Servicing Agreement. As such, Odyssey will make the decision regarding loan sales. However, the Owners can direct otherwise in accordance with the Odyssey Servicing Agreement. This is a very similar arrangement to the rights vested in the 1st loss Noteholders in other asset class deals.

b. Do you have any available data to provide insight on expected recovery amounts from loan sale process? Provide additionally information on the loan sale commission discussed in our prior call (is there a formally documented commission schedule?)

- o One component of Odyssey's overall strategy for the Trusts is to maximize the value of certain loans that, based upon the scoring models, will have a greater likelihood of obtaining a higher value as a sale than if not sold and collected as part of the collection process over time. Each loan is valued based on borrower, loan, and historical performance characteristics. Cash flows are measured and compared to market prices for each loan and loan pools identified for sale are those meeting client specific requirements. Odyssey will run a competitive bid process with debt buyers to achieve the best execution and price for portfolio sales.

  Typically three loan categories are established to determine sale strategy:

  High Value "Keeper" Loans
    Consistent payments and amortization characteristics create high NPV
    These best cash flowing loans do not currently obtain high enough prices to sell
  Sale Pool Loans
    Sweet spot for sale, as loans have lower NPV's and high market value purchase price
  Low Value Loans
    Typically non-performing and would realize the lowest sale price. Recommendation is to hold these loans until they are re-performing so that they can achieve a higher sales price. Sale price is below potential cash flowing NPV. Needs further rehabilitation effort with intention to secure payments to move up to High Value and Sale Pools

- o The commission is 10% on calculated on sales proceeds. This is established in Section 2 C. (iii) of the Odyssey Servicing Agreement.

c. For loans currently in default, have any been identified for sale?

- o No loans have specifically or definitely been identified for sale.

- o That said, we expect to do a rigorous analysis on the out-of-statute loans once the Odyssey Agreement is in effect.

5. **Fees & Expenses**

    a. Can you confirm that the existing fixed fee in the servicing agreement is paid on loans currently in default (i.e. what happens if a loan is charged off).

        o Section 5 A. of the existing Special Servicing Agreement calculates the Servicing Fee as "A fixed fee at a rate equal to 1/12 of 0.01% of the aggregate outstanding Pool Balance (for Student Loans owned by such Trust) as of the last day of the prior calendar month." The Indenture defines Pool Balance as "...the aggregate principal balance of the Financed Student Loans at the end of the preceding Collection Period (including accrued interest thereon...)". Further a Financed Student Loan is "...(a) Student Loan identified as such in each of the pool supplements dated as of the Closing Date...). In other words, there is no concept of charged-off loans in terms of reducing the Pool Balance.

    b. In our prior call, we noted that expense reimbursement would be inside of caps but noticed that this section in the black-lined agreement from 12/4 was deleted. Can you please confirm that the reimbursement of expenses will remain inside of the existing caps per the original agreement? Is there a revised draft that references the existing caps?

        o Yes, the expense reimbursements will be subject to the exact same caps as per the original Special Servicing Agreement. The Odyssey Agreement includes the exact same capped schedules (which represents a cap of those expenses in the aggregate between both agreements and all deals).

    c. Can provide any guidance on the magnitude of the fees related to Section 5 (B) of the new agreement? Are these fees in addition to the fees in the existing agreement?

        o Section 5 (B) of the Odyssey Servicing Agreement is exactly the same as the Special Servicing Agreement. These are reimbursement for fees incurred by the Special Servicer or Odyssey that are directly related to performing the duties under the agreements. This is fair and standard language and is meant to allow for reimbursement of things like unexpected legal fees, etc. that might be incurred separate from the fees reimbursable to Subservicers or for Early Awareness and Default Prevention Services (each limited by the capped schedules). It is expected that these fees will be de minimis.

6. **General Documentation Questions**

    a. In the existing base documents:

        o Prior to the Teri Settlement, defaulted loans were submitted to Teri for 100% reimbursement. Post settlement, how are defaulted loans handled? How are they reflected in the servicer reports?

            ▪ Generally, post-TERI Settlement, when loans default, the primary servicer notifies the Special Servicer that a loan has defaulted and transfers the loan files to the Special Servicer. The Special Servicer in turn engages Subservicers to perform collections. Upon execution of the Odyssey Servicing Agreement, the primary servicers will be notified to direct all newly defaulted loans to Odyssey, thereby avoiding any conflict between agreements.

    b. The existing servicing agreement makes reference to a minimum disposition price for loan sales. How does the proposed special servicing agreement fit within the provisions of the existing base documents? Is there a conflict between this disposition price required in the existing base documents and provision 2 (C) (iii) of the proposed special servicing agreement?

- The existing Special Servicing Agreement does not refer to a disposition price. In fact, the existing Special Servicing Agreement does not have a mechanism for disposing of loans in accordance with the existing base documents. This is a primary purpose of the Odyssey Servicing Agreement – that is, it introduces the ability to dispose of loans in accordance with the base documents.
- The Odyssey Servicing Agreement is drafted precisely to conform with the base documents and the procedure and requirements described in the base documents. The procedure to dispose of loans (i.e., sell, transfer, exchange or otherwise dispose) is described under Sections 2.09 (Release of Collateral) and Section 3.14 (Disposing of Financed Student Loans) of the Indentures (as well as other relevant coordinated powers of the Trust Agreements). The base documents require that 1) loans be sold to a Servicer in accordance with the Servicing Agreement, and at a disposition price specified in such Servicing Agreement. The Odyssey Agreement establishes the disposition price in Section 2 B. (iii). Further, Section 3.14 of the Indenture requires 1) an Issuer Order (from the Owners/Owner Trustee) stating the sales price and directing the loans to be sold, 2) a certificate by an Authorized Officer to the effect that the disposition price is greater than or equal to the amount required by the applicable Servicing Agreement, and 3) an opinion of counsel stating, among other things, that all the required conditions precedent have been complied with.

c. In the new agreement:
  - What's the difference between provisions 2 (B) (vi) and 2 (B) (xiii) of the proposed special servicing agreement?
    - Section 2 (B) (xiii) is the exact language contained in the existing Special Servicing Agreement and only applies to Subservicers. The subtle difference between these sections is that 1) Section 2 (B) (vi) contemplates the added situation where Odyssey may directly receive cash or receipt of collection proceeds and thereby requires Odyssey to remit such amounts to the Odyssey Collection Account, and 2) Section 2 (B) (vi) requires that the amounts be deposited with (2) days of receipt.
  - Can you discuss what provision 8 (vi) of the proposed special servicing agreement intending to address?
    - We added a Standard of Care Rep and Warranty provision to hold Odyssey to an explicit high standard in performing the duties and responsibilities of the Odyssey Servicing Agreement. This is an important provision as it relates to all aspects of the agreement, but for example, as it relates to the Servicer's collection practices (in the context of fair collection practices and compliance with the CFPB rules) as well as the manner in which it conducts loan sales (in the context of obtaining a fair market value in arm's length transactions).

## 7. Data Requests

a. Breakdown of the estimated $4 billion of defaulted loans with no repayments by trust. How are these loans reflected in the servicer reporting? If possible, provide data by origination channel (i.e. school vs DTC) for each trust.

b. Dollar amount of cumulative defaults for each quarter since origination, segmented by when the loans initially came into repayment (repayment vintage). If possible, provide data by origination channel.

c. Dollar amount of recoveries for each quarter since origination, segmented by repayment vintage. If possible, break out Teri guarantee recoveries vs other. Provide any data or general information on the type of recoveries received (i.e. lump sum vs payment plan)?

d. Breakdown of original and current balance segmented by repayment vintage for each trust. If possible, provide data by origination channel.

- See attached data (Defaults and Recoveries.xlsx). As of the date of this response, we are still compiling some of the requested data.

## Waiver Agreement

This Waiver Agreement, dated as of February 4, 2015 (this "Agreement"), is entered into by and among Odyssey Education Resources LLC ("Odyssey"), as the Servicer (together with its successors and assigns, the "Servicer"), and each of the Trusts listed on Schedule A attached hereto (the "Trusts"). Any capitalized terms used, but not defined herein shall have the meaning given to such term set forth in the Basic Documents (as that term is defined in the Indenture applicable to each such Trust, the "Basic Documents").

WHEREAS, the parties hereto have entered into that certain Servicing Agreement, dated as of December 30, 2014 (the "Servicing Agreement"), by and between Odyssey and the Trusts.

WHEREAS, pursuant to the terms of the Servicing Agreement the servicing of all new Defaulted Loans as of the date that the Servicing Agreement is effective, are to be transferred and assigned to Odyssey for servicing.

WHEREAS, the Servicing Agreement became effective on the date that the Rating Agency Condition was satisfied.

NOW THEREFORE, in consideration of the forgoing and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. Any capitalized terms used, but not defined herein shall have the meaning given to such term set forth in the Servicing Agreement.

2. Odyssey and the Trusts, hereby waive the requirement under the Servicing Agreement that all Defaulted Loans be transferred and assigned to Odyssey, until such time that the Owners of the Trusts, through Issuer Order, direct the Administrator to begin transferring and assigning the servicing of such loans to Odyssey.

3. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to conflicts of laws provisions thereof (other than Section 5-1401 of the New York General Obligations Law).

4. This Agreement may be executed in counterparts, each of which when so executed shall together constitute but one and the same agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

ODYSSEY EDUCATION RESOURCES LLC, as the Servicer

By: _____
Name: Donald Uderitz
Title: CEO

Each of the Trusts listed on Schedule A, attached hereto
By: NC OWNERS LLC, as Owner,
By: NC RESIDUALS OWNERS TRUST, as Sole Member,
By: VCG Securities LLC, as Agent

By: _____
Name: Donald Uderitz
Title: Authorized Signatory

Pursuant to Section 3.07(e) of the Amended and Restated Trust Agreement (the "Declaration") of NC Residuals Owners Trust dated May 14, 2009, the undersigned responsible officer of VCG Securities LLC, as Agent, hereby certifies that all conditions precedent, if any, provided for in the Declaration and any applicable Transaction Document (as defined in the Declaration) relating to this letter have been complied with.

By: _____
Name: Donald Uderitz
Title: Authorized Signatory

ACKNOWLEDGED:
GSS DATA SERVICES, INC., as Administrator

By. _____
Name:
Title:

CONFIDENTIAL

Trusts:
- The National Collegiate Student Loan Trust 2003-1;
- The National Collegiate Student Loan Trust 2004-1;
- The National Collegiate Student Loan Trust 2004-2;
- The National Collegiate Student Loan Trust 2005-1;
- The National Collegiate Student Loan Trust 2005-2;
- The National Collegiate Student Loan Trust 2005-3;
- The National Collegiate Student Loan Trust 2006-1;
- The National Collegiate Student Loan Trust 2006-2;
- The National Collegiate Student Loan Trust 2006-3;
- The National Collegiate Student Loan Trust 2006-4;
- The National Collegiate Student Loan Trust 2007-1; and
- The National Collegiate Student Loan Trust 2007-2.


Indentures:
Each of the following Indentures, as amended or supplemented, entered into by and between
U.S. Bank National Association, as Indenture Trustee and:
- The National Collegiate Student Loan Trust 2003-1, dated as of December 1, 2003;
- The National Collegiate Student Loan Trust 2004-1, dated as of June 1, 2004;
- The National Collegiate Student Loan Trust 2004-2, dated as of October 1, 2004;
- The National Collegiate Student Loan Trust 2005-1, dated as of February 1, 2005;
- The National Collegiate Student Loan Trust 2005-2, dated as of June 1, 2005;
- The National Collegiate Student Loan Trust 2005-3, dated as of October 1, 2005;
- The National Collegiate Student Loan Trust 2006-1, dated as of March 1, 2006;
- The National Collegiate Student Loan Trust 2006-2, dated as of June 1, 2006;
- The National Collegiate Student Loan Trust 2006-3, dated as of September 1, 2006;
- The National Collegiate Student Loan Trust 2006-4, dated as of December 1, 2006;
- The National Collegiate Student Loan Trust 2007-1, dated as of March 1, 2007; and
- The National Collegiate Student Loan Trust 2007-2, dated as of June 1, 2007.

## Officers' Certificate of Issuer

January 14, 2016

U.S. Bank National Association
Corporate Trust Services-SFS
One Federal Street
3rd Floor
Boston, MA 02111

Attention: <u>Mr. David Duclos – Ref. The National Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, 2005-3 (the "Trusts")</u>

Dear Ladies and Gentlemen:

Pursuant to each of the Indentures listed in Annex B between each of the Trusts listed in Annex A, each a Delaware statutory trust (the "Issuers"), and U.S. Bank National Association, in its capacity as Indenture Trustee thereunder, the Issuers HEREBY CERTIFY that all conditions precedent provided for in the Indenture to the execution and delivery of the Servicing Agreement attached hereto as Annex C between Odyssey Education Resources LLC and the Trusts (the "Odyssey Servicing Agreement") HAVE BEEN SATISFIED and HEREBY REQUESTS YOU TO ACKNOWLEDGE the Odyssey Servicing Agreement.

In support of this certificate the undersigned states as follows:

1. We have read all covenants, conditions and definitions in the Trusts relating thereto;
2. We have reviewed authorizations confirming that all Owners consent to, and have directed the action taken herein, and certifications from the Owners as to the statements made in this certificate upon which the undersigned has conclusively relied;
3. In our opinion we have made such examination as is necessary to enable us to express the informed opinion that all such necessary covenants and conditions as a condition precedent to the valid execution and delivery of, the Odyssey Servicing Agreement, have been complied with; and
4. In our opinion, all necessary covenants and conditions required regarding the valid execution and delivery of the Odyssey Servicing Agreement have been complied with.

Sincerely,

THE NATIONAL COLLEGIATE STUDENT LOAN TRUSTS 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, and 2005-3

BY: WILMINGTON TRUST COMPANY, not in its Individual capacity but solely as Owner Trustee for THE NATIONAL COLLEGIATE STUDENT LOAN TRUSTS 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, and 2005-3

By: _____

Name: Dorri Costello

Title:             Vice President

cc: NC Residual Owners Trust
VCG Securities LLC

NCSLT-00000465

## Annex A

### Trusts

- National Collegiate Student Loan Trust 2003-1, created pursuant to the Trust Agreement dated as of December 1, 2003

- National Collegiate Student Loan Trust 2004-1, created pursuant to the Trust Agreement dated as of June 10, 2004

- National Collegiate Student Loan Trust 2004-2, created pursuant to the Trust Agreement dated as of October 28, 2004

- National Collegiate Student Loan Trust 2005-1, created pursuant to the Trust Agreement dated as of February 23, 2005

- National Collegiate Student Loan Trust 2005-2, created pursuant to the Trust Agreement dated as of June 9, 2005

- National Collegiate Student Loan Trust 2005-3, created pursuant to the Trust Agreement dated as of October 12, 2005

**Annex B**

Indentures

- National Collegiate Student Loan Trust 2003-1, created pursuant to the Indenture dated as of December 1, 2003

- National Collegiate Student Loan Trust 2004-1, created pursuant to the Indenture dated as of June 10, 2004

- National Collegiate Student Loan Trust 2004-2, created pursuant to the Indenture dated as of October 28, 2004

- National Collegiate Student Loan Trust 2005-1, created pursuant to the Indenture dated as of February 23, 2005

- National Collegiate Student Loan Trust 2005-2, created pursuant to the Indenture dated as of June 9, 2005

- National Collegiate Student Loan Trust 2005-3, created pursuant to the Indenture dated as of October 12, 2005

**Annex C**

[Odyssey Servicing Agreement]

CONFIDENTIAL

## SERVICING AGREEMENT

This Servicing Agreement, dated as of December 30, 2014 (this "Agreement"), is entered into by and among Odyssey Education Resources LLC ("Odyssey"), as the Servicer (together with its successors and assigns, the "Servicer"), and each of the Trusts listed on Schedule A attached hereto (the "Trusts"). Any capitalized terms used, but not defined herein shall have the meaning given to such term set forth in the Basic Documents (as that term is defined in the Indenture applicable to each such Trust, the "Basic Documents").

WHEREAS, the Trusts desire to, from time to time, dispose of certain defaulted Financed Student Loans;

WHEREAS, pursuant to the Indenture applicable to each Trust, Financed Student Loans may only be sold, transferred or otherwise disposed of to a servicer at a disposition price specified under the applicable Servicing Agreement;

WHEREAS, each of the Trusts has previously appointed other entities as the servicer of certain Financed Student Loans and accordingly Odyssey is likely not performing all of the servicing responsibilities with respect to the Financed Student Loans;

WHEREAS, none of the existing servicers of the Financed Student Loans nor their applicable Servicing Agreements have a mechanism currently in place to dispose of Financed Student Loans;

WHEREAS, Odyssey will utilize employees and agents (appointed from time to time by it, as provided herein) who are experts in the management of collections on and the disposition of Financed Student Loans;

WHEREAS, each of the Trusts is appointing Odyssey as a Servicer under each Trust's respective Trust Agreement, to perform certain limited duties with respect to certain Financed Student Loans owned by the Trusts that are defaulted or Loans Eligible For Sale (as defined below); and

WHEREAS, Servicer is being engaged pursuant hereto to purchase Loans from each Trust as directed or permitted by the applicable Trust.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties agree as follows:

Section 1.       Definitions.   Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Basic Documents. For purposes of this Agreement, the following capitalized terms shall have the respective meanings set forth below:

"Loans Eligible For Sale" means Financed Student Loan(s) owned by a Trust for which the borrower of such Financed Student Loan has failed to repay such Financed Student Loan according to the terms agreed to in the applicable controlling loan documents and agreements, and such Borrower(s) shall have been delinquent in its repayment obligations for no less than 180 days.

"Defaulted Loan" means any Financed Student Loan owned by a Trust for which the borrower of such Financed Student Loan has failed to repay such Financed Student Loan according to the terms agreed to in the applicable controlling loan documents and agreements, provided however, that such Borrower shall have been delinquent in its repayment obligations for no less than 31 days;

"Default Prevention Services" means such services determined by the Servicer to be desirable to collect and seek enforcement of Financed Student Loans that are greater than 30 days past due and less than 180 days past due.  Default Prevention Services may include both telephonic and mail correspondence and related monthly reporting.

"Early Awareness Services" means such services determined by the Servicer to be desirable to reduce the number and percentage of Financed Student Loans becoming delinquent in the repayment process prior to the initial payment due date, including without limitation, services that are intended to alert borrowers and co-borrowers to their repayment obligations, available borrower benefits (such as ACH automatic payments) and contact information for the Servicer. Early Awareness Services may include both telephonic and mail contacts, as well as address verification and skip tracing.

Section 2.    Appointment:  Servicing Duties.

A. Appointment. Each of the Trusts hereby hires, designates and appoints the Servicer as a Servicer under each Trust's applicable, respective Indenture to perform the servicing duties (as defined below) with respect to Loans Eligible For Sale and Defaulted Loans, and the Servicer accepts such appointment and agrees to perform such duties with respect to the Loans Eligible For Sale and Defaulted Loans in accordance with the terms of this Agreement and each Indenture.

B. Services. The Servicer shall take such actions as it shall deem reasonably necessary or appropriate to administer and oversee the enforcement and collection of Loans Eligible For Sale and Defaulted Loans, and to provide recommendations to the relevant Trust with respect to those Loans Eligible For Sale to be sold by the terms hereof, to maximize the collection of amounts payable on the Financed Student Loans (collectively, the "Services"), including without limitation:

(i)     Retaining and entering into agreements with licensed collection agencies, loan brokers and other legally authorized persons (the "Subservicers") engaged in providing default prevention and collection services and loan sale services, in form and substance satisfactory to the Servicer, pursuant to which the Subservicers, for and on behalf of the applicable Trust, will contact borrowers with respect to the Loans Eligible For Sale and Defaulted Loans, and seek enforcement and collection of such Loans Eligible For Sale and Defaulted Loans, including without limitation Early Awareness Services and Default Prevention Services when applicable;

(ii)    At the sole discretion of the Servicer, (a) performing periodic audits of Subservicers for compliance and performance reviews and (b) providing oversight of the activities of Subservicers with regard to account management, litigation assistance, and/or settlement strategies;

(iii)   Replacing any Subservicer who, in the sole judgment of the Servicer, is deemed to be deficient or negligent in performing the duties outlined in its subservicing agreement with the Servicer;

(iv)    Requiring in the applicable subservicing agreement that the Subservicers provide certain monthly reports to the Servicer with respect to Loans Eligible For Sale and Defaulted Loans serviced by such Subservicer, in each case, in a form and substance satisfactory to the Servicer;

(v)     With respect to Loans Eligible For Sale and Defaulted Loans, reviewing claim packages as described in subparagraph (xi);

(vi)    With respect to Loans Eligible For Sale and Defaulted Loans being serviced by the Servicer or Subservicers, remitting within two (2) days of receipt to the Odyssey Collection Account (as hereinafter defined) for the receipt of all cash collected by Servicer and for the receipt of collections from a Subservicer for the benefit of the respective Trusts.

(vii)   With respect to Loans Eligible For Sale or Defaulted Loans (a) roll or reassign such loans being serviced by Servicer into a default recovery queue for collection effort or a queue for sale efforts in accordance with the provisions of Section 2(C) below, (b) direct any Subservicer to roll or reassign any loans that become Charge-Off Loans to the Servicer for

assignment into the queue for sale efforts, and (c) remit within two (2) days of receipt to the Odyssey Collection Account (as hereinafter defined) for the receipt of collections for the benefit of the respective Trusts, as their interests may appear, all cash collected on all Loans Eligible For Sale in the queue for sale until such time as the loan is sold.

(viii) Reporting to the relevant Trust all Loans Eligible For Sale being held in the queue for purchase; soliciting direction from the Trust as to which loans shall be sold pursuant to the terms of Section 2(C) below.

(ix) Conduct the sale of all Loans Eligible For Sale in accordance with the provisions or Section 2(C) below.

(x) Establishing and maintaining an account or accounts (the "Odyssey Collection Account") in the name of the Indenture Trustee (or its agent or custodian), for benefit of the applicable secured parties of the Trusts under the respective Indentures, for the deposit by Servicer and any Subservicer of net collections (including all net proceeds of any sale of Loans Eligible For Sale in accordance with the provisions of 2(C) below) on all Loans Eligible For Sale and Defaulted Loans serviced by Servicer or Subservicer for the respective Trust and in connection therewith, preparing or causing to be prepared such control agreement or agreements as may be necessary or desirable to maintain and preserve the lien and security interest therein of the Indenture Trustee under the respective Indentures;

(xi) Reviewing claim packages prepared by any Servicer or Subservicer with respect to Loans Eligible For Sale and Defaulted Loans to confirm, on the basis of such review, that (a) the Servicer or Subservicer has complied with applicable servicing guidelines and (b) the loan originator has complied with applicable program guidelines;

(xii) Receiving reports from Servicers and Subservicers related to payments with respect to Loans Eligible For Sale and Defaulted Loans and updating records with respect to Financed Student Loans as interest and other charges accrue and amounts are collected;

(xiii) Remitting or causing the Subservicers to remit net collections received on Loans Eligible For Sale and Defaulted Loans to the Odyssey Collection Account;

(xiv) Retaining counsel on behalf of the applicable Trust (whether directly or through collection agencies) to further pursue enforcement and collection of Loans Eligible For Sale and Defaulted Loans, including through litigation and bankruptcy or probate proceedings; and

(xv) Negotiating any settlement or compromise of any claim with respect to a Loans Eligible For Sale or Defaulted Loans, which in the reasonable judgment of the Servicer are more likely to produce greater proceeds of collection than by virtue of a forbearance, payment management or other accommodation with the borrower; and

(xvi) At the sole discretion of the Servicer, identifying, recommending, selling, transferring, exchanging, purchasing or otherwise disposing of Loans Eligible For Sale in accordance with the Basic Documents.

For the avoidance of doubt the parties hereto hereby acknowledge and agree that nothing in this Agreement is intended to nor does it amend the applicable Trust Agreement, Indenture or Administration Agreement for each Trust or limit in any way the Trusts' rights thereunder, including without limitation, the right to direct or restrict the activities of the Servicer.

C. Purchase of Loans Eligible For Sale. The Servicer shall take all such action, as it shall deem reasonably necessary or appropriate to purchase the Loans Eligible For Sale, including without limitation:

(i)      Entering into custodial agreements either directly or through agents for the purpose of perfecting a security interest in the Loans Eligible For Sale and to provide for the safekeeping of the Loans Eligible For Sale and all documents and information relating to the Loans Eligible For Sale;

(ii)      Preparing all necessary sale documentation including, but not limited to, appropriate terms required for each bidder, the loan purchase agreement and other related documentation required to memorialize and accomplish the sale of the Loans Eligible For Sale;

(iii)      In its sole discretion, determining the purchase price for each such Loan Eligible For Sale that it determines to purchase pursuant to the terms hereof based on one of the two following methods: (a) 10% less than the highest bid received pursuant to the Servicer marketing the Loans Eligible For Sale for sale to at least three (3) qualified bidders and conducting the sale process in a manner that, in the sole judgment of the Servicer, will yield the highest and best net proceeds to be paid in exchange for the Loans Eligible For Sale, provided however, that with respect to such sale process, Servicer shall, at a minimum: (i) provide an information packet ("Information Packet") applicable to each sale which describes the loans offered for sale and contains such other customary information applicable to such sale; (ii) in a good faith effort to maximize the proceeds to the Trust from the sale of the Loans, invite a sufficient number of qualified bidders under the circumstances to participate in such sale, and in no event shall the Servicer receive less than three (3) bids from qualified bidders; (iii) establish a time period between the distribution of the Information Packet and the acceptance of bids to allow the prospective bidders to research and analyze the Loans Eligible For Sale; and (iv) hold the sale at a convenient time and in a convenient location or (b) 10% less that the average value established pursuant to the Servicer engaging two (2) reputable appraisers, in the business of appraising loans, to appraise the Loans Eligible for Sale which the Servicer intends to purchase;

(iv)      Notifying the Relevant Trust and the Administrator that each of the Loans Eligible For Sale sold pursuant to the Loan Sale is a Liquidated Student Loan pursuant to the Basic Documents;

(v)      Simultaneous with the Loan Sale, remitting or causing the Subservicers to remit the Liquidation Proceeds and all Recoveries associated with the Liquidated Student Loans to the Odyssey Collection Account.

     Section 3.      Incorporation.   As of the date hereof, the definition of "Servicing Agreement" in each of the Indentures shall include this Agreement, the definition of "Servicer" in each of the Indentures shall include the Servicer and any Servicing Fee and other fees and expenses payable under this Agreement to the Servicer shall be a "Servicing Fee" for purposes each of the Indentures.

     Section 4.      Subservicers.   In carrying out its duties under this Agreement with respect to the Loans Eligible For Sale and Defaulted Loans, the Servicer may retain and employ Subservicers to perform any of the Services with respect to the Financed Student Loans owned by any of the Trusts, and to commence any actions or proceedings the Subservicers deem necessary or appropriate in connection with such enforcement or collection efforts on such Loans Eligible For Sale and Defaulted Loans.

     Section 5.      Servicing Fee; Reimbursement for Expenses.   As compensation for the performance of the Servicer's obligations under this Agreement and as reimbursement for its expenses related thereto, the Servicer shall be entitled to a fee and expense reimbursement (the "Servicing Fee") payable from each Trust in accordance with the related Indenture on each Distribution Date consisting of:

     A.      Reimbursement by each Trust for all of the Servicer's expenses incurred in performing its obligations hereunder for such Trust, including all fees and expenses of all Subservicers and other persons appointed as agents of the Servicer pursuant to this Agreement and any other expenses incurred by the

NCSLT-00000472

Servicer on behalf of each Trust, including costs and expenses incurred by the Servicer in establishing and maintaining the Odyssey Collection Account; provided that the fees and expenses of Subservicers with respect to collections on Loans Eligible For Sale and Defaulted Loans shall be paid from such collections prior to remittance to such Odyssey Collection Account, as described in Section 2(B)(vii), 2(B)(x) and 2(c)(vii) above. The reimbursement described in this Section 5(A) with respect to Default Prevention Services (but not with respect to Early Awareness Services) shall not exceed the dollar amount listed for each Trust on Schedule B, attached hereto, in the aggregate per calendar month per respective Trust. The reimbursement described in this Section 5(A) with respect to Early Awareness Services shall not exceed the dollar amount listed for each Trust on Schedule C attached hereto, in the aggregate for each such Trust until its respective Indenture is discharged.

B. In carrying out the foregoing duties or any of its other obligations under this Agreement, the Servicer may charge a fee for any collection services that it provides and enter into transactions or otherwise deal with any of its affiliates, including, without limitation, collection agency which affiliates may also charge reasonable fees and receive other forms of remuneration, provided however, that the terms of any such transaction or dealings with an affiliate shall be, in the Servicer's opinion, no less favorable to the Trusts than would be available from unaffiliated parties.

Section 6.     Term of Agreement: Resignation and Removal of Servicer.

A. Term. This Agreement shall continue in force with respect to each Trust until the dissolution of such Trust and the payment in full of the Notes under the related Indenture, upon which event this Agreement shall automatically terminate with respect to that Trust.

B. Resignation. Subject to Section 6(D) of this Agreement, the Servicer may resign its duties hereunder by providing the Trust, the Administrator and the Indenture Trustee with at least 10 days' prior written notice.

C. Removal for Cause. Subject to Section 6(D) of this Agreement, the Indenture Trustee shall have the right to remove the Servicer with the prior written consent of the Trust, by delivering to the Servicer written notice of termination if any of the following events shall occur:

(i)     The Servicer shall default in the performance of any of its duties under this Agreement and, after written notice of such default, shall not cure such default within forty-five days (or such longer period as shall be reasonably satisfactory to the Indenture Trustee);

(ii)     A court having jurisdiction in the premises shall enter a decree or order for relief, and such decree or order shall not have been vacated within 60 days, with respect to any involuntary case commenced against the Servicer under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect or shall appoint a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for the Servicer or any substantial part of its property or order the winding-up or liquidation of its affairs; or

(iii)     The Servicer shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, shall consent to the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator or similar official for it or any substantial part of its property, shall consent to the taking of possession by any such official of any substantial part of its property, shall make any general assignment for the benefit of its creditors or shall fail generally to pay its debts as they become due.

The Servicer agrees that if any of the events specified in clauses (ii) or (iii) of this Section shall occur, it shall give written notice thereof to the Trust, each of the Rating Agencies and the Indenture Trustee within two Business Days after the happening of such event. Concurrently with the giving of such notice as provided above (and in any event no later than five (5) Business Days after receipt of such notice of

termination), the Servicer shall identify any Loans Eligible For Sale and Defaulted Loans still being serviced by it hereunder.

D. Succession. No resignation or removal of the Servicer pursuant to this Section shall be effective until a successor Servicer (which Servicer shall be reasonably acceptable to the Indenture Trustee) shall have agreed in writing to be bound by the terms of this Agreement in the same manner as the Servicer is bound hereunder. The appointment of any successor Servicer shall be effective only after each Rating Agency shall have been given 10 days' prior notice of such proposed appointment and each Rating Agency other than Fitch Ratings (Fitch, Inc.) shall have declared in writing that such appointment will not result in a reduction or withdrawal of the then-current rating of the Notes.

Section 7.    Action upon Termination. Resignation or Removal.    Promptly upon the effective date of termination of this Agreement pursuant to Section 6(A) of this Agreement or the resignation or removal of the Servicer pursuant to Section 6(B) or Section 6(C) of this Agreement, the Servicer shall be entitled to be paid all fees and reimbursable expenses accruing to it to the date of such termination, resignation or removal. The Servicer shall forthwith upon such termination pursuant to Section 6 of this Agreement deliver to the Trusts as appropriate, all property and documents of or relating to the Financed Student Loans then in the custody of the Servicer pursuant to this Agreement. In the event of the resignation or removal of the Servicer pursuant to Section 6 of this Agreement, the Servicer, for a period of not less than 120 days following notice of such resignation or removal, shall cooperate with the Trusts and take all reasonable steps requested to assist the Trusts in making an orderly transfer of the duties of the Servicer to the successor Servicer, as applicable.

Section 8.    Representations and Warranties.    The Servicer hereby makes the following representations and warranties to each of the Trusts:

(i)     Organization and Good Standing. The Servicer is an entity duly organized, validly existing, and in good standing under the laws of its state of incorporation or formation or the laws of the United States, and is in compliance with the laws of each state in which any property is located to the extent necessary to perform its obligations hereunder.

(ii)    No Violation. Neither the execution and delivery by the Servicer of this Agreement, nor the consummation by it of the transactions contemplated hereby, nor the performance of and compliance by the Servicer with the provisions hereof, will conflict with or result in a breach or violation of, or constitute a default (or an event which, with notice or the lapse of time, or both, would constitute a default) under, the organizational documents (its articles of incorporation or charter or by-laws) of the Servicer, any of the provisions of any judgment, decree, demand, or order of any federal, state, or local court binding on the Servicer, or any of the provisions of any indenture, mortgage, contract, instrument, or other document to which the Servicer is a party or by which it is bound, or result in the creation or imposition of any lien, charge, or encumbrance upon any of its properties pursuant to the terms of any indenture, mortgage, contract, instrument, or other document. Neither the execution and delivery by the Servicer of this Agreement, nor the consummation by it of the transactions contemplated hereby, nor the performance of and compliance by the Servicer with the provisions hereof will, to its knowledge, result in a breach of any law, rule or regulation of any federal, state or local governmental or regulatory authority binding on the Servicer. The Servicer is not otherwise in violation of any law, rule, regulation, judgment, decree, demand, or order (of any federal, state or local governmental or regulatory authority or court), which violation, in the Servicer's good faith and reasonable judgment, is likely to affect materially and adversely either its ability to perform its obligations hereunder, or the financial condition of the Servicer.

(iii)   Authorization and Enforceability.  The execution and delivery by the Servicer of this Agreement, the consummation of the transactions contemplated hereby, and the performance and compliance by the Servicer with the terms hereof are within the powers of the Servicer

and have been duly authorized by all necessary action on the part of the Servicer. All organizational resolutions and consents necessary for the Servicer to enter into and consummate all transactions contemplated hereby have been obtained, This Agreement has been duly executed and delivered by the Servicer and constitutes the legal, valid and binding obligation of the Servicer enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, and other similar laws affecting creditors' rights generally, and to general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law. The Servicer has not failed to obtain any consent, approval, authorization, or order of, or failed to cause any registration or qualification with, any court or regulatory authority or other governmental body having jurisdiction over the Servicer, which consent, approval, authorization, order, registration, or qualification is required for, and the absence of which would materially adversely affect, the legal and valid execution, delivery, and performance of this Agreement by the Servicer,

(iv)   Approvals and Permits.   The Servicer possesses such certificates, authorizations, licenses, and permits issued by the appropriate state, federal, and foreign regulatory agencies or bodies necessary to conduct the business now operated by it, and it has not received any notice of proceedings relating to the revocation or modification of any such certificate, authorization, or permit which, singly or in the aggregate, if the subject of an unfavorable decision, ruling, or finding, would materially and adversely affect the ability of the Servicer to perform its obligations hereunder.

(v)   No Litigation.   No litigation is pending or, to the best of the Servicer's knowledge, threatened against it, which, if determined adversely to the Servicer would prohibit the Servicer from entering into this Agreement or, in the good faith and reasonable judgment of the Servicer, is likely to materially and adversely affect either its ability to perform its obligations hereunder or the financial condition of the Servicer.

(vi)   Standard of Care.   In exercising its duties hereunder, Servicer agrees to use at least the same degree of care that it would use if the Defaulted Loans and Loans Eligible For Sale were Servicer's own property, but no less than a reasonable degree of care.

Section 9.   Indemnification.   The Servicer will indemnify each of the Trusts, the Owner Trustee and the Indenture Trustee and their respective officers, directors, employees and agents for, and hold them harmless against, any losses, liability or expense, including reasonable attorneys' fees and expenses, incurred in the absence of willful misconduct, negligence or bad faith on the part of the Trusts, the Owner Trustee, the Indenture Trustee (as applicable) and any Administrator, Servicer, Sub-Servicer or other agent of or servicer provider to the Trust and any of their agents, arising out of the willful misconduct, gross negligence or bad faith of the Servicer (or its agents) in the performance of the Servicer's duties contemplated by this Agreement; provided that neither the Servicer nor any of its directors, officers, employees or agents shall be liable for any action taken or for refraining from the taking of any action pursuant to instructions or directions from the Trust, the Administrator or the Indenture Trustee or in accordance with this Agreement. To the extent any indemnification amounts are not paid by the Servicer, such amounts shall be paid by each Trust (to the extent permitted under the applicable Indenture as indemnities, fees and expenses of the Servicer paid after the payment of principal and interest) in accordance with the respective Pool Balance of Financed Student Loans then owned by each Trust.

Section 10.   Records: Inspection.   The Servicer shall maintain appropriate books of account and records relating to services performed hereunder, which books of account and records shall be accessible for inspection by the Indenture Trustee at any time during normal business hours. The Servicer hereby grants the Indenture Trustee the right, for so long as any of the Notes remain outstanding, to perform ongoing due diligence review of the Servicer's activities hereunder; provided that, such due diligence be conducted in a reasonable manner, convenient to the Servicer and the Indenture Trustee. All expenses associated with the

NCSLT-00000475

performance of the due diligence review shall be paid by the Trusts and shall be subject to the Monthly Reimbursement Limit described in Section 5(A).

Section 11.    Reporting; Additional Information to be Furnished. On the tenth Business Day after the end of each calendar month, the Servicer shall furnish the Administrator, on behalf of the Trusts, an electronically transferred data file containing a monthly collection report regarding the Loans Eligible For Sale and Defaulted Loans in a form satisfactory to the Administrator. On the tenth Business Day after the end of each calendar month, the Servicer shall furnish the Administrator on behalf of the Trusts an electronically transferred data file containing recovery data for Loans Eligible For Sale and Defaulted Loans owned by each respective Trust and other information as required by Regulation AB, each for investor reporting purposes. The Servicer shall furnish to the Administrator on behalf of the Trusts from time to time such additional information regarding the Loans Eligible For Sale and Defaulted Loans as the Administrator on behalf of the Trusts shall reasonably request.

Section 12.    Subservicing Agreement. The Servicer will cause each subservicing agreement with a Subservicer to contain provisions consistent with this Agreement, including provisions requiring the applicable Subservicer to maintain adequate records and procedures with respect to a Financed Student Loan and its performance. Each subservicing agreement shall be terminable by the Servicer upon thirty days written notice, and shall provide that any successor to the Servicer shall succeed to the Servicer thereunder.

Section 13.    Regulation AB. On or before September 15 of each calendar year beginning in 2015, the Servicer shall deliver to the Administrator any reports, Servicer compliance statements and attestations as may be required pursuant to the terms of any Indenture. In the event the Servicer is required to deliver to the Administrator the documents described in this Section 13, the costs associated with delivering such reports, including the fees and expenses of a registered public accounting firm, shall be borne by the Administrator and reimbursed by the Trusts as a Servicer expense; provided however that the obligation of the Servicer to deliver any such reports shall terminate if such reports are no longer required by Regulation AB.

Section 14.    Security Interest. Each of the Trusts hereby Grants to the Indenture Trustee as of the date hereof, all of the Trust's right, title and interest in and to this Agreement and all present and future claims, demands, causes and chooses in action in respect of this Agreement and all payments on or under and all proceeds of every kind and nature whatsoever in respect of this Agreement. The foregoing Grant is made in trust to secure the payment of principal of and/or interest on, as applicable, and any other amounts owing in respect to the Notes, all as provided in the Indentures. The Indenture Trustee, as Indenture Trustee on behalf of the holders of the Notes, acknowledges such Grant, and accepts the Grant in accordance with the provisions of the Indentures.

Section 15.    Amendments. This Agreement may be amended from time to time by the parties hereto to add additional trusts, provided that any amendment must be accompanied by the written consent of the Trust and upon satisfying the Rating Agency Condition.

Section 16.    Independence of the Servicer. For all purposes of this Agreement, the Servicer shall be an independent contractor and shall not be subject to the supervision of the Trusts with respect to the manner in which it accomplishes the performance of its obligations hereunder. Unless expressly authorized by the Trusts, the Servicer shall have no authority to act for or represent the Trusts, respectively, in any way other than as specified hereunder and shall not otherwise be deemed an agent of the Trusts.

Section 17.    No Joint Venture. Nothing contained in this Agreement (i) shall constitute the Servicer and any of the Trusts as members of any partnership, joint venture, association, syndicate, unincorporated business or other separate entity, (ii) shall be construed to impose any liability as such on any of them, or (iii) shall be deemed to confer on any of them any express, implied or apparent authority to Incur any obligation or liability on behalf of the others.

Section 18. <u>Other Activities of the Servicer</u>. Nothing herein shall prevent the Servicer or its Affiliates from engaging in other businesses or, in its or their sole discretion, from acting in a similar capacity as servicer for any other person or entity even though such person or entity may engage in business activities similar to those of the Trusts.

Section 19. <u>Notices</u>. Any notice, report or other communication given hereunder shall be in writing and addressed as follows:

If to the Servicer, to:

> Odyssey Education Resources LLC
> 800 Corporate Drive,
> Ft. Lauderdale, FL 33334
> Attn: Tom Glanfield

> With a copy to:

> Cook and Sadorf, PL
> 1744 N. Belcher Rd., Suite 150
> Clearwater, FL 33765
> Attn: Rick Sadorf

If to the Trusts, to:

> Wilmington Trust Company
> Rodney Square North
> 1100 North Market Street
> Wilmington, DE 19890-0001
> Attn: Corporate Trust Administration

> With a copy to:

> VCG Securities LLC
> 407 SE 1st Street
> Delray Beach, FL 33483
> Attn: Donald Uderitz

Or to such other address as any party shall have provided to the other parties in writing. Any notice required to be in writing hereunder shall be deemed given if such notice is mailed by certified mail, postage prepaid, sent by overnight courier for next-day delivery or hand-delivered to the address of such party as provided above.

Section 20. <u>Notice to Noteholders</u>. Promptly upon execution of this Agreement, but in any event no later than 30 days following execution hereof, the Servicer shall deliver to the Indenture Trustee of each of the Trusts an executed copy of this Agreement along with a form of notice to each Noteholder to be distributed to each Noteholder by the Indenture Trustee in accordance with Article XI of each Indenture to the effect that the respective Trust has entered into this Agreement and has appointed Odyssey as Servicer and each Noteholder can request a copy of the Agreement by contacting the Indenture Trustee.

Section 21. <u>Miscellaneous</u>.

A. <u>Successors and Assigns</u>. This Agreement may not be assigned by the Servicer unless such assignment is previously consented to in writing by the Indenture Trustee and unless each Rating Agency, after having been given 10 days prior notice of such assignment, shall have declared in writing that such assignment will not result in a reduction or withdrawal of the then-current rating of the Notes or Certificates. An assignment with such consent and satisfaction, if accepted by the assignee, shall bind the assignee

hereunder in the same manner the Servicer is bound hereunder. Notwithstanding the foregoing, this Agreement may be assigned by the Servicer, without the consent of the Indenture Trustee to a corporation or other organization that is a successor (by merger, consolidation or purchase of assets) to the Servicer; provided that such successor organization executes and delivers to the Indenture Trustee and the other parties hereto an agreement in which such corporation or other organization agrees to be bound hereunder in the same manner as the Servicer is bound hereunder. Subject to the foregoing, this Agreement shall bind any such permitted successors or assigns of the parties hereto.

B. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to conflicts of laws provisions thereof (other than Section 5-1401 of the New York General Obligations Law).

C. <u>Headings</u>. The section headings hereof have been inserted for convenience of reference only and shall not be construed to affect the meaning, construction or intent of this Agreement.

D. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which when so executed shall together constitute but one and the same agreement.

E. <u>Severability</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

F. <u>Limitation of Liability of Owner Trustee</u>. Notwithstanding anything contained herein to the contrary, this instrument has been executed by Wilmington Trust Company, not in its individual capacity but solely in its capacity as Owner Trustee of each of the Trusts, and in no event shall Wilmington Trust Company in its individual capacity or any beneficial owner of the Trusts have any liability for the representations, warranties, covenants, agreements or other obligations of the Trusts hereunder, as to all of which recourse shall be had solely to the assets of the Trusts. For all purposes of this Agreement, in the performance of any duties or obligations of the Trusts hereunder, the Owner Trustee shall be subject to, and entitled to the benefits of, the terms and provisions of Articles VIII, IX and X of the each Trust Agreement of the Trusts.

G. <u>Third Party Beneficiary</u>. The parties hereto acknowledge that the Noteholders, Certificateholders and the Indenture Trustee are express third party beneficiaries hereof and are entitled to enforce their respective rights hereunder as if actually parties hereto.

H. <u>No Petition</u>. The parties hereto will not at any time institute against the Trusts any bankruptcy proceeding under any United States federal or state bankruptcy or similar law in connection with any obligations of the Trusts under any Basic Documents as defined in the Indenture.

I. <u>Grant</u>. Each Trust hereby acknowledges that this Agreement is a "Servicing Agreement" for all purposes of its applicable Indenture. Each Trust hereby grants to the Indenture Trustee, as trustee under each Indenture for the benefit of the Noteholders and other secured parties as applicable under the applicable Indenture, all of its right, title and interest in and to (i) the Agreement; and (ii) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, condemnation awards, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of the foregoing. The Administrator on behalf of each Trust shall take all steps necessary to ensure the perfection and priority of the Indenture Trustee's security interest in the foregoing collateral. By its signature below, the Indenture Trustee on behalf of the Noteholders and other secured parties as applicable, acknowledges such Grant.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

ODYSSEY EDUCATION RESOURCES LLC, as the Servicer

By: _____

Name: Donald Uderitz

Title: Authorized Signatory

Each of the Trusts listed on Schedule A, attached hereto

By: WILMINGTON TRUST COMPANY, not in its individual capacity but solely as Owner Trustee

By: _____

Name: Dorri Costello

Title: Assistant Vice President

ACKNOWLEDGED:

GSS DATA SERVICES, INC., as Administrator

By. _____

Name:

Title:

U.S. BANK NATIONAL ASSOCIATION, as Indenture Trustee for each of the Indentures listed on Schedule A attached hereto

By. _____

Name:

Title:

Trusts:

- The National Collegiate Student Loan Trust 2003-1;
- The National Collegiate Student Loan Trust 2004-1;
- The National Collegiate Student Loan Trust 2004-2;
- The National Collegiate Student Loan Trust 2005-1;
- The National Collegiate Student Loan Trust 2005-2; and
- The National Collegiate Student Loan Trust 2005-3.

Indentures:

Each of the following Indentures, as amended or supplemented, entered into by and between U.S. Bank National Association, as Indenture Trustee and:

- The National Collegiate Student Loan Trust 2003-1, dated as of December 1, 2003;
- The National Collegiate Student Loan Trust 2004-1, dated as of June 1, 2004;
- The National Collegiate Student Loan Trust 2004-2, dated as of October 1, 2004;
- The National Collegiate Student Loan Trust 2005-1, dated as of February 1, 2005;
- The National Collegiate Student Loan Trust 2005-2, dated as of June 1, 2005; and
- The National Collegiate Student Loan Trust 2005-3, dated as of October 1, 2005.

CONFIDENTIAL

NCSLT-00000480

TA594

## SCHEDULE B

[Schedule of Default Prevention Services Reimbursement Limits per Trust by Calendar Month]

CONFIDENTIAL

## SCHEDULE C

[Schedule of Early Awareness Services Reimbursement Limits per Trust by Calendar Month]

## Exhibit C

[Opinion of Counsel]

CONFIDENTIAL

NCSLT-00000483

TA597

# CHAITMAN LLP
### 465 PARK AVENUE
### NEW YORK, NY 10022
### (888) 759-1114
TELEPHONE & FAX

January 14, 2016

**VIA EMAIL**

U. S. Bank National Association
Corporate Trust Services-SFS
One Federal Street
3rd Floor
Boston, MA 02111

      Re:    Opinion of Counsel re: National Collegiate Student Loan Trusts and Odyssey
             Servicing Agreement

Ladies and Gentlemen:

As special litigation counsel to the Trusts listed on Exhibit A, we have been asked, in accordance with Section 11.01 of the Indenture applicable to each of the named Trusts, to provide an opinion respecting the actions directed in the Officers' Certificate of Issuer related hereto, and in particular the action requesting U.S. Bank National Association, in their capacity as Indenture Trustee, to provide written acknowledgement of the Odyssey Servicing Agreement dated as of December 30, 2014.

As such counsel, we have examined the relevant Indentures, Trust Agreements, the Odyssey Servicing Agreement, and such other documents and papers as we have deemed necessary as a basis for the opinions hereinafter set forth, including such covenants or conditions and the definitions relating therein relating hereto. In all such examinations made by us in connection with this opinion, we have assumed the genuineness of all signatures, the completeness and authenticity of all records and all documents submitted to us as originals, the conformity with the originals of all documents submitted to us as copies thereof and the accuracy of statements as to factual matters made to us in discussions. In rendering this opinion, we have relied, as to all questions of fact material to this opinion, upon certificates of officers and agents of the Owners (as defined in the Indenture of each of the referenced Trusts) and upon the representations made to us by one or more officers or agents of the Owners. Although we have not conducted any independent investigation of, or attempted to verify independently, such factual matters, nothing has come to our attention leading us to question the accuracy of such certificates or representations.

Based upon and subject to the foregoing, we are of the opinion that the execution of the Odyssey Servicing Agreement is authorized and/or permitted by the applicable Indentures and that all conditions precedent to such execution have been complied with.

We are members of the bar of the State of New York and this opinion is limited to the laws of the States of New York and the Federal laws of the United States of America.

{00017954 2 }

CONFIDENTIAL

NCSLT-00000484

TA598

Our opinions contained herein are rendered only as of the date hereof, and we undertake no obligation to update this letter or the opinions contained herein after the date hereof.

We express no opinion on any matter not discussed in this letter. This letter is rendered for the sole benefit of the addressee hereof, and no other person or entity is entitled to rely hereon. Copies of this letter may not be made available, and this letter may not be quoted or referred to in any other document made available to any other person or entity except to (i) any applicable rating agency, institution providing credit enhancement or liquidity support or governmental authority, (ii) any accountant or attorney for any person or entity entitled hereunder to rely hereon or to whom or which this letter may be made available as provided herein and (iii) as otherwise required by law.

Very truly yours,

Chaitman LLP

Chaitman LLP

{00017954 2 }

CONFIDENTIAL

# CHAITMAN LLP
## 465 PARK AVENUE
## NEW YORK, NY 10022
## (888) 759-1114
TELEPHONE & FAX

January 14, 2016

**VIA EMAIL**

U. S. Bank National Association
Corporate Trust Services-SFS
One Federal Street
3rd Floor
Boston, MA 02111

> Re: Opinion of Counsel re: National Collegiate Student Loan Trusts and Odyssey
> Servicing Agreement

Ladies and Gentlemen:

As special litigation counsel to the Trusts listed on Exhibit A, we have been asked, in accordance with Section 11.01 of the Indenture applicable to each of the named Trusts, to provide an opinion respecting the actions directed in the Officers' Certificate of Issuer related hereto, and in particular the action requesting U.S. Bank National Association, in their capacity as Indenture Trustee, to provide written acknowledgement of the Odyssey Servicing Agreement dated as of December 30, 2014.

As such counsel, we have examined the relevant Indentures, Trust Agreements, the Odyssey Servicing Agreement, and such other documents and papers as we have deemed necessary as a basis for the opinions hereinafter set forth, including such covenants or conditions and the definitions relating therein relating hereto. In all such examinations made by us in connection with this opinion, we have assumed the genuineness of all signatures, the completeness and authenticity of all records and all documents submitted to us as originals, the conformity with the originals of all documents submitted to us as copies thereof and the accuracy of statements as to factual matters made to us in discussions. In rendering this opinion, we have relied, as to all questions of fact material to this opinion, upon certificates of officers and agents of the Owners (as defined in the Indenture of each of the referenced Trusts) and upon the representations made to us by one or more officers or agents of the Owners. Although we have not conducted any independent investigation of, or attempted to verify independently, such factual matters, nothing has come to our attention leading us to question the accuracy of such certificates or representations.

Based upon and subject to the foregoing, we are of the opinion that the execution of the Odyssey Servicing Agreement is authorized and/or permitted by the applicable Indentures and that all conditions precedent to such execution have been complied with.

We are members of the bar of the State of New York and this opinion is limited to the laws of the States of New York and the Federal laws of the United States of America.

{00017954 2 }

CONFIDENTIAL

NCSLT-00001317

TA600

Our opinions contained herein are rendered only as of the date hereof, and we undertake no obligation to update this letter or the opinions contained herein after the date hereof.

We express no opinion on any matter not discussed in this letter. This letter is rendered for the sole benefit of the addressee hereof, and no other person or entity is entitled to rely hereon. Copies of this letter may not be made available, and this letter may not be quoted or referred to in any other document made available to any other person or entity except to (i) any applicable rating agency, institution providing credit enhancement or liquidity support or governmental authority, (ii) any accountant or attorney for any person or entity entitled hereunder to rely hereon or to whom or which this letter may be made available as provided herein and (iii) as otherwise required by law.

Very truly yours,

Chaitman LLP

Chaitman LLP

{00017954 2 }

CONFIDENTIAL



## AUTHORIZATION AND DIRECTION LETTER

February 17, 2016

Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-0001
Attn: Corporate Trust Administration

Re:     Authorization re: National Collegiate Student Loan Trusts

Ladies and Gentlemen:

Pursuant to Section 4.02 of the Trust Agreements listed in Exhibit A (the "Trust Agreements"), among National Collegiate Funding LLC, a Delaware limited liability company, as depositor (the "Depositor"), The Education Resources Institute, Inc., a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws, and Wilmington Trust Company, a Delaware trust company, as successor to Delaware Trust Company National Association, as trustee (the "Owner Trustee"), the undersigned hereby authorizes and directs the Trustee to take the following action:

1.  Deliver the letter attached hereto as Exhibit B to GSS Data Services, Inc. ("Goal") in their capacity as Administrator;

2.  Take any and all additional action as may be necessary, advisable, or appropriate to carry out the purpose and intent of this letter.

NC Owners LLC agrees to indemnify, defend and hold harmless Wilmington Trust Company and the Owner Trustee and any of the officers, directors, employees and agents of Wilmington Trust Company (collectively, the "Indemnified Persons") from and against any and all losses, damages, liabilities, claims, actions, suits, costs, expenses, disbursements (including all reasonable fees and expenses of its counsel, agents and other experts), taxes and penalties of any kind and nature whatsoever (collectively "Expenses"), to the extent that such Expenses arise out of or are imposed upon or asserted at any time against such Indemnified Person in connection with the actions taken by the Owner Trustee pursuant to this Authorization and Direction Letter. The indemnity contained herein shall survive the resignation or removal of the Owner Trustee or the termination of the Trust Agreement.

CONFIDENTIAL

The undersigned confirms in accordance with Section 4.02 of the Trust Agreement that all action requested to be taken by the Owner Trustee in connection with this Authorization and Direction Letter is not contrary to the Trust Agreement or any Trust Related Agreement.

Capitalized terms used herein and not otherwise defined are used as defined in the Trust Agreement.

Very truly yours,

NC OWNERS LLC, as Majority Owner

by NC RESIDUALS OWNERS TRUST, as Sole Member

by VCG SECURITIES LLC, as Agent

by: _____
Name: Donald Uderitz
Title: Authorized Signatory

Pursuant to Section 3.07(e) of the Amended and Restated Trust Agreement (the "Declaration") of NC Residuals Owners Trust dated May 14, 2009, the undersigned responsible officer of VCG Securities LLC, as Agent, hereby certifies that all conditions precedent, if any, provided for in the Declaration and any applicable Transaction Document (as defined in the Declaration) relating to the proposed action have been complied with.

by _____
Name: Donald Uderitz
Title: Authorized Signatory

CONFIDENTIAL

## Exhibit A

Trusts

- National Collegiate Student Loan Trust 2003-1, created pursuant to the Trust Agreement dated as of December 1, 2003

- National Collegiate Student Loan Trust 2004-1, created pursuant to the Trust Agreement dated as of June 10, 2004

- National Collegiate Student Loan Trust 2004-2, created pursuant to the Trust Agreement dated as of October 28, 2004

- National Collegiate Student Loan Trust 2005-1, created pursuant to the Trust Agreement dated as of February 23, 2005

- National Collegiate Student Loan Trust 2005-2, created pursuant to the Trust Agreement dated as of June 9, 2005

- National Collegiate Student Loan Trust 2005-3, created pursuant to the Trust Agreement dated as of October 12, 2005

- National Collegiate Student Loan Trust 2006-1, created pursuant to the Trust Agreement dated as of March 9, 2006

- National Collegiate Student Loan Trust 2006-2, created pursuant to the Trust Agreement dated as of June 8, 2006

- National Collegiate Student Loan Trust 2006-3, created pursuant to the Trust Agreement dated as of September 28, 2006

- National Collegiate Student Loan Trust 2006-4, created pursuant to the Trust Agreement dated as of December 7, 2006

- National Collegiate Student Loan Trust 2007-1, created pursuant to the Trust Agreement dated as of March 8, 2007

- National Collegiate Student Loan Trust 2007-2, created pursuant to the Trust Agreement dated as of June 14, 2007

**Exhibit B**

[GSS Letter]

February 17, 2016

GSS Data Services, Inc.
401 West A Street, Suite 1300
San Diego, CA 92101
Attention: Mr. Ken Ruggiero

Re: National Collegiate Student Loan Trusts; Acknowledgement of Odyssey Servicing Agreement; Payment of Odyssey Invoices

Ladies and Gentlemen:

We refer you to the Administration Agreements (the, "Administration Agreements") for the National Collegiate Student Loan Trusts listed on Exhibit A (the "Trusts"), by and between Wilmington Trust Company, not in its individual capacity, but solely as Owner Trustee (the "Owner Trustee"), U.S. Bank National Association, as Indenture Trustee (the "Indenture Trustee"), The National Collegiate Funding LLC, as Depositor (the "Depositor") and First Marblehead Data Services, Inc., as Administrator (the "Administrator"). Capitalized terms used herein without definition have the meaning assigned to them in the Administration Agreements and in the Trust Agreements.

The Trusts have entered into a Servicing Agreement (the "Odyssey Servicing Agreement") with Odyssey Education Resources LLC ("Odyssey") and you have previously received a copy of the related Officers' Certificate of Issuer and Opinion of Counsel whereby the Trusts and their counsel have certified that all conditions precedent for the execution of the Odyssey Servicing Agreement have been satisfied. You have also previously received Issuer Orders to acknowledge and execute your signature on the Odyssey Servicing Agreement and to cause the payment of all of the outstanding and future invoices submitted by Odyssey.

To date, you have willfully ignored all previous direction from the Issuer given by Issuer Order and you are now considered in breach of the Administration Agreements, specifically Section 1 (a) (i) (G).

The undersigned Trusts hereby give GSS Data Services, Inc. ("GSS"), as Administrator the following instructions pursuant to each of the Administration Agreements, effective immediately:

CONFIDENTIAL

i. GSS is hereby directed to acknowledge the Odyssey Servicing Agreement by executing on the signature line in the space provided therein and return such executed Servicing Agreement to the Trusts (care of the Owner Trustee) and Odyssey;

ii. On behalf of the Trusts, GSS is hereby directed to immediately cause the payment of all outstanding Odyssey invoices that have been previously submitted to GSS, as the Administrator, in accordance with the Administration Agreements and the Indentures;

iii. On behalf of the Trusts, GSS is hereby directed to timely cause the payment of all ongoing Odyssey invoices that are submitted to GSS, as the Administrator, in accordance with the Administration Agreements and the Indentures;

iv. GSS is hereby directed to take any and all additional action as may be necessary, advisable, or appropriate to carry out the purpose and intent of this letter, including the preparation of any and all direction, notification or other communication to the Indenture Trustee as necessary or required pursuant to the Indenture.

This Letter is executed and delivered on behalf of the Trusts by Wilmington Trust Company, not in its individual capacity but solely as Owner Trustee of the Trusts, and the statements contained herein are those of the Trusts and not Wilmington Trust Company. Further, Wilmington Trust Company has relied upon the accuracy and completeness of such statements and certifications in its execution and delivery of this letter on the authorization and directions received by the Owners.

Sincerely,

THE NATIONAL COLLEGIATE STUDENT LOAN TRUSTS 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, and 2005-3

BY: WILMINGTON TRUST COMPANY, not in its Individual capacity but solely as Owner Trustee for THE NATIONAL COLLEGIATE STUDENT LOAN TRUSTS 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, and 2005-3

By: _____

Name: Dorri Costello
Title: Vice President

## Exhibit A

- National Collegiate Student Loan Trust 2003-1, created pursuant to the Trust Agreement dated as of December 1, 2003;

- National Collegiate Student Loan Trust 2004-1, created pursuant to the Trust Agreement dated as of June 10, 2004;

- National Collegiate Student Loan Trust 2004-2, created pursuant to the Trust Agreement dated as of October 28, 2004;

- National Collegiate Student Loan Trust 2005-1, created pursuant to the Trust Agreement dated as of February 23, 2005;

- National Collegiate Student Loan Trust 2005-2, created pursuant to the Trust Agreement dated as of June 9, 2005;

- National Collegiate Student Loan Trust 2005-3, created pursuant to the Trust Agreement dated as of October 12, 2005.

## Costello, Dorri

| | |
|---|---|
| **From:** | Costello, Dorri |
| **Sent:** | Wednesday, March 09, 2016 2:54 PM |
| **To:** | lgotthoffer@chaitmanllp.com; 'Tad Cook' (tad@cooksadorf.com); Don Uderitz (don@vcg.cc); Jorge Rodriguez-Lugo |
| **Cc:** | peterson@rlf.com; Doneene Damon (damon@rlf.com) |
| **Subject:** | FW: NCSLT Trusts |
| **Attachments:** | Goal VCG Response Letter to February 17 2016 Issuer Letter.pdf |

Good Afternoon,

Please see attached and below.

Thanks,

Dorri

**From:** Ryan Gray [mailto:rgray@goalsolutions.com]
**Sent:** Wednesday, March 09, 2016 2:42 PM
**To:** Costello, Dorri
**Cc:** Tristan Fleming
**Subject:** RE: NCSLT Trusts

Please find the attached response to the 2/17/16 letter.

Regards,
Ryan

**From:** Costello, Dorri [mailto:DCostello@wilmingtontrust.com]
**Sent:** Wednesday, February 17, 2016 1:59 PM
**To:** Ken Ruggiero <kruggiero@goalsolutions.com>; Ryan Gray <rgray@goalsolutions.com>
**Subject:** NCSLT Trusts

Good Afternoon,

Please see attached notice with regards to the NCSLT Trusts listed on Exhibit A.

Thank You,

Dorri Costello, CCTS
Vice President | Wilmington Trust Company
302 636 6194 | (F) 302-636-4140
dcostello@wilmingtontrust.com

************************************
This email may contain privileged and/or confidential information that is intended solely for the use of the addressee. If you are not the intended recipient or entity, you are strictly prohibited from disclosing, copying, distributing or using any of the information contained in the transmission. If you received this communication in

1

CONFIDENTIAL

# GSS DATA SERVICES, INC.

402 West Broadway
20th Floor
San Diego, CA 92101

March 9, 2016

National Collegiate Student Loan Trusts 2003-1,
2004-1, 2004-2, 2005-1, 2005-2 and 2005-3
c/o Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890
Attention: Dorri Costello, Vice President

**Re:** **National Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2 and 2005-3 (the "NCSLT Trusts")**

Dear Ms. Costello:

Reference is made to your correspondence, dated February 17, 2016 (the "February 17, 2016 Letter"), regarding the NCSLT Trusts and the duties being performed by GSS Data Services, Inc. ("GSS") pursuant to the Administration Agreements for each of the NCSLT Trusts entered into by and among the applicable NCSLT Trust, Wilmington Trust Company, not in its individual capacity, but solely as owner trustee (the "Owner Trustee"), U.S. Bank National Association, as indenture trustee ("Indenture Trustee"), The National Collegiate Funding LLC, as depositor, and GSS, as successor administrator (in such capacity, the "Administrator"). In addition, the Administrator is in receipt of the Issuer Order, dated January 20, 2016 (the "Issuer Order"), executed on behalf of the NCSLT Trusts by Wilmington Trust Company, not in its individual capacity but solely as Owner Trustee.

The February 17, 2016 Letter states that GSS, as the Administrator, has willfully ignored the Issuer Order and is in breach of the Administration Agreements. GSS denies the assertions that it is in breach of any provision of the Administration Agreements. GSS, as the Administrator and solely pursuant to direction of the NCSLT Trust pursuant to the Issuer Order, included the amounts invoiced by Odyssey for the period from January 2015 through January 2016 in the Monthly Issuer Orders for the February 2016 Payment Date.

Sincerely,

GSS DATA SERVICES, INC.

By: _____
Ryan Gray, Vice President