IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN THE MATTER OF THE NATIONAL COLLEGIATE STUDENT LOAN TRUSTS 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, and 2005-3 | ) ) ) ) ) C.A. No. 16-341-SLR |

# INDENTURE TRUSTEE'S REPLY BRIEF SUPPORTING ITS MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:
Michael A. Collyard
Thomas F. Berndt
Peter Ihrig
ROBINS KAPLAN LLP
800 LaSalle Ave., Suite 2800
Minneapolis, MN 55402
(612) 349-8500

Dated: April 5, 2017

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
*Attorneys for U.S. Bank National Association*

# TABLE OF CONTENTS

                                                                                             **Page**

Legal Argument ................................................................................................................. 1

    I.        The Odyssey Agreement is invalid. ..................................................................... 1

                A.        The Issuers' argument that the Odyssey Agreement does not amend the Indentures and existing servicing agreements ignores the Indentures' plain language and puts form over substance. ................... 2

                B.        The Indentures do not permit the Issuers to order the Indenture Trustee to sell loans to Odyssey, and certainly not for less than Full Payment ................................................................................................................ 3

                C.        The Issuers' explanation of why the Indentures exempt Section 3.14 sales from TIA certification and reporting requirements is nonsensical. .............................................................................................. 6

    II.      Odyssey is not entitled to reimbursement as a matter of law and, although the Indenture Trustee disputes the value of any "services" Odyssey provided the Trusts, the Court need not resolve this issue now .............................. 7

    III.     Odyssey is not entitled to reimbursement because it did not expressly notify the rating agencies that Odyssey's appointment would increase servicing fees. ....................................................................................................... 7

Conclusion ........................................................................................................................ 8

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*MHR Capital Partners LP v. Presstek, Inc.*,
  12 N.Y.3d 640 (N.Y. 2009) ................................................................................................7

*Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*,
  2000 U.S. Dist. LEXIS 3941 (S.D.N.Y. Mar. 29, 2000) ........................................................6

*Simon v. Etgen*,
  213 N.Y. 589 (N.Y. 1915) ..................................................................................................3

*Twin Bridges LP v. Draper*,
  2007 Del. Ch. LEXIS 136 (Del. Ch. Sept. 14, 2007) ............................................................3

*Warberg Opportunistic Trading Fund, L.P. v GeoResources, Inc.*,
  112 A.D.3d 78 (N.Y. App. Div. 1st Dep't 2013) ..................................................................2

**Other Authorities**

Merriam-Webster's Collegiate Dictionary 39 (Eleventh Ed. 2012) .................................................2

**LEGAL ARGUMENT**

**I. The Odyssey Agreement is invalid.**

The Issuers ignore the plain meaning of the phrase "waive, amend, modify, supplement, or terminate" and, by urging this Court to ignore the Odyssey Agreement's practical effects, elevate form over substance. And the Issuers' purported "mechanism" for selling loans to Odyssey is broken because the Indentures do not enable the Issuers to order the Indenture Trustee to sell loans to a servicer. Read as a whole, the Indentures require Full Payment for loans sold under Section 3.14; otherwise, the Indenture Trustee could not deposit the requisite Purchase Amount into the Collection Account. If Full Payment were not required, the drafters could not have exempted such loans from TIA registration and reporting requirements because they could not have guaranteed that the sale price listed in future servicing agreements would not impair the securities' value.

To distract from the flaws in Odyssey's appointment, the Issuers wrongly claim, without any support, that U.S. Bank "is making millions of dollars in fees" for its role as special servicer.[1] The Issuers claim that "U.S. Bank's Opening Brief studiously avoids mentioning the elephant in the room: U.S. Bank is making millions of dollar [sic] of fees based on loans that are generating no revenue for the Trusts, and it desperately wants to avoid having the Trusts sell non-performing loans, since [this] would deprive U.S. Bank of the fees it earns on such loans."[2] This is simply untrue. There is no elephant in the room. U.S. Bank does not receive *any* servicing compensation from its role as special servicer. All servicing fees otherwise payable under the

---

[1] Answering Brief of Trusts in Opposition to Indenture Trustee's Motion for Summary Judgment (the "Opposition"), D.I. 63 at 17.
[2] Opposition at 2-3.

1

Special Servicing Agreement are split between the special sub-servicers.[3] U.S. Bank retains no fees in connection with its role as special servicer.

### A. The Issuers' argument that the Odyssey Agreement does not amend the Indentures and existing servicing agreements ignores the Indentures' plain language and puts form over substance.

The Odyssey Agreement waives, amends, modifies, supplements, or terminates the Indentures and existing servicing agreements and, therefore, required Noteholder and Indenture Trustee approval. And the Issuers' various arguments do nothing to change this conclusion. First, the Issuers argue that "[t]he fact that some of the provisions of the Odyssey Agreement are different from provisions in the Special Servicing Agreement does not 'effectively' convert it into an amendment to the Special Servicing Agreement."[4] The Issuers are wrong. In granting Odyssey new powers no other servicer enjoys and weakening or eliminating Noteholder and Indenture Trustee rights and protections, the Odyssey Agreement effectively amends—and, in any event, waives, modifies, supplements or terminates—the Basic Documents' terms.

Whether the Odyssey Agreement is styled as a formal amendment is inconsequential. The term "amend" is defined as "to alter *formally* by modification, deletion, or addition."[5] This suggests that "modify" and "supplement" mean something other than *formal* alterations. *See Warberg Opportunistic Trading Fund, L.P. v GeoResources, Inc.*, 112 A.D.3d 78, 83 (N.Y. App. Div. 1st Dep't 2013) ("A reading of a contract should not render any portion meaningless."). The drafters' use of these words suggests their intent to capture even *informal* alterations like the Odyssey Agreement, whose "different provisions" have the effect of modifying or supplementing a Basic Document, though not titled as amendments. As explained in the

---

[3] *See* Ihrig Decl., D.I. 59 at Ex. 11; Ex. A to Reply Declaration of Peter C. Ihrig (December 11, 2012 Letter from U.S. Bank to GSS Data Services).
[4] Opposition at 7.
[5] Merriam-Webster's Collegiate Dictionary 39 (Eleventh Ed. 2012) (emphasis added).

Indenture Trustee's opening brief, the Odyssey Agreement alters the terms of numerous Basic Documents.

The Issuers next argue that, because the Special Servicing Agreement does not contain an exclusivity clause, they are free to supplant it without Noteholder and Indenture Trustee approval.[6] But such an interpretation would eviscerate the Noteholder approval requirement if, rather than having to obtain Noteholder approval to modify Basic Documents, the Issuers could simply draft new, alternative agreements with different terms. The drafters did not intend to allow the Issuers to make an end-run around the Noteholder approval requirement so easily. This can be seen in the broad standard they created—requiring Noteholder approval for any waiver, amendment, modification, supplement, or termination of any of the Basic Documents' terms.

The Issuers' arguments put form over substance. But "[i]t is the very nature of equity to look beyond form to the substance of an arrangement. Equity will not permit one to evade the law by dressing what is prohibited in substance in the form of that which is permissible." *Twin Bridges LP v. Draper*, 2007 Del. Ch. LEXIS 136, *31 (Del. Ch. Sept. 14, 2007); *Simon v. Etgen*, 213 N.Y. 589, 592 (N.Y. 1915) ("Equity looks through the form to the substance and purpose of the agreement, and moulds its decree in accordance with what the parties may fairly be presumed to have intended."). Here, regardless of its form, the Odyssey Agreement has the effect of waiving, amending, modifying, supplementing, or terminating the Basic Documents and therefore required Noteholder and Indenture Trustee approval.

### B. The Indentures do not permit the Issuers to order the Indenture Trustee to sell loans to Odyssey, and certainly not for less than Full Payment.

The Issuers state that "[t]he mechanism for the sale of loans would be that the Trusts would issue an Issuer Order to the Indenture Trustee directing the sale of loans to Odyssey and

---

[6] *See* Opposition at 7.

stating the purchase price."[7] But there is nothing in the Indentures that allows the Issuers to order the Indenture Trustee to sell loans to Odyssey. The Issuers misleadingly claim that Indenture Section 2.09 allows them to order the Indenture Trustee to sell loans to Odyssey. Yet Section 2.09 merely states that "the Indenture Trustee shall release property from the lien of this Indenture only upon receipt of an Issuer Request accompanied by an Officers' Certificate of the Issuer." In other words, an Issuer Request and an Officers' Certificate are necessary but insufficient, by themselves, to force the Indenture Trustee to sell loans to a servicer. Similarly, Indenture Section 3.14 states that loans "may only be sold" by the Indenture Trustee under certain conditions; like Section 2.09, it does not *require* the Indenture Trustee to sell loans upon the Issuers' demand.[8]

Restricting the Issuers' ability to order the Indenture Trustee to release loans from the Indenture Trust Estate is consistent with the Indentures' other provisions. Under the Granting Clause, the Issuers broadly grant "all . . . . right, title and interest" to the loans to the Indenture Trustee to secure payment of principal and interest on the Notes. Section 3.08 sharply limits the Issuers' ability to transfer or otherwise compromise the Indenture Trust Estate, for example, by prohibiting the Issuers from selling or transferring the Indenture Trust Estate's assets "except as expressly permitted by this Indenture or any other Basic Document." Read as a whole, the Indentures demonstrate the drafters' intent to preclude the Issuers from ordering the Indenture Trustee to sell loans out of the Indenture Trust Estate and to require Noteholder and Indenture Trustee approval for any new agreement that would waive, amend or modify the restrictions the Indentures place on the sale of Indenture Trust Estate assets.

---

[7] Opposition at 12.
[8] Indenture Section 6.02(i) states "[a]ny permissive right or authority granted to the Indenture Trustee shall not be construed as a mandatory duty." D.I. 59 at Ex. 4.

The Issuers also claim that "U.S. Bank's arguments confuse the concept of market value with the amount needed to repay the loan" because "at some places U.S. Bank's brief complains that the Odyssey Agreement allows sales of loans at below fair value . . . , [but] in other places . . . argues that 'Full Payment' is required by the Indenture."[9] It is true that these are two different concepts, but the Indenture Trustee does not "confuse" the two.

To be clear, reading Indenture Sections 3.14 and 8.01(c) together demonstrates that any loans sold to a servicer must be for *repayment* value, which the Indenture Trustee's brief refers to as "Full Payment." Section 8.01(c) requires the Indenture Trustee to deposit the "Purchase Amount" for loans sold to servicers into the Collection Account. "Purchase Amount" is defined as "100% of the amount required to prepay in full the [loan]"—in other words, repayment value.[10] And the Indenture Trustee could not make the required deposit if the servicer did not pay the full repayment value for the loan. Thus, reading Sections 3.14 and 8.01(c) together demonstrates that the drafters intended loans sold to a servicer to be for repayment value and the Odyssey Agreement violates the Indentures by allowing Odyssey to purchase loans at less than repayment value.

But the Odyssey Agreement goes even further by allowing Odyssey to purchase loans at below *market* value. With defaulted loans, like those Odyssey would be servicing, there is a substantial risk that the loan will not be fully repaid. Considering the elevated risk of nonpayment, the defaulted loans' *market* value may be substantially less than their repayment value. The Odyssey Agreement not only allows Odyssey to purchase loans at less than *repayment* value, it allows Odyssey to purchase loans at 10% below *market* value. Section 2(C)(iii) of the Odyssey Agreement allows Odyssey to buy loans out of the Indenture Trust

---

[9] Opposition at 13.
[10] D.I. 59 at Ex. 4 at A-24.

5

Estate at "10% less that [sic] the average value established [by] two (2) reputable appraisers." This appraised value reflects a loan's market value. By allowing Odyssey to buy loans at 10% less than their appraised value, it allows Odyssey to buy loans at below *market* value. It is this aspect of the Odyssey Agreement—combined with VCG's control of the Issuers and close association with Odyssey—that creates a particular risk for self-dealing to the detriment of Noteholders.

### C. The Issuers' explanation of why the Indentures exempt Section 3.14 sales from TIA certification and reporting requirements is nonsensical.

The Issuers argue that "[t]here is no merit to U.S. Bank's attempt to rely on the Trust Indenture Act ('TIA') for the notion that Full Payment is required."[11] The Issuers' logic appears to be that loans sold under Section 3.14 are exempted from TIA certification and reporting requirements so long as the loans are sold for the amount listed in a servicing agreement. But this is an entirely circular argument. The fact that a price is listed in a newly drafted servicing agreement (e.g. the Odyssey Agreement) does not guarantee that the loan will be sold for an amount—like that contractually mandated Purchase Amount—that necessarily will not impair the securities under indenture. *See Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*, 2000 U.S. Dist. LEXIS 3941, *19 (S.D.N.Y. Mar. 29, 2000) (TIA Section 314 "is not applicable in any case in which release could not possibly impair the security under the indenture"). The only way the drafters could have known that the price in any future servicing agreements would necessarily not impair the securities under indenture was to require that loans sold under Section 3.14 be for Full Payment (i.e. repayment value).

---

[11] Opposition at 17.

**II.  Odyssey is not entitled to reimbursement as a matter of law and, although the Indenture Trustee disputes the value of any "services" Odyssey provided the Trusts, the Court need not resolve this issue now.**

The Issuers' brief incorrectly states that the Indenture Trustee "has abandoned the position it took in the Petition that Odyssey should not be paid because it had not rendered services to the Trusts."[12] The Indenture Trustee has in no way abandoned this argument. It simply requires a factual determination inappropriate for resolution as a matter of law at this stage of the proceeding. Against this Court's admonition that testimony should be presented live, not through declarations, the Issuers have submitted numerous self-serving declarations attesting to the supposed "value" of the services Odyssey performed. The Court need not address this question, however, because Odyssey's legally invalid appointment and failure to satisfy a condition precedent to increasing servicing fees preclude reimbursement as a matter of law.

**III.  Odyssey is not entitled to reimbursement because it did not expressly notify the rating agencies that Odyssey's appointment would increase servicing fees.**

The Issuers do not dispute that the Odyssey Agreement would increase "Servicing Fees." Nor do they dispute that satisfying the Indentures' Rating Agency Condition is an express condition precedent to increasing Servicing Fees. Rather, the Issuers claim that, by providing a copy of the Odyssey Agreement to the rating agencies, which "set forth the fees Odyssey would receive . . . the ratings agencies were fully informed about the increased fees."[13]

But strict compliance with a condition precedent is required and simply attaching the Odyssey Agreement did not satisfy this condition. "Express conditions must be literally performed; substantial performance will not suffice." *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (N.Y. 2009). The Indentures state: "'<u>Rating Agency Condition</u>' means, with respect to any *action*, that each Rating Agency shall have been given 10 days' prior notice

---

[12] Opposition at 18-19.
[13] Opposition at 19.

7

*thereof* . . . and that none of the Rating Agencies shall have notified the . . . Indenture Trustee, in writing that such *action* will . . . result in a reduction or withdrawal of the then current rating of the Notes."[14] The only "action" the Issuers' November 25, 2014 letter mentions is appointing Odyssey—it says nothing about servicing fees. And whether the rating agencies could have somehow surmised of the increased servicing fees by reading the Odyssey Agreement is irrelevant. With respect to whether the condition precedent was satisfied, all that matters is whether Odyssey literally performed the action of providing "notice" of the increased servicing fees. Odyssey's failure to literally perform the notice required to satisfy the Rating Agency Condition—an express condition precedent for increasing Servicing Fees—precludes it from being reimbursed out of the Indenture Trust Estate.

## CONCLUSION

The Indenture Trustee respectfully requests that the Court deny the Issuers' motion and grant the Indenture Trustees' cross motion seeking instructions that (1) Odyssey's appointment under the Odyssey Agreement is invalid and (2) Odyssey's invoiced expenses should not be paid from the Indenture Trust Estate.

---

[14] D.I. 59, Ex. 4 at A-24 (emphasis added).

Respectfully submitted,

*/s/ Andrew E. Russell*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
*Attorneys for U.S. Bank National Association*

OF COUNSEL:
Michael A. Collyard
Thomas F. Berndt
Peter Ihrig
ROBINS KAPLAN LLP
800 LaSalle Ave., Suite 2800
Minneapolis, MN 55402
(612) 349-8500

Dated: April 5, 2017