## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN THE MATTER OF THE NATIONAL          )
COLLEGIATE STUDENT LOAN TRUSTS        )          C.A. No. 16-341-JFB-SRF
2003-1, 2004-1, 2004-2, 2005-1, 2005-2 and )
2005-3.                                )          **UNDER SEAL**
                                       )

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

This is an action arising from a "Trust Instructional Proceeding," a Minnesota statutory

proceeding initiated for the purpose of seeking instruction concerning trust administration

relating to the appointment and payment of a loan servicer for transactions relating to loans held

by the trusts. Presently before the court are the following motions: (1) the motion for summary

judgment of respondents National Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-

1, 2005-2, and 2005-3 (the "Trusts"); and (2) the motion for summary judgment of petitioner

U.S. Bank National Association, in its capacity as indenture trustee[1] ("U.S. Bank" or the

"Indenture Trustee"). (D.I. 55; D.I. 57) For the following reasons, I recommend granting the

Trusts' motion for summary judgment (D.I. 55), and denying the Indenture Trustee's motion for

summary judgment (D.I. 57).

### II.    BACKGROUND

#### A. Factual Background

Six Delaware statutory trusts, identified as National Collegiate Student Loan Trusts 2003-

---

[1] On May 2, 2017, interested parties, and holders of notes in the trusts that are subject to this
action, Waterfall Asset Management, LLC, OWS ABS Fund II, L.P., OWS COF I Master, L.P.,
OWS Credit Opportunity I, LLC, and One William Street Capital Master Fund, Ltd. informed
the court in advance of the May 11, 2017 oral argument that they support the Indenture Trustee's
position and motion for summary judgment. (D.I. 69)

1, 2004-1, 2004-2, 2005-1, 2005-2, and 2005-3 (the "Issuers" or the "Trusts"), were created between 2003 and 2005 to acquire pools of student loans, facilitate the issuance and sale of notes (the "Notes") backed by the private student loans (the "Loans") to investors (the "Noteholders"), and provide for the servicing of the Loans ("Loan Servicing").[2] (D.I. 1-1 at ¶¶ 10-11) Wilmington Trust Company ("WTC" or the "Owner Trustee") acts as the current trustee. (*Id.* at ¶ 10) The Trusts are "owner-directed" Trusts, meaning that, as provided in § 2.03(b)(i) of the Trust Agreements, in conducting the operations of the Trusts, the Trusts act solely in their own name, and "the Owner Trustee or other agents selected in accordance with this Agreement will act on behalf of the Trust subject to direction by the Owners...." (D.I. 61 at TA353) Each Trust entered into an Indenture through which it pledged loans, and the rights under the Basic Documents[3], to U.S. Bank as the Indenture Trustee (the "Indentures"). (D.I. 1-1 at ¶ 11) The Trusts issued multiple classes of Notes backed by the Loans, granting the Noteholders the right to repayment from the principal and interest payments collected from the borrowers who took out the Loans. (*Id.*)

The Trusts first entered into an Administration Agreement with First Marblehead Data Services, Inc. ("FMDS") to act as administrator to the Trusts. (D.I. 61 at TA155) When the

---

[2] Loan Servicing" is the process by which borrowers' principal and interest payments on Loans are collected and remitted to the Indenture Trustee, for distribution to Noteholders, and, if applicable, certificate holders ("Certificate Holders"). Certificate Holders, also known as the "Owners," hold certificates that represent equitable interests in the Trusts themselves. (D.I. 59, Ex. 3 at § 3.01(a)) The Certificate Holders receive payment on their certificates only after the Noteholders receive payments on their Notes. (*Id.*, Ex. 4 at § 8(d)(12))

[3] "Basic Documents" include the Indentures, the Master Servicing Agreement, and the Special Servicing Agreement. It is defined in the Indentures to include "the Trust Agreement, the Grantor Trust Agreement, the Indenture, all Student Loan Purchase Agreements, the Deposit and Sale Agreement, the Servicing Agreements, the Administration Agreement, the Back-up Administration Agreement, the Custodial Agreements, the Note Depository Agreement, the Guarantee Agreements, the TERI Deposit and Security Agreement, any Program Manual and other documents and certificates delivered in connection with any thereof." (D.I. 61 at TA400)

2

Notes were issued, the Pennsylvania Higher Education Assistance Agency ("PHEAA") was each Trust's sole or primary servicer, bound by the PHEAA Servicing Agreement. (D.I. 1-1 at ¶ 15) At that time, The Educational Resources Institute Inc. ("TERI") guaranteed full repayment on the Loans by agreeing to purchase a Loan for 100% of the Loan's outstanding principal balance, plus all accrued interest, whenever a borrower failed to make payments on a Loan for a specific number of days, went bankrupt, or died. (D.I. 59, Ex. 5 at S30-S31) In 2008, TERI went bankrupt and ceased guaranteeing Loans. (D.I. 58 at 9) Following TERI's bankruptcy, the Trusts entered into a Special Servicing Agreement, dated March 1, 2009 (the "Special Servicing Agreement"), with First Marblehead Education Resources, Inc. ("FMER"), providing for servicing of defaulted Loans. (D.I. 1-1 at ¶ 16) The Special Servicing Agreement established U.S. Bank as the back-up Special Servicer for the Trusts. (*Id.*) The Special Servicing Agreement also established requirements that had to be satisfied before a successor Special Servicer could be appointed. (D.I. 59, Ex. 6 at § 6.E) Specifically, the Special Servicing Agreement required that the Trusts provide written notice to the rating agencies,[4] and receive written confirmation from the rating agencies, that the proposed appointment would not result in a reduction or withdrawal of the Notes' then-current ratings (the "SSA Rating Agency Condition"). (*Id.* at §§ 6.E, 16)

In 2012, FMDS was sold to GSS Data Services, Inc. ("GSSDS" or the "Administrator"), who now acts as the Administrator to the Trusts. (D.I. 1-1 at ¶ 17) Shortly after that sale, FMER resigned as Special Servicer, causing U.S. Bank to assume the role as back-up Special Servicer. (*Id.* at ¶ 16)

---

[4] The three credit rating agencies are Standard & Poor's Rating Services, Moody's Investor Services, Inc., and Fitch Ratings. (D.I. 64 at TA619)

3

In 2014, the owners of the beneficial interests in the Trusts were an affiliate of Citibank named SL Resid Holdings, LLC ("Citibank") and NC Owners, LLC ("NC Owners") (collectively, the "Owners"). (D.I. 64 at TA620) On December 30, 2014, the Owners entered into an agreement with Odyssey Education Resources LLC ("Odyssey"), whereby Odyssey would act as a "Servicer" for each Trust's Loans (the "Odyssey Agreement"). (D.I. 1-1 at ¶¶ 19-20) VCG Securities, LLC ("VCG") was the authorized representative of the Owners in connection with the transaction, and was an affiliate of Odyssey. (*Id.*; D.I. 64 at TA620)

The Odyssey Agreement provides that Odyssey will service "Defaulted Loans"[5] and "Loans Eligible for Sale."[6] (D.I. 59, Ex. 8 at § 2.B) The Owners directed WTC as Owner Trustee to execute the Odyssey Agreement on behalf of the Trusts (D.I. 61 at TA516), which it did (D.I. 61 at TA35). On December 8, 2015, the Trusts submitted more than $1.24 million in invoices from Odyssey for payment from the Indenture Trust Estate (the "Odyssey Invoices"). (D.I. 59, Ex. 9) Each Odyssey Invoice seeks "Reimbursement of Expenses" in varying amounts on a monthly basis from January 2015 through February 2016. (*Id.*)

## B. Procedural History

On February 18, 2016, the Indenture Trustee filed a "Petition for Instructions in the Administration of Trusts Pursuant to Minnesota Statute § 501C.0201" in Minnesota's Second Judicial District Court, in the County of Ramsey. (D.I. 1-1) The Indenture Trustee sought the

---

[5] The Odyssey Agreement defines "Defaulted Loans" as a "[Loan] owned by a Trust for which the borrower of such [Loan] has failed to repay such [Loan] according to the terms agreed to in the applicable controlling loan documents and agreements, provided however, that such Borrower shall have been delinquent in its repayment obligations for no less than 31 days[.]" (D.I. 59, Ex. 8 at § 1)

[6] The Odyssey Agreement defines "Loans Eligible for Sale" as a "[Loan] owned by a Trust for which the borrower of such [Loan] has failed to repay such [Loan] according to the terms agreed to in the applicable controlling loan documents and agreements, and such Borrower(s) shall have been delinquent in its repayment obligations for no less than 180 days." (D.I. 59, Ex. 8 at § 1)

4

state court's instruction regarding VCG's "attempt to appoint Odyssey as a servicer or special servicer for each Trust under the Odyssey Agreement." (*Id.* at ¶ 2) Specifically, the Indenture Trustee sought the court's instruction on three issues: (1) whether, under the governing agreements, Odyssey was properly appointed as a servicer or special servicer and whether the Odyssey Agreement was valid and binding, such that the Indenture Trustee should release funds necessary to compensate Odyssey for any future services performed; (2) to the extent Odyssey was properly appointed as servicer or special servicer and the Odyssey Agreement is valid and binding, how to resolve certain conflicts between the Odyssey Agreement and the governing agreements; and (3) to the extent Odyssey was properly appointed, whether to release the funds necessary to pay the Odyssey Invoices. (*Id.* at ¶¶ 5-7)

On March 25, 2016, WTC removed the action to the United States District Court for the District of Minnesota. (D.I. 1) On May 4, 2016, the parties stipulated to transfer the case to this court, and the action was transferred on May 11, 2016. (D.I. 16; D.I. 19) On March 15, 2017, both the Trusts and Indenture Trustee filed cross-motions for summary judgment.[7] (D.I. 55; D.I. 57) The court heard oral argument on May 12, 2017.

## III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

---

[7] On September 18, 2017, the Trusts filed a notice of supplemental authority and attached a Proposed Consent Judgment (the "Consent Judgment") that was negotiated between the Consumer Financial Protection Bureau ("CFPB") and the equity owners of the Trusts and that is subject to an ongoing court-approval proceeding in this District. (D.I. 76) At oral argument, the Trusts referred to the investigation by the CFPB regarding the servicing activities involving loans owned by the Trusts. (5/12/17 Tr. at 7:5-10) However, the Trusts assertion of "abusive conduct by U.S. Bank's Subservicer" is not at issue in the current case. (*Id.*; D.I. 56 at 16-17) The pending motions regard only the issue of the validity of Odyssey's appointment as a servicer and Odyssey's right to reimbursement for its alleged servicing costs. The Consent Judgment submitted by the Trusts does not address either of these two issues, and does not aid in the court's ruling on summary judgment.

5

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). Material facts are those that could affect the outcome of the proceeding, and "a

dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury

to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir.

2011) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986)). Pursuant to Rule

56(c)(1), a party asserting that a fact is genuinely disputed must support its contention either by

citing to "particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made

for the purposes of the motion only), admissions, interrogatory answers, or other materials," or

by "showing that the materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.

R. Civ. P. 56(c)(1)(A) & (B).

Courts considering cross-motions for summary judgment will treat each motion

independently. *T-Mobile, Ne., LLC v. City of Wilmington*, 2018 WL 1472526, at \*2 (D. Del.

Mar. 26, 2018) (citing *Rains v. Cascades Industries, Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)).

The moving party bears the initial burden of proving the absence of a genuinely disputed

material fact.[8] *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden then shifts to the

non-movant to demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Williams v. Borough of West Chester, Pa.*, 891

---

[8] The Trusts contend that "the Indenture Trustee has the burden of proving that the proposed transaction is not permitted." (D.I. 56 at 8) (citing *Bank of N.Y. Mellon v. Realogy Corp.*, 979 A.2d 1113, 1121 (Del. Ch. 2008)). The Indenture Trustee argues that the *Realogy* case was a declaratory judgment action, so its reasoning does not apply to a Trust Instructional Proceeding like the case at bar. (D.I. 65 at 3) The Indenture Trustee argues, and this judicial officer agrees, that the analysis is subject to the summary judgment standard pursuant to Rule 56. (*Id.*)

6

F.2d 458, 460-61 (3d Cir. 1989). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). However, the existence of some evidence in support of the nonmoving party may not be sufficient to deny a motion for summary judgment. Rather, there must be enough evidence to enable a jury reasonably to find for the nonmoving party on the issue. *See Anderson*, 477 U.S. at 249. If the nonmoving party fails to make a sufficient showing on an essential element of its case on which it bears the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## IV. DISCUSSION

### A. Odyssey's Appointment as a Servicer

The Indenture Trustee argues that Odyssey was not validly appointed to act as a Servicer because neither the Noteholders nor the Indenture Trustee approved Odyssey's appointment, as the Indentures require. (D.I. 58 at 2) Specifically, the Indenture Trustee argues that (1) the Odyssey Agreement purporting to appoint Odyssey as a servicer would waive, amend, modify, supplement, or terminate the Basic Documents' terms, and, therefore, Indenture Trustee and Noteholder approval was required; and (2) the Odyssey Agreement is invalid because the Trusts did not satisfy the SSA Rating Agency Condition. (D.I. 58 at 9-12) The Trusts argue that its hiring of Odyssey as an additional servicer complied with all provisions of the relevant agreements, and that the Odyssey Agreement does not conflict with any provisions of the Special Servicing Agreement or any Basic Document.[9] (D.I. 56 at 1-2)

---

[9] The Indenture Trustee points to the affiliation of VCG and Odyssey as evidence of self-dealing

7

### 1. Indenture Trustee and Noteholder Approval

The Indenture Trustee first argues that the Odyssey Agreement would waive, amend, modify, supplement, or terminate the terms of the Basic Documents, so Noteholder and Indenture Trustee approval was required for Odyssey's appointment. (D.I. 58 at 9-10; D.I. 65 at 4) The Trusts argue that it had the power to appoint Odyssey as a Servicer and enter into the Odyssey Agreement, and the Odyssey Agreement does not modify the terms of the Special Servicing Agreement or other Basic Documents. (D.I. 63 at 6) The Indentures require Noteholder and Indenture Trustee approval for anything that "waive[s], amend[s], modif[ies], supplement[s], or terminate[s]" the Basic Documents or their terms, "except to the extent otherwise provided therein." (D.I. 61 at TA65-66, § 3.07) As such, the court must determine whether the Odyssey Agreement waives, amends, modifies, supplements, or terminates the Basic Documents, thus triggering the requirement to obtain Noteholder and Indenture Trustee approval in accordance with the Indentures.

New York law governs the Indentures, Special Servicing Agreement, and the Odyssey Agreement. (D.I. 59, Ex. 6 at § 22.B; Ex. 8 at § 21.B; Ex. 4 at § 11.13) Under New York law, "[i]ndentures are to be read strictly and to the extent they do not expressly restrict the rights of the issuer, the issuer is left with the freedom to act, subject only to the boundaries of other

---

in the transaction to appoint Odyssey as a loan servicer. (D.I. 65 at 8; 5/12/17 Tr. at 22:5-11) The Trusts retort that U.S. Bank's poor performance as a Special Servicer has resulted in expired and, thus, uncollectible loans in which no payments are being made on about three-quarters of the loans. (D.I. 56 at 2; 5/12/17 Tr. at 6:22-7:4) Moreover, the Trusts suggest that U.S. Bank is motivated to avoid having non-performing loans sold to Odyssey because removing such loans from the pools would deprive U.S. Bank of the fees it earns on such loans. (D.I. 56 at 3-4) U.S. Bank responds that it does not receive the fees, but passes them through to sub-servicers. (5/12/17 Tr. at 25:2-10) The court finds that each side's self-interest arguments are not dispositive of the issues in dispute, which rest on strict construction of the Indentures, Special Servicing Agreement, Odyssey Agreement, and other Basic Documents relating to the Trusts.

positive law." *San Antonio Fire & Police Pension Fund v. Amylin Pharm., Inc.*, 983 A.2d 304, 314 (Del. Ch.), *aff'd*, 981 A.2d 1173 (Del. 2009) (applying New York law) (citing *In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at \*35 (Del. Ch. Sept. 19, 2008) (same)). Under the Indentures, the Trusts have the power to, *inter alia*, "provide for the administration of the Trusts and the servicing of the [] Loans," and "to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith." (D.I. 61 at TA353, §§ 2.03(a)(ii), (iii)) While the Trusts previously entered into servicing agreements with different entities, such as the Master Servicing Agreement and the Special Servicing Agreement, no provision in those agreements, or any other relevant agreement, purports to establish an exclusive arrangement pursuant to which the Trusts forfeited their right and power under Sections 2.03(a)(ii) and (iii) of the Indentures to enter into other servicing agreements for the Loans. The Master Servicing Agreement, for example, states: "[n]othing herein shall be construed to create an exclusive arrangement as to First Marblehead Corporation ("FMC").[10] The Servicer understands and agrees that FMC may enter into other agreements for the servicing of Private Student Loans in the future." (D.I. 61 at TA471, § 15.03) Moreover, the Indentures state that "the [Trusts] will contract with other [p]ersons to assist it in performing its duties under this Indenture." (*Id.* at TA65, § 3.07(b)) The language from these agreements makes clear that the Trusts could subsequently enter into additional servicing contracts. The parties do not cite to any provision in the Basic Documents that requires either Noteholder or Indenture Trustee approval before the Trusts can hire a servicer. Therefore, because the Indentures and other Basic Documents do not expressly restrict the rights of the Trusts to hire

---

[10] The Trusts are the assignees of FMC's rights under the Master Servicing Agreement. (D.I. 61 at TA426)

9

other servicers, the Trusts retained the right to hire Odyssey.

Although the Trusts retained the right to hire Odyssey as a servicer, the court must next determine whether the Odyssey Agreement waives, amends, modifies, supplements, or terminates the Basic Documents or their terms.[11] The complaint does not enumerate a list of purported conflicts between the Odyssey Agreement and Basic Documents. (D.I. 1, Ex. 1) However, the Indenture Trustee argues in its briefs, and at oral argument, that the Odyssey Agreement materially weakens or eliminates numerous rights and protections that the Special Servicing Agreement provides to the Noteholders and Indenture Trustee: (1) by allowing defaulted Loans to be sold at below-market value; (2) by weakening the Noteholders' and Indenture Trustee's indemnification rights with respect to defaulted loan servicing; (3) by weakening the Noteholders' and Indenture Trustee's ability to remove Odyssey for cause; (4) by weakening protections in the event Odyssey's parent company encounters financial hardship; and (5) by eliminating the requirement that the Administrator consent to any amendments. (D.I. 58 at 10; 5/12/17 Tr. at 30:1-31:12) The court will discuss each of these alleged conflicts in turn.

### a. Odyssey's Purchase and Sale of Loans "Below Market Value"

The Indenture Trustee first argues that the Odyssey Agreement modifies the existing servicing agreements and Indentures because the Special Servicing Agreement does not allow Loans to be sold (*see* D.I. 59, Ex. 6), whereas the Odyssey Agreement allows Odyssey to

---

[11] The Indenture Trustee contends that newly-defaulted loans that would be serviced by Odyssey under the Odyssey Agreement are "already subject to the SSA." (D.I. 58 at 6-7) However, the SSA defines "defaulted loans" that the Special Servicer would service as loans where the Servicer, PHEAA, has determined that the borrower has defaulted and PHEAA "has notified the Special Servicer of such occurrence." (D.I. 61 at TA120) Consequently, the Special Servicer services only those loans that are directed to it by PHEAA, and until PHEAA does so, any such loans are not subject to the SSA. The Odyssey Agreement is an agreement with an *additional* servicer, so the SSA remains in effect, and, as such, Odyssey will not service any loans that are currently being serviced by U.S. Bank.

purchase and sell Loans "below-market value" (D.I. 59, Ex. 8 at § 2.C). (D.I. 58 at 10; D.I. 65 at 6) The Trusts argue that although the Special Servicing Agreement does not allow U.S. Bank to purchase Loans from the Trusts whereas the Odyssey Agreement allows Odyssey to do so, this does not effectively waive or amend the Special Servicing Agreement. (D.I. 66 at 4) Specifically, the Special Servicing Agreement does not prohibit the sale of non-performing Loans, and instead provides that U.S. Bank will perform its duties in accordance with the terms of the Indentures, which specifically allow the sale of Loans (D.I. 61 at TA69, § 3.14). (D.I. 66 at 4)

There are two key provisions in the Indentures that relate to the sale and purchase of loans: Section 2.09 and Section 3.14. Section 2.09, entitled "Release of Collateral" provides that the Indenture Trustee "shall release property from the lien of this Indenture only upon receipt of an Issuer Request accompanied by an Officers' Certificate of the Issuer. (D.I. 61 at TA60, § 2.09) Section 3.14 provides that:

> Other than pursuant to Article V, Financed Student Loans may only be sold, transferred, exchanged, or otherwise disposed of by the Indenture Trustee free from the lien of this Indenture (i) for transfer to a Guarantee Agency pursuant to the terms of the applicable Guarantee Agreement; (ii) to a Seller or the Depositor in accordance with the applicable Student Loan Purchase Agreement or the Deposit and Sale Agreement; or (iii) to the Servicer in and, in each case, if the Indenture Trustee is provided with the following:
>
> > (a) an Issuer Order stating the sale price and directing that Financed Student Loans be sold, transferred or otherwise disposed of an delivered to a transferee whose name shall be specified; and
> >
> > (b) a certificate signed by an Authorized Officer of the Issuer to the effect that the disposition price is equal to or in excess of the amount required by the applicable Guarantee Agreement in the cause of clause (i), by the applicable Student Loan Purchase Agreement in the case of clause (ii), or by the Servicing Agreement in the case of clause (iii).
> >
> > (c) Subject to the provisions of the Indenture and except for sales of Financed Student Loans pursuant to this Section 3.14, the Indenture Trustee shall release property from the lien of this Indenture only upon receipt of an Issuer Order, an

11

Opinion of Counsel and independent certificates in accordance with [Trust Indenture Act] Sections 314(c) and 314(d)(1) or an Opinion of Counsel in lieu of such independent certificates to the effect that the [Trust Indenture Act] does not require any such independent certificates.

(d) Each Noteholder, by the acceptance of a Note, acknowledges that from time to time the Indenture Trustee shall release the lien of this Indenture on any Financed Student Loan to be sold pursuant to this Section 3.14, and each Noteholder, by the acceptance of a Note, consents to any such release.

(D.I. 61 at TA69, § 3.14)[12]

The Indenture Trustee argues that Section 3.14 is irrelevant, as it only applies to Loans sold by the Indenture Trustee, not by Odyssey on behalf of the Trusts. (D.I. 58 at 14) The Indenture Trustee contends that Loans sold under the Odyssey Agreement cannot be characterized as disposed of "by the Indenture Trustee" because Odyssey acts for the Trusts, not for the Indenture Trustee. (*Id.*) However, the Indenture Trustee's argument confuses the Odyssey Agreement's mechanism for the sale of loans. Under the Odyssey Agreement, Odyssey would not itself be selling loans on behalf of the Trusts; rather, Odyssey would be purchasing the loans sold out of the Trusts. For example, the Odyssey Agreement states that Odyssey "is being engaged pursuant hereto to purchase Loans from each Trust as directed or permitted by the applicable Trust" (D.I. 61 at TA25), and that Odyssey "shall take all such action, as it shall deem reasonably necessary or appropriate to purchase the Loans Eligible for Sale" (D.I. 61 at TA27, § 2C). Thus, the mechanism for the sale of loans would be that the Trusts would issue an Issuer Order to the Indenture Trustee directing the sale of the loans to Odyssey and stating the purchase price, which must be equal to or more than the amount required by the Odyssey Agreement.

---

[12] In sum, Section 3.14 allows the Indenture Trustee to dispose of Loans to three parties: a guarantor, a seller, and a servicer. (D.I. 61 at TA69, § 3.14) Loans sold to the Servicer must be at a "price equal to or in excess of the amount required by the applicable Servicing Agreement." (*Id.* at § 3.14(b))

This procedure follows the directive of Section 3.14(a). (D.I. 61 at TA69, § 3.14(a)) Thus, Section 3.14 is not "irrelevant" as the Indenture Trustee proposes, and specifically allows for the sale of Loans to a servicer such as Odyssey.[13]

The Indenture Trustee argues, in the alternative, that even if Section 3.14 permits the Trusts to sell Loans to the Servicer, it does not allow sales at below-market value, but rather only "contemplates" Loans sold for "an amount equal to all outstanding principal and accrued interest for any Loan it purchases." (D.I. 58 at 16) In support of this argument, the Indenture Trustee contends that sales to Servicers under Section 3.14 require an "amount required by the Servicing Agreement," and the definition of "Servicing Agreement" includes the PHEAA Servicing Agreement, which requires full payment. (*Id.*)

However, the Indenture Trustee mischaracterizes the Odyssey Agreement's determination of sale price. First, the Odyssey Agreement provides two detailed methods of calculating market value,[14] and then provides that the sale must be at that price, less a 10%

---

[13] The Indenture Trustee also argues that "the fact that other sections of the Indentures allow the Trusts to request that the Indenture Trustee dispose of Loans, but only if the Trusts furnish certain items including an opinion of counsel, suggests that Section 3.14 does not apply to Loans disposed of by the Indenture Trustee at the Trusts' request." (D.I. 58 at 15) The Indenture Trustee cites to Section 8.05, which requires that the Indenture Trustee receive "seven days' notice," "copies of any instruments involved," and "an Opinion of Counsel" when the Indenture Trustee is "requested by the Trusts" to "release property from the lien of this Indenture, or convey the Indenture Trustee's interest in the same" under Section 8.04(a). (D.I. 61 at TA101, § 8.05) And, because Section 3.14(c) explicitly exempts loans transferred under Section 3.14 from such requirements (*Id.* at TA69, § 3.14(c)), the Indenture Trustee argues that this is evidence that the parties intended to distinguish between Loans disposed of by the Indenture Trustee under Section 3.14 and Loans disposed of by or on behalf of the Trusts. (D.I. 58 at 15) However, the Indenture Trustee ignores the plain language of Section 3.14: the Indenture Trustee may sell loans when provided an Issuer Order stating the sale price and directing that the Loans be sold. (D.I. 61 at TA69, § 3.14(a)) Thus, the sales of loans to Odyssey under the Odyssey Agreement satisfy Section 3.14, and, as such, no Noteholder consent to such sales is required.

[14] To determine the purchase price for the Loans, the Odyssey Agreement employs two methods: (a) the highest bid received from at least three qualified bidders when conducting the sale in a manner that will yield the "highest and best net proceeds to be paid" in exchange for the Loans;

commission Odyssey can retain on the sale. (D.I. 61 at TA28, § 2(C)(iii)) Therefore, the

Odyssey Agreement does not allow the sale of loans below market value. Moreover, Section

3.14(b) explicitly states that the sale of loans to a servicer shall be at a price "equal to or in

excess of the amount required by the applicable Servicing Agreement." (*Id.* at TA69, § 3.14(b))

Section 3.14 does not state that the sales price must be the full amount needed to repay the loan.

The Indenture Trustee's suggestion that because the PHEAA Servicing Agreement requires full

payment on the sale of a loan and is explicitly defined as a "Servicing Agreement" subject to

Section 3.14 is unavailing. The definition of "Servicing Agreement" also includes "any other

servicing agreement between the [Trusts] and a servicer," which would include the Odyssey

Agreement. (*Id.* at 422) The provisions or definitions of the PHEAA Servicing Agreement do

not control how a provision in the Indenture must be construed.

The Indenture Trustee also cites to Section 8.01(c)[15] of the Indentures, which requires the

---

or (b) the average value determined from the appraisal values of two reputable appraisers. (D.I.
61 at TA28, § 2(C)(iii))

[15] Section 8.01, entitled "Collection of Money" provides as follows:

(a) Except as otherwise expressly provided herein, the Indenture Trustee may demand
payment or delivery of, and shall receive and collect, directly and without intervention or
assistance of any fiscal agent or other intermediary, all money and other property payable
to or receivable by the Indenture Trustee pursuant to this Indenture. The Indenture
Trustee shall apply all such money received by it on behalf of the noteholders of the
Notes as provided in this Indenture. Except as otherwise expressly provided in this
Indenture, if any default occurs in the making of any payment or performance under any
agreement or instrument that is part of the Indenture Trust Estate, the Indenture Trustee
may take such action as may be appropriate to enforce such payment of performance,
including the institution and prosecution of appropriate Proceedings. Any such action
shall be without prejudice to any right to claim a Default under this Indenture and any
right to proceed thereafter as provided in Article V.

(b) The Indenture Trustee shall deposit into the Collection Account all payments it
receives from the Servicer by or on behalf of the Obligors with respect to the Student
Loans, and all related Liquidation Proceeds and Recoveries, as collected during the
Collection Period. For purposes of this Article VIII, the phrase "payments by or on

14

Indenture Trustee to deposit the "aggregate Purchase Amount[16]...and all other amounts received from the Sellers or the Servicer" for Loans purchased into the "Collection Account." (D.I. 59, Ex. 4 at § 8.01(c)) The Indenture Trustee advocates for an interpretation of this provision as requiring full payment for the sale of Loans because the Indenture defines "Purchase Amount" as 100% of the amount necessary to prepay the Loan (D.I. 58 at 16). However, this provision designates where the Indenture Trustee must deposit the money it collects, not how much the Indenture Trustee must collect. Under New York law, "written agreements are construed in accordance with the [contracting] parties' intent, and the best evidence of what parties to a written agreement intend is what they say in their writing. As such, a written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms." *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (2013) (internal citations omitted). Odyssey's purchasing of loans is subject to Section 3.14, wherein the Indenture does not use the term "Purchase Amount" as it does in 8.01(c). Thus, the definition of "Purchase Amount" does not change Section 3.14(b), which, instead, requires that the purchase price is to be "equal to or in excess of the amount required by the Servicing Agreement." (D.I. 59, Ex. 4 at

---

behalf of Obligors" shall mean payments made with respect to the Student Loans, as applicable, by or on behalf of borrowers thereof and the Guarantee Agency.

(c) The Indenture Trustee shall deposit into the Collection Account the aggregate Purchase Amount it receives with respect to Purchased Student Loans and all other amounts received from the Sellers or the Servicer with respect to the Student Loans. The Indenture Trustee shall deposit into the Collection Account all amounts transferred from the Pre-Funding Account pursuant to Section 8.10.

(D.I. 59, Ex. 4 at § 8.01)

[16] "Purchase Amount" is defined as follows: "[A]s of the close of business on the last day of a Collection Period, 100% of the amount required to prepay in full the respective Financed Student Loan, in each case under the terms thereof including all accrued interest thereon expected to be capitalized upon commencement of repayment or during determent or forbearance." (D.I. 61 at TA419)

§ 3.14(b))

The Indenture Trustee's argument that the Trust Indenture Act ("TIA")[17] also supports

interpreting Section 3.14 to require full payment is similarly unavailing. (D.I. 58 at 17) TIA

Sections 314(c) and 314(d)(1) protect Noteholders by requiring that the obligor deliver certain

certifications and reports regarding the value of collateral the obligor seeks to have released from

the lien created by the Indenture. 15 U.S.C. §§ 77nnn(c), (d)(1). According to the Indenture

Trustee, because Indenture Section 3.14(c) exempts Loans sold under Section 3.14 from these

TIA provisions requiring certification and reporting, this is further evidence that the Loans can

only be sold for full payment. (D.I. 58 at 17) Again, the Indenture Trustee asks the court to

interpret a provision that does not address repayment amounts as requiring the Servicer to make

only a full payment when purchasing a loan. The TIA provisions the Indenture Trustee cites

require opinions as to fair value stating that the proposed release does not impair the security in

contravention of the provisions of the Indenture. A strict reading of Section 3.14 does not

require full payment. Section 3.14 does not require the filing of an opinion under TIA Section

314(d)(1) when a loan is purchased by Odyssey, or another servicer, recognizing that sales of

loans for less than full payment are not in contravention of the Indenture so long as the sales

comply with Section 3.14 and are at the requisite price determined by the applicable servicing

agreement. Simply because the parties drafted Section 3.14(c) to explicitly exempt the sales of

loans from the TIA certification and reporting requirements does not support an interpretation of

Section 3.14 to require full payment for such sales.

Lastly, the Indenture Trustee argues that the Prospectus Supplements are consistent with

interpreting Section 3.14 of the Indenture as requiring full payment for Loans sold to the

---

[17] The TIA is incorporated into each Indenture. (*See* D.I. 59, Ex. 4 at 1)

Servicer. (D.I. 58 at 18) Specifically, the Indenture Trustee argues that because the Prospectus Supplement does not disclose the risk that loans might be prepaid at less than full payment, it assumes that prepayments of loans would necessarily involve payment in full prior to maturity. (*Id.*) However, the Indenture Trustee does not deny that the Prospectus Supplement discloses the risk of defaults. All of the servicing agreements, including the Special Servicing Agreement and the PHEAA Servicing Agreement, permit the servicers to enter into compromises with delinquent borrowers whereby the loan is settled for less than the amount of indebtedness remaining. (*See* D.I. 61 at TA123, § 2B(xvi); D.I. 61 at TA681-82) Second, the prepayments discussed in the Prospectus Supplement section cited by the Indenture Trust involve situations where PHEAA, or another seller, breached a representation or warranty and were therefore required to buy back a loan. (D.I. 59, Ex. 5 at S-60) Even if full payment is required in such a specific situation, that does not mean full payment is also required for the sale of non-performing loans. Thus, the lack of any risk disclosure in the Prospectus Supplement about the price at which non-performing loans can be sold does not support the Indenture Trustee's argument that the Prospectus Supplement contemplates that sales under Section 3.14 will only be for full payment.

Although the Odyssey Agreement expressly permits Odyssey to purchase defaulted loans from the Trusts, whereas the Special Servicing Agreement does not permit the Indenture Trustee to purchase loans, this distinction does not rise to the level of a conflict between the Odyssey Agreement and the Special Servicing Agreement. The Special Servicing Agreement does not expressly prohibit the sale of non-performing loans to other servicers, and as such must be interpreted strictly. *Amylin Pharm.*, 983 A.2d at 314. Therefore, Odyssey's right pursuant to the Odyssey Agreement to purchase Loans does not "waive, amend, modify, supplement, or

terminate" the Special Servicing Agreement or other Basic Documents, triggering Indenture Trustee and Noteholder approval.[18]

### b. Rights of Noteholders and Indenture Trustee

The Indenture Trustee argues in its briefs and at oral argument that the Odyssey Agreement effectively modifies the Special Servicing Agreement by materially weakening or eliminating rights and protections the Special Servicing Agreement provides to the Noteholders and Indenture Trustee with respect to defaulted loan servicing,[19] the ability to remove Odyssey for cause,[20] the possibility that Odyssey's parent company will encounter financial hardship,[21] and the requirement that the Administrator consent to any amendments.[22] (D.I. 58 at 10-11; D.I. 65 at 9-10)

However, no provision in the Indentures or in the Special Servicing Agreement provides that every servicing agreement must be a mirror-image of every other servicing agreement. The

---

[18] Section 3.14(d) of the Indenture states that "[e]ach Noteholder, by the acceptance of a Note, acknowledges that from time to time the Indenture Trustee shall release the lien of this Indenture on any ... Loan to be sold pursuant to Section 3,14m and each Noteholder, by acceptance of a Note, consents to any such release." (D.I. 61 at TA69, § 3.14(d))

[19] The Special Servicing Agreement provides for indemnification arising from the Special Servicer's "willful misconduct, negligence or bad faith" (D.I. 59, Ex. 6 at § 10), while the Odyssey Agreement provides for indemnification arising from Odyssey's "willful misconduct, gross negligence or bad faith" (*Id.*, Ex. 8 at § 9).

[20] Under the Special Servicing Agreement, the Indenture Trustee "shall" remove the Special Servicer upon the occurrence of certain specified defaults. (D.I. 59, Ex. 6 at § 6.D) Under the Odyssey Agreement, the Indenture Trustee "shall have the right" to remove Odyssey upon the occurrence of certain specified defaults, "with the prior written consent of the Trust." (*Id.*, Ex. 8 at § 6.C)

[21] Under the Special Servicing Agreement, the Special Servicer is removed if its parent cannot pay its debts or reports that it has less than $30 million in cash on hand. (D.I. 59, Ex. 6 at § 6.D(iv)) The Odyssey Agreement does not contain an analogous provision with regard to Odyssey's parent company. (*See id.*, Ex. 8 at § 6.C)

[22] The Special Servicing Agreement cannot be amended without the Administrator's written consent (D.I. 59, Ex. 6 at § 16), whereas the Odyssey Agreement requires the consent of the Trusts to amend (*Id.*, Ex. 8 at § 15).

provisions of the Special Servicing Agreement that the Indenture Trustee cites remain in place and govern U.S. Bank's, or another Special Servicer's, performance thereunder. The Odyssey Agreement does not change these provisions, nor was Odyssey appointed as a Special Servicer. Moreover, after the Odyssey Agreement was executed, the Trusts and Odyssey entered into a waiver agreement (the "Waiver Agreement"), whereby, until further notice, they waived the provision in the Odyssey Agreement calling for newly defaulted loans to be allocated to Odyssey. (D.I. 61 at TA575) The Waiver Agreement clarifies that no conflict between the Odyssey Agreement and the Special Servicing Agreement exists. As such, the Odyssey Agreement does not alter the rights of the Noteholders and Indenture Trustee under the Special Servicing Agreement. Therefore, Noteholder consent to Odyssey's appointment was not required, and Odyssey was properly appointed as a Servicer.

### c. Substance vs. Form

Finally, the Indenture Trustee argues that in order to determine if a later-executed agreement "amends" earlier agreements, the court should look to the agreement's substance, not its form. (D.I. 65 at 10) According to the Indenture Trustee, the Odyssey Agreement has the effect of altering the terms of the Indentures and existing servicing agreements, so it "cannot be legally enforced." (*Id.* at 11) However, in accordance with New York law, the terms of an indenture must be construed strictly. *Amylin Pharm.*, 983 A.2d at 314. Therefore, the court must narrowly construe the terms "amend, waive, modify, supplement, and terminate."

Neither of the cases the Indenture Trustee cites lend support so its position. In *Twin Bridges LP v. Draper*, the Delaware Court of Chancery applied the step-transaction doctrine, where it treated an amendment to a limited partnership agreement and subsequent merger as "part and parcel of one integrated transaction," holding, therefore, that the new agreement

19

amended the original partnership agreement. 2007 WL 2744609, at *10 (Del. Ch. Sept. 14, 2007). However, the facts of *Twin Bridges* bear no resemblance to the situation at bar. Odyssey has not "effected an amendment in a fashion [to] avoid the need for a unanimous vote [as required by the agreement]." *Id.* Odyssey followed the mandate of the applicable provisions in the Basic Documents, and has not made an amendment to the Special Servicing Agreement or other relevant agreements. In *President & Fellows of Harvard College v. Glancy*, the Delaware Court of Chancery held that a later-executed shareholder agreement effectively amended a pre-existing voting trust agreement, requiring unanimous shareholder approval, because the subsequent agreement "altered the original terms of the [existing voting trust] in several ways. 2003 WL 21026784. *39 (Del. Ch. Mar. 21, 2003). In contrast, the Odyssey Agreement does not alter the terms of the Special Servicing Agreement or other Basic Documents, and the Special Servicing Agreement is still in effect. Moreover, these two cases were decided under Delaware law, but New York law applies to the Indenture, Odyssey Agreement, and the Special Servicing Agreement. (D.I. 59, Ex. 6 at § 22.B; Ex. 8 at § 21.B; Ex. 4 at § 11.13) Construing the language of the Indenture in accordance with New York law, the Odyssey Agreement does not modify the provisions of the Special Servicing Agreement.

### 2. The Rating Agency Condition

Next, the Indenture Trustee argues that Odyssey's appointment is invalid for the failure to satisfy the SSA Rating Agency Condition. (D.I. 58 at 12) Specifically, the Indenture Trustee contends that under the Special Servicing Agreement, appointing a successor special servicer requires satisfaction of the SSA Rating Agency Condition, but fails to cite to the provision to which it is referring. (*Id.* at 18) The Trusts argue that the provision to which the Indenture Trustee refers, Section 6E of the SSA, does not apply in this scenario, and it therefore satisfied

20

the applicable rating agency condition required by the Indentures for the Trusts ("Indenture Rating Agency Condition"). (D.I. 63 at 10)

The court recommends finding that the Trusts satisfied the applicable Indenture Rating Agency Condition. The Indenture Rating Agency Condition requires that the Rating Agencies be given ten days prior notice of a proposed servicing agreement, and, if none provide notice within ten days that the agreement will result in a reduction or withdrawal of the rating of the Notes, then the servicing agreement is acceptable, as it does not impair the rating. (D.I. 61 at TA419) On November 25, 2014, the Trusts provided the rating agencies with a copy of the Odyssey Agreement. (D.I. 61 at TA539) No rating agency objected to the notice the Trusts provided, and the Indenture Rating Agency Condition, unlike the SSA Rating Agency Condition, does not require that the rating agencies respond affirmatively in writing. (D.I. 61 at TA419; D.I. 59, Ex. 6 at § 6E)

The Indenture Trustee's contention that a replacement Special Servicer cannot be properly appointed without written confirmation from each rating agency is not applicable in the present case. (D.I. 61 at TA125, § 6E) Section 6E only applies to the resignation or removal of the Special Servicer, and the appointment of a successor Special Servicer. (*Id.*) The Odyssey Agreement only hires Odyssey to be an additional servicer. (D.I. 59, Ex. 8) The Odyssey Agreement does not remove U.S. Bank as Special Servicer, nor does it purport to appoint Odyssey as a successor Special Servicer. (*Id.*) The Trusts specifically informed the rating agencies that "the existing Special Servicing Agreement (U.S. Bank and Goal) will stay in full force and effect. The [L]oans that are currently being serviced under that agreement will continue to be serviced under that agreement." (D.I. 61 at TA568) The rating agency condition contained in Special Servicing Agreement § 6E is, therefore, inapplicable, and the Trusts

satisfied the applicable Indenture Rating Agency Condition required in this instance.

## B. Odyssey's Reimbursement

The Indenture Trustee argues[23] that even if Odyssey's appointment was valid, the Odyssey Invoices effectively increase "Servicing Fees" under the Indentures, which the Basic Documents prohibit unless the Indenture Rating Agency Condition for increasing Servicing Fees is satisfied, which the Trusts did not satisfy. (D.I. 58 at 18) The Trusts argue that the Odyssey Invoices should be paid because the invoices were sent to the Administrator as required by the relevant agreements, and it is a violation of those agreements to withhold payment of the invoices. (D.I. 56 at 16-19)

The court recommends payment of the Odyssey Invoices. First, the Trusts' handling of the invoices from Odyssey complied with the requirements of the relevant agreements. The Odyssey Invoices were sent to the Administrator, with the direction that they be processed and paid. (D.I. 59, Ex. 9) Section 1(a)(i)(G) of the Administration Agreement obligates the Administrator to "take all appropriate action that is the duty of the Issuer to take pursuant to the Trust Related Agreements including, without limitation, ... [p]roviding instructions to the Indenture Trustee as required by Section 8.02(d) of the Indenture." (D.I. 61 at TA156) Section 8.02(d) of the Indenture provides that the Administrator "shall instruct the Indenture Trustee" to make distributions to pay "Servicing Fees," and that "the Indenture Trustee shall comply with such instruction." (*Id.* at TA98) However, the Administrator objected to the bills and requested additional information concerning the invoices. (D.I. 56 at 20; D.I. 59, Ex. 9) The Owner

---

[23] The Indenture Trustee first argues that Odyssey cannot, as a matter of law, earn Servicing Fees because its appointment was ineffective for lack of Trustee and Noteholder approval. (D.I. 58 at 18) However, as discussed in § IV(A), *supra*, the court recommends finding that Odyssey was validly appointed as a Servicer. Therefore, the court's recommendations on this issue are the same as previously discussed.

Trustee thereupon issued an Issuer Order directing the Administrator to prepare and transmit all of the documents necessary to cause the Indenture Trustee to pay the Odyssey invoices. (D.I. 61 at TA284-85) The Administrator did so, but when it transmitted the invoices to the Indenture Trustee, the Administrator stated that it had concerns about whether Odyssey was properly appointed a servicer. (*Id.* at TA302-06) Moreover, the Indenture Trustee protests the invoices because "no documentation or backup for the expenses allegedly incurred by Odyssey has been provided." (*Id.* at TA 14 ¶ 34; TA 9 ¶ 7) However, the Indenture Trustee has not cited to any provision in the Indenture, Administration Agreement, or any other relevant agreement, that requires any "documentation or backup" be given to the Administrator or the Indenture Trustee from the servicers as a precondition to payment of such servicers' invoices. Under the Indenture, the Indenture Trustee is obligated to pay to Odyssey invoices sent to it by the Administrator.

The Indenture Trustee argues that the Odyssey Agreement effectively increases Servicing Fees, and the Trusts failed to satisfy the Indenture Rating Agency Condition required by the governing agreements for increased servicing fees. (D.I. 58 at 18-19) The Indentures provide that Servicing Fees "may be increased upon satisfying the [Indenture] Rating Agency Condition." (D.I. 59, Ex. 4 at 108) The Indenture Rating Agency Condition requires that the Rating Agencies be given ten days prior notice a proposed servicing agreement and that none provide notice within ten days that the agreement will result in a reduction or withdrawal of the rating of the Notes. (*Id.* at 105) Under the Odyssey Agreement, Odyssey may purchase loans out of the Indenture Trust Estate and retain a 10% commission. (D.I. 59, Ex. 8 at § 2.C) The Indenture Trustee contends that this commission increases the Servicing Fees payable from the Indenture Trust Estate because the existing Servicing Fees represent a percentage of the loans' outstanding principal balance, and the Odyssey Agreement neither reduces this percentage nor

23

exempts loans serviced under the Odyssey Agreement from the aggregate loan balance used to calculate the existing Servicing Fees. (D.I. 58 at 19) However, the Indenture Rating Agency Condition was satisfied. The Trusts provided notice to the rating agencies, and none provided notice of any reduction or withdrawal of the rating. (D.I. 61 at TA614, TA619-40) Although the letter from the Trusts' lawyer to the rating agencies did not specifically mention increased servicing fees, the Trusts provided the rating agencies with a copy of the Odyssey Agreement, which sets forth the fees Odyssey would receive, such as the 10% commission on sales of loans. (*Id.* at TA619-40) The rating agencies were therefore provided notice of the servicing fees applicable under the Odyssey Agreement, and none provided notice that the Odyssey Agreement would result in a reduction or withdrawal of the rating of the Notes. Thus, the Indenture Rating Agency Condition was satisfied.

Because Odyssey was properly appointed as a Servicer, and the Trusts complied with the Indenture Rating Agency Condition, the court recommends payment of the Odyssey Invoices.

## V.    CONCLUSION

For the foregoing reasons, I recommend granting the Trusts' motion for summary judgment (D.I. 55), and denying the Indenture Trustee's motion for summary judgment (D.I. 57).

Given that the court has relied upon material that technically remains under seal, the court is releasing this Report and Recommendation under seal, pending review by the parties. In the unlikely event that the parties believe that certain material in this Report and Recommendation should be redacted, the parties should jointly submit a proposed redacted version by no later than **May 4, 2018**. The court will subsequently issue a publicly available version of its Report and Recommendation.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: April 25, 2018

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE