**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN THE MATTER OF THE NATIONAL COLLEGIATE STUDENT LOAN TRUSTS 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, and 2005-3. | C.A. No. 16-341-JFB-SRF |

**THE TRUSTS' RESPONSE TO THE INTERESTED NOTEHOLDERS'
OBJECTION TO THE APRIL 25, 2018 REPORT AND RECOMMENDATION**

**GRANT & EISENHOFER P.A.**
James J. Sabella (Del. Bar No. 5124)
jsabella@gelaw.com
Michael T. Manuel (Del. Bar No. 6055)
mmanuel@gelaw.com
123 Justison Street
Wilmington, DE  19801
302-622-7000

and

Charles T. Caliendo (pro hac vice)
ccaliendo@gelaw.com
485 Lexington Avenue
New York, NY 10017
646-722-8500

*Attorneys for National Collegiate
Student Loan Trusts 2003-1, 2004-1,
2004-2, 2005-1, 2005-2, and 2005-3*

June 6, 2018

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................................... 1

I.      THE INTERESTED NOTEHOLDERS' FAILURE TO COMPLY WITH THE
        STANDING ORDER REQUIRES THAT THE COURT OVERRULE THEIR
        OBJECTION ...................................................................................................................... 1

II.     THE NEW ARGUMENT THAT THE ODYSSEY AGREEMENT
        VIOLATES THE INDENTURES' GRANTING CLAUSE IS MERITLESS .................... 3

III.    THE NEW ARGUMENT THAT THE ODYSSEY AGREEMENT
        VIOLATES "SELF-DEALING PROHIBITIONS" IN THE BASIC
        DOCUMENTS IS MERITLESS ......................................................................................... 4

CONCLUSION .............................................................................................................................. 10

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bukovinsky v. Pennsylvania*,
455 Fed. App'x. 163 (3d Cir. 2011)........................................................................ 1-2

*LiquidX Inc. v. Brooklawn Cap., LLC*,
254 F. Supp. 3d 609 (S.D.N.Y. 2017)........................................................................7

*Masimo Corp. v. Philips Elec. N.A. Corp.*,
62 F. Supp. 3d 368, 377 (D. Del. 2014)....................................................................1

*Roso v. Saxon Energy Corp.*,
758 F. Supp. 164 (S.D.N.Y. 1991)............................................................................7

*San Antonio Fire & Police Pension Fund v. Amylin Pharm., Inc.*,
983 A.2d 304 (Del. Ch.), *aff'd*, 981 A.2d 1173 (Del. 2009)....................................3

**Statutes and Rules**

Fed. R. Civ. P. 72 ......................................................................................................1

Fed. R. Civ. P. 72(b)(2)..............................................................................................1

Pursuant to Fed. R. Civ. P. 72(b)(2), Respondents National Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, and 2005-3 (the "Trusts") submit this response to the Interested Noteholders' May 23, 2018 objection (D.I. 91; the "Noteholder Obj.") to the April 25, 2018 Report and Recommendation ("R&R") by Magistrate Judge Fallon (D.I. 79).

## PRELIMINARY STATEMENT

Before the Magistrate Judge, the Interested Noteholders filed a statement of interest arguing that the Odyssey Agreement amends the Special Servicing Agreement and that, therefore, Noteholder consent was required.  *See* D.I. 69.  Now, after the R&R meticulously dismantled that argument, the Interested Noteholders have shifted their position and raise a host of new arguments that they did not present to the Magistrate Judge.  They do so, however, without identifying the new arguments and explaining why they were not presented to the Magistrate Judge – which is required by this Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72 (the "Standing Order").  Indeed, they did not even file the certification required by the Standing Order until the day *after* they filed their objections, notwithstanding that the Standing Order mandates that the certification be filed *with* the objections.

As shown below, the Noteholder Obj. should be overruled both because of their violations of the Standing Order and because all of their arguments are manifestly insufficient.

## I.  THE INTERESTED NOTEHOLDERS' FAILURE TO COMPLY WITH THE STANDING ORDER REQUIRES THAT THE COURT OVERRULE THEIR OBJECTION

Arguments that were not presented to the Magistrate Judge are now untimely and waived. "[P]arties objecting to a Magistrate Judge's report or order are required to adhere to the arguments, evidence, and issues they presented first to the Magistrate Judge."  *Masimo Corp. v. Philips Elec. N.A. Corp.*, 62 F. Supp. 3d 368, 377 (D. Del. 2014).  "[I]ssues raised for the first time in objections to the magistrate judge's recommendation are deemed waived."  *Bukovinsky v.*

*Pennsylvania*, 455 Fed. App'x. 163, 165-66 (3d Cir. 2011) (internal quotation marks omitted).

This Court's Standing Order (¶ 5) *requires* a party objecting to a Magistrate Judge's report and recommendation file *at the same time* the objection is filed a certification stating that there are no new arguments being presented:

> Any party filing objections…to a Magistrate Judge's … recommended disposition **must** include, *along with the objections*, a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and describing the good cause for failing to previously raise the new legal/factual arguments before the Magistrate Judge.

(Bolded emphasis in original; italicized emphasis added).  Even though the R&R specifically directed the parties' to the Standing Order and stated that a copy is available on the Court's website (*see* R&R at 24-25), the Noteholder Obj. contained no such certification.  The Interested Noteholders' belated, untimely attempt to file the required certification the day *after* the Noteholder Obj. was filed (*see* D.I. 95) does nothing to cure their failure because the Standing Order requires that it "**must**" be "include[d] along with the objections."  It was not, and therefore the Noteholder Obj. must be overruled.

Furthermore, the untimely certification falls far short of what the Standing Order requires.  Standing Order ¶ 5 requires the objector to identify the new arguments and explain why they were not presented to the Magistrate Judge.  The Interested Noteholders' certification states that, with exceptions not relevant here, the Noteholder Obj. does "not contain new legal or factual arguments not previously raised before the Magistrate Judge."  D.I. 95.  This is demonstrably false.  For example, the argument that "the Odyssey Agreement violates the Indentures' and the Trust Agreements' self-dealing prohibitions," Noteholder Obj. at 7, appears nowhere in the Interested Noteholders' submission to Magistrate Judge Fallon.  *See* D.I. 69.  The Interested Noteholders' assertion that Magistrate Judge Fallon "overlooked" this argument, Noteholder Obj. at 7, is frivolous; a court cannot "overlook" an argument that was never

presented.  Similarly, the Interested Noteholders' argument concerning the impact of the Granting Clause in the Indentures is also new.  And the certification does not even purport to explain the good cause justifying the Interested Noteholders' failure to make these and other arguments before the Magistrate Judge.

The Interested Noteholders' egregious violations of the Standing Order suffice to justify overruling its objections.

## II.    THE NEW ARGUMENT THAT THE ODYSSEY AGREEMENT VIOLATES THE INDENTURES' GRANTING CLAUSE IS MERITLESS

The Interested Noteholders assert that the Odyssey Agreement violates the Indentures' Granting Clause.  D.I. 61-2 at TA46-47.  *See* Noteholder Obj. at 5-7.  This new argument, also raised by U.S. Bank in its objections but not presented to the Magistrate Judge, should not be considered here.  *See* Point I *supra*.  In any event, the argument is meritless.  In the interests of judicial economy, the Trusts respectfully refer the Court to and hereby incorporate by reference their response to the objection filed by U.S. Bank, which explains why this new argument fails.

The Interest Noteholders' Granting Clause argument presents one position a bit different from the arguments made by U.S. Bank.  Noteholder Obj. 6-7 argues that provisions in the Odyssey Agreement giving the Trusts power over whether Odyssey should be removed for cause violate the Granting Clause.  But the Granting Clause says no such thing, and its terms must be strictly construed.  "Indentures are to be read strictly and to the extent they do not expressly restrict the rights of the issuer, the issuer is left with the freedom to act …."  *San Antonio Fire & Police Pension Fund v. Amylin Pharm., Inc*., 983 A.2d 304, 314 (Del. Ch.), *aff'd*, 981 A.2d 1173 (Del. 2009) (applying New York law).  Furthermore, underscoring that the Interested Noteholders' argument runs contrary to the established understanding as to how the Granting Clause should be interpreted, PHEAA's Master Servicing Agreement, entered into long before

3

the current Owners acquired their interests in the Trusts, similarly provided that the right to terminate the PHEAA rests with the Trusts.  D.I. 61-15 at TA468 § 14.02.[1]

## III.  THE NEW ARGUMENT THAT THE ODYSSEY AGREEMENT VIOLATES "SELF-DEALING PROHIBITIONS" IN THE BASIC DOCUMENTS IS MERITLESS

Even if the Noteholder Obj. did not have to be overruled for failure to comply with the Standing Order, the new argument that § 2.03(b)(iv) of the Trust Agreements (D.I. 61-13 at TA353) supposedly contains an outright prohibition on agreements between the Issuer/Trust and any Affiliate of the Issuer (*i.e.*, Odyssey), Noteholder Obj. at 8-9, is devoid of merit.

Section 2.03 of the Trust Agreements (entitled "Purposes and Powers") contains a list of the purposes of the Trust and its permissible activities (*e.g.*, "to provide for the administration of the Trust and the servicing of the Student Loans" and "to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing").  *See* Trust Agreement §§ 2.03(a)(ii) & (iii) (D.I. 61-13 at TA353).  Section 2.03(b) contains a list of standards for Trust operations including, for example, that:  (1) "[t]he Trust will act solely in its own name and the Owner Trustee or other agents…will act on behalf of the Trust subject to direction by the Owners…," § 2.03(b)(i); (2) "[t]he Trust's funds and assets shall at all times be maintained separately from those of the Owners and any of their respective Affiliates," § 2.03(b)(ii); and (3) "[t]he Trusts shall maintain complete and correct books…," § 2.03(b)(iii).  The standards also include § 2.03(b)(iv) — the section to which the Interested Noteholders point to support their argument that the Trust Agreements supposedly contain an outright prohibition on agreements between the Issuer/Trust and any Affiliate of the Issuer.  Section 2.03(b)(iv) states:

---

[1] Section 14.02 gave the right to terminate PHEAA to First Marblehead Corporation ("FMC"), the securitization sponsor.  D.I. 61-15 at TA468.  FMC's rights were assigned to the Trusts.  *See* D.I. 61-15 at TA493.

The Trust shall conduct its business at the office of the Owner Trustee and will use stationery and other business forms of the Trust under its own name and not that of the Owners or any of the respective Affiliates, and will avoid the appearance (A) of conducting business on behalf of any Owner or any Affiliate of an Owner or (B) that the assets of the Trust are available to pay the creditors of the Owner Trustee or any Owner.

The Interested Noteholders assert that because § 2.03(b)(iv) states that the Trust "will avoid the appearance of conducting business on behalf of" any Affiliate of the Owner, the section creates an outright prohibition on the Trust entering into a servicing agreement with Odyssey because Odyssey is an Affiliate of the Owners.  Noteholder Obj. at 9-10.  This argument is without merit for four reasons.

First, the Trust is not via the Odyssey Agreement conducting business "on behalf of" Odyssey.  Quite the opposite, Odyssey, as a servicer of assets owned by the Trusts, is conducting business on behalf of the Trust.  Thus, the Interested Noteholders have it backwards and their interpretation of § 2.03(b)(iv) does not make sense.  The section would only be applicable (arguably) if, Odyssey (the Affiliate) *hired the Trust* to perform services for Odyssey, which is not the case here.  Consequently, even if this section involving "appearances" were an outright prohibition on a situation where a Trust conducts business on behalf of one of its Affiliates, such is not even the case here.  Therefore, the Interested Noteholders' argument fails.

Second, § 3.23(l) of the Indentures (D.I. 61-5 at TA75) states:

The Issuer will maintain an arm's length relationship with…any of the Issuer's Affiliates.  Any Person that renders or otherwise furnishes services to the Issuer will be compensated by the Issuer at market rates for such services it renders or otherwise furnishes to the Issuer except as otherwise provided in this Indenture.

Thus, the Basic Documents expressly contemplate that there will, in fact, be relationships between the Trust/Issuer and the Trust/Issuer's Affiliates (such as Odyssey) and mandate that such relationships be of a particular kind (*i.e.*, "arm's length" and at "market rates").  If such

relationships were prohibited by § 2.03(b)(iv) of the Trust Agreements (as the Noteholder Obj. posits), it would make no sense to include § 3.23(l) in the Indentures.  The fact that the Indentures contemplate such relationships is fatal to the Interested Noteholders' position that the Trust Agreements supposedly forbid them.

Third, if the Interested Noteholders' argument were correct (it is not), the entire securitization transaction could never have happened in the first instance because it is littered with instances where the original Owner caused the Trusts to enter into agreements with the Owner's Affiliates.  For example, the original Owner was The National Collegiate Funding LLC (also known as the "Depositor").  The original Owner/Depositor was a wholly-owned subsidiary of FMC, which, in turn, had another wholly-owned subsidiary named First Marblehead Data Services Inc. ("FMDS").  FMC and FMDS were Affiliates of the original Owner/Depositor within the meaning of the Trust Agreements.  In connection with the securitization, the original Owner/Depositor caused the Trusts to enter into agreements with FMDS, including the Administration Agreements appointing FMDS as the Administrator.  *See* D.I. 61-11 at TA155. The very existence of these initial agreements between the Trusts and Affiliates of the original Owner/Depositor demonstrates the lack of merit in the Interested Noteholders' argument that such relationships were outright prohibited by § 2.03(b)(iv) of the Trust Agreements.

Fourth, the purpose of § 2.03(b) of the Trust Agreements is to prevent the Trust from providing services to third parties that might result in the Trust and the third party being deemed alter egos, which could result in a piercing of the corporate veil that might give rise to an attachment of Trust assets for activities that the Trust engaged in unconnected to the

securitization transaction and/or substantive consolidation of the Trusts' assets with those of a third party in the event of bankruptcy.[2]  Such is clearly not the situation here.

The Noteholder Obj., alternatively, presents the entirely new assertion that if such agreements between the Issuer/Trust and an Affiliate of the Issuer (*i.e.*, Odyssey) are permissible, the Odyssey Agreement violated § 3.23(l) of the Indentures (D.I. 61-5 at TA75) because it was "not an arm's length transaction" and there was "self-dealing" by Odyssey. Noteholder Obj. at 8.  This argument is without merit for at least five reasons.

First, the cases cited by the Noteholders for the proposition that the "arm's length" provision of § 3.23(l) was violated are inapposite.  *See* Noteholder Obj. at 8 (citing *LiquidX Inc. v. Brooklawn Cap., LLC*, 254 F. Supp. 3d 609 (S.D.N.Y. 2017), and *Roso v. Saxon Energy Corp.*, 758 F. Supp. 164 (S.D.N.Y. 1991)).  Neither case involved construction of the terms of an indenture (let alone these particular Indentures) and, thus, neither case has any bearing here.[3]

Second, the relationship here is at arm's length and there was no self-dealing.  The Interested Noteholders' contention that the terms of the agreement were "dictated

---

[2] *See* https://www.americanbar.org/content/dam/aba/events/real_property_trust_estate/2004/ moskowitz_paper_1_special_purpose_bankruptcy_remote_entities.authcheckdam.pdf at  7-8.

[3] *Roso* involved a civil RICO action that followed a criminal trial where the criminal (and civil) defendant was indicted and convicted of grand larceny for misrepresentations related to supposedly "arm's length" appraisal transactions.  "At the criminal trial, the appraisals were determined to have been fraudulent."  *Roso*, 758 F. Supp. at 169.  The court's holding was that *given the criminal conviction* the defendant was collaterally estopped from re-litigating the issue of fraud in the civil case.  *Id.*  There is no criminal conviction for grand larceny or fraud at issue here (nor are there even any allegations of fraud) and, thus, this case involving the legal standard for collateral estoppel has no bearing here.  Similarly, *LiquidX* involved whether two companies were alter egos such that the corporate veil could properly be pierced.  The evidence adduced at trial found that the two corporations were "virtually indistinguishable" because, *inter alia*, they had the same offices, the same employees and shared "all relevant business functions— *e.g.*, IT maintenance, payment of bills and salaries."  254 F. Supp. 2d at 617.  The court merely noted that these examples of not dealing at "arm's length" were a significant factor in finding that the two companies were alter egos.  *Id.* at 618.  There are no such allegations here.

impermissibly" by the Owners at the expense of the Trusts, Noteholder Obj. at 9, is plainly inaccurate. The Odyssey Agreement (D.I. 61-1 at TA25-38) was signed by a third party, Wilmington Trust Company as Owner Trustee – a fact that the Interested Noteholders deliberately omit. In addition, the Odyssey Agreement complies with all of the requirements of the Basic Documents and contains many provisions that are *indicative of* an arm's length relationship, not contrary to one. For example, the Odyssey Agreement: (a) contains a provision allowing the Indenture Trustee to remove Odyssey for cause (§ 6.C.); (b) provides that Odyssey will indemnify, *inter alia*, the Trusts and the Indenture Trustee (§ 9); (c) allows the Indenture Trustee to inspect Odyssey's servicing records (§ 10); and (d) expressly provides that the Noteholders, Certificateholders and the Indenture Trustee are third-party beneficiaries of the agreement "and are entitled to enforce their respective rights hereunder as if actually parties hereto" (§ 21.G). In addition, the Odyssey Agreement does not pay Odyssey the standard one basis point fee that is paid to the Special Servicer. *See* D.I. 61-21 at TA561-62 ("To keep from adding any additional fees to the NCSLT Trusts, the Odyssey Agreement does not pay Odyssey the 1 bp Special Servicing Fee."). A party allegedly engaging in self-dealing does not include provisions in the contract imposing an indemnification obligation on itself, allowing its own removal for cause, permitting the counterparty to access its records or recognizing third party beneficiaries with a right to sue. Nor does it waive fees to which it would otherwise have been entitled. The inclusion of such provisions establishes that the relationship here was on arm's length terms and contradicts the Interested Noteholders' baseless accusations of self-dealing.

These provisions also defeat the Interest Noteholders' hyperbole that Magistrate Judge Fallon "would afford VCG *carte blanche* to plunder the Trusts for VCG's own benefit," Noteholder Obj. at 2, and that the R&R "disregards the virtually limitless potential for VCG to

self-deal under the Odyssey Agreement." *Id.* at 3 (emphasis by the Interested Noteholders).  The Odyssey Agreement contains detailed provisions to make sure that Odyssey purchases loans at market value.  *See* D.I. 61-1 at TA28 § 2C(iii).  And, a noted above, it makes the Noteholders and the Indenture Trustee third-party beneficiaries with a right to sue.  *Id*. at TA34 § 21G.  If improper conduct were to occur in connection with the Odyssey Agreement, those third-party beneficiaries could sue.  The hypothetical parade of horribles that the Interested Noteholders claim the Magistrate Judge's R&R will cause simply cannot occur.

Third, the Trusts' action here in complying with the Indenture Rating Agency Condition cuts sharply against the argument that there was a bad faith attempt to self-deal at the expense of the Trusts or the Noteholders.  As the R&R discusses at 20-22, the Indenture Rating Agency Condition (D.I. 61-14 at TA419) required that the Trusts send the Odyssey Agreement to the Rating Agencies to see whether a rating agency objected.  The Trusts forthrightly complied with this condition by sending the Odyssey Agreement and extensive other information to the Rating Agencies.  *See* D.I. 61-17 at TA539-74.  No Rating Agency objected.  This action by the Trusts to protect the Noteholders' interests, as well as the "non-reaction" of the Rating Agencies, further demonstrate that there was no bad faith here.

Fourth, the Interested Noteholders' citation to Black's Law Dictionary's generalized definition of the meaning of "arm's length," Noteholder Obj. at 8, is inapposite because the relevant meaning of the phrase is specified in § 3.23(l)'s second sentence, which explains that arm's length means at "market rates."  D.I. 61-5 at TA75.

Fifth, the Odyssey Agreement provides for sales of loans at market rates.  The Interested Noteholders' position that the Administrator challenged Odyssey's expenses because they were not at market rates and that Magistrate Judge Fallon overlooked that fact, Noteholder Obj. at 9

n.6, is pure fiction.  The Administrator never objected to specific Odyssey expenses at all, let alone on the basis that they were not at market rates.  Rather, as the R&R plainly recognizes, the Administrator merely stated "that it had concerns about whether Odyssey was properly appointed a servicer."  R&R at 23.  Thus, the Interested Noteholders' argument that the Odyssey Agreement was not at market rates is not only impermissibly new, but also disingenuously false.

Moreover, the assertion that the Odyssey Agreement is somehow not at "market rates' because it allows for "unspecified" expenses, Noteholder Obj. at 9, is without merit.  Other servicing agreements similarly do not specify the precise expenses that are reimbursable by the Trusts, *see, e.g.*, Special Servicing Agreement § 5.B (D.I. 61-11 at TA123) (providing for reimbursement "for all of the Special Servicer's expenses incurred in performing its obligations hereunder for such Trust…"), which demonstrates that the Odyssey Agreement is consistent with market terms.  Similarly, the Noteholder Obj. provides no evidence for the assertion that the 10% commission in the Odyssey Agreement is anything other than a market rate commission and, indeed, the fact that the Rating Agencies did not object to such provision after vetting the Odyssey Agreement bears that out.[4]

<u>**CONCLUSION**</u>

The Trusts respectfully request that the Court overrule the Noteholder Obj. and adopt Magistrate Judge Fallon's thorough and well-reasoned R&R.

---

[4] At the end of their argument, the Interested Noteholders assert in a footnote that the Odyssey Agreement violates § 3.14 of the Indentures (D.I. 61-5 at TA69) because that section supposedly "prohibits sales to any party other than the Guarantor, the Seller, the Depositor or a Servicer," Noteholder Obj. at 10 n.7, and the Odyssey Agreement allows not merely a sale to Odyssey but also essentially allows Odyssey to "broker" the sale of loans to third parties. *Id.*  This argument, which was not presented to the Magistrate Judge, lacks merit and elevates form over substance. Nothing in § 3.14 precludes a servicer from purchasing a loan and immediately reselling it to a third party.

Dated:   June 6, 2017

Respectfully submitted,

**GRANT & EISENHOFER P.A.**

By    /s/ James J. Sabella
James J. Sabella (Del. Bar No. 5124)
jsabella@gelaw.com
Michael T. Manuel (Del. Bar No. 6055)
mmanuel@gelaw.com
123 Justison Street
Wilmington, DE  19801
302-622-7000

and

Charles T. Caliendo (pro hac vice)
ccaliendo@gelaw.com
485 Lexington Avenue
New York, NY 10017
646-722-8500

*Attorneys for National Collegiate Student Loan
Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2,
and 2005-3*

## <u>CERTIFICATE OF SERVICE</u>

I, James J. Sabella, hereby certify on June 6, 2018, a true and correct copy of the

foregoing document was filed and served via CM/ECF upon the following counsel of record:

Jeffrey Thomas Castellano
John W. Shaw
SHAW KELLER LLP
1105 North Market Street, 12th Floor
Wilmington, DE 19801
jcastellano@shawkeller.com
jshaw@shawkeller.com

*/s/ James J. Sabella*
James J. Sabella (Del. Bar No. 5124)